UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| _____ | : | |
| N.A. Lambrecht and Jeffrey P. Jannett, | : | |
| Derivatively on Behalf of Nominal | : | |
| Defendant Eli Lilly & Company | : | |
| | : | |
| Plaintiffs, | : | C.A. No. 1:08-cv-0068-WTL-TAB |
| | : | |
| v. | : | |
| | : | |
| Sidney Taurel, John C. Lechleiter | : | |
| Sir Winfreid Bischoff, J. Michael Cook, | : | |
| Franklyn G. Pendergast, Kathi P. Seifert, | : | |
| George M. Fisher, Alfred G. Gilman, | : | |
| Martin S. Feldstein, J. Erik Fyrwald, | : | |
| Ellen R. Marram, Sir John Rose, | : | |
| Charles E. Golden, Steven C. Beering, | : | |
| August M. Watanabe, Linda Lay, | : | |
| Randall L. Tobias and | : | |
| J. Clayburn LaForce, Jr., | : | |
| | : | |
| Defendants | : | |
| | : | |
| -and- | : | |
| | : | |
| ELI LILLY & COMPANY, | : | |
| | : | |
| Nominal Defendant. | : | |
| _____ | : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF**
**<u>PRELIMINARY APPROVAL OF PROPOSED SETTLEMENT</u>**

**TABLE OF CONTENTS**

**PAGE**

I.     INTRODUCTION ...................................................................................................1

II.    PROCEDURAL BACKGROUND OF THE DERIVATIVE ACTIONS .........................4

     A.    The Derivative Actions..................................................................................4

     B.    Coordination of the Derivative Actions and Investigation of the Derivative Claims .....................................................................................6

     C.    The Design and Negotiation of Detailed Governance and Compliance Proposals.................................................................................8

III.   SUMMARY OF PROPOSED RELIEF ....................................................................11

     A.    Lilly's Adoption of the Scientific Core Objective and the Compliance Core Objective.....................................................................11

          1.    The Scientific Core Objective.................................................11

          2.    The Compliance Core Objective.............................................13

     B.    Board Level Provisions................................................................................14

          1.    Science & Technology Committee ("STC").............................14

               a.    Reports to the STC........................................................14

                    (1)    Reporting from Management............................15

                    (2)    Other Reporting from the CMO........................15

                      (3)    Reporting from the Vice President-Global Patient Safety ...........................................16

                    (4)    Reporting from the Vice President-Quality......................17

                b.    Annual Assessment of Effectiveness and the Adequacy of Information..............................................18

i

2.     The Public Policy and Compliance Committee ........................................18

     a.    CECO Reporting ........................................................................19

     b.    General Auditor and Vice President-Quality Reporting...............20

     c.    Direct Access to the PPCC ........................................................21

     d.    Board Responsibility for Appointment and Retention .................21

     e.    Oversight of Enterprise Risk Management...................................21

     f.    Annual Assessment of the Adequacy of Information Flows .........22

3.     The Compensation Committee ................................................................23

4.     Tone at the Top ......................................................................................24

5.     Enhanced Corporate Governance Practices..............................................25

     a.    Board Membership.....................................................................25

     b.    The Presiding Director and the Role of Independent Directors.....26

     c.    Compliance Component to Annual Board Self-Assessment .........26

     d.    Board Training and New Director Orientation .............................26

C.     Management Level Provisions................................................................27

1.     Life Cycle Management..........................................................................27

     a.    The Chief Medical Officer ("CMO") ...........................................28

     b.    Vice President-Patient Global Safety ("VP-GPS") ......................29

     c.    Patient Safety Physicians ("PSPs").............................................32

     d.    Clinical Plan Document Template .................................................34

2.     Enhanced Global Ethics, Compliance and
Operational Risk Management ...................................................36

     a.     The Chief Ethics and Compliance Officer ("CECO")..................36

     b.     Enterprise Risk Management ...................................................39

     c.     Compliance Training ...............................................................39

     d.     Performance and Compensation ..................................................40

     e.     Discipline ..............................................................................41

     f.     Monitoring ............................................................................41

D.     The Three Year Commitment Period ....................................................42

E.     The Funding Commitment ...................................................................42

IV.     PRELIMINARY RELIEF SOUGHT AT THIS TIME.......................................43

V.     APPLICABLE LEGAL STANDARDS ...........................................................44

A.     Settlements Are Generally Favored .......................................................44

B.     The Proposed Settlement Meets the
Standard for Preliminary Approval........................................................45

     1.     The Proposed Settlement Offers
Substantial Benefits to Lilly and Its Shareholders....................................48

     2.     The Stage of Proceedings and Discovery Completed.......................49

     3.     The Opinion of Competent Counsel…………………………………50

     4.     The Complexity, Expense, Risk and Likely Duration of
Continued Litigation ................................................................51

VI.     THE PROPOSED NOTICE TO LILLY SHAREHOLDERS
IS ADEQUATE ...................................................................................52

VII.     CONCLUSION.....................................................................................53

# TABLE OF AUTHORITIES

## CITATIONS

*Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305 (7th Cir. 1980) .................................................44, 46

*Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ........................................................45, 50

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985),
*cert. denied*, 478 U.S. 1004 (1986) .........................................................................................44

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ....................................................................52

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998) .........................................................................44

*Freeman v.Berge*, 68 Fed.Appx. 738 (7th Cir. 2003) ............................................................48, 50

*Granada Investments, Inc. v. DWG Corporations*, 962 F.2d 1203 (6th Cir. 1992) ....................51

*Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers,*
*L.L.P.*, 212 F.R.D. 400 (E.D. Wis. 2002) .................................................................................50

*In re AOL Time Warner Shareholder Deriv. Litig.*, 2006 U.S. Dist. LEXIS 63260
(S.D.N.Y, September 6, 2006) ...................................................................................................45

*In re Bromine Antitrust Litig.*, 203 F.R.D. 403 (S.D. Ind. 2001) ................................................45

*In re Public Service Co. Deriv. Litig.*, 125 F.R.D. 484 (S.D. Ind. 1988) ....................................53

*In re Schering-Plough Corp. Shareholders Derivative Litig.,* 2000 U.S. Dist. LEXIS 2569,
(D.N.J. 2008) .............................................................................................................................47

*In re Warner Communications Securities Litigation*, 618 F.Supp. 735 (D.C.N.Y. 1985) ............50

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) ...........................................................................44, 46

*Kessler v. Am. Resorts Int'l Holiday Network, Ltd.*, Nos. 05-5944, 07-2439,
2007 WL 4105204, (N.D. Ill. Nov. 14, 2007) .........................................................................46

*Kyriazi v. Western Elec. Co.*, 647 F.2d 388 (3d Cir.1981) ..........................................................53

*Lazy Oil Co. v. Witco Corp.*, 95 F. Supp.2d 290 (W.D. Pa. 1997), *aff'd* 166 F.3d 581
(3d Cir. 1999)......................................................................................................................50

*Maher v. Zapata Corp.,* 714 F.2d 436 (5th Cir.1983) ....................................................51

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)............................53

*Shimmel v. Goldman*, 57 F.R.D. 481 (S.D.N.Y. 1973)....................................................45

*Tucker v. Walgreen Co.*, Nos. 05-440, 07-172, 2007 WL 2915578 (S.D. Ill. Oct. 5, 2007)........46

*Uhl v. Thoroughbred Tech. & Telecomms, Inc.*, 309 F.3d 978 (7th Cir. 2002) ..............46

*Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS 26246 (D.N.J. Oct. 28, 2005)....47, 49, 51

## RULES AND MANUALS

Federal Rules of Civil Procedure ............................................................................ *passim*

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §11:41 (4th ed. 2002) ............45

*Manual for Complex Litigation Third* §30.41 .................................................................45

# I.    INTRODUCTION

Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, Plaintiffs in the related Derivative Actions (defined below), by and through the undersigned counsel, respectfully request preliminary approval of the proposed settlement ("Settlement") set forth in the Stipulation of Settlement ("Stipulation") (attached hereto at Exhibit 1), executed as of  February 25,  2010, as being fair, adequate, reasonable, and in the best interests of  Eli Lilly and Company ("Lilly" or the "Company") and its shareholders.

Under well-established precedent, at this initial stage of the settlement review process, courts focus on whether a proposed settlement appears to be the product of serious, informed and non-collusive negotiations, has no obvious deficiencies, and provides relief that falls within the range of possible approval.  Under this standard of review, preliminary approval is warranted in this case.

As detailed below, the proposed Settlement was reached after an extensive factual and legal investigation, commencing in 2007.  The parties undertook substantive, arm's-length settlement negotiations, conducted over an eighteen month period, involving not only experienced outside and in-house counsel, but also senior-level business, compliance and medical risk management personnel of Lilly and experts retained by Plaintiffs' Counsel.  In addition to their extensive negotiations, the parties also sought the assistance and expertise of retired Chief Magistrate Judge Edward A. Infante, a highly experienced mediator in the resolution of complex litigation such as the Derivative Actions.

1

As set forth in the Stipulation, Plaintiffs, and the Settling Defendants acknowledge and agree that the Derivative Claims filed by the Plaintiffs, and the negotiations leading to this Settlement, were a substantial factor in the decisions by the Company to adopt, implement, enhance and/or maintain the corporate governance provisions set forth in Exhibit A to the Stipulation (the "Corporate Governance Terms").  The Special Litigation Committee of Lilly's Board of Directors (the "SLC")[1] has made the same acknowledgment.   The Corporate Governance Terms provide a substantial benefit to the Company, including in the prevention and detection of potential violations of law, regulation and Company policy.

The Company agrees to maintain its commitment to the effective implementation of the Corporate Governance Terms for a three year period from the date the Settlement receives Court approval (the "Agreed Upon Term").  The Settlement further provides that during the Agreed Upon Term, Lilly will commit from its treasury funds as are necessary to implement the provisions set forth in Exhibit A to the Stipulation.[2]

This action arose out of allegations regarding off-label marketing and concealment of risks in connection with the prescription drugs Zyprexa and Prozac, which resulted in Lilly being subjected to governmental and civil litigation.    In Plaintiffs' view, the provisions of the proposed Settlement go to the issues at the heart of the government and tort claims that exposed

---

[1] The SLC was made up of two then-current directors, Messr. J. Michael Cook (who has since retired from the Board) and Erik Fyrwald, and one non-director, James A. Henderson.  The SLC was constituted in or around early August 2007 to investigate allegations raised in the Demand Letters.

[2] In addition, if, during the Agreed Upon Term, the Chief Ethics and Compliance Officer at Lilly wishes to seek additional funding for compliance-related expenditures, he or she shall be permitted at his or her option to petition directly the Board or an appropriate committee of the Board that such funding be included in or covered by business plans and budgets that are approved by the Board or such committee.

Lilly to the substantial damages it incurred to resolve the civil and criminal claims. In their reports, filed simultaneously herewith, Plaintiffs' experts[3] have opined that the relief achieved under the Settlement provides substantial benefits to Lilly; that the Settlement places Lilly at the forefront of the industry; and that the Settlement provides a sound foundation for the management of drugs and drug candidates throughout their life cycle at Lilly. Moreover, the proposed Settlement eliminates the risk of delay or non-recovery, as well as the uncertainty and expense of continued litigation.

