## CORPORATE GOVERNANCE TERMS

I. **BOARD LEVEL**

    A.    <u>Board Oversight of Compliance and Risk Management.</u>

        The Board of Directors shall adopt a resolution stating that the Company's compliance objectives shall include:

        (1) to operate its business to deliver quality, innovative medicines that improve individual patient outcomes and, in so doing, earn the trust and respect of our patients and customers,

        (2) to operate in compliance with all applicable laws and regulations,

        (3) to conduct its activities and have policies and procedures in place so as to avoid adverse regulatory enforcement action, and

        (4) to promptly detect, correct and prevent the recurrence of off-label promotion activities violative of applicable law, regulation, and/or Company policy by any Lilly employee or any person acting on Lilly's behalf.

        (the "Compliance Core Objective"). Such resolution shall direct the Chief Executive Officer and the Chief Ethics and Compliance Officer to take all actions necessary and appropriate to achieve this objective.

    B.    <u>Public Policy and Compliance Committee.</u>

        1.    The Company presently has and shall maintain at least during the Agreed Upon Term, a Public Policy and Compliance Committee of the Board of Directors (Committee).

        2.    The Committee shall consist of at least three members, all of whom shall be independent directors.

        3.    The Committee shall exercise reasonable oversight over the implementation and effectiveness of the Company's internal controls over non-financial legal and regulatory compliance, including but not limited to, compliance with statutes and regulations of Medicare, Medicaid, and all other federal health care programs (as defined in 42 U.S.C. 1320a-&b(f)) (Federal Health Care Requirements) and with the statutes and regulations of the Food and Drug Administration (FDA requirements). To that end, the Committee shall exercise reasonable oversight over the implementation and effectiveness of the Company's internal audit program to the extent that such program relates to non-financial legal and regulatory compliance. In coordination with the Audit Committee, the Committee shall exercise reasonable oversight over compliance with the

        Company's *The Red Book: Standards of Business* Conduct as well as the Company's enterprise risk management program.

4. The Committee shall meet at least five times per year, and at such other times as it determines to be necessary or appropriate. At least four times per year, the Committee shall review and oversee significant elements of Lilly's compliance programs, including but not limited to evaluating effectiveness of the programs and receiving updates about the activities of the Chief Ethics and Compliance Officer and other compliance personnel. At least one meeting per year shall be a joint session with the Audit Committee to review major non-financial compliance matters.

5. The Chief Ethics and Compliance Officer is required to make at least four reports per year to the Committee, or more often, if requested by the Committee or the Chief Ethics and Compliance Officer, pursuant to an annual agenda developed by the Committee and the Chief Ethics and Compliance Officer. The agenda will include substantive reports related to compliance matters; matters of implementation of existing compliance programs; monitoring and adjustment of such programs; the Company's processes for receiving and investigating compliance or ethics-related complaints; exceptions reporting; the allocation of resources to the compliance organization and compliance-related initiatives; and, at least annually, a strategic review of emerging trends (external or specific to the Company) affecting the Company's regulatory compliance and, as appropriate, plans of action to respond to such trends from a preventive compliance standpoint. The Chief Ethics and Compliance Officer will promptly report compliance matters directly to the Chair of the Committee based on the nature of the matter and if, in the view of the Chief Ethics and Compliance Officer, prompt reporting is warranted.

6. For at least the Agreed Upon Term, the Committee shall assess annually the adequacy of the reporting and information flows it is receiving, and make such changes as are required to maintain and enhance the committee's effectiveness, including recommending to the full board any desirable changes to its charter or membership.

7. The Committee shall annually review and approve the aspects of the Company's annual integrated audit plan that relate to legal and regulatory compliance excluding financial, Good Manufacturing Practices, and Good Clinical Practices. Periodically throughout the year, the Committee will receive reports from the General Auditor concerning the status of the implementation of the annual audit plan in the relevant areas. The General Auditor shall promptly report all material findings to the Committee, and management shall thereafter report to the Committee on any action plans to address the material findings until such time as the findings have been remediated to the Committee's satisfaction. At least annually, the Committee will receive a report from the General Auditor regarding the

>   Internal Audit Department's assessment of the effectiveness of the Company's compliance and related risk management controls.

8.  The Committee shall annually review and approve the Company's annual audit plan relating to manufacturing quality, Good Manufacturing Practices and Good Clinical Practices compliance. Periodically throughout the year, the Committee will receive reports from the Vice President of Quality concerning the status of manufacturing quality, clinical quality, and the implementation of the annual audit plan. The Vice President of Quality shall promptly report all material findings to the Committee, and management shall thereafter report to the Committee on any action plans to address the material findings until such time as the findings have been remediated to the Committee's satisfaction.