As detailed below, the substantial relief which the Settlement provides is well within the range of benefits that support "possible approval" of a settlement, in light of, *inter alia*, the scope and nature of governance and compliance reforms approved by courts in other major derivative actions and the evolving trend in the courts recognizing the substantial value of significant governance and compliance relief obtained in resolution of derivative claims. Moreover, the substantial factual and legal investigation and document production detailed herein, and the lengthy, arm's length settlement process, including the role of Judge Infante as mediator, reflect the serious, informed and non-collusive nature of the parties' negotiations. For all of these reasons, Plaintiffs respectfully request that the Court grant preliminary approval of the proposed Settlement, and enter the [Proposed] Preliminary Approval Order, attached as Exhibit C to the

---

[3] Plaintiffs' retained as experts in this action the following individuals with substantial experience and expertise in areas which were the focus of the parties' negotiations: Dr. Mitchell Glass, a medical doctor with expertise in the pharmaceutical industry and drug development; Professor Donald C. Langevoort, an expert in the areas of corporate governance and compliance, and Mr. James Lam, an expert in the area of enterprise risk management ("ERM").

Stipulation, providing for the schedule of dates for the various events leading up to and including

the Settlement Hearing in accordance with the schedule set forth at page 44 herein.

## II.   PROCEDURAL BACKGROUND OF THE DERIVATIVE ACTIONS

### A.   The Derivative Actions

In 2007, three Lilly shareholders wrote to Lilly's board of directors ("Board") demanding

that the Board take remedial action for alleged breaches of fiduciary duty (the "Demand

Letters").[4]   A variety of issues were raised in the Demand Letters regarding Lilly's allegedly

illegal marketing and promotion of Prozac, Evista, and Zyprexa, including concealment of

metabolic side effects of Zyprexa and off-label marketing, and best price reporting in connection

with Axid, Evista, Humalog, Humulin, Prozac and Zyprexa.   The alleged wrongful conduct has

been the subject of governmental investigations by the Department of Justice ("DOJ"), and

private civil actions, consolidated by order of the Multi-District Litigation Panel in the Eastern

District of New York (the "MDL").   Lilly resolved its actions with the DOJ in January 2009 and

with the bulk of the private personal injury civil litigants under the MDL by 2007.   The alleged

wrongful conduct also is the subject of on-going third party payor litigation, alleging that the

Company overcharged for these drugs.

Between January and June 2008, a total of seven shareholder derivative complaints (the

---

[4] Indiana law provides for shareholder derivative actions as a means of seeking redress for harm to a corporation either following the board of directors' wrongful refusal of a pre-suit demand for remedial action, or without such a pre-suit demand, based on allegations that making a demand on the board would be futile, for example, because the board was not independent or disinterested.  As happened here, significant corporate controversies such as those reflected in the Lilly Derivative Actions often result in the filing of multiple shareholder derivative actions premised on both wrongful refusal of demand and claims of demand futility.

"Derivative Complaints") were filed in three separate jurisdictions[5] on behalf of Lilly alleging, in part, that current and former directors of Lilly (the "Individual Defendants") breached their fiduciary duties of care and oversight in connection with the alleged misconduct described above, exposing Lilly to substantial risk of damage, including regulatory and private investigations and litigation.

On March 20, 2008, counsel for plaintiffs in certain then-filed derivative actions, counsel for the SLC and counsel for Lilly negotiated and entered into an agreement pursuant to which the parties agreed, *inter alia*, to establish a parallel track to explore possible resolution of the derivative claims and to enter into a discovery process (the "Settlement Process Agreement"). This was a successor agreement to an agreement plaintiffs Jannett and Lambrecht, counsel for Lilly, and counsel for the SLC had entered into in December 2007. Between March and June 2008, plaintiffs' counsel in the remaining derivative actions became signatories to the Settlement Process Agreement. The parties notified the courts in the three jurisdictions where the Derivative Actions are pending of the Settlement Process Agreement. As a result, at the request of the parties to the *Waldman v. Taurel, et al.* action, Judge Weinstein of the Eastern District of New York first adjourned the hearing on, and then terminated the pending motion to dismiss filed in that action. Judge Weinstein further directed that the parties report to the court every sixty days on the status of the three derivative cases filed in that jurisdiction. Likewise, the

---

[5] The Derivative Actions include the actions captioned *Lambrecht, et al. v. Taurel, et al.*, C.A. No. 1:08-cv-0068-DFH-TAB (S.D. Ind.) and *Zemprelli vs. Taurel et al.*, C.A. No. 1:08-cv-0854-SEB-TAB (S.D. Ind.); *Waldman v. Taurel, et al.*, C.A. No. 08-cv-560 (E.D.N.Y), *Robbins v. Taurel, et al.*, C.A. No. 08-cv-1471 (E.D.N.Y.) and *City of Taylor General Employees Retirement System v. Taurel, et al.*, C.A. No.

Indiana State Court stayed proceedings on the two derivative actions filed in that jurisdiction. By Order dated June 26, 2008, Magistrate Judge Baker granted the parties' motion to defer the response date in the actions pending in this Court.  As described below, Magistrate Judge Baker has taken the lead in overseeing the progress of the settlement process through telephonic status conferences held with the parties following an initial pretrial conference in May 2008.  Upon this Court's approval of the Settlement, the parties will take all steps necessary to dismiss the Derivative Actions pending in other jurisdictions, and the parties expect that those cases will be dismissed promptly with prejudice.

> **B.**     **Coordination of the Derivative Actions and**
> **Investigation of the Derivative Claims**

In connection with the Demand Letters and the filing of the Derivative Complaints, Plaintiffs' Counsel undertook substantial investigation, including of publicly available information such as the Company's SEC filings, related to the alleged wrongdoing.  Between May and July 2008, using their investigation as a basis, Plaintiffs' Counsel entered into discussions with defense counsel regarding the scope and timing of relevant document production.  As a result of these discussions, beginning in July 2008 and continuing through May 2009, Defendants produced on a rolling basis over 85,000 pages of documents, including deposition transcripts and exhibits of forty-eight (48) Lilly employees who had testified in the MDL and related proceedings, twenty-two (22) expert witness transcripts, reports and exhibits, and documents related to, among other issues, the safety, efficacy and off-label marketing of

---

08-cv-1554 (E.D.N.Y.); and *Solomon v. Taurel, et al.*, Cause No. 49D12 08 03PL013729 and *Staehr v. Taurel, et al.*, Cause No. 49DO2 08 03CT013786, pending in the Marion County Superior Court, Indiana.

Zyprexa.

In order to assure the effective and efficient prosecution of the Derivative Actions, Plaintiffs' Counsel entered into a coordination agreement in May 2008 (the "Coordination Agreement"). Pursuant to the terms of the Coordination Agreement, an Executive Committee was formed, which included counsel from each law firm representing a plaintiff in a Derivative Action. Karen L. Morris (of Morris and Morris LLC Counselors at Law) and Richard D. Greenfield (of Greenfield & Goodman LLC) were chosen to serve as Co-Chairs of the Executive Committee (the "Co-Chair Counsel"). The Co-Chair Counsel, in coordination and consultation with the other members of the Executive Committee, have worked to ensure the efficient coordination and management of the litigation and conduct of the settlement negotiations.

Under the structure established by the Coordination Agreement, documents as produced were reviewed and analyzed by assigned Plaintiffs' Counsel under the supervision of the Co-Chair Counsel. Plaintiffs' Counsel also undertook a thorough analysis of Lilly's financial and operating condition based on review of financial reports, news articles and other publicly available information. This review and analysis provided Plaintiffs' Counsel with a detailed understanding of both the alleged wrongdoing, and of Lilly's organizational structure during the period of the alleged wrongdoing, and thereafter.

In addition to the merits-based document production and analysis, Plaintiffs' Counsel provided Lilly with detailed document requests relating to Lilly's internal governance and compliance systems. This analysis was relevant to Plaintiffs' Counsel's work in designing and negotiating governance and compliance proposals tailored to the wrongdoing alleged in the

7

Derivative Actions.  Lilly produced relevant documents between August 2008 and May 2009 as part of the Company's rolling document production described above.

### C.   The Design and Negotiation of Detailed Governance and Compliance Proposals

The work by Plaintiffs' Counsel in the design and negotiation of detailed governance and compliance reform proposals (discussed below) was informed by, among other sources, their merits analysis in terms of understanding how Lilly functioned during the period of the alleged wrongdoing.

Plaintiffs' Counsel's work in connection with the design and negotiation of proposed corporate governance and compliance reforms included, *inter alia*, benchmarking governance and compliance processes and practices within the pharmaceutical industry, both at the time of the alleged wrongdoing and currently, and assessing available corporate governance and compliance materials from numerous sources, including evolving industry guidelines, private reform proposals and academic and industry literature.  Plaintiffs' Counsel also reviewed and assessed Lilly's Board committee charters and charter provisions, as appropriate, in connection with crafting and negotiating governance and compliance proposals.

As part of this process, Plaintiffs' Counsel conducted in-depth legal research and factual investigation regarding issues relevant to the drug life cycle analysis, which Plaintiffs' Counsel believed was critical to any potential settlement of the Derivative Actions.  This analysis included, *inter alia*, a thorough analysis of such issues as when a drug company must and/or is permitted to effect a labeling change to reflect new risk information under the Food, Drug and Cosmetic Act and the FDA's regulations; an analysis of the circumstances under which a drug

company is required to communicate with the medical community concerning safety data from clinical trials, toxicology studies and/or other sources; review and analysis of laws and regulations governing the use of outside expert advisory panels; analysis of the statutes, regulations and regulatory guidance governing the labeling of prescription drugs in the U.S.; analysis of FDA post-approval study processes and procedures; and analysis of relevant regulations and regulatory guidance governing prescription drug post-marketing reporting.

Plaintiff's Counsel, working with their experts, particularly their pharmaceutical and drug development expert, researched, crafted and presented to the Company a series of governance, compliance, and medical risk management proposals.  These proposals, provided to Lilly on a rolling basis,[6] were the subject of extensive discussions and negotiations among the parties. Over the course of multiple face-to-face meetings and telephonic conferences, the parties discussed Plaintiffs' proposals in substantial detail within the context of Lilly's operations and business.  As appropriate, Plaintiffs' pharmaceutical expert, Dr. Glass, participated in these discussions, as did senior personnel at Lilly with knowledge of and responsibility over Lilly's operations in substantive corporate governance topic areas, including, *inter alia*, the Vice President, Compliance and Enterprise Risk Management and Chief Compliance Officer; the Manager, Enterprise Risk Management, Global Compliance and Ethics Program Office;  the

---

[6] Plaintiffs sent their Management Level and Public Policy and Compliance Committee proposals to Lilly in September 2008, followed by their Off-Label proposal in November 2008 and their Best Price proposal in December 2008.  In January 2009, Plaintiffs provided defendants with their proposal with respect to Management Compensation, followed in March 2009 by the presentation of Plaintiffs' Life Cycle Management proposal.  Plaintiffs provided two proposals regarding Enterprise Risk Management, the first in December 2008, and their revised proposal in March 2009.  In addition, Plaintiffs provided proposals related to the Board in May 2009.