9.  The Committee shall oversee the process by which Enterprise Risk Management (ERM) programs are reviewed by various Board committees and the full Board. The Committee shall exercise reasonable oversight over non-financial compliance risk aspects of the ERM program.

10. The Committee shall receive at least annually a report from the Chief Ethics and Compliance Officer concerning the design, implementation, and continuing operation of the Company's ERM program, as well as reports concerning risk management aspects of strategic initiatives of the Company and developments affecting the Company's business, operations, and affairs.

11. With respect to risk disclosure, the Committee will coordinate its activities with those of the Audit Committee to assist in ensuring that appropriate disclosures of material risks to the Company's business are included in the Company's public financial disclosures in accordance with applicable laws and regulations.

12. The Committee is free to retain its own independent advisors, at Company expense, to assist with its responsibilities as described above. The Committee will have access to and will have discussions with an external advisor for at least the first 12 months following the effective date of this agreement to assist it in oversight of non-financial compliance.

13. The Committee Chairman in consultation with the Committee shall approve the appointment and retention of the Chief Ethics and Compliance Officer. The Audit Committee Chairman, in consultation with the Audit Committee, will approve the appointment and retention of the Company's General Auditor.

14. The Chief Ethics and Compliance Officer, the General Auditor, the Vice President of Quality and the General Counsel will have direct access to the

      Committee and its members and will be regularly invited to attend Committee meetings.

  15. The Committee shall have executive sessions at least semiannually to discuss compliance and ERM matters without management present. The Committee will also hold private sessions at least semiannually with the Chief Ethics and Compliance Officer, the General Auditor and the Vice President of Quality to discuss, among other things, management support for their respective organizations, including resource allocation and leadership tone.

C. <u>Compensation Committee.</u>

The Compensation Committee of the Board of Directors shall retain primary responsibility regarding compensation. The CEO will discuss the compliance performance of the executive officers with the Compensation Committee of the Board of Directors annually, as part of a review of the performance and associated compensation decisions for executive officers. The Vice President of Human Resources, Global Compensation and Benefits shall report annually to the Compensation Committee on the results of the periodic monitoring of compliance objectives for Executive Officers described in Section II.H.4, below.

D. <u>Science and Technology Committee.</u>

  1. Lilly shall adopt policies and procedures to support scientific excellence in the development and communication of product safety and effectiveness information and the medical and scientific risks and benefits throughout the life cycle of products in development and commercial products. These policies and procedures shall be intended to assure that objective scientific inquiry, analysis and communication in matters affecting patient benefit and safety shall be of paramount importance (the "Product Safety and Medical Risk Management Core Objective").

  2. <u>Board-Level Oversight Charter Revisions.</u> To provide for board-level oversight of product safety and medical risk management matters and the Company's efforts to achieve the Product Safety and Medical Risk Management Core Objective, the Lilly Board of Directors shall revise the charter of its Science and Technology Committee as follows:

    a. <u>Purpose.</u> The material under the heading "Purpose" shall be revised to add the following additional purpose of the committee: The Science and Technology Committee shall advise the board on scientific matters involving the safety and effectiveness of the Company's marketed products and drugs or compounds in late-stage clinical development and shall assist the board of directors in exercising reasonable oversight of product safety and medical risk management.

b. <u>Composition and Term.</u> The material under the heading "Composition and Term" shall be revised to add the following substantive requirement:

> All members of the Science and Technology Committee shall meet the New York Stock Exchange standards for director independence, and the requirements of Section I.G. below.

c. <u>Administrative Matters.</u> The material under the heading "Administrative Matters" shall be revised to add the following substantive requirements:

> (1) The Science and Technology Committee shall hold scheduled meetings not less than three times per year. Special meetings of the Science and Technology Committee may be called to address specific and/or emergent matters.
>
> (2) The Science and Technology Committee shall be authorized to select and retain its own scientific, medical, and risk management advisors and consultants at the Company's expense.
>
> (3) The Science and Technology Committee and each of its members shall be free to talk directly with any members of management in discharging its responsibilities, and the Science and Technology Committee Chairman may designate any officer or employee of the Company for attendance at any committee meeting.

d. <u>Supporting Corporate Staff.</u> The material under the heading "Supporting Corporate Staff" shall be revised to add the following substantive requirements:

> (1) The Chief Medical Officer of the Company shall report to the committee at least once annually, and more regularly at the discretion of the committee chair.
>
> (2) The Chief Medical Officer shall provide support to the Science and Technology Committee and shall attend committee meetings as directed by the Science and Technology Committee Chairman in accordance with the Science and Technology Committee agenda and the needs of the committee.

e. <u>Duties and Responsibilities.</u> The material under the heading "Duties and Responsibilities" shall be revised to add the following duties, responsibilities, and authority to the existing duties, responsibilities, and authority of the Science and Technology Committee:

(1) To obtain from management, on a periodic basis, (or more frequently if the Chief Medical Officer or the Committee believes necessary) reasonable assurance of the effective design and implementation of policies and procedures designed to maintain the primacy, in matters affecting patient benefit and safety, of objective scientific inquiry, analysis and communication, including annual reports from the Chief Medical Officer regarding the implementation and ongoing monitoring of such policies and procedures, the identification of important medical and scientific risks and the resolution of those risks.

(2) To retain such scientific and medical advisors and consultants as are, in the judgment of the committee, necessary and appropriate to assist it in meeting its duties and responsibilities.

(3) To report annually to the full board regarding its oversight of the Company's efforts to maintain the primacy of objective scientific inquiry, analysis and communication in matters affecting patient benefit and safety.

(4) To assess annually the effectiveness of the Science and Technology Committee and the adequacy of the reporting and information flows it is receiving, and to make such changes as are required to maintain and enhance the committee's effectiveness, including recommending to the full board any desirable changes to its charter or membership.

3.   <u>Chief Medical Officer Reports to the Committee.</u>  In furtherance of the committee's duties described in subparagraph (e) above, during the Agreed Upon Term the committee shall receive the following reports from the Chief Medical Officer:

(1) Not less than annually, and consistent with the Medical Review and Safety Review Committee Charters, a report concerning the Medical Review Committee's conclusion that the Company has taken necessary and appropriate steps to discover, analyze, interpret, investigate, and communicate significant patient safety risks affecting the subject products or compounds in development; or the plans sufficient to permit such a conclusion on a basis acceptable to the Science and Technology Committee.

(2) With respect to products that are nearing first major launch, a report that the planned scope of initial marketing of the drug is appropriate, from a medical content perspective, given the state

      of knowledge concerning patient safety and efficacy, and benefit/risk assessment.

     (3) prompt reports concerning patient safety issues relating to the labeling or promotion of a product or other product safety matters, where escalation of the issue to the Science and Technology Committee is desirable in the judgment of the Chief Medical Officer, provided that the Chief Medical Officer has first informed and discussed the matter with the Chief Scientific Officer and the CEO.

   4. <u>Vice President of Global Patient Safety Reports to the Committee.</u>  Not less than annually, a report concerning unresolved patient safety and utility issues that have been elevated to the Corporate Patient Safety Committee and the remediation of such issues shall be provided to the Science and Technology Committee by the Vice President of Global Patient Safety.

   5. <u>Monitoring by the Vice President of Quality</u>.  The Vice President of Quality shall monitor and audit the policies, procedures, systems and internal controls implemented to achieve the Product Safety and Risk Management Core Objective, and report any significant findings to the Science and Technology Committee not less than annually or promptly as needed.

 E. <u>Tone-from-the-Top Communication.</u>

   1. The Chief Executive Officer and the Chairman of the Board of Directors shall design periodic communications regarding a culture of compliance and performance with integrity, in consultation with the Chief Ethics and Compliance Officer.

   2. The Chief Executive Officer shall meet at least annually with senior management in the Company to emphasize the importance of compliance and to underline expectations for their roles and their accountability for compliance and ethics within their organizations.

 F. <u>Director Training.</u>  For at least the Agreed Upon Term, the Company shall provide risk, governance and compliance training to its directors as the Board determines is necessary to support its oversight undertakings, as set forth herein, including training regarding Lilly's compliance program and Lilly's written Code of Conduct, *The Red Book*.  The Company agrees that it will maintain its current new director orientation program, including, *inter alia*, training with respect to Board and Committee responsibilities; review of the pharmaceutical industry and issues facing the industry, including health care compliance risks; and corporate governance and regulatory trends.  The Company agrees that it will add the following additional subjects to its new director orientation program: Board and

        Committee responsibilities set forth in this Agreement; review of the Company's compliance history; and pharmacovigilence compliance risks.

G.    <u>Director Independence.</u>  The Company will agree, on a prospective basis, to extend to four years the "cooling off" period for former employees or related parties to be considered as independent under the Board's director independence standards.