9

Deputy General Counsel and Corporate Secretary; the Head of Global Medical, Regulatory and Safety and Chief Medical Officer; the Executive Director, Global Medical, Regulatory and Safety; the Lilly USA Compliance Officer. In addition, Professor Langevoort and Mr. Lam assisted Plaintiffs' Counsel in the negotiation of relevant provisions of the Corporate Governance Terms.

The parties also retained the services of retired Judge Edward A. Infante, the former Chief Magistrate Judge of the U.S. District Court, Northern District of California, to assist in the resolution of the derivative claims through mediation. Judge Infante was provided detailed written submissions related to merits and damages, and participated in a full day session in New York, as well as in multiple telephone conferences. Only after having reached agreement in principle of all of the terms of the Settlement, the parties again sought the assistance of Judge Infante in a separate mediation of the proposed amount of attorneys' fees, inclusive of expenses, that Plaintiffs' Counsel would seek from the Court.

The parties have kept the courts in each jurisdiction where the Derivative Actions are pending apprised of the progress of the settlement process and the parties' negotiations through periodic status conferences and status reports. Following a May 2008 status conference, Magistrate Judge Baker directed that the parties apprise the Court at regular intervals on the progress of the settlement process. During these calls, which occurred in August 2008, November 2008, February 2009 and July 2009, the parties described in detail the status of the settlement process, including the nature of the documents, materials and other information made available to Plaintiffs, meetings between the parties, and written materials prepared by Plaintiffs

10

to be provided to Defendants.[7]   The substantive governance, compliance and medical risk management reforms reflected in the Corporate Governance Terms are the result of this lengthy, intensive, and arm's-length process.

## III.   SUMMARY OF PROPOSED RELIEF

Following the discussions and negotiations detailed above, the parties arrived at the enhanced governance, compliance, and risk management policies, procedures and provisions set forth in the Stipulation, which provide the basis for the Settlement, key features of which are discussed below.

### A.   Lilly's Adoption of the Scientific Core Objective and the Compliance Core Objective

Plaintiffs believe it is essential to establish a top level mandate as the foundation of improved governance, compliance and risk management practices at Lilly.  To achieve this, the Stipulation provides for the express adoption of clearly stated objectives in the areas of product safety and medical risk management and legal and regulatory compliance at the Company.

#### 1.   The Scientific Core Objective

As detailed below, central aspects of the design and negotiation of the proposed Settlement relate to the management of safety and benefit issues in connection with Lilly's products and products candidates throughout their entire life cycle.  A principal component of the proposed Settlement provides for Lilly's adoption of the Product Safety and Medical Risk Management Core Objective (referred to herein as the "Scientific Core Objective").   The

---

[7] As directed by the two courts, the parties likewise reported regularly on the status of the settlement process to the Eastern District of New York and the Indiana State Court where the other Derivative

Settlement provides that Lilly shall adopt policies and procedures to support scientific excellence in the development and communication of product safety and effectiveness information and the medical and scientific risks and benefits throughout the life cycle of both products and product candidates at the Company.

Plaintiffs' pharmaceutical expert believes that adoption of the Scientific Core Objective provides a substantial benefit to Lilly and its shareholders.  Dr. Glass, in his Expert Report, states that the requirement to adopt the Scientific Core Objective:

> provides the foundation for the strengthening Lilly's systems of corporate governance, internal control and operations in the area of product safety and benefit.  By adopting the Scientific Core Objective, Lilly recognizes the unique nature of medical risk that arises from drug development and marketing, and assigns oversight for this risk up to the Board, through the Science & Technology Committee ("S&T Committee"), which has the scientific and medical expertise to meet this oversight responsibility.

Glass Report at ¶ 9.  Likewise, Mr. James Lam, Plaintiffs' enterprise risk management ("ERM") expert, concludes:

> In my opinion, the adoption of the Scientific Core Objective and the improvements to the governance and reporting processes for the Science and Technology Committee will enhance Board oversight of critical risks associated with clinical development processes, patient benefit and safety, and product quality and labeling.  As such, these improvements will likely lead to enhanced control and mitigation of product liability, regulatory, and reputational risks.

Lam Report ¶ 11.

Pursuant to the proposed Settlement, specific responsibilities are set out at both the management and the Board levels in connection with the achievement of the Scientific Core Objective at Lilly.  As described below, the proposed Settlement provides both for critical

Complaints were pending.

functions, duties and responsibilities at the management level in support of the effective implementation of the policies and procedures necessary to support the adoption of the Scientific Core Objective, and for oversight responsibility over that Objective at the Board level, through the Science & Technology Committee ("STC").

### 2.     The Compliance Core Objective

The proposed Settlement also provides that Lilly will adopt a Compliance Core Objective.   Under the terms of the proposed Settlement, the Company's Compliance Core Objective will include: (i) operating Lilly's business to deliver quality, innovative medicines that improve individual patient outcomes, and, in so doing, earn the trust and respect of patients and customers; (ii) operating Lilly's business in compliance with applicable laws and regulations; (iii) conducting Lilly's activities and having policies and procedures in place to avoid adverse regulatory enforcement action; and (iv) promptly detecting, correcting and preventing the recurrence of off-label promotion activities that violate applicable law, regulation, and/or Company policy by any Lilly employee or any person acting on Lilly's behalf.

Mr. Lam found the adoption of the Compliance Core Objective at Lilly to be significant:

> In my opinion, the adoption of such a board-level resolution, including individual accountabilities for the Chief Executive Officer and Chief Ethics and Compliance Officer and ongoing communications at the highest levels of the organization [provided for under the proposed Settlement and described below], provides the 'tone from the top'" that will drive the Company to balance its business and financial objectives with patient care and compliance objectives.

Lam Report ¶ 7.

As with the Scientific Core Objective, the proposed Settlement reflects Board oversight of compliance and risk management matters on the part of the Public Policy and Compliance

13

Committee ("PPCC").   In addition, the Settlement provides for enhanced responsibilities, processes and procedures related to the effective implementation of the Compliance Core Objective at the management level within Lilly.

**B.      Board Level Provisions**

**1.      Science & Technology Committee ("STC")**

The proposed Settlement provides the STC with oversight responsibility for the effective design and implementation of the policies and procedures necessary to support the Company's adoption of the Scientific Core Objective.   In connection with this responsibility, the proposed Settlement provides for Lilly to amend the STC charter in multiple respects, including, among others, expressly providing for: (i) STC reporting to the full Board regarding the safety and effectiveness of Lilly's marketed products and drugs/compounds in late-stage clinical development; (ii) STC responsibility to assist the Board in exercising reasonable oversight of product safety and medical risk management at Lilly; and (iii) the ability of the STC to retain outside scientific, medical and risk management consultants and to freely speak with members of management, including in-house medical and scientific personnel.

**a.      Reports to the STC**

To support the STC's ability to meet its critical oversight function in connection with the Scientific Core Objective, the Settlement provides for timely reporting to the STC from multiple sources within Lilly, including:

### (1)   Reporting from Management

The Settlement provides that the STC will obtain from management on a periodic basis (or more frequently if the Chief Medical Officer ("CMO") or the STC believes it to be necessary), reasonable assurances of the effective design and implementation of the policies and procedures designed to maintain the primacy, in matters affecting patient benefit and safety, of objective scientific inquiry, analysis and communication, including annual reports from the CMO regarding the implementation and ongoing monitoring of such policies and procedures, the identification of important medical and scientific risks and the resolution of those risks. These reports will inform the STC of the status of Lilly's implementation of policies and procedures supporting the Scientific Core Objective and will highlight significant medical and scientific risks affecting single products and global product development at the Company. *See* Glass Report ¶ 10.d.

### (2)   Other Reporting from the CMO

The Settlement also provides for multiple reports from the CMO to the STC, including:

- not less than annually, a report concerning the conclusion of the Medical Review Committee (chaired by the CMO) either that the Company has taken necessary and appropriate steps to discover, analyze, interpret, investigate, and communicate significant patient safety risks affecting the products and product candidates, or setting out plans sufficient to permit such a conclusion on a basis acceptable to the STC;

- for products nearing first major launch, a report regarding whether the planned scope of initial marketing of the drug is appropriate, from a medical content perspective, given the state of knowledge concerning patient safety and efficacy, and benefit/risk assessment; and

- prompt reporting regarding patient safety issues related to product labeling or promotion or other product safety matters, where, after having informed and discussed the matter with the Chief Scientific Officer and the CEO, the CMO believes escalation of the issue

15

to the STC is desirable.

Dr. Glass states in his Expert Report that, in his opinion, the requirement of prompt reporting and escalation ensures that the STC will have prompt knowledge of significant safety issues:

> I believe that this escalation provision is one of a number of provisions that will help ensure prompt resolution of safety issues raised, for example, as discussed below, through the Product Safety Physicians or the Clinical Plan Document ("CPD"). Escalation to the Board by the CMO ensures that the STC will receive prompt communication of unresolved safety issues in accordance with the Scientific Core Objective and independent of commercial influence.

Glass Report ¶ 10.c.

### (3) Reporting from the Vice President-Global Patient Safety

The Settlement provides that at least annually, the Vice President-Global Patient Safety (VP-GPS) – who reports directly to the CMO – shall report to the STC regarding both unresolved patient safety and utility issues that have been elevated to the Corporate Patient Safety Committee, and the remediation of such issues. This reporting by the VP-GPS complements the CMO reporting to the STC, providing the STC with a complete picture regarding both emergent, unresolved patient safety issues that were escalated, and patient safety issues that were resolved at the management level. *See* Glass Report ¶ 10.e.

Assessing the required CMO and VP-GPS reporting responsibilities to the STC under the proposed Settlement, Dr. Glass opines:

> It is my opinion that the reporting responsibilities of the CMO and the VP- GPS to the S&T Committee are robust and provide the depth and frequency of reporting necessary to support the S&T Committee's oversight responsibilities as set forth in the Settlement. Based upon these reports, the S&T Committee will be able to meet its responsibility for oversight of the primacy of patient safety and to provide assurance to the entire Board that the Scientific Core Objective is well

16

established and is the guiding principle for scientific decision making with respect
to safety and efficacy for the entire life cycle of Lilly products.

Glass Report ¶ 12.

### (4)    Reporting from the Vice President-Quality

The Settlement provides for the VP-Quality to monitor and audit the policies, procedures,
systems and internal controls implemented to achieve the Scientific Core Objective, and to report
any significant findings to the STC not less than annually or promptly as needed.  Dr. Glass finds
that this will be a substantive review, requiring reporting to the STC by the VP-Quality of any
significant findings, thereby assessing whether the relevant procedures and systems are
identifying and resolving safety and benefit issues as required by the Scientific Core Objective.
In Dr. Glass' opinion, this activity is critical, as continuous assessment is necessary to ensure
that the Scientific Core Objective remains paramount and is not compromised, even
inadvertently.  *See* Glass Report ¶ 13.

Overall, Dr. Glass finds that the scope and nature of the reporting obligations to the STC
under the proposed Settlement serve a critical function: "Direct reporting to the S&T Committee
ensures oversight and informed decision-making at the highest level of the corporation."  Glass
Report at ¶ 13.