H.    <u>Directors.</u>

1. In the selection of its four most recent Board members, the Company and the Board placed substantial weight on compliance objectives as a result of litigation, including the Shareholder Derivative Litigation.

2. In the review materials given to the Directors and Corporate Governance Committee for its annual recommendations whether to renominate incumbent directors whose terms are expiring, the Company will add a reference that the committee should consider, among other factors, the Board member's Objectivity, Candor, Ethical Commitment, Independence, Preparedness, and Participation.

3. The Company will agree that prospectively it will limit the number of other public company directorships a director may hold, including the Lilly directorship, to no more than four; provided, however, that the Chair of the Directors and Corporate Governance Committee may grant a waiver of this limitation if the Chair concludes that the director seeking such waiver would be able to fulfill his or her obligations to the Lilly Board while maintaining directorships in excess of four.

4. The Company will agree to include in its corporate governance guidelines that all directors are encouraged to raise and discuss with the Chair of the Board, the Presiding Director or the Corporate Secretary any items they believe should be considered for inclusion on the agenda for Board or Committee meetings.

5. The Company agrees that the qualifications of a Board nominee will be considered, inter alia, in the context of the Committee assignments the nominee would receive.

6. The Company will agree to maintain its policy reflected in the current Guidelines in effect as of the date of this Agreement (the "Guidelines") that Board members may not draw on the stock-based compensation they receive until after they leave the service of the Board.

I. Presiding Director.

1. The Company has conformed the description of the role of the Presiding Director in the Guidelines to that in its 2009 proxy statement.

2. The Company will agree that the Presiding Director will be elected annually by the independent directors of the Board.

J. Annual Board and Committee Assessments. The Company will include in its Board and relevant Committee assessment questionnaires a specific question assessing Board and Committee performance regarding compliance and oversight, including the Board and Committee responsibilities set forth in this Agreement.

K. Board and Board Committees.

1. The Company agrees that it will confirm in writing that the Board and each of the Board Committees has the authority to retain independent advisors if the Board or Committee believes this would be necessary to fulfill their duties.

2. The Company agrees that each of the Board Committees will assess and determine the appropriate number of meetings to be held each year in light of its responsibilities, including responsibilities under the corporate integrity agreement and this Agreement.

II. **MANAGEMENT LEVEL**

A. Chief Ethics and Compliance Officer.

1. The Company presently has a Chief Ethics and Compliance Officer, and the Company will retain the position of Chief Ethics and Compliance Officer for at least the Agreed Upon Term.

2. The Chief Ethics and Compliance Officer shall have primary oversight responsibilities for the Company's global compliance program and shall be responsible for developing and implementing policies, procedures and practices designed to support the effective implementation of Lilly's compliance program.

3. The Chief Ethics and Compliance Officer shall be a member of the senior management of the Company, reporting directly to both the Chief Executive Officer of the Company, as well as the Public Policy and Compliance Committee of the Board of Directors, as set forth in Section I.B. above.

4. The Chief Ethics and Compliance Officer shall be a member of the Executive Committee, which is the Company's most senior management committee.

5. The Chief Ethics and Compliance Officer shall be responsible for monitoring the day-to-day compliance activities engaged in by Eli Lilly and Company, and the Company's US-based and International affiliates.

6. The Company will provide the Chief Ethics and Compliance Officer with sufficient staff and funding necessary to fulfill their responsibilities.

   a. The Company shall create a vice-president level position entitled "Vice President, Global Compliance Strategy and Enterprise Risk Management," who shall report to the Chief Ethics and Compliance Officer and assist the Chief Ethics and Compliance Officer in the development of a global compliance strategy that is supported by appropriate policies, processes, and practices. In addition, this leader will partner with senior leaders across Lilly to drive the culture change that reflects highly ethical and compliant behaviors, and will address emerging regulatory and enforcement trends and enterprise-level risks.

   b. The Company shall create a director-level position entitled "Senior Director, Enterprise Risk Management" who shall report to the Vice President, Global Compliance Strategy and Enterprise Risk Management and shall assist the Chief Ethics and Compliance Officer in the Enterprise Risk Management Function (and such other matters as the Chief Ethics and Compliance Officer deems appropriate).