### b.    Annual Assessment of Effectiveness and the Adequacy of Information

Further reflecting the importance of timely and adequate information flow to the STC in
order for it to fulfill the oversight responsibilities provided for under the proposed Settlement, in

addition to the reporting described above, the proposed Settlement also provides that the STC charter will be revised to provide for the STC to annually assess the adequacy of the reporting and information flows it receives, and to make such changes as are required to maintain and enhance the committee's effectiveness, including recommending to the full Board any desirable changes to its charter or membership.

*   *   *

In connection with the Settlement provisions related to the adoption of the Scientific Core Objective and the enhanced responsibilities of the STC, Dr. Glass opines that:

> It is my opinion that the Board level product safety and medical risk management oversight provisions offer substantial benefits to the Company.  Together with supporting management level changes (discussed below), these Board level provisions represent a significant commitment to Lilly's governance and internal control processes relating to product safety and medical risk management throughout the life cycle of Lilly's products.  If faithfully implemented, I believe that the adoption and maintenance of these provisions will contribute substantially to adequately resourced, timely and objective scientific inquiry, analysis and communication in matters affecting patient benefit and safety, and will provide powerful support in the prevention and detection of the types of issues that gave rise to the derivative actions.

Glass Report ¶ 16.

### 2.      The Public Policy and Compliance Committee

The Settlement sets forth compliance oversight commitments, including in connection with the Compliance Core Objective, on the part of the Public Policy and Compliance Committee of the Board (the "PPCC").  The PPCC, comprised of independent directors, has responsibility over non-financial compliance and non-financial compliance risk aspects of the enterprise risk management ("ERM") program at Lilly.  The Settlement provides for enhanced

18

oversight responsibilities by the PPCC in connection with these functions, as well as with oversight responsibilities in connection with operational audit at the Company.   Professor Langevoort, Plaintiffs' corporate governance and compliance expert, states in his Expert Report:

> Because independent directors are not involved with the company on a day-to-day basis, their involvement means little unless they gain sufficient knowledge of compliance or risk-related matters to play a constructive role in addressing those issues.   COSO is specific in saying that the involvement of the board of directors in compliance and risk management oversight must be evaluated in large part by reference to the "sufficiency and timeliness with which information is provided to board or committee members, to allow monitoring of management's objectives and strategies, the entity's financial position and operating results and terms of significant agreements" and the "sufficiency and timeliness with which the board or audit committee is apprised of sensitive information, investigations and improper acts (*e.g.*, travel expenses of senior officers, significant litigation, investigations of regulatory agencies, defalcations . . . .)" (*Integrated Framework*, pp. 31-32).

Langevoort Report, ¶ 23.   In this respect, to support the PPCC's ability to meet its enhanced oversight responsibilities, the proposed Settlement provides for timely information flow, in the form of direct reporting to the PPCC, from, among others officers, the Chief Ethics and Compliance Officer ("CECO"), the General Auditor and the Vice President-Quality.

### a.   CECO Reporting

Under the terms of the proposed Settlement, on an annual basis, the PPCC and the CECO must jointly develop an agenda that specifies the topics for the CECO's quarterly reporting to that committee on substantive compliance matters.   Agenda topics shall include, for example, implementation of existing compliance programs, processes for receiving and investigating compliance or ethics-related complaints, exceptions reporting, the allocation of resources to the compliance organization and compliance-related initiatives, emerging compliance trends and, as

appropriate, plans of action to respond to such trends from a preventive compliance standpoint. In addition to such quarterly reporting to the entire committee, the CECO will also report compliance matters directly to the Chair of the PPCC if, in the CECO's view, prompt reporting is warranted.

### b.      General Auditor and Vice President-Quality Reporting

The proposed Settlement provides that the PPCC will annually review and approve the aspects of Lilly's integrated audit plan that relate to legal and regulatory compliance (excluding financial, Good Manufacturing Practices and Good Clinical Practices).   Pursuant to the Settlement, periodically throughout the year, the PPCC will receive reports from the General Auditor concerning the status of the implementation of the annual audit plans in the relevant areas, and will receive prompt reports regarding material findings, with management providing follow-up reports until such time as those findings have been remediated to the PPCC's satisfaction.

The proposed Settlement provides for similar review, approval and reporting procedures from the VP-Quality regarding those aspects of the audit plan, such as Good Manufacturing Processes, over which that officer, rather than the General Auditor, has primary responsibility.

In addition, pursuant to the proposed Settlement, at least annually, the General Auditor will report to the PPCC regarding the Internal Audit Department's assessment of the effectiveness of the Company's compliance and related risk management controls.

### c.      Direct Access to the PPCC

Importantly, the Settlement provides that the CECO, the General Auditor, the VP-Quality

and the General Counsel will have direct access to the PPCC and will regularly be invited to attend committee meetings, and that the CECO, General Auditor and VP-Quality will have private sessions at least semiannually with the PPCC to discuss, among other things, management support for their organizations, including resources and management tone.

### d.     Board Responsibility for Appointment and Retention

The Proposed Settlement provides that the chairman of the PPCC, in consultation with the PPCC, will approve the appointment and retention of the CECO, and that the Audit Committee Chairman, in consultation with the Audit Committee, will approve the appointment and retention of the General Auditor.

### e.     Oversight of Enterprise Risk Management

The proposed Settlement addresses both Board and management level changes directed to Lilly's enterprise risk management ("ERM") system.  At the Board level, the Settlement provides that the PPCC will oversee the process by which ERM programs are reviewed by Lilly's Board and its various committees, with specific responsibility for the non-financial compliance risk aspects of the ERM program.  To support the Board's ability to meet this responsibility, the Settlement provides that the PPCC will receive a report each year from the CECO regarding the design, implementation and operation of Lilly's ERM program, as well as reports concerning risk management aspects of Company strategic initiatives and developments affecting the Company's business, operations and affairs.

Plaintiffs' ERM expert, Mr. Lam, states that:

The role of the board is widely recognized as critical to effective corporate governance and risk management.  .  .  .   Collectively, the provisions in the

21

> Agreement related to board reporting will significantly increase the level of risk transparency not only at the board level, but also throughout the Company.  In my experience, the development and implementation of more effective board reports concerning risk management and compliance naturally lead to the identification, collection, and analysis of critical risk and compliance information throughout an organization.   In other words, improving board reporting leads to enhanced enterprise-wide risk transparency because the necessary risk and compliance information must be gathered and analyzed at all levels of the organization. . . . Enhanced risk transparency will likely result in more timely identification, reporting, and resolution of risk management and compliance issues.

Lam Report ¶ 12.

In addition, the proposed Settlement provides that at least once a year, the PPCC will meet in joint session with the Audit Committee to review major non-financial compliance matters, and will coordinate with the Audit Committee to assist in assuring that appropriate risk disclosures are included in the Company's public financial reports as required by law.

### f.       Annual Assessment of the Adequacy of Information Flows

Pursuant to the proposed Settlement, the PPCC, like the STC, will annually assess the adequacy of the reporting and information flows it receives, and make such changes as are required to maintain and enhance the committee's effectiveness, including recommending to the full Board any desirable changes to its charter or membership.

*   *   *

Regarding the role of the PPCC at Lilly and the enhanced oversight responsibilities it assumes under the proposed Settlement, Mr. Lam concludes:

> In my opinion, the PP&C Committee represents the centralized non-financial risk management and compliance committee for Lilly. . . .  The PP&C Committee provisions are significant and will enhance the effectiveness of this critical board oversight function.   If faithfully implemented by Lilly, adoption of these governance, risk, and compliance improvements will contribute to more effective

board oversight and monitoring of non-financial legal and regulatory compliance, as well as enterprise risk management and manufacturing quality. These improvements, together with the management supports discussed below, will likely lead to the reduction of operational, legal, regulatory, reputational, and other enterprise-wide risks for the Company.

Lam Report ¶ 8.

### 3.      The Compensation Committee

Mr. Lam expressly notes: "In my assessment, one of the most significant provisions of the Agreement is related to the linkage between compliance factors and executive compensation." Lam Report ¶ 14. The Settlement provides that the Compensation Committee of the Board, as part of a review of the performance and associated compensation decisions for executive officers at Lilly, annually will discuss with the CEO the compliance performance of executive officers. Under the Settlement, Human Resources will report annually to the Compensation Committee regarding the results of periodic monitoring of compliance objectives, which the Settlement provides must be set by executive officers (*see* Section V.C.2.d. below).

Mr. Lam goes on to find:

In my opinion, by incorporating compliance objectives into executive compensation and succession planning, these requirements will have a far-reaching impact on the culture, values, and executive/employee behavior throughout the Company. First, I believe the linkage between compliance and compensation will extend beyond the top executives to the performance reviews and compensation systems of middle managers and other employees. Senior executives who are accountable and rewarded for compliance will in turn make sure those reporting to them are also accountable and rewarded. Second, the implementation of these requirements will likely result in the development of specific milestones to improve compliance systems and processes, as well as key risk indicators that track risk management performance and internal control effectiveness. Such milestones and key risk indicators will be needed as the criteria for assessing the compliance component of executive compensation. Finally, these requirements will help the Company in achieving one of the key

23

tenets of enterprise risk management, which is balancing the 'hard side' and the 'soft side' of risk management.

Lam Report ¶ 14.

### 4.      Tone at the Top

Professor Langevoort expressly notes that:

Both COSO and the OSG emphasize the need for a "top-down" commitment by the board of directors and senior management to a culture of integrity and responsibility.   The OSG states that organizations must "promote an organizational culture that encourages ethical conduct and a commitment to compliance with law."  Similarly, COSO states that "the effectiveness of internal controls cannot rise above the integrity and ethical values of the people who create, administer and monitor them" (*Integrated Framework*, p. 23).

Langevoort Report ¶ 47.  The proposed Settlement provides that Lilly's CEO and the Chairman of the Board of Directors, in consultation with the CECO, will design periodic communications regarding a culture of compliance and performance with integrity.  The Settlement also provides that the CEO will meet at least annually with senior management to emphasize the importance of compliance and to emphasize their roles and accountability for both compliance and ethics at Lilly.

Mr. Lam states that, in his opinion, the adoption of the Compliance Core Objective, including individual accountabilities for the Chief Executive Officer and Chief Ethics and Compliance Officer and ongoing communications at the highest levels of the organization discussed above, "provides the 'tone from the top' that will drive the Company to balance its business and financial objectives with patient care and compliance objectives."  Lam Report ¶ 7.

### 5.      Enhanced Corporate Governance Practices

The proposed Settlement also includes provisions designed to enhance Lilly's Board

24

level corporate governance practices, including:

### a. Board Membership

To assure that individuals with appropriate technical experience, expertise and education are nominated to the Board so as, for example, to comply with the enhanced oversight responsibilities of the STC and PPCC provided for under the proposed Settlement, the Settlement provides that Lilly will consider prospective committee assignments when assessing the qualifications of Board nominees. In addition, the Settlement provides that determination for re-nomination will include consideration of such factors as objectivity, candor, ethical commitment, independence, preparedness and participation.

To help ensure that Board members have the time necessary to commit to Lilly, the Settlement provides that the number of other public company boards on which Lilly directors may sit shall be prospectively limited to four (including Lilly). To provide appropriate flexibility to Lilly, the Settlement further provides that the Chair of the Directors and Corporate Governance Committee may, on a case-by-case basis, grant a waiver of this limitation under appropriate circumstances.