   c. The Company shall create a vice-president level position entitled, "Vice President, Global Ethics and Compliance Officer, Business Liaison" who shall report to the Chief Ethics and Compliance Officer. This vice president role shall oversee the compliance function within the Company and its various U.S.-based and International affiliates and shall be responsible for developing and implementing policies, procedures and practices designed to promote compliance in that affiliate with applicable law or requirements regarding applicable health care programs. Compliance officers within the U.S.-based and International affiliates shall have the responsibility for promoting compliance in that affiliate with applicable law or requirements regarding applicable health care programs. Compliance officers of the Company's U.S.-based affiliate and International affiliates shall report directly up through the Vice President, Global Ethics and Compliance Officer, Business Liaison. Each International Affiliate compliance officer shall report on a dotted-line basis to their respective General Manager and directly through their senior compliance officers to the Vice President, Global Ethics and Compliance Officer, Business Liaison.

   d. The Company shall create a senior director-level position entitled "CIA Project Manager," who shall assist the Chief Ethics and Compliance Officer in implementing and monitoring policies,

        procedures, and practices designed to promote compliance with the requirements set forth in the Company's Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services dated January 14, 2009 (the "CIA"), Federal health care program requirements, and FDA requirements.

    e. The Chief Ethics and Compliance Officer shall assess annually the staffing and funding requirements necessary to fulfill his or her responsibilities and may, in consultation with the CEO, reorganize, reduce or augment his or her staff.

    f. All compliance related investigations shall be conducted under the authority of the Chief Ethics and Compliance Officer, with the exception of those instances in which are determined to be conducted by the Law Division under the attorney client privilege, and Human Resource related investigations led by the Human Resources Department.

    g. Any exceptions to Lilly's compliance-related policies and procedures must be approved in advance by the department leader with responsibility for the policy or procedure from which the exception is sought (the "Responsible Department"). All requests for such exceptions must first be reviewed by both the Legal Department and the Chief Ethics and Compliance Officer or his or her designee. Any determination by the Responsible Department that is contrary to the recommendation of the Chief Ethics and Compliance Officer must be immediately reported to the Chief Ethics and Compliance Officer.

B. <u>Compliance and Risk Management Committee.</u>

    1. The Company presently has a Compliance Committee, and shall revise the Compliance Committee's charter to include, in addition to its present oversight of the Company's non-financial compliance-related functions, responsibility of oversight of enterprise-risk management (ERM). The Company shall maintain the Compliance and Risk Management Committee at least during the Agreed Upon Term.

    2. The Compliance and Risk Management Committee shall be chaired by the Chief Ethics and Compliance Officer and consist of other members of senior management, including appropriate executives of relevant departments such as Legal, Human Resources, Lilly Research Laboratories, Corporate Affairs, Global Marketing and Sales, Regulatory, and relevant members of Senior Management in Marketing and Sales positions in Lilly's US-based affiliate.

    3. The Compliance and Risk Management Committee will meet at least quarterly.

C. <u>Enterprise Risk Management Function.</u>

1. The Chief Ethics and Compliance Officer shall be responsible for the Company's ERM function.

2. The Company's ERM function shall be designed with consideration to the COSO Enterprise Risk Management Integrated Framework.

3. The Compliance and Risk Management Committee shall assist the Chief Ethics and Compliance Officer and the Senior Director of Enterprise Risk Management in identifying, prioritizing, assessing, evaluating, and mitigating risks across the enterprise.

4. The Company's ERM function shall consider implementing program enhancements recommended by Standard & Poor's during their annual debt rating to review its ERM function and shall consider any changes to the design and implementation of that ERM function that Standard & Poor's may recommend.

D. <u>Compliance Training.</u>  The Company shall retain a speaker recommended by plaintiffs (*e.g.*, Wanda Wallace, Ph.D.) for "400 series" compliance-related leadership training presentations for its US-based affiliate.

E. <u>Chief Medical Officer.</u>

1. The Chief Medical Officer and Vice President, Global Medical, Regulatory and Safety:

    a. shall be in charge of the Company's combined Global Medical, Regulatory and Safety Department;

    b. shall be the senior medical officer of the Company and shall have executive authority over all medical physicians employed in drug development and medical research by the Company on issues of drug utility and safety and regulatory compliance;

    c. shall have supervisory responsibility and authority over: (i) the senior officer in charge of Global Regulatory Affairs;  and (ii) the Vice President of Global Patient Safety;

    d. shall act as chairman of the Company's Medical Review Committee;

    e. shall report annually to the Science and Technology Committee concerning the activities of: (i) the Combined Global Medical, Regulatory and Safety Department; and (ii) the Medical Review Committee;

    f.   shall have senior executive authority and oversight responsibility for all product safety functions, including pharmacovigilance and the activities of the Vice President of Global Patient Safety; and all subordinate Product Safety Physicians;

    g.   shall monitor the implementation of the Company's policies, procedures, systems and internal controls designed to achieve the Product Safety and Medical Risk Management Core Objective, and shall report on the status and findings of such monitoring annually to the Science and Technology Committee;

    h.   shall take such steps as are necessary to pursue the continuous improvement of the Company's policies, procedures, systems and internal controls designed to achieve the Product Safety and Medical Risk Management Core Objective.

    i.   The Chief Medical Officer shall assess annually the staffing and funding requirements necessary to fulfill his responsibilities and may, in consultation with the Executive Vice President of Science and Technology, reorganize, reduce or augment his staff.