The Settlement further provides for amending the Company's Corporate Governance Guidelines (the "Guidelines") to prospectively establish independence standards for Board membership more stringent than the New York Stock Exchange (NYSE) listing standards.

### b. The Presiding Director and the Role of Independent Directors

In order to enhance the role of the independent directors at Lilly, the Settlement provides that the Presiding Director will be elected annually by the independent directors. Lilly's

25

Guidelines will be amended to expressly encourage all directors to raise and discuss with the Chair of the Board, the Presiding Director or the Corporate Secretary any items they believe should be considered for inclusion on the agenda for Board or committee meetings.

### c.    Compliance Component to Annual Board Self-Assessment

In addition to the Settlement provisions regarding annual self-assessment of the effectiveness of the STC and the PPCC and the adequacy of reporting and information flow to each, the proposed Settlement provides that the Company will include in the Board and relevant committee self-assessment questionnaires a specific question assessing Board and committee performance regarding compliance and oversight, including related to the Board and committee responsibilities set forth in the Settlement.

### d.    Board Training and New Director Orientation

The Settlement provides that the Company shall provide risk, governance and compliance training to its directors as the Board determines is necessary to support its oversight undertakings.  Lilly will maintain its new director orientation program, including training with respect to Board and committee responsibilities; review of the pharmaceutical industry and issues facing the industry, including health care compliance risks; and corporate governance and regulatory trends.  Lilly also agrees that its new director orientation program will be expanded to include Board and committee responsibilities set forth in this Settlement; review of the Company's compliance history; and pharmacovigilence[8] compliance risks.

### C.    Management Level Provisions

---

[8] At pharmaceutical companies, pharmacovigilence is responsible for product and product candidate

1.      **Life Cycle Management**

The proposed Settlement sets forth detailed and comprehensive provisions addressing drug life cycle management within Lilly.  These far-reaching provisions are designed to provide a sound foundation for the management of drugs and drug candidates throughout their life cycle. As noted above, Lilly's adoption of the Scientific Core Objective applies across the entire Company, making patient safety paramount in decision-making across the drug development and post-launch process.  Dr. Glass states:

> Based on my experience in drug development and Life Cycle Management, Lilly's adoption of the Scientific Core Objective provides a powerful statement of its priorities that aligns corporate decision making with its responsibility to patients, providers and regulatory authorities.

Glass Report ¶ 9.

As detailed below, the proposed Settlement provides the Chief Medical Officer ("CMO") with management level responsibility for the implementation of the Scientific Core Objective. The responsibilities of the Vice President-Global Patient Safety ("VP-GPS"), who reports to the CMO, are substantially expanded and enhanced, and the critical position of Product Safety Physicians ("PSPs") shall have responsibility for tracking safety issues for each drug and drug candidate throughout its life cycle, from late stage development through patent expiration.

a.      **The Chief Medical Officer ("CMO")**

The authority, responsibilities and staffing of the CMO are substantially enhanced under the proposed Settlement.  The Settlement provides that the CMO, who is in charge of Lilly's combined Global Medical, Regulatory and Safety Departments:

safety.

º     shall have senior executive authority and oversight responsibility for all product safety functions at Lilly, including pharmacovigilence;

º     shall monitor the implementation of, and take steps necessary to continuously improve, Lilly's policies, procedures, systems and internal controls designed to achieve the Scientific Core Objective, and shall report on the status and findings of such monitoring annually to the STC;

º     shall be the senior medical officer of the Company, and shall have executive authority over all medical physicians employed in drug development and medical research by the Company on issues of drug utility and safety and regulatory compliance;

º     both in his capacity as the Chair of the MRC and as the head of Global Medical, Global Regulatory Affairs[9] and Global Patient Safety, shall be provided robust information flow related to emerging product safety and efficacy issues;

º     has a direct line of responsibility in the area of patient safety, from the Vice President-Global Patient Safety (VP-GPS), and through him or her, to the Patient Safety Physicians (PSPs), which reporting structure assures the independence of this critical function from commercial considerations; and

º     shall assess annually the staffing and funding requirements necessary to fulfill his responsibilities and may, in consultation with the Executive Vice President of Science and Technology, reorganize, reduce or augment his staff.

As discussed above (*see* Section V.B.1.a.) the Settlement provides for robust reporting obligations by the CMO to the STC to support that committee's enhanced oversight responsibilities in connection with the Scientific Core Objective.

### b.    Vice President-Patient Global Safety ("VP-GPS")

The VP-GPS, responsible under the settlement for overseeing Patient Safety Physicians ("PSPs," discussed below), reports directly to the CMO. The VP-GPS is tasked with critical safety review processes in connection with Lilly's adoption under the proposed Settlement of the

---

[9] Regulatory Affairs manages the company's relationship with regulators, including the product approval process.

Scientific Core Objective, including authority over and responsibility for all scientific analysis and interpretation of data and clinical studies related to utility and safety over the life cycle of each product and product candidate. As such, the VP-GPS is responsible not only for ensuring the continuous identification and resolution of patient safety issues, but also for tracking and resolving safety and risk signals in light of product utility and benefit. Maintenance of this responsibility under the proposed Settlement through all stages of the product life cycle provides a continuously developing product safety record and the timely updating of the clinical experience with Lilly products and product candidates.

The Settlement provides that the VP-GPS is responsible for all scientific analysis and interpretation of data and clinical studies, as well as for surveillance relating to product safety derived from clinical studies. The Settlement provides that the VP-GPS has responsibility for developing and implementing policies and procedures, among other things, for ascertaining and addressing issues arising in connection with the safety of Lilly's products and maintaining practices at Lilly to facilitate the collection and timely disclosure of information concerning the safe use of Lilly products. As such, the VP-GPS will be regularly informed regarding safety issues to be reported externally to, for example, regulators and health care providers, and will establish the policies and procedures to ensure that these disclosures occur on a timely and accurate basis.

Pursuant to the proposed Settlement, the VP-GPS is responsible for providing recommendations to the CMO regarding the initiation of the next stage of a product or product candidate's development or expansion of commercialization, as supported by a risk versus

benefit analysis across all target populations.  The Settlement provides that the VP-GPS will also make recommendations to the CMO regarding whether proposed additional studies would add usefully to the weight of evidence for a product's safety profile, including with respect to resolving open issues around off-label patient populations and safety.

Recognizing that safety information can arise after product launch, the Settlement provides for responsibility to the VP-GPS for recommending to the CMO and Global Product Labeling Committee all safety-related labeling changes for Lilly products.  As discussed above, reflecting the critical importance of labeling issues, under the proposed Settlement, the CMO has express responsibility and authority to elevate to the attention of the Board (by way of the STC) safety-related labeling issues that are not satisfactorily resolved at the management level.

As noted above, a critical responsibility of the VP-GPS under the proposed Settlement is oversight of all Product Safety Physicians, including assigning PSPs to products and product candidates; ensuring that the PSPs have completed full and accurate safety assessments prior to each Medical Review Committee meeting concerning relevant products and product candidates; and making recommendations regarding the hiring, retention, performance evaluation, compensation and promotion of PSPs.  As Dr. Glass opines, the VP-GPS will be responsible for escalating safety signals identified by the PSPs, whether the safety signal affects individual patients or populations.  In addition, the VP-GPS will receive recommendations from the PSPs for appropriate studies and resource allocation to support each product in light of the Scientific Core Objective, and will manage those recommendations through the CMO.

As discussed above, the VP-GPS is also tasked with direct reporting, at least annually, to

the STC regarding unresolved patient safety and utility issues that have been elevated to the

Corporate Patient Safety Committee, as well as regarding the remediation of such issues.  As Dr.

Glass states:

> The analysis and communication of these reports to the CMO and to the S&T
> Committee would identify strengths and weaknesses of Lilly's Pharmacovigilance
> system and should provide the basis for robust assessment and the prioritization
> of the resolution of identified safety and utility issues.  . . .  Escalation by the VP-
> GPS, whether to the CMO, the Corporate Patient Safety Committee or the S&T
> Committee is free of undue commercial influence.

Glass Report ¶ 22.

*   *   *

As detailed in his Expert Report, Dr. Glass believes the VP-GPS plays a critical role

under the proposed Settlement:

> The VP-GPS, as the manager of the Product Safety Physicians, is charged with ensuring
> that the appropriate data collection, selection, analysis and interpretation are reported,
> and that the Scientific Core Objective is maintained as paramount throughout the life
> cycle of each product.  In my opinion, the VP-GPS, as the manager of the Product Safety
> Physicians and as a key member of the MRC, provides a critical management function in
> support of the achievement of the Scientific Core Objective.

Glass Report ¶ 28.

### c.        Product Safety Physicians ("PSPs")

The proposed Settlement provides for the creation of PSPs, who play a key role in the

integrated safety review process provided for under the Settlement.  PSPs are senior level

physicians whose principal responsibility is acting as a medical science advocate for product

safety.  Under the terms of the Settlement, every Lilly product currently on the market and every

31

product candidate at the Company at the end of Phase 2 in the development process[10] will have a PSP with assigned responsibility for safety issues throughout that product's life cycle.

The PSP will act as a senior level medical science advocate for product safety and compliance with the Scientific Core Objective.  To assure effective performance in meeting this critical responsibility, the Settlement directly ties PSP professional advancement and compensation at Lilly to the VP-GPS' assessment of their effectiveness in promoting the Scientific Core Objective with respect to their individual product/product candidate.

As such, PSPs assigned to particular products are responsible for assuring that safety issues affecting the product are given primary weight in all labeling decisions, including (as noted above) elevating any disagreements concerning safety issues in labeling decisions to, among others, the VP-GPS and CMO as appropriate and necessary, to assure that the matter is resolved in a manner consistent with maintaining the primacy of patient benefit and safety.  Dr. Glass notes: "In my opinion, this independent safety function, which is carried up to the CMO – and through the CMO, to the Board – strongly supports the implementation of the Scientific Core Objective."  Glass Report ¶ 30.

The PSP assigned to each product or product candidate must assure that all available product data is comprehensively reviewed for patient safety issues, and, at least annually (and more often as necessary) report to the VP-GPS on patient safety aspects of the Clinical Plan

---

[10] Dr. Glass explains the Phases of drug development as follows: "Clinical trials supporting drug development and marketing are divided into four phases: Phase 1 focuses on safety.  Phases 2 and 3 studies test safety and efficacy in increasing test populations to support regulatory approval to market the product for specific diseases or disorders.  Phases 1 through 3 studies occur prior to a product being marketed to the public.  Phase 4 studies support expanding the marketing of an approved drug."  Glass Report ¶ 4 fn 1.

Document (the "CPD"), including making recommendations for reprioritizing clinical resources when the PSP believes such additional resources are necessary to fully develop required patient safety information for the product.  In Dr. Glass' opinion:

> Such reports provide a detailed update regarding the state of safety and development studies, investigations and analyses pertaining to the product or product candidate, and include requisitioning for reprioritizing critical resources whenever, in the judgment of the Product Safety Physician, such additional resources are necessary to  develop robust patient safety information for the product.

Glass Report ¶ 31.  Demonstrating the Company's commitment to this process, the Settlement further provides that the allocation of required funding will be ensured through Lilly's budget management and approval processes.