2.   <u>The Vice President of Global Patient Safety.</u>

    a.   shall report to the Chief Medical Officer and shall have authority over and responsibility for all scientific analysis, interpretation of data and studies, and surveillance relating to product utility and safety, derived from investigation within Lilly through all phases of pre-clinical and clinical development, as well as all pharmacovigilance and pharmacoepidemiology activities relating to Lilly products and product candidates.

    b.   The Vice President of Global Patient Safety's duties and responsibilities shall include, without limitation:

        (1) developing and implementing the Company's policies and procedures for ascertaining and addressing issues arising around the safety of Lilly products including for data acquisition, analysis, interpretation and reporting, and making corresponding recommendations to the Chief Medical Officer;

        (2) maintaining practices that meet regulatory expectations for adverse event reporting, pharmacovigilance, and pharmacoepidemiology;

        (3) developing and implementing policies and procedures to facilitate the collection and timely disclosure of information concerning the safe use of Lilly products;

      (4)  recommending to the Chief Medical Officer and Global Product Labeling Committee safety-related labeling changes for Lilly products;

      (5) exercising oversight over all Product Safety Physicians ("PSPs"), including:

          (a) assigning PSPs as needed to products in development or to products;

          (b) ensuring that the responsible PSPs have completed full and accurate safety assessments prior to each Medical Review Committee meeting concerning all products and product candidates scheduled for review at such meeting; and

          (c) hiring, retention, performance evaluation, compensation and promotion of such physicians, which recommendations shall afford primary weight to assessment of each Product Safety Physician's effectiveness in promoting the Product Safety and Medical Risk Management Core Objective with respect to the product or products for which each such officer is responsible.

    c. reporting to the Chief Medical Officer the recommendations concerning the initiation of the next stage of a product or product candidate's development or expansion of commercialization based on a determination as to whether the database and weight of evidence support appropriate benefit versus risk across all target populations, and whether the additional studies proposed add usefully to the weight of evidence for the product safety profile, including with respect to resolving open issues around off-label patient populations and safety.

3.    <u>Product Safety Physicians.</u>  For each product/compound in development and marketed product, there shall be a senior-level medical science officer assigned to ownership of patient safety issues (the "Product Safety Physician") from the end of Phase II clinical trials throughout the life-cycle of the product. Product Safety Physicians shall report up through the Global Patient Safety organization to the Vice President of Global Patient Safety and be accountable to ensure that all available product data is comprehensively reviewed for patient safety issues, that significant patient safety issues present in the data are promptly analyzed and interpreted, and that such safety issues are fully explored, where appropriate, through the development of additional hypotheses and testing thereof, and the collection of additional data.

    a. The Product Safety Physician shall take all steps necessary to assure that data selection, analysis, and interpretation are completed

       thoroughly and expeditiously in accordance with Lilly's metrics and standards, and shall make corresponding resource recommendations to the Vice President of Global Patient Safety.

    b.    The Product Safety Physician shall also be responsible for assuring that safety issues affecting the product are given primary weight in all labeling decisions, including elevating any disagreements concerning safety issues in labeling decisions to the Vice President of Global Patient Safety and/or the Safety Review Committee (SRC), and, when appropriate, also to the Chief Medical Officer and/or the Medical Review Committee to assure that the matter is resolved in a manner consistent with the Company's policy to maintain the primacy of patient benefit and safety.  Also within the scope of the Product Safety Physician's responsibility is ensuring that scientific evidence supporting the benefit:risk assessment of a product is not overstated or presented in a misleading way.

    c.    Each Product Safety Physician shall, for each product and product candidate for which he or she is responsible, report concerning the Clinical Planning Document on a not less than annual basis or more often as needed upon the occurrence of certain events (new safety signal, new study results, or a significant regulatory interaction, *e.g.*) to the VP of Global Patient Safety. Each annual report shall be in the form of a detailed update regarding the state of safety and development studies, investigations and analyses pertaining to the product or product candidate. This annual report shall include requisitioning for reprioritizing clinical resources whenever, in the judgment of the Product Safety Physician, such additional resources are necessary to fully develop robust patient safety information for the product.  Allocation of required funding will be ensured through Lilly's budget management and approval processes.