The proposed Settlement provides that PSPs will have full access to the entire clinical data base for a product or product candidate, and are accountable to ensure that all available product data is comprehensively reviewed for patient safety issues, that significant patient safety issues are promptly analyzed and interpreted, and that such patient safety issues are fully explored, for example, in clinical trials and post-marketing surveillance.

PSPs are also responsible under the proposed Settlement for ensuring that the scientific evidence supporting a benefit/risk assessment of a product is not overstated or presented in a misleading way.  The Settlement also provides that PSPs shall coordinate with the VP-GPS and the regulatory function at Lilly to assure that all product safety data, analysis, interpretation and investigations are appropriately disclosed to the FDA and corresponding foreign regulators.

Recognizing the critical function PSPs perform under the proposed Settlement, Dr. Glass opines:

33

> In my opinion, the access of a senior medical scientist responsible for patient safety and dedicated to a product or product candidate throughout its entire life cycle is a crucial element of the Company's ability to meet the Scientific Core Objective.   .   .   .   The Company shall provide the resources, authority, compensation and reporting structure necessary to assure the PSPs are able to fulfill their critical safety-related responsibilities.

Glass Report ¶ 35.

### d.        Clinical Plan Document Template

As noted above, the Settlement provides for the adoption and maintenance of the Clinical

Plan Document Template ("CPD").  In Dr. Glass' opinion:

> The clinical plan document ("CPD") is the standardized framework for Lilly team members, including medical research, health outcomes and marketing experts, regulatory affairs, medical research and safety, to contribute to product development and strategy.  The CPD will be the key document for tracking the development of each product and product candidate over its entire life cycle, from the beginning of development to the expiration of the patent.  The CPD is overseen by the Medical Review Committee.  Contributors to the CPD have substantive input into their areas of expertise.  The CPD is designed to align clinical research activity to resource allocation, including budget, and to serve as the central authoritative repository of clinical and regulatory strategy safety and risk issues, and their resolution for the entire life cycle of the product.

Glass Report ¶ 36.

Because the CPD is maintained and continually updated over the entire life cycle of each

product and product candidate, it will collect all relevant information about that product/product

candidate, allowing for real-time analysis of evolving safety, risk and effectiveness issues.  This

continuity is essential in Dr. Glass' view:

> In my opinion, the continuity afforded by a single document that tracks the entire life cycle of the product will provide substantial protection against the loss of important information, and will support the timely identification and resolution of safety, efficacy and labeling issues as they arise.

34

Glass Report ¶ 36.

As Dr. Glass opines, key aspects of the CPD are the risk minimization and risk management plans. The risk minimization plan will track to resolution each risk identified over the life cycle of the product, ensuring that all relevant information is maintained and easily retrievable from a single source. The risk management plan will include a comprehensive listing of clinical and non-clinical risk for each product/product candidate requiring a plan and action by Phamacovigilence at Lilly. Dr. Glass finds that:

> The Company commits to risk identification and resolution from the first human exposure through the entire life cycle of each product. This approach exceeds regulatory requirements for risk identification and mitigation plans, which focus on the initial launch, and are limited in scope and duration.

Glass Report ¶ 38.

Relevant to the alleged conduct that underlay the derivative claims, the CPD recognizes that off-label use is always a medical risk for which there must be a written plan and appropriate Company action. Information captured in the CPD, combined with the PSPs' role in identifying unresolved safety issues, is designed under the proposed Settlement to ensure Lilly will promptly address off-label use to minimize patient exposure without adequate data support from sponsored clinical trials.

As related to Lilly's ability to achieve the Scientific Core Objective, Dr. Glass further finds:

> In my opinion, the CPD is a critical tool for enabling the CMO to report to the S&T Committee and for meeting the Scientific Core Objective. The CMO, in reporting to the S&T Committee in his capacity as Chair of the Medical Review Committee, will have as a critical resource the CPD – which reflects input from the key stakeholders for each product. In my opinion, the elements of strategy

and operations, and the substance of the CPD are adequate to ensure careful ongoing evaluation of each product candidate to enable the CMO to provide accurate, adequate and timely reporting to the S&T Committee.

Glass Report at ¶ 44.

### 2. Enhanced Global Ethics, Compliance and Operational Risk Management

#### a. The Chief Ethics and Compliance Officer ("CECO")

Under the proposed Settlement, the CECO, along with the Chief Executive Officer, are responsible for taking all actions necessary and appropriate to achieve the Compliance Core Objective.

Enhancing the organizational stature and authority of the CECO, the proposed Settlement provides that the CECO shall be both a member of senior management with the rank of not less than Senior Vice President, and a member of the Executive Committee of the Company, which is Lilly's most senior management committee. Further enhancing the CECO function, the Settlement provides for the creation of the following new Vice President and Senior Director level positions at the Company, reflecting a substantial commitment of resources to the development of a robust centralized global compliance and enterprise risk management system:

    º      Vice President, Global Compliance Strategy and Enterprise Risk Management, who will report to the CECO and will have responsibility for assisting in the development of global compliance strategy, partnering with senior leaders across Lilly to drive the culture change that reflects highly ethical and compliant behaviors, and addressing emerging regulatory and enforcement trends and enterprise-level risks.

    º      Vice President, Global Ethics and Compliance Officer, Business Liaison, who will report to the CECO and will oversee the compliance function within the Company and its various US-based and International affiliates and will be responsible for developing and implementing policies, procedures and practices

36

designed to promote compliance in that affiliate with applicable law or requirements regarding applicable health care programs. Compliance officers of the Company's US-based affiliate and International OUS affiliates (responsible for promoting compliance in each affiliate) will report directly up through the Vice President, Global Ethics and Compliance Officer, Business Liaison, providing for compliance reporting independent of the business lines.

º      Senior Director, Enterprise Risk Management, who reports to the Vice President, Global Compliance Strategy and Enterprise Risk Management, and will assist the CECO in administration of enterprise risk management at the Company.

º      CIA Project Manager, who will coordinate administration of compliance with the Company's obligations under the Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, dated January 14, 2009.

As summarized above (*see* Section V.B.2.a) and set forth in detail in the Settlement, the CECO is responsible for direct and timely reporting to the PPCC. As Professor Langevoort states:

> [T]he Proposed Settlement expands and enhances the separate governance structure for non-financial compliance risks, through the Public Policy and Compliance Committee ("PPCC") of the Lilly Board of Directors, which oversees and works closely with the company's Chief Ethics and Compliance Officer ("CECO"). The role, responsibilities and authority of the CECO is also strengthened by adding new senior support positions so as to create a more powerful and wide-ranging compliance platform with Lilly.

Langevoort Report ¶ 7.

In addition, the Settlement sets forth compliance policy provisions, including that, with limited exceptions, all compliance-related investigations shall be conducted under the authority of the CECO, and all requested exceptions from Lilly compliance policies and procedures must be reviewed in advance by the CECO and legal. Any determination to grant an exception that is contrary to the CECO's recommendation must be immediately reported to the CECO.

37

As noted above, the appointment and retention of the CECO must be approved by the Chairman of the PPCC, in consultation with other committee members.  Pursuant to the proposed Settlement, on an annual basis, the CECO will assess the staffing and funding necessary to carry out his or her responsibilities, and in consultation with Lilly's Chief Executive Officer, reorganize, reduce or augment the staff.  In addition, if, during the Agreed Upon Term (defined in Section V.D. below), the CECO at Lilly wishes to seek additional funding for compliance-related expenditures, he or she shall be permitted at his or her option to petition directly the Board or an appropriate committee of the Board that such funding be included in or covered by business plans and budgets that are approved by the Board or such committee.

Professor Langevoort finds that the enhanced CECO responsibilities provided for under the proposed Settlement reflect emerging compliance best practices.  *See, e.g.*, Langevoort Report ¶¶ 40-41.


### b.       Enterprise Risk Management

At the management level, the CECO is responsible for Lilly's enterprise risk management ("ERM") function.  As discussed above, the Settlement provides for the creation of two new senior executive positions related to ERM: the Vice President, Global Compliance Strategy and Enterprise Risk Management and the Senior Director, Enterprise Risk Management.  Under the Settlement, the Compliance and Risk Management Committee shall assist the CECO and the Senior Director of Enterprise Risk Management in identifying, prioritizing, assessing, evaluating and mitigating risks across the enterprise.  As discussed at

38

Section V.B.2.e. above, the Settlement provides for direct reporting by the CECO to the PPCC in connection with ERM at Lilly, and for Board level oversight of, among other matters, resource allocation to the CECO related to compliance and ERM functions. In addition, as Professor Langevoort notes:

> The Proposed Settlement also expands the responsibilities of Lilly's Compliance and Risk Management Committee – made up of senior managers from throughout the Lilly organization, and chaired by the CECO – to include enterprise risk management (including assisting the CECO in identifying, prioritizing, assessing, evaluating and mitigating risks throughout the enterprise), and states that the enterprise risk management function shall be designed with consideration to COSO's 2004 *Integrated Framework*.

Langevoort Report ¶ 41. Mr. Lam concludes that "the Agreement will significantly enhance the effectiveness of risk management processes and internal controls at the management level." Lam Report ¶ 13.

### c.  Compliance Training

The Settlement provides for Lilly to retain a speaker identified by Plaintiffs' Counsel for 400 series compliance-related leadership training presentations for its US-based affiliates.

### d.  Performance and Compensation

Professor Langevoort states that:

> Because most serious compliance issues result from incentive pressures, it is essential that the compensation and discipline system recognize the paramount importance of compliance and ethics and assure that there are appropriate penalties for poor compliance and ethics and rewards for good compliance and ethics.

Langevoort Report ¶ 42. The Settlement provides that all senior management personnel shall include a compliance objective and measurement of that objective in their annual performance

39

management plans.  These objectives will be personalized to each executive based on job content and level.  To insure these compliance objectives are included in these executives' performance management plan, Lilly will undertake periodic monitoring and sample auditing.  Achievement of performance objectives will factor in compensation decisions for these senior executives.  Mr. Lam states that in his opinion:

> The establishment of a compliance objective in all executive and senior management annual performance plans and reviews is significant and far-reaching because it will raise awareness and accountability for compliance and risk management at the highest levels of the Company.

Lam Report ¶ 14.

Also pursuant to the proposed Settlement, the CECO shall provide compliance performance feedback for senior management to both the CEO (as part of the semi-annual executive review and during the end-of-year performance review) and the Senior Vice President of Human Resources (as input to the Company's on-going succession management review process).

In addition, pursuant to the proposed Settlement, the Company shall continue to make the promotion of, and adherence to, the Company's Code of Conduct, *The Red Book*, an element in evaluating the performance of all employees.

### e.    Discipline

The proposed Settlement also provides that Company employees are subject to appropriate disciplinary action if they violate any law regulation, or Company policy or procedure, including federal health care program requirements, FDA requirements, or company policy related thereto.  Pursuant to the Settlement, the CECO will provide an organization-level

summary of disciplinary actions on a quarterly basis to the CEO, who will be advised specifically of all compliance related performance issues and disciplinary actions involving senior management, and be involved in determining the associated compensation consequences that will result from these issues and actions.

### f.    Monitoring

The Settlement provides for at least annual reporting to the PPCC regarding the results of the annual surveys of interactions with health care professionals set forth in the Company's Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, dated January 14, 2009 (the "CIA").