    d.    The Product Safety Physician shall coordinate with the Vice President of Global Patient Safety and the regulatory function to assure that all product safety data, analysis, interpretation, and investigations are appropriately disclosed to the FDA and corresponding foreign regulators.  Comprehensive documentation of all communications relating to the investigation, analysis, interpretation and communication of safety issues relating to the product are maintained within approved GPS documentation archives and as per GPS Standard Operating Procedures (SOPs).

F.    <u>Clinical Plan Document.</u>  Lilly has adopted and shall maintain during the Agreed Upon Term a Clinical Plan Document Template ("CPD") which will: (1) define and document the medical research activities and regulatory strategy associated with the clinical development of a product from First Human Dose (FHD) through the end of the product life cycle; (2) be linked to the Development Core Safety

-15-

>Information, the Core Data Sheet ("CDS"), Development Safety Update Reports, Periodic Safety Update Reports, and Safety Risk Management Plans; (3) track all important identified medical, regulatory and safety issues to resolution throughout the life cycle of each product; and (4) document supporting resource and budget information. The MRC will review the CPD at least annually or more frequently as new events or data dictate or as needed based on ongoing safety surveillance efforts.

G. <u>Discipline.</u>  If the Company determines that an employee has violated any law, regulation or Company policy or procedure, including any Federal health care program requirement, FDA requirement, or Company's policy regarding same, the Company must respond with disciplinary action that the Company deems appropriate.

   1. The Chief Ethics and Compliance Officer shall provide an organizational-level summary on a quarterly basis to the Chief Executive Officer regarding compliance-related performance issues and associated disciplinary actions.

   2. The Chief Executive Officer will be advised of all compliance-related performance issues, disciplinary actions, and involved in associated compensation implications for all senior management.

H. <u>Performance and Compensation.</u>  At least during the Agreed Upon Term, the Company shall continue to make the promotion of, and adherence to, the Company's Code of Conduct, *The Red Book*, an element in evaluating the performance of all employees. In addition:

   1. All senior management shall include a compliance objective and measurement of that objective into their annual performance management plans. Those objectives may, and will, differ based on job content and level. Periodic monitoring and auditing of a sample will occur to ensure these compliance objectives are present in executive's performance management plans. Achievement of performance objectives will factor into compensation decisions.

   2. The Chief Ethics and Compliance Officer shall provide compliance performance feedback for senior management to the Chief Executive Officer as part of the semi-annual executive review, as well as during the end-of-year performance review.

   3. The Chief Ethics and Compliance Officer shall provide compliance performance feedback for senior management to the Senior Vice President of Human Resources as input in the Company's ongoing succession management review process.

   4. At year end the Chief Ethics and Compliance Officer, Chief Audit Officer and the VP of Global Compensation and Benefits will review the

        performance and compensation outcomes for all senior management.  This audit will include a review of actions taken as a result of the semi-annual executive review of compliance and ethics requirements and performance to those requirements.  Additionally, learnings from the review will be cycled back in to improving the process and outcomes in future cycles.

    5. Senior Management sales leadership will design and implement sales incentive programs with oversight from Sales and Marketing Compliance and Global Compensation and Benefits.

## III. MONITORING

A. <u>Survey of Interactions with HCPs.</u>

The results of the annual surveys of interactions with health care professionals set forth in the CIA will be reported on an at least annual basis to the Public Policy and Compliance Committee of the Board of Directors.

B. <u>TLAC Activities.</u>

All communications to external parties regarding products and product candidates, including by the Lilly Answers Center, shall include only medical and scientific conclusions approved by Lilly Medical.  Additional review and consultation may be provided by Lilly Regulatory and Lilly Legal.  The Chief Medical Officer shall have executive authority over the Lilly Answers Center.

C. <u>Field Force Monitoring.</u>

The ride- alongs shall be scheduled throughout the year, shall include each therapeutic area and actively promoted brand, and shall be conducted across the United States.  A plan for the distribution of the ride-alongs across therapeutic areas and actively promoted brands shall be developed each year involving a relative assessment of the potential risk for improper off-label promotion.

D. <u>FDA-Regulated Speaker Program Monitoring</u>.

    1. The Compliance Department shall design and maintain an FDA-Regulated Speaker Program Monitoring Program to monitor presentations given by HCP speakers on Lilly's behalf to observe the appropriateness of the presentations and to identify potential off-label promotional activities.