The Settlement also provides that field force monitoring, in the form of "ride-alongs" with sales representatives, shall be based on a relative assessment of the potential risk for improper off-label promotion.

In addition, the Settlement provides that all communications to external parties regarding products and product candidates, including by the Lilly Answers Center, shall include only medical and scientific conclusions approved by Lilly Medical.   Additional review and consultation may be provided by Lilly Regulatory and Lilly Legal.   Pursuant to the Settlement, the Chief Medical Officer shall have executive authority over the Lilly Answers Center.

The Settlement also sets forth specific provisions related to the monitoring of FDA-regulated speaker programs and educational grants and continuing medical education to ensure compliance with Lilly's compliance program or policies and procedures.

41

### D.      The Three Year Commitment Period

As described in more detail in Exhibit A to the Stipulation, the Company has agreed to keep in place the changes in corporate governance, compliance and risk management structures and procedures for a three year period from the date the Settlement receives Court approval (the "Agreed Upon Term").   Subject to Board approval as necessary, Lilly shall reassess the processes implemented under the Agreement after three years to determine whether to continue or modify them.  As noted above, certain of the Board-level changes are reflected in amendments and changes to the Company's Guidelines and board committee charters.

### E.      The Funding Commitment

Lilly agrees that for the Agreed Upon Term it will commit from its treasury funds as are necessary to implement the provisions set forth in Exhibit A.  This commitment is critical.  As Professor Langevoort concludes:

> The OSG requires that the individuals within the organization who are given compliance oversight responsibilities have "adequate resources" to perform their tasks.  While this is a vague admonition, it reflects the concern that companies are inclined to short-change their compliance programs, thereby disabling what on paper appears to be a first-rate system.  The reason is not necessarily sinister. Good compliance programs do not generate measurable "return on investment" or other metrics that are important when corporate budgeting decisions are made. More immediately justifiable investments tend to get priority, even though the costs to the company from compliance and ethics failures can be catastrophic.  To this end, Lilly agrees that for the Agreed Upon Term it will commit from its treasury funds as are necessary to implement the provisions set forth in the Proposed Settlement.

Langevoort Report ¶ 49.

## IV.     PRELIMINARY RELIEF SOUGHT AT THIS TIME

Plaintiffs respectfully request that the Court enter the [Proposed] Order Preliminarily

Approving the Proposed Settlement and Providing for Notice to Eli Lilly & Company Shareholders (the "Preliminary Approval Order"), in the manner and form submitted herein as Exhibit B to the Stipulation.  The Preliminary Approval Order, if approved by the Court, will:

(a)    preliminarily approve the proposed Settlement as set forth in the Stipulation;

(b)    establish a procedure for Lilly Shareholders to follow should they wish to object to the proposed Settlement, including setting a date by which any such objections must be made;

(c)    direct that the Notice of Eli Lilly & Company Derivative Actions Settlement (the "Settlement Notice"), substantially in the form attached as Exhibit D to the Stipulation, be mailed to the last known address of Lilly Shareholders as of the Record Date of February 12, 2010 and that the summary notice ("Summary Notice"), substantially in the form attached as Exhibit E to the Stipulation, be published in accordance with the terms of the Stipulation; and,

(d)    schedule a hearing for the Court to consider final approval of the Settlement (the "Settlement Hearing").

Plaintiffs, after conferring with defense counsel, offer for the Court's consideration the following proposed schedule of dates for the various events leading up to and including the Settlement Hearing:

| Mailing of the Settlement Notice to Lilly Shareholders | within 5 days of entry of the Preliminary Approval Order |
|---|---|
| Publication of Summary Notice | within 10 days of entry of the Preliminary Approval Order |
| Filing of initial brief in support of final approval of Settlement | 28 days prior to the Settlement Hearing |
| Last day for Shareholders to file any objection to the Settlement | 14 days prior to the Settlement Hearing |
| Filing of supplemental briefs in support of final approval of Settlement, as necessary | Up to 7 days prior to the Settlement Hearing |
| Settlement Hearing | Approximately 45 days following the entry of the Preliminary Approval Order |

43

## V.     APPLICABLE LEGAL STANDARDS

### A.     Settlements Are Generally Favored

There is an overriding public interest in settling and quieting litigation, and this is particularly true in derivative and class actions and other complex litigation. *See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation."); *E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884, 888-89 (7th Cir. 1985), *cert. denied*, 478 U.S. 1004 (1986) (noting that there is a general policy favoring voluntary settlements of class action disputes); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement."), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Class action and derivative settlements minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources, and are particularly favored. *Armstrong*, 616 F.2d at 313 (*citing Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *In re AOL Time Warner Shareholder Deriv. Litig.*, 2006 U.S. Dist. LEXIS 63260 *8 (S.D.N.Y, September 6, 2006) (recognizing the public policy favoring settlement of shareholder derivative litigation); *Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) (settlement of shareholder derivative suits are particularly favored); *Shimmel v. Goldman*, 57 F.R.D. 481, 487 (S.D.N.Y. 1973) ("settlements of shareholder derivative actions are particularly favored because such litigation is 'notoriously difficult and unpredictable'"). *See also*, 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* §11:41 at 87 (4th ed. 2002) ("The compromise of complex litigation is encouraged by the courts and favored by public policy.").

**B.      The Proposed Settlement Meets the
Standard for Preliminary Approval**

Rule 23.1 of the Federal Rules of Civil Procedure requires court approval for the settlement of a derivative claim.   On preliminary approval, the Court is not required to make a final determination that a proposed settlement is fair and reasonable.   "If the preliminary evaluation of the proposed settlement does not disclose grounds to doubt its fairness or other obvious deficiencies . . . and [it] appears to fall within the range of possible approval," the Court should direct that notice be disseminated and schedule a final approval hearing.   *Manual for Complex Litigation Third* §30.41 at 297 (the "Manual").

A proposed settlement falls within the "range of possible approval" under Rule 23(e) when it is conceivable that the proposed settlement will meet the standards applied for final approval.   *See, e.g.*, *In re Bromine Antitrust Litig.*, 203 F.R.D. 403, 416 (S.D. Ind. 2001) ("All that is required at the preliminary hearing in order to progress to the fairness hearing is that the proposed settlement be 'within the range of possible approval.'  . . .  This bar is low.") (*quoting In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 (7th Cir. 1979)); *Kessler v. Am. Resorts Int'l Holiday Network, Ltd.*, Nos. 05-5944, 07-2439, 2007 WL 4105204, at *5 (N.D. Ill. Nov. 14, 2007) ("a more summary version" of the fairness hearing inquiry takes place at the preliminary approval phase); *Tucker v. Walgreen Co.*, Nos. 05-440, 07-172, 2007 WL 2915578, at *3 (S.D. Ill. Oct. 5, 2007) (same).  The standard for final approval of derivative and class action settlements is whether the proposed settlement is fair, reasonable, and adequate. Fed. R. Civ. P. 23(e) and 23.1; *see, also*, *Uhl v. Thoroughbred Tech. & Telecomms, Inc.*, 309

45

F.3d 978, 986 (7th Cir. 2002); *Isby*, 75 F.3d at 1198-99.  In describing the process for approval

of class action litigation, the Seventh Circuit has found:

> District court review of a class action settlement proposal is a two-step process.
> The first step is a preliminary, pre-notification hearing to determine whether the
> proposed settlement is "within the range of possible approval."  This hearing is
> not a fairness hearing; its purpose, rather, is to ascertain whether there is any
> reason to notify the class members of the proposed settlement and to proceed with
> a fairness hearing. Manual for Complex Litigation s 1.46, at 53-55 (West 1977).
> If the district court finds a settlement proposal "within the range of possible
> approval," it then proceeds to the second step in the review process, the fairness
> hearing.   Class members are notified of the proposed settlement and of the
> fairness hearing at which they and all interested parties have an opportunity to be
> heard.

*Armstrong*, 616 F.2d at 314.

There is no doubt that the proposed Settlement is well "within the range of possible

approval."  The relief provided, as detailed herein, is substantial.  Courts have long recognized

that in derivative actions, non-monetary benefits, such as material changes in corporate

management or policies, provide real and substantial benefits and warrant approval.  Courts'

recognition of the importance of these types of reforms has heightened in the post-Enron era.

*See, e.g.*, *In re Schering-Plough Corp. Shareholders Derivative Litig.*, 2000 U.S. Dist. LEXIS

2569, *15 (D.N.J. 2008) ("This litigation provides an example of how derivative actions that

result in the adoption of rigorous compliance standards confer tangible benefits to the

corporation and its shareholders."); *Unite Nat'l Ret. Fund v. Watts*, 2005 U.S. Dist. LEXIS

26246 *9-*10 (D.N.J. Oct. 28, 2005) ("*Shell Deriv.*") (the court, stating "the most important

factor in evaluating the fairness of the settlement agreement is the benefit to the corporation,"

approved settlement providing for governance and compliance relief).

46

The proposed Settlement is supported not only by experienced counsel for the parties, but also by experts in the fields of governance and compliance, enterprise risk management and pharmaceutical drug research and development, whose expert reports (filed herewith), as reflected above, detail the substantial benefits of the proposed Settlement to Lilly and its shareholders.   The comprehensive corporate governance, compliance and medical risk management reforms reflected in the proposed Settlement are wide-ranging, and will serve to establish Lilly as a leader in pharmaceutical best-in-class practices designed, *inter alia*, to prevent and detect potential violations of law, regulation and Company policies.

In reaching the proposed Settlement, counsel for the parties have been involved in extensive factual and legal investigation, and arm's-length negotiations, both face-to-face and by telephone, over an eighteen month period**,** and have engaged in mediation before retired U.S. Magistrate Judge Infante.   The description provided above of the course of the Plaintiffs' investigation and review and analysis of document production, as well as of the parties' settlement process fully support the intensive and the arm's-length nature of the parties' discussions, meetings, negotiations and mediation sessions.   The fact that these negotiations took place against a backdrop of significant litigation risk on both sides, and following a detailed investigative process by both the SLC and Plaintiffs' Counsel, is further evidence of the arm's-length nature of the proposed Settlement.

While only summarily reviewed at the preliminary approval stage, the Seventh Circuit has set forth factors for consideration in deciding whether to grant final approval to a proposed settlement:

47

> In making that determination, a district court should examine (1) the strength of the plaintiffs' case compared to the amount of the settlement offer; (2) an assessment of the likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6) the stage of the proceedings and amount of discovery completed at the time of settlement.

*Freeman v.Berge*, 68 Fed.Appx. 738, 742-43 (7th Cir. 2003), *citing Isby v. Bayh,* 75 F.3d 1191, 1199 (7th Cir. 1996).  As described below, assessment of those factors relevant to this stage of the proceeding further fully support preliminary approval of the proposed Settlement at this time

### 1. The Proposed Settlement Offers Substantial Benefits to Lilly and Its Shareholders

As detailed above and in the accompanying expert reports, the proposed Settlement provides valuable and wide-ranging corporate governance, compliance and medical risk management provisions that Plaintiffs believe go to the heart of the alleged underlying wrongdoing at issue in the Derivative Actions.  As the expert reports detail, these changes demonstrate the substantial benefits of the proposed Settlement to Lilly and its shareholders, including with respect to the detection and prevention of potential violations of law, regulation and Company policy and to the primacy of patient safety.  *See e.g., Shell Deriv.*, 2005 U.S. Dist. LEXIS 26246 *18 ("the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement . . . will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings.").