    2. In the event that a compliance issue, including but not limited to a potential off-label promotion or noncompliance with Lilly's compliance program or policies and procedures, is identified during any Observation (as defined in the CIA at Provision III.K., p. 25), Lilly shall investigate the incident and take appropriate corrective action.

E. <u>Educational Grant and CME Monitoring.</u>

1. The Compliance Department shall design and maintain an Educational Grant and CME Monitoring Program to monitor the process for funding grants and to monitor CME events supported by educational grants from Lilly to observe whether there is any inappropriate influence by Sales or Marketing personnel.

2. In the event that a compliance issue, including but not limited to a potential kickback or noncompliance with Lilly's compliance program or policies and procedures, is identified during any Observation, Lilly shall investigate the incident and take appropriate corrective action.

IV. **COORDINATION OF NON-FINANCIAL AUDITING FUNCTION**

A. During the Agreed Upon Term, the Company shall design and implement integrated internal non-financial audit capabilities designed to assist the Company in assessing and evaluating its systems, processes, policies, procedures and practices related to the Company's Promotional and Product Services Related Function. The Company's internal audit capabilities in this regard shall be sufficient to supplant the Systems and Transactional Reviews of its Promotional and Product Services Related Function as described in Appendix B to the CIA and currently performed by an Independent Review Organization under that Agreement. When that Agreement expires the Systems and Transactional Reviews described in Appendix B to that Agreement will be included in the risk assessment process and will be audited on a periodic for a period no less than five years.

B. The Company currently conducts periodic internal audits of processes and transactions relating to compliance with Anti-Kickback, Foreign Corrupt Practices Act, and other laws and regulations regarding improper forms of payment. During the Agreed Upon Term, the Company will conduct risk-based audits, including of compliance and risk management (as determined by the General Auditor and as reflected in the annual Integrated Audit Plan) across the enterprise. The Company shall review and enhance its audit capabilities and programs with respect to the internal audit of transactions and compliance processes and develop an Integrated Audit Plan that shall contemplate both periodic Systems and Transaction Reviews of the following types of activities:

   a. grants administered by the Lilly Grant Office;

   b. retention of HCPs and scientific experts as advisors or consultants;

   c. market research activities involving HCPs and HCIs;

   d. HCP speaker programs;

   e. sponsorship or funding of continuing medical education programs;

        f. sponsorship or funding of clinical research activities; and

        g. discounts, rebates and valuable services provided to customers in connection with product sales.

C. The General Auditor shall request the Chair of the Audit Committee to authorize the General Auditor, prior to December 31, 2011, to conduct an external assessment by a qualified, independent reviewer. In conformance with the International Standards for the Professional Practice of Internal Auditing the General Auditor is required to develop and maintain a quality assurance and improvement program that covers all aspects of internal audit activity. The General Auditor shall report the results and recommendations of the independent reviewer to the Audit Committee of the Board of Directors.

## V. DISCLOSURE PROGRAM

A. At least during the Agreed Upon Term, the Company shall maintain a program designed to facilitate communications relating to adherence to the Company's compliance program, including with respect to Federal health care programs and FDA requirements and Lilly's policies.

B. The Program shall include a mechanism, including a toll-free compliance telephone line, and/or on-line electronic reporting to enable individuals within Lilly or externally, including HCPs, to report to the Chief Ethics and Compliance Officer or his or her designee any identified issues or questions associated with Lilly's policies, conduct, practices, or procedures with respect to the Company's compliance program believed by the individual to be a potential violation of criminal, civil or administrative law, including with respect to a Federal health care program or FDA requirement.

C. Lilly shall appropriately publicize the existence of the disclosure mechanism.

D. Upon receipt of a disclosure, the Chief Ethics and Compliance Officer (or designee) shall gather all relevant information from the disclosing individual and make a preliminary, good faith inquiry into the allegations set forth in every disclosure to ensure that he or she has obtained all of the information necessary to determine whether a further review should be conducted.

E. For any disclosure that is sufficiently specific so that it reasonably (1) permits a determination of the appropriateness of the alleged improper practice; and (2) provides an opportunity for taking corrective action, the Company shall conduct an internal review of the allegations and ensure that proper follow-up is conducted.

F. The Chief Ethics and Compliance Officer (or her designee) shall maintain a disclosure log, which shall include a record and summary of each disclosure received, the status of the respective internal reviews, and any corrective action taken in response to the internal review.