### 2. The Stage of Proceedings and Discovery Completed

As set forth above, prior to arriving at the proposed Settlement, Plaintiffs' Counsel conducted a detailed investigation of the alleged wrongdoing, including, *inter alia*, analysis of

48

tens of thousands of pages of documents and a review of seventy (70) fact and expert deposition transcripts from the MDL Proceedings and related litigation.  Plaintiffs' Counsel also conducted extensive legal research and analysis supporting the legal merits of their fiduciary duty claims and an in-depth analysis of Lilly's organizational structure and alleged operational weaknesses at the heart of the Derivative Claims.   In addition to detailed analysis of regulatory and industry corporate governance and compliance goals, trends and benchmarks, Plaintiffs' Counsel, in consultation with Dr. Glass, their pharmaceutical and drug development expert, researched and drafted multiple comprehensive governance, compliance and drug life-cycle proposals which they provided to Lilly.   Thereafter, Plaintiffs' Counsel had multiple meetings and telephone conversations with counsel for Lilly, as well as with Lilly's CECO and risk management personnel and other senior level executives, including the Chief Medical Officer, to discuss Plaintiffs' proposals and to exchange ideas in an open dialogue.   Dr. Glass directly participated in these discussions.   Plaintiffs' Counsel also consulted with their compliance, corporate governance and risk management experts at this time.   The governance, compliance and risk management provisions set forth in the Stipulation are the product of this intensive process.

Through the negotiation and mediation process, each party has clearly demonstrated its extensive grasp of both the facts and the law relevant to its claims and positions.  The derivative claims had thus clearly reached the stage where the parties "have a clear view of the strengths and weaknesses of their cases."  *In re Warner Communications Securities Litigation*, 618 F.Supp. 735, 745 (D.C.N.Y. 1985).  *See also*, *Cohn*, 375 F. Supp. 2d at 855 ("In assessing the merits of the settlement, plaintiffs' counsel considered the factual and legal questions that were

disputed in the derivative actions.  The court considered that the proposed settlement was made after counsel had conducted an extensive investigation. . . .").

### 3.    The Opinion of Competent Counsel

Plaintiffs' Counsel are highly experienced in the specialized area of complex derivative and other shareholder litigation.  In a case such as this, where both Plaintiffs' Counsel and defense counsel have extensive experience in derivative and class action litigation, and have engaged in thorough investigation and discovery, courts recognize the judgment of those experienced trial counsel in assessing the reasonableness of a proposed settlement.  *See, e.g., Freeman*, 68 Fed. Appx. at 743 (district court properly relied on the opinion of class counsel, a team of experienced and well-respected attorneys, who reached the agreement only after exhaustive negotiations and extensive discovery); *Great Neck Capital Appreciation Inv. P'ship, L.P. v. PricewaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 410 (E.D. Wis. 2002) ("opinion of competent counsel weighs in favor of approval of a settlement"); *Lazy Oil Co. v. Witco Corp.*, 95 F. Supp.2d 290, 331 (W.D. Pa. 1997), *aff'd* 166 F.3d 581 (3d Cir. 1999) (court evaluating settlement "should keep in mind the unique ability of class and defense counsel to assess the potential risks and rewards of litigation" (*quoting Manual for Complex Litigation* § 30.42)); *see also, Maher v. Zapata Corp.,* 714 F.2d 436, 454 (5th Cir.1983).  In this action, experienced counsel, fully knowledgeable about the relevant facts and law and negotiating at arm's-length, have weighed the factors discussed above and fully endorse the proposed Settlement.

### 4.    The Complexity, Expense, Risk and Likely Duration of Continued Litigation

As courts have recognized, derivative litigation is "notoriously difficult and

50

unpredictable." *See, e.g.*, *Granada Investments, Inc. v. DWG Corporations*, 962 F.2d 1203, 1205 (6th Cir. 1992). *See also*, *Shell Deriv.*, 2005 U.S. Dist. LEXIS 262465 *13 ("Here, Plaintiffs face the 'difficulties inherent in derivative litigation as well as significant procedural and substantive obstacles.'"). As discussed above, the factual and legal issues triggered by the derivative claims are complex and technical in nature, requiring expert analysis. Each Individual Defendant strongly denies liability and disputes the factual and legal predicates underlying the derivative claims. Litigating these claims to trial and on appeal would entail substantial costs and impose material burden on both parties. The Lilly Board created a Special Litigation Committee ("SLC") in response to the demand letters. Plaintiffs faced the risk that the SLC would determine to dismiss the Derivative Actions, which determination could have been held conclusive, unless Plaintiffs could demonstrate that the SLC lacked independence or did not conduct an investigation in good faith. Additionally, Plaintiffs faced risks related to whether their allegations adequately pleaded demand futility and/or that demand was wrongfully refused under Fed. R. Civ. P. 23.1. Should Plaintiffs' claims have proceeded to trial, there would be a clear evidentiary dispute regarding the knowledge and conduct of the directors and senior officers in connection with the misconduct alleged. It is in this context that Plaintiffs would have to establish the breaches of fiduciary alleged in the Derivative Actions.

In addition to uniquely derivative risks, Plaintiffs face risks inherent in any complex litigation, including, *inter alia*, establishing liability posed by conflicting testimony and evidence, and the unpredictability of a lengthy and complex jury trial, the possible unavailability of witnesses, and the possibility that jurors could react to the evidence in unforeseen ways.

Should Plaintiffs prevail on liability, they would continue to face substantial hurdles in demonstrating and quantifying damages, with any such showing reasonably ending up as a battle of competing experts; a situation fraught with risks for both sides in a hotly contested litigation.

Plaintiffs respectfully contend that consideration of each of the above factors within the context of the proposed Settlement fully supports the Court's grant of preliminary approval at this time.

## VI.     THE PROPOSED NOTICE TO LILLY SHAREHOLDERS IS ADEQUATE

The forms of notice to the Lilly Shareholders provided for in the Stipulation satisfy due process under the relevant state and federal rules and legal precedent.  *See, e.g.*, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 172-77 (1974).   The proposed Settlement Notice and Summary Notice provided for in the Stipulation and discussed above are clearly "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections."  *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  For notice to be adequate in a derivative context, the Third Circuit has found that:

> Nonparty shareholders must be given notice of a proposed settlement of a shareholder's derivative action. *Maher v. Zapata Corp.*, 714 F.2d 436, 450 (5th Cir.1983).   Federal Rule of Civil Procedure 23.1 requires the district judge to direct the manner in which this notice should be given. To satisfy due process, the notice "must be sufficiently informative and give sufficient opportunity for response."

*Kyriazi v. Western Elec. Co.*, 647 F.2d 388, 395 (3d Cir.1981).  *See also*, *In re Public Service Co. Deriv. Litig.*, 125 F.R.D. 484, 486 (S.D. Ind. 1988) (notice that provided complete and

accurate information of all material elements of the litigation and proposed settlement found to constitute valid and adequate notice under Rule 23(e)).

Here, the proposed form of Settlement Notice (Exhibit D to the Stipulation) describes in plain English all material terms and conditions of the proposed Settlement; the facts and considerations that caused Plaintiffs' Counsel to conclude that the proposed Settlement is fair and adequate; the amount of attorneys' fees, inclusive of expenses, and incentive awards to named Plaintiffs to be sought, the procedure for objecting to the proposed Settlement; and the date, place, and time of the Settlement Hearing. With the Court's approval, the Settlement Notice will be sent by first class mail to each Lilly shareholder who held common stock as of the Record Date of February 12, 2010, as well as to a list of thousands of record holding entities, no later than five (5) days following the entry of the Preliminary Approval Order.   In addition, the Summary Notice will be published once in *The Wall Street Journal* within ten (10) days following the entry of the Preliminary Approval Order.   These proposed forms of notice will fairly and reasonably apprise Lilly Shareholders of the proposed Settlement, and of their options with respect thereto, and thus, fully satisfy due process requirements.

## VII.   CONCLUSION

Plaintiffs respectfully request that the form of [Proposed] Preliminary Approval Order (Exhibit B to the Stipulation), be entered granting preliminary approval to the proposed Settlement, setting a date for the Settlement Hearing and ordering notice to Lilly Shareholders of record (in the forms attached as Exhibits D and E to the Stipulation), to be disseminated in the manner as provided in the Stipulation.

Dated: February 25, 2010

Respectfully submitted,

s/ Karen L. Morris
Karen L. Morris
Patrick F. Morris
MORRIS and MORRIS LLC
   COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
Phone: (302) 426-0400
Fax: (302) 426-0400
kmorris@morrisandmorrislaw.com

Richard D. Greenfield
Ann M. Caldwell
GREENFIELD & GOODMAN, LLC
250 Hudson Street – 8th Floor
New York, NY 10013
Phone: (917) 495-4446

David C. Campbell
BINGHAM MCHALE LLP
10 West Market Street, Suite 2700
Indianapolis, IN  46204-4900
Phone: (317) 635-8900

James P. Stenski
CANTRELL, STRENSKI & MEHRINGER, LLP
2400 Market Tower
10 West Market Street
Indianapolis, IN  46204
Phone: (317) 352-3500

*Attorneys for Plaintiffs, Jeffrey P. Jannett and N.A. Lambrecht, Derivatively on Behalf of Nominal Defendant, Eli Lilly & Company*

54

Of Counsel:

ABBEY SPANIER RODD & ABRAMS LLP
Karin E. Fisch
212 East 39th Street
New York, NY  10016

COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS LLP
Andrew J. Brown
655 West Broadway, Suite 1900
San Diego, CA 92101

FARUQI & FARUQI, LLP
Beth A. Keller
369 Lexington Avenue
New York, NY 10017

PASKOWITZ & ASSOCIATES
Lawrence D. Paskowitz
60 East 42nd Street, 46th Floor
New York, NY  10165

ROBBINS UMEDA LLP
Daniel R. Forde
600 B Street, Suite 1900
San Diego, CA 92101

ROY JACOBS & ASSOCIATES
Roy L. Jacobs
60 E. 42nd Street, 46th Floor
New York, NY 10165

THE WARNER LAW FIRM
Paul T. Warner
11123 McCracken Circle, Suite A
Cypress, TX 77429

## CERTIFICATE OF SERVICE

I hereby certify that on February 25, 2010, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Michael E. Baughman
Robert L. Hickok
PEPPER HAMILTON LLP
baughmanm@pepperlaw.com
hickokr@pepperlaw.com

Christopher G. Scanlon
Matthew T. Albaugh
BAKER & DANIELS
chris.scanlon@baker.com
matthew.albaugh@bakerd.com

Jan M. Carroll
BARNES & THORNBURG LLP
jan.carroll@btlaw.com

Peter T. Barbur
Duane L. Loft
Kyle W. Mach
CRAVATH SWAINE & MOORE LLP
pbarbur@cravath.com
dloft@cravath.com
kmach@cravath.com

Marc J.M. Moss
MARC J.M. MOSS, ESQ.
mmoss@mosslawllc.com

Paul T. Warner
THE WARNER LAW FIRM
pwarner@warner-law.net

/s/ Patrick F. Morris

56