**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **N A. Lambrecht and Jeffrey P. Jannett,** | ) | |
| **Derivatively and on Behalf of Nominal** | ) | |
| **Defendant Eli Lilly & Company,** | ) | |
| | ) | **Civil Action No. 08-cv-0068 DFH TAD** |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **Sidney Taurel, John C. Lechleiter,** | ) | |
| **Sir Winfried Bischoff, J. Michael Cook,** | ) | |
| **Franlyn G. Pendergast, Kathie P. Seifert** | ) | |
| **George M. Fisher, Alfred G. Gilman,** | ) | |
| **Martin S. Feldstein, J. Erik Fyrwald,** | ) | |
| **Ellen R. Marram, Sir John Rose,** | ) | |
| **Charles E. Golden, Steven C. Beering,** | ) | |
| **August M. Watanabe, Linda Lay,** | ) | |
| **Randall L. Tobias and** | ) | |
| **J. Clayburn LaForce, Jr.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **-and-** | ) | |
| | ) | |
| **ELI LILLY & COMPANY,** | ) | |
| | ) | |
| **Nominal Defendant.** | ) | |

## REPORT OF DR. MITCHELL GLASS

**I.      INTRODUCTION**

1.      I, Mitchell Glass, under penalties as provided by law, declare that the statements set forth in this Report are true and correct to the best of my knowledge.  I am over the age of 21, and have personal knowledge of the facts stated herein.

2.      I have been asked by plaintiffs' counsel in this derivative litigation, brought on behalf of Eli Lilly & Company ("Lilly"), to assist in the design of the plaintiffs' proposals and to

1

provide an expert opinion based on my involvement in the negotiations and my review of the terms of the proposed settlement (the "Settlement") related to the management of Lilly's products and products in development, throughout their life cycle ("Life Cycle Management"). The Life Cycle Management provisions are far-reaching, and place Lilly at the forefront of the industry.  The framework and undertakings set forth in the proposed Settlement provide a sound foundation for the management of drugs throughout their life cycle, and underpin the effective implementation of the Product Safety and Medical Risk Management Core Objective (the "Scientific Core Objective," discussed below) which makes "paramount" patient safety and benefit in all Lilly decision-making in the drug development and post-launch process.  My opinion discusses the detailed provisions that the parties have agreed upon which are designed to implement the Scientific Core Objective.  In my opinion, the Life Cycle Management provisions, if faithfully implemented by the Company, provide a substantial benefit in supporting sound scientific decision-making and in the detection and prevention of the issues that underlay the derivative claims.

## II.    BACKGROUND AND QUALIFICATIONS

3.      I am a medical doctor who received an A.B. with Special Honors in Biology from the University of Chicago in 1973, and a M.D. from the University of Chicago in 1977.  I have completed a residency in internal medicine, a fellowship in pulmonary medicine and a post-doctoral fellowship in respiratory physiology, all at the University of Pennsylvania and affiliates. In addition, I have been an Assistant Professor of Medicine and Physiology at the University of Pennsylvania, and an Attending Physician at the Pulmonary Section, Graduate Hospital in Philadelphia, Pennsylvania.  I have a specialty certification in Internal Medicine, and a sub-

specialty certification in Pulmonary and Critical Care Medicine from the American Board of Internal Medicine.

4.      I have had extensive experience in the pharmaceutical industry, including managing pulmonary drug development as an Executive Director at ICI Pharmaceutical Group, and later, Zeneca PLC.  I was a Vice President and Director, CardioPulmonary (Pulmonary/Diabetes) Therapeutic Unit Clinical Research, Development and Medical Affairs at SmithKline Beecham Pharmaceuticals, responsible for overseeing all aspects of Phase 2 through Phase 4 clinical trials[1] across a range of over twenty drugs and drug candidates.

5.      For five years, I was the Chief Medical Officer and Senior Vice President Strategic Drug Development, Clinical Development and Regulatory Affairs at AtheroGenics, Inc.  While at AtheroGenics, I was responsible for the filing of five Investigational New Drug applications.  I was the senior representative to both the FDA and the equivalent Canadian regulatory authority.  In addition, while there, I established and managed a new development department that included Development Chemistry, Toxicology, Drug Metabolism and Biometrics/Data Management, Clinical Research and Safety, Regulatory Affairs and Quality Assurance, and was the Chairman of the Pharmaceutical Review Board for integration of Research and Development at the Company.

6.      I have also served as a Director, President and Chief Operating Officer of geneRx+ (a start-up biotech company), and Chief Executive Officer and a Director of Aqumen NA, Inc., a Japanese ophthalmic biotech company.  I presently work as a consultant to start-up pharmaceutical and device companies.  Over the course of my career, I have actively interacted

---

[1] Clinical trials supporting drug development and marketing are divided into four phases: Phase 1 focuses on safety.  Phases 2 and 3 studies test safety and efficacy in increasing test populations to support regulatory approval to market the product for specific diseases or disorders.  Phases 1 through 3 studies occur prior to a product being marketed to the public.  Phase 4 studies support expanding the marketing of an approved drug.

with the FDA and other regulatory authorities in the U.S. and abroad across a variety of drug and drug treatments, from inception through approval and launch.  I have also developed integrated development teams at three companies consisting of the departments engaged in the drug development process, including biostatistics, clinical research, quality assurance, pharmacovigilance and regulatory affairs.[2]

7.      On behalf of the Pharmaceutical Education and Research Institute (PERI), established by the Pharmaceutical Research Manufacturers' Association (PhRMA), I have co-directed an annual  course on Drug Development for Medical Scientists**,** introducing drug development, pharmacovigilance, and regulatory affairs to physicians and scientists new to drug development.

8.      I have been a grant awardee of both the National Institutes of Health and the American Lung Association.  I have written over thirty-five papers or abstracts on topics related to medicine, drug development and basic science.  I have attached a copy of my Curriculum Vitae as Exhibit A to my Report.

## III.      BOARD LEVEL REFORMS

### A.      Adoption of the Product Safety and Medical Risk Management Core Objective

9.      The Company will adopt and implement, as a matter of corporate policy, the Scientific Core Objective to "assure that objective scientific inquiry, analysis and communication in matters affecting patient benefit and safety shall be of paramount importance."  *See* Stipulation of Settlement, Exhibit A "Corporate Governance Terms" (referred to herein as "Exhibit A") § I.D.1.  In my opinion, Lilly's adoption of the Scientific Core Objective provides the foundation for the strengthening of Lilly's systems of corporate governance, internal control

---

[2]  At a pharmaceutical company, Pharmacovigilance oversees safety of products and product candidates, and Regulatory Affairs manages the company's relationship with regulators, including the product approval process.

and operations in the area of product safety and benefit. By adopting the Scientific Core

Objective, Lilly recognizes the unique nature of medical risk that arises from drug development

and marketing, and assigns oversight for this risk up to the Board, through the Science &

Technology Committee ("S&T Committee"), which has the scientific and medical expertise to

meet this oversight responsibility. To assure going forward that S&T Committee members

continue to have this necessary expertise, Lilly will consider, among other factors, committee

assignments when assessing the qualifications of Board nominees. Based on my experience in

drug development and Life Cycle Management, Lilly's adoption of the Scientific Core Objective

provides a powerful statement of its priorities that aligns corporate decision making with its

responsibility to patients, providers and regulatory authorities.

      **B.**      **Science & Technology Committee**

      10.      In order to support Board level oversight of the Company's efforts to achieve the

Scientific Core Objective, the Lilly Board shall revise the charter of its S&T Committee to

encompass advising the Board on scientific matters involving product safety and efficacy and

assisting the Board in exercising reasonable oversight of product safety and medical risk

management. The S&T Committee will have oversight responsibility for the effective

implementation of the Scientific Core Objective across Lilly, including early development, Phase

4 clinical trials, commercial activity and all territories. Detailed reporting provisions to the S&T

Committee by the Chief Medical Officer ("CMO"), the Vice President of Quality and the Vice

President Global Patient Safety will support the S&T Committee in its expanded oversight

responsibility.

      **a.**      **Reporting on behalf of the Medical Review Committee.** Not less than

annually (and consistent with the charters of the Medical Review Committee ("MRC")

and the Safety Review Committee), the CMO must provide a report concerning the MRC's conclusion that the Company has taken necessary and appropriate steps to discover, analyze, interpret, investigate, and communicate significant patient safety risks affecting the subject products or compounds in development.   Related to oversight of the clinical development process, this requirement provides for engaged scientific oversight by the Committee.  The CMO is the Chair of the MRC, and provides his report on behalf of the senior management engaged in product development across all compounds, product candidates and products.  For those products for which the CMO cannot report a conclusion that all necessary and appropriate steps have been taken with respect to safety and benefit, the Committee must be assured of the adequacy of the recommendations and the plans to address unresolved issues.  With respect to such unresolved issues, the CMO must recommend plans "to permit such a conclusion on a basis acceptable to the Science and Technology Committee" (*see* Exhibit A § I.D.3.(1)), and the S&T Committee must decide whether the clinical and non-clinical studies proposed in each plan are adequate and consistent with the Scientific Core Objective.

   **b.**  **First Major Launch.**  With respect to products that are nearing first major launch, the CMO must provide to the S&T Committee a report that the planned scope of initial marketing of the drug is appropriate from a medical content perspective, given the state of knowledge concerning patient safety and efficacy, and benefit/risk assessment.  The CMO, and (as discussed below) the physicians and scientific personnel who report to him, will assess the benefit of the drug in light of key factors, including: (i) the risks associated with the new product as reflected in the results of clinical trials (the "clinical data base"); (ii) the safety signals that have not been completely resolved based

on the clinical database; (iii) the risks in light of the disease target (*e.g.*, heart failure versus hay fever); and (iv) the risks associated with existing, alternative treatments. Based on this analysis, the CMO and the MRC will develop a benefit/risk assessment of each new drug or biologic, which establishes the potential benefit of the drug in light of the risks associated with its use or proposed use.

On this basis, the CMO and his department may report that a product has limited data and should be initially launched only to specialists (*e.g.*, psychiatrists) in treating serious disorders (*e.g.*, schizophrenia) and that substantially more data must be developed to support use by physicians in general practice (*e.g.*, for anxiety). The S&T Committee will review the pre-launch assessment to ensure that it conforms to the Scientific Core Objective and reflects the primacy of patient safety. This process should therefore provide substantial patient benefit, as well as protection to Lilly from preventable liability, recalls or reputational harm due to unaddressed medical risk.

c.  **Prompt Reporting and Escalation.**  The CMO must provide prompt reports concerning patient safety issues related to the labeling or promotion of a product or other product safety matters, where, in the judgment of the CMO, escalation of the issue to the S&T Committee is desirable, provided that the CMO has first informed and discussed the matter with the Chief Scientific Officer and the CEO. In my opinion, prompt reporting and escalation ensures that the S&T Committee – the appropriate Board committee – will have prompt knowledge of significant safety issues. I believe that this escalation provision is one of a number of provisions that will help ensure prompt resolution of safety issues raised, for example, as discussed below, through the Product Safety Physicians or the Clinical Plan Document ("CPD"). Escalation to the Board by

the CMO ensures that the STC will receive prompt communication of unresolved safety issues in accordance with the Scientific Core Objective and independent of commercial influence.

In addition, this provision ensures that senior executive management of Lilly is fully aware of issues that the CMO deems necessary for escalation to the Board, and that remain unresolved, and reinforces to senior management the substantial and continuing oversight responsibility of the Board.

**d.      Implementation and Monitoring.**  Not less than annually, the S&T Committee will be provided a report from the CMO regarding the implementation and ongoing monitoring of: (i) policies and procedures at Lilly designed to maintain the primacy, in matters affecting patient benefit and safety, of objective scientific inquiry, analysis and communication; (ii) the identification of important medical and scientific risk; and (iii) the resolution of those risks.  This report will inform the S&T Committee of the status of Lilly's implementation of policies and procedures supporting the Scientific Core Objective and will highlight significant medical and scientific risks affecting single products and global product development at the Company.  The CMO will be made aware of these issues concerning policies or procedures and risks, including their resolution or escalation, through the activities of the Pharmacovigilance, Medical Research and Regulatory Affairs departments that report to him.  Non-clinical and clinical risks will be identified by appropriate team members in the CPD and reported to the MRC.

**e.      Management Level Remediation.**  Not less than annually, the S&T Committee will be provided a report by the Vice President, Global Patient Safety (VP-

GPS) concerning unresolved patient safety and utility issues that have been elevated to the Corporate Patient Safety Committee, and the remediation of such issues.  The VP-GPS reports to the CMO.  The VP-GPS reporting complements the CMO reporting to the S&T Committee, providing the S&T Committee with a complete picture regarding both emergent, unresolved patient safety issues that were escalated, and patient safety issues that were resolved at the management level.

11.      In addition, the Stipulation provides that the CMO will report to the S&T Committee at least once annually, and more regularly at the discretion of the Committee Chair, and will attend Committee meetings as directed by the Committee Chair.

12.      It is my opinion that the reporting responsibilities of the CMO and the VP- GPS to the S&T Committee are robust and provide the depth and frequency of reporting necessary to support the S&T Committee's oversight responsibilities as set forth in the Settlement.  Based upon these reports, the S&T Committee will be able to meet its responsibility for oversight of the primacy of patient safety and to provide assurance to the entire Board that the Scientific Core Objective is well established and is the guiding principle for scientific decision making with respect to safety and efficacy for the life cycle of Lilly products.

13.      In addition to reporting from the CMO and VP- GPS, the Vice President of Quality also reports to the S&T Committee.  The Vice President of Quality shall monitor and audit the policies, procedures, systems and internal controls implemented to achieve the Scientific Core Objective.  This is a substantive review requiring reporting to the S&T Committee by the VP-Quality of any significant findings, thereby assessing whether the system is identifying and resolving safety and benefit issues as required by the Scientific Core Objective.   This activity is critical.  Continuous assessment is necessary to ensure that the

Scientific Core Objective remains paramount and is not compromised, even inadvertently. Direct reporting to the S&T Committee ensures oversight and informed decision-making at the highest level of the corporation.  In addition, I believe the VP-Quality is the appropriate person to perform this function at Lilly.  He or she is independent of functional areas and commercial pressure and has the necessary technical and scientific expertise to undertake the technical assessment the audit process will require.

14.     The S&T Committee may select and retain its own scientific, medical and risk management advisors and consultants at the Company's expense.   In addition, members of the S&T Committee have free access to in-house expertise, which could include experts in such fields as biostatistics, epidemiology, product safety and the diseases and disorders under study. These settlement provisions contemplate focused Board level oversight by the S&T Committee, underpinned by internal and external expert input.

15.     Directly relevant to assuring that the S&T Committee is receiving necessary information on a timely basis, the Committee must annually assess its own effectiveness and the adequacy of the reporting and information flow it receives, and to make such changes as are required to maintain and enhance the Committee's effectiveness, including recommending to the full Board any desirable changes to the Committee's charter or membership.

16.     It is my opinion that the Board level product safety and medical risk management oversight provisions offer substantial benefits to the Company.  Together with supporting management level changes (discussed below), these Board level provisions represent a significant commitment to Lilly's governance and internal control processes relating to product safety and medical risk management throughout the life cycle of Lilly's products.  If faithfully implemented, I believe that the adoption and maintenance of these provisions will contribute

substantially to adequately resourced, timely and objective scientific inquiry, analysis and communication in matters affecting patient benefit and safety, and will provide powerful support in the prevention and detection of the types of issues that gave rise to the derivative actions.

## IV.    MANAGEMENT LEVEL REFORMS

### A.    Chief Medical Officer

17.    The CMO shall have primary executive responsibility for achieving the Scientific Core Objective, and, as detailed above, the CMO has direct reporting responsibilities to the S&T Committee.  The CMO is responsible to "take such steps as are necessary to pursue the continuous improvement of the Company's policies, procedures, systems and internal controls designed to achieve the Product Safety and Medical Risk Management Core Objective," (Exhibit A § II.E.1.h.)  and he or she "shall monitor the implementation of the Company's policies, procedures, systems and internal controls designed to achieve the Product Safety and Medical Risk Management Core Objective, and shall report on the status and findings of such monitoring annually to the Science and Technology Committee."  (Exhibit A § II.E.1.g.)

18.    A reporting structure shall be established within the product safety function, from the Product Safety Physicians (PSPs) – who operate at the individual product or product candidate level, up through the VP-GPS to the CMO (who , as noted above, reports to the S&T Committee of the Board).  Reflecting this critical function at Lilly, the CMO "shall have senior executive authority and oversight responsibility for all product safety functions, including pharmacovigilance and the activities of the Vice President of Global Patient Safety, and all subordinate Product Safety Physicians" (Exhibit A § II.E.1.f.) , and the CMO "shall be the senior medical officer of the Company and shall have executive authority over all medical physicians

employed in drug development and medical research by the Company on issues of drug utility and safety and regulatory compliance."  (Exhibit A § II.E.1.b.)

19.    The CMO will have substantial oversight of clinical trials at Lilly.  All Lilly-sponsored clinical trials will be subject to the Scientific Core Objective, on which the CMO is obligated to report at least annually.  The proposed Settlement provides for robust information flow to the MRC and the CMO (both in his capacity as Chair of the MRC and as the head of Global Medical, Global Regulatory Affairs and Global Patient Safety), to ensure that they have the information necessary to evaluate each product and product candidate on an on-going basis with respect to emerging safety and efficacy analyses that are the basis of an ongoing benefit: risk assessment.  This reporting structure provides the basis for the MRC's conclusion related to safety and efficacy which underlies the required CMO reporting to the S&T Committee regarding the effective implementation of the Scientific Core Objective (detailed above).  As such, in my opinion, the CMO is fully informed to weigh the evidence and to formulate a benefit: risk assessment for populations of potential patients for each product and/or product candidate in light of its initial launch strategy and subsequent commercial development.

### B.    Vice-President, Global Patient Safety

20.    The VP-GPS will have authority over and responsibility for all scientific analysis, interpretation of data and studies, and surveillance relating to product utility and safety for Lilly products and product candidates.  See Exhibit A §II.E.2.a.  As such, the Global Patient Safety function will collect, analyze, interpret and report data concerning subjects and patients throughout the life cycle of the product.  Coordination of the Global Patient Safety function under the CMO is critical to enabling the CMO to meet his or her responsibility to "have senior

executive authority and oversight responsibility for all product safety functions" (see Exhibit A §II.E.1.f.).

21.     The VP-GPS explicitly retains responsibility for product candidates and marketed products throughout the life cycle of the product.  The VP-GPS continuously assesses, based on reporting, including from PSPs, each product or product candidate in the context of the overall benefit/risk assessment.  The VP-GPS is responsible not only for ensuring the continuous identification and resolution of patient safety issues, but also for tracking and resolving safety and risk signals in light of product utility.  For example, the VP-GPS is responsible for recommending to the CMO and Global Product Labeling Committee safety-related labeling changes for Lilly products and recommending whether additional studies proposed would add usefully to the weight of evidence for the product safety profile, including with respect to resolving open issues around off-label patient populations and safety.  The VP-GPS' assessment of benefit and risk will be based on the results of adequate and well-controlled clinical trials and the pharmacovigilance data base.

22.     The VP-GPS will report to the CMO, and, as the head of the Safety Review Committee, at least annually to the S&T Committee.  These reports will provide key data on the nature of unresolved issues across clinical trial programs or for marketed products.  Specific unresolved issues will be reported from the VP-GPS as head of the Safety Review Committee to the Corporate Patient Safety Committee; the substance of these reports will be shared not less than annually with the S&T Committee. The analysis and communication of these reports to the CMO and to the S&T Committee would identify strengths and weaknesses of Lilly's Pharmacovigilance system and should provide the basis for robust assessment and the prioritization of the resolution of identified safety and utility issues. For example, if a large

percentage of a product revenue is derived from sales in a population that has been inadequately studied to characterize the benefits and risks as a result of off-label use initiated by outside experts, *i.e.*, prescribing physicians, the VP-GPS is specifically empowered to recommend that resources be reprioritized to address the safety and efficacy issues in the off-label population since such use would constitute an expansion of commercialization.  These safety issues will be identified by reports of side effects associated with off-label use that will be reported to the Company and to regulatory authorities.  These safety signals will be considered, in the absence of any significant demonstration of benefit, as unresolved safety issues.  The VP-GPS will also be responsible for escalating safety signals identified by Product Safety Physicians ("PSP"), whether the safety signal affects individual patients or populations.  Escalation by the VP-GPS, whether to the CMO, the Corporate Patient Safety Committee or the S&T Committee is free of undue commercial influence.

23.     Second, the continuity of the VP-GPS's responsibility for patient safety provides important benefits and support for the CMO's implementation of the Scientific Core Objective. The VP-GPS's continuing responsibility through all stages of the product life cycle will translate into a continuously developed product safety record, and timely updating of the clinical experience with each Lilly product.  The VP- GPS will assign Product Safety Physicians (PSPs) as needed to products or products in development to ensure continuity of safety reporting and risk identification throughout the product life cycle that is captured in the CPD. The management of risk including from animal studies, starting with first human exposure and continuing through the entire life cycle of a product far exceeds any regulatory requirement for risk identification and mitigation.   In my opinion, the fact that these issues will be collected, continually updated and preserved in the CPD and that the primary function of the PSPs is to manage these issues to

resolution ensures that they will be addressed in a timely manner, well in advance of product

marketing.  The VP-GPS will receive recommendations from Product Safety Physicians for

appropriate studies and resource allocation to support each product in light of the Scientific Core

Objective, and to manage these recommendations through to the CMO and resource allocation

decision.  He or she will support the MRC review, not less than annually, of whether all

necessary and appropriate steps to discover, analyze and communicate product safety issues have

been taken.

24.     Third, the VP-GPS's charge includes operational responsibility for "maintaining

practices that meet regulatory expectations for adverse event reporting" (Exhibit A §II.E.2.b.(2))

and "developing and implementing policies and procedures to facilitate the collection and timely

disclosure of information concerning the safe use of Lilly products."  (Exhibit A §II.E.2.b.(3))

As a result of these provisions, the VP-GPS will be regularly informed regarding safety issues to

be reported externally to, for example, regulators and health care providers, and will establish the

policies and procedures to ensure that these disclosures are timely and accurate.

25.     The VP-GPS is also responsible for ensuring that data, analysis, interpretation and

subsequent investigations are appropriately communicated internally and disclosed externally for

both product candidates and marketed products.

a.     **Product Candidates**.  The VP-GPS will receive regular reports from

subordinates (from scientists on product candidates from first human exposure through

the end of Phase II clinical trials, and from PSPs thereafter) as safety issues arise and will

ensure the safe use of Lilly product candidates pursuant to the CPD.  Thus, for example,

during development, this could result in disclosure to investigational review boards and

ethics committees through the clinical team, enabling rapid deployment of new

information into the field, affecting, if appropriate, the informed consent or conduct of ongoing trials. The VP-GPS would report to the MRC the emergence of a safety signal for elevated blood sugar (hyperglycemia) during clinical trials or toxicology studies in animals. This report could then lead to a change in the informed consent for subjects enrolling in subsequent trials and the addition of fasting blood glucose monitoring during adequate and well controlled clinical trials. This timely disclosure and action reinforces, in my opinion, the role of the VP- GPS in ensuring the primacy of safety for patients and research subjects as a matter of corporate policy.

b. **Marketed Products.** The VP-GPS is responsible for recommending, directly to the CMO and to Lilly's Global Product Labeling Committee, safety-related changes to the existing label for Lilly products, supported by assigned Project Safety Physicians (described below). For example, if elevated plasma glucose (*e.g.*, blood sugar levels) is listed as an adverse drug reaction, and upon clinical use patients develop diabetes, the VP-GPS would promptly investigate and determine whether the cases of diabetes are reasonably associated with the use of the drug and whether "risk of developing diabetes" should be elevated to a warning in the label. In my opinion, direct reporting of labeling recommendations from the officer charged with implementing policies and procedures for ascertaining product safety information will help to ensure the independence of such recommendations, and the analysis and interpretation upon which they are based, from internal or external influences.

26. The VP-GPS has an additional strategic role – to recommend to the CMO whether a product is appropriate to enter the next phase of development or expanded commercialization. This recommendation applies both to products in development and to marketed products seeking

to expand commercialization, for example, by entering a new population (*e.g.*, children) or by seeking a new indication (*e.g.*, depression in addition to bipolar disorder).  The VP-GPS's recommendation will be based on an analysis of safety data, the weight of evidence supporting the product in its marketed or intended use, and whether the proposed scope of work (*e.g.*, new clinical studies) will add usefully to the weight of evidence for: (i) the existing product safety profile; (ii) the safety in new target patient populations; or (iii) the resolution of outstanding issues around off-label drug use.  The VP-GPS will use weight of evidence, *i.e.*, whether there is a reasonable likelihood that the use of the drug can be shown or predicted to be associated with a particular effect, to assess both safety and benefit. During this assessment process, the VP-GPS will receive a recommendation from the assigned PSP as to whether the resources for a program should be allocated to address unresolved issues, including off-label use.  As discussed below, because all off-label use is defined in the CPD as an unresolved medical risk, all safety signals generated from off-label use, even those previously seen for an approved indication, will be treated as unresolved safety issues by the PSP and the VP-GPS.  There will be no demonstration of effectiveness from adequate and well controlled clinical trials to offset the safety signals in this unstudied population and to provide a basis for suggesting an acceptable benefit: risk assessment.  In my opinion, this key strategic role by the VP-GPS will serve to promote the primacy of patient safety issues in decisions surrounding the development and commercialization of Lilly's marketed products.

27.      The Settlement's specific provisions concerning the VP-GPS's management and supervision of the Product Safety Physicians are of particular importance.   The VP-GPS oversees the hiring, retention, performance evaluation, promotion, and compensation of the Product Safety Physicians.  In reaching these determinations, the VP-GPS "shall afford primary

weight to assessment of each Product Safety Physician's effectiveness in promoting the Product

Safety and Medical Risk Management Core Objective with respect to the product candidates or

products for which each such officer is responsible."  Exhibit A § II.E.2.b.(5)(c)  As described

below, if faithfully executed, this process will powerfully promote the Company's achievement

of the Scientific Core Objective by creating a class of senior-level physicians whose

compensation and professional advancement at Lilly will directly depend on the effectiveness of

their promotion of the primacy of patient safety through objective scientific inquiry, analysis,

and communication.

28.     The VP-GPS, as the manager of the Product Safety Physicians, is charged with

ensuring that the appropriate data collection, selection, analysis and interpretation are reported,

and that the Scientific Core Objective is maintained as paramount throughout the life cycle of

each product.   In my opinion, the VP-GPS, as the manager of the Product Safety Physicians and

as a key member of the MRC, provides a critical management function in support of the

achievement of the Scientific Core Objective.

##### C.     Product Safety Physicians

29.     A Product Safety Physician, reporting up through the VP-GPS and the CMO

within the Global Patient Safety organization, will be assigned to every marketed product and

investment stage compound in development [from the end of Phase II clinical trials] throughout

the life cycle of the product.  The Product Safety Physician's role is designed to create, for each

product, a senior-level medical science advocate for product safety and the Scientific Core

Objective.  As discussed above, PSP compensation shall be aligned with their "effectiveness in

promoting the Product Safety and Medical Risk Management Core Objective with respect to" the

products to which they are assigned.  (Exhibit A § III.E.2.b.(5)(c)

30.     The PSPs report directly to the VP-GPS who chairs the Safety Review Committee and reports directly to the CMO.  The PSP shall "be responsible [for] assuring that safety issues affecting the product are given primary weight in all labeling decisions."  (Exhibit A §II.E.3.b.) In my opinion, this independent safety function, which is carried up to the CMO – and through the CMO, to the Board – strongly supports the implementation of the Scientific Core Objective.

31.     The Product Safety Physicians are required to report to the VP-GPS not less than annually, and more often as needed (for example, upon the occurrence of a new safety signal, new study results or a significant regulatory interaction) for each product and product candidate over which the Product Safety Physician has responsibility.  Such reports provide a detailed update regarding the state of safety and development studies, investigations and analyses pertaining to the product or product candidate, and include requisitioning for reprioritizing critical resources whenever, in the judgment of the Product Safety Physician, such additional resources are necessary to  develop robust patient safety information for the product. Demonstrating the Company's commitment to this process, the "allocation of required funding will be ensured through Lilly's budget management and approval processes."  (Exhibit A § II.E.3.c.)

32.     The PSPs are also responsible for the management of critical elements of the CPD (discussed below).  The PSPs are responsible for analyzing the entire clinical data base pursuant to the CPD for safety signals throughout the life of each product or product candidate, whether such safety signals are serious, such as cancers, birth defects, or life threatening infections, or are less common safety signals that occur more frequently with higher drug dose or than with treatment with placebo.

33.     The PSP is "accountable to ensure that all available product data is comprehensively reviewed for patient safety issues, that significant patient safety issues present in the data are promptly analyzed and interpreted, and that such safety issues are fully explored, where appropriate, through the development of additional hypotheses and testing thereof, and the collection of additional data."  (Exhibit A § II.E.3.)  As such, the PSP will be responsible both to generate and to test hypotheses about the safety signals within the data set and to communicate these within the CPD and to members of the project team in accordance with Lilly's metrics and standards.  These safety signals will contribute to the on-going benefit/risk analysis of each product and product candidate.

34.     Where product safety-related disagreements arise in connection with product labeling, the Product Safety Physician shall elevate the matter for review to the VP-GPS and/or the Safety Review Committee, and, when appropriate, also to the CMO and/or the Medical Review Committee "to assure that the matter is resolved in a manner consistent with the Company's policy to maintain the primacy of patient benefit and safety."  (Exhibit A § II.E.3.b.)

35.     In my opinion, the access of a senior medical scientist responsible for patient safety and dedicated to a product or product candidate throughout its entire life cycle is a crucial element of the Company's ability to meet the Scientific Core Objective.  *See also*, discussion below regarding the Clinical Plan Document Template. The Company shall provide the resources, authority, compensation and reporting structure necessary to assure the PSPs are able to fulfill their critical safety-related responsibilities.

## V.     CLINICAL PLAN DOCUMENT (TEMPLATE)

36.     The clinical plan document ("CPD") is the standardized framework for Lilly team members, including medical research, health outcomes and marketing experts, regulatory affairs,

medical research and safety, to contribute to product development and strategy.  The CPD will

be the key document for tracking the development of each product and product candidate over its

entire life cycle, from the beginning of development to the expiration of the patent.  The CPD is

overseen by the Medical Review Committee.  Contributors to the CPD have substantive input

into their areas of expertise.  The CPD is designed to align clinical research activity to resource

allocation, including budget, and to serve as the central authoritative repository of clinical and

regulatory strategy safety and risk issues, and their resolution for the entire life cycle of the

product.  In my opinion, the continuity afforded by a single document that tracks the entire life

cycle of the product will provide substantial protection against the loss of important information,

and will support the timely identification and resolution of safety, efficacy and labeling issues as

they arise.  For example, identification of a toxicology finding of excessive weight gain in

laboratory animals would be identified as a non-clinical risk that requires resolution.  In my

opinion, this resolution would require hypothesis testing through scientifically collected data

analysis and interpretation of toxicology and clinical studies sufficient to confirm or discount the

risk in patients and drafting the label accordingly. The risk and the history of its resolution would

appear in the CPD throughout the life cycle of the product.

      37.     In addition, life cycle tracking through a single document that is shared broadly

within Lilly will enable adjustment of clinical plans and commercial forecasts based on objective

review of scientific data before expectations are shared externally, for example, with analysts.

      38.     For each product, the CPD includes a draft Risk Management Plan (dRMP) which

evolves, over time, into a Risk Management Plan for each approved product. The Company

commits to risk identification and resolution from the first human exposure through the entire

life cycle of each product.  This approach exceeds regulatory requirements for risk identification

and mitigation plans, which focus on the initial launch, and are limited in scope and duration. The CPD will be linked continuously to the Lilly safety databases and the regulatory approved core data sheet (CDS) for each product.  This will include a comprehensive listing of non-clinical and clinical risks for each product and product candidate that requires a plan and action by Pharmacovigilance.  This plan is provided by the VP-GPS and his or her subordinates, and specifically by the Project Safety Physicians, once the product is approved for investment (*i.e.*, at the end of Phase 2 drug development).  The CPD also includes a risk minimization plan which tracks to resolution each identified risk (see example above).  This information must be captured in writing, and will support the periodic report of the CMO (as Chair of the MRC) to the S&T Committee.

39.     In my opinion, the requirement for risk identification and a risk mitigation plan for each identified risk or safety signal is the key portion of the CPD.  Risk that is identified early, either from animal toxicology studies or clinical trials, will be addressed in the development program, will shape the proposed label, and be resolved or reflected in the assessment of utility and market potential prior to launch and later pressure due to commercial expectations.  The risk assessment, which must be consistent with the Scientific Core Objective, will provide an informed guide to the appropriate use of Lilly products.   It provides the Company with an ongoing basis for action to mitigate risk and provides the CMO with an objective basis for reporting to the S&T Committee on the safety and risks associated with each product throughout development.  Documentation of unresolved safety issues, once identified, will maximize the likelihood of bringing appropriate and necessary resources to bear to resolve such issues, and to determine whether a new safety warning may be appropriate.

40.     The CPD also provides an objective basis for audits by the VP-Quality (discussed above) with respect to processes and implementation of the Scientific Core Objective.  Thus, in my opinion, these audits will identify, for example, unmitigated risks, including off-label use of products and report these unresolved issues directly to the S&T Committee on a regular (not less than annual) basis.

41.     The CPD recognizes that off-label use is always a medical risk for which there must be a written plan and appropriate Lilly action.  As note above, any benefit; risk analysis that is based on a confirmed safety signal without clinically demonstrated effectiveness will generate an unresolved safety issue that must be addressed.  There are two risk mitigation responses to off-label use.  Either response will require the Company to amend its regulatory strategy, which is also contained and updated in the CPD and to communicate the change in strategy to the FDA and other regulatory authorities.  The Company may develop a new scientific database based on adequate and well controlled clinical trials that support inclusion of previously off-label use in the product label. The Company can also provide a clear public signal that certain off-label use cannot be supported for a given product, which could include a change to the product label.  In my opinion, the recognition within the CPD that off-label use always creates a risk within the Company provides a rigorous basis for review and amendment of regulatory strategy in the post-approval period and will lead to adoption of effective risk mitigation.

42.     Regulatory strategy is an integral part of each CPD.  The Regulatory Strategy section of the CPD, drafted by Regulatory Affairs, who is represented on each project team, will include an assessment of whether currently scheduled or proposed clinical trials will support a label change to permit marketing to new or expanded populations, and, if not, will offer proposals of clinical trials that might support such a label change.  In my opinion, the regulatory

strategy, taken together with the PSP role in identifying unresolved safety issues, should ensure that Lilly will promptly address off-label use to minimize patient exposure without adequate data support from sponsored clinical trials.

43.     The CPD will contain, for each product and product candidate, a list of product decisions and critical success factors.  These factors include, for example, safety and effectiveness across a broad range of ages, safe and effective use with other widely prescribed medications, and superiority to other drugs used to treat the same disease or disorder. The analyses of the data with respect to these critical success factors will be available for real-time comparison with the evolving safety and effectiveness profile of each product and product candidate.  In my opinion, the establishment and communication of these factors should enable an early and ongoing appraisal of the probability of success for each product and product candidate based primarily on the evidence from controlled clinical trials, thereby mitigating medical risk for product candidates and products.  For example, if one such critical success factor is once daily dosing, and based on Phase 1 data a product candidate should be dosed at 20 milligrams (mg)/day by dosing 4 times daily at 5 mg, the critical success factor will drive early development of a controlled release once daily formulation (version) of the product candidate or early termination of the program, rather than dosing once daily with 50mg, which may achieve efficacy but will be associated with an increased risk of side effects, thereby violating the Scientific Core Objective.

44.     In my opinion, the CPD is a critical tool for enabling the CMO to report to the S&T Committee and for meeting the Scientific Core Objective.  The CMO, in reporting to the S&T Committee in his capacity as Chair of the Medical Review Committee, will have as a critical resource the CPD – which reflects input from the key stakeholders for each product.  In

my opinion, the elements of strategy and operations, and the substance of the CPD are adequate to ensure careful ongoing evaluation of each product candidate to enable the CMO to provide accurate, adequate and timely reporting to the S&T Committee.

## VI. PRODUCT-RELATED EXTERNAL COMMUNICATIONS

45.     All external communications for product candidates as well as products shall include only medical and scientific conclusions approved by Lilly Medical. This provision provides far reaching protection to the Company at a number of levels, particularly when taken together with the responsibility of the Product Safety Physician to ensure that the benefit: risk assessment of a product is not overstated or presented in a misleading way.  Scientific conclusions, as presented in the Scientific Core Objective, are the product of data that have been analyzed and interpreted using scientific methodology and weight of evidence to assess efficacy and safety.  These limitations will be especially critical later in the development process, when the elements of the draft launch label are well characterized.

46.     For product candidates, meetings with consultants prior to approval and launch often include physician experts who are likely to be among the first to prescribe a new product after its launch (early adopters and key opinion leaders), and whose prescribing behavior is widely shared through positions of prominence at international meetings or through access to the medical media.  As described above, these experts, who are external to the Company, will receive only approved scientific conclusions, which should prevent the promulgation of incomplete results or analyses that might lead to individual interpretation and off label use in the immediate post launch period until adequate and well controlled clinical trials are undertaken and reported.

47.     In implementing this provision, for approved products, Lilly Medical would review the data collected by the Company from Phase 1 through Phase 4 clinical trials, and may also review peer-reviewed publications and ongoing third party research to ensure that only scientifically supported conclusions are communicated externally.  In my opinion, this provision should ensure that experts presenting data on behalf of Lilly or presenting materials provided by Lilly will present only scientifically valid analyses and interpretations of Lilly products.

48.     With respect to TLAC, which affects marketed products, answers to questions will be limited to scientifically supported conclusions.  The CMO will have executive authority over TLAC.  In my opinion, this standard will provide Lilly Medical the basis for designing a series of answers to frequently asked questions that ensures accuracy and completeness without overstating data-based analysis, interpretation and conclusions.  This standard will be especially critical in crafting responses to questions about comparative effectiveness of Lilly products to competitors that may not have been compared directly in controlled clinical trials.

## VII.   CONCLUSION

49.     The Settlement, if implemented faithfully, provides the basis for far reaching changes that place Lilly at the forefront of the pharmaceutical industry.  As discussed above, in my opinion, the adoption of the Scientific Core Objective under the proposed Settlement sets a clear objective of the primacy of patient safety and benefit in the identification and resolution of issues that may arise during product development and commercialization.  The Scientific Core Objective will shape Company decision making regarding each product candidate and product throughout its entire life cycle, from pre-clinical development through patent expiration.  The Settlement provides the necessary Board level oversight of the adoption and implementation of the Scientific Core Objective at Lilly, supported by frequent and robust reporting to the S&T

26

Committee that, in my opinion, is necessary to ensure the primacy of patient safety within the organization.

50.     The Settlement provides a strong management structure to oversee and implement the Scientific Core Objective, empowering the Chief Medical Officer with executive level authority, supported, through the VP-GPS and PSPs – by a ground-level up safety structure of dedicated, high level medical personnel responsible for identifying and resolving safety issues tracked in the CPD on a product-by-product basis from inception throughout the life of each product and product candidate. The CPD plays a critical role in this process by acting as a single authoritative repository of information over the entire life cycle of the product. The proposed Settlement further assures adequate resources, authority and staffing to the CMO to meet his obligations and responsibilities related to the Scientific Core Objective.

51.     As discussed above, the Settlement provisions directed to Life Cycle Management at Lilly, including the adoption of a weight of evidence standard to drive scientific decision making, study design and resource allocation related to benefit as well as risk, are, in my opinion, comprehensive and far-reaching, and should play a substantial role in ensuring vigorous scientific management of Lilly products and product candidates.

Dated: February 23, 2010

_____
Mitchell Glass

27

# EXHIBIT A

## CURRICULUM VITAE

*Mitchell Glass, M.D.*

**EDUCATION:**

| | |
|---|---|
| 1973 | A.B. Special Honors in Biology, University of Chicago |
| 1977 | M.D. University of Chicago |

**POSTGRADUATE TRAINING, FELLOWSHIP AND FACULTY APPOINTMENTS:**

| | |
|---|---|
| 1977-83 | Residency in Internal Medicine, Fellowship in Pulmonary Medicine and Post-doctoral fellowship in respiratory Physiology, University of Pennsylvania |
| 1985-89 | Assistant Professor Medicine and Physiology, U. of P Attending Physician, Pulmonary section, Graduate Hospital (Phila). |

**DRUG DEVELOPMENT MILESTONES:**

- 4 NDAs (New Drug Application) and MAAs (Marketing Approval Application)
- 7 pre-NDA meetings (and international counterparts)
- 7 end of Phase 2 Meetings
- >40 INDs (Investigational New Drug Application)
- Developed and built out interdisciplinary therapeutic area integrated development teams (Zeneca; AtheroGenics; Aqumen)
- Managed annual budgets from $<250,000 to > $150million

**INDUSTRIAL EXPERIENCE:**

<u>Present:</u> Consultant to start-up pharmaceutical and device companies

       CEO and Director, AVATAR Biosystems Incorporated

       CMO and Director, OrphageniX, Inc (targeted gene alteration, oligonucleotide therapy))

       Chairman, Clinical Advisory Board of Topigen, Inc.

<u>May 2005 – June 2008</u> CEO and Director Aqumen NA, Inc. (Japanese ophthalmic biotech);

                Director Aqumen KK

<u>October 2004 – June 2006 Chief Scientific Officer University City Science Center (Philadelphia PA)</u>

<u>May 2003 – June 2004 </u>Director (Board) and president and COO of geneRx+

<u>1997- 2003:</u> Chief Medical Officer, SVP Strategic Drug Development, Clinical Development and

                Regulatory Affairs, AtheroGenics, Inc. Alpharetta GA

Responsibilities included:

- Managing annual budget that grew from $250,000 to > $20million
- Filing 5 INDs and acting as senior representative to HPFB and FDA
- Initial and subsequent clinical plans for AGI-1067, AGIX 4207 and AGI-1096
- Corporate Officer.  Member of IPO Team
- Establishing and managing a new development department that grew from n =1 to 29, including Development Chemistry, Toxicology, ADME and Biometrics/Data Management, Clinical Research and Safety; Regulatory Affairs and Quality Assurance;
- Chairman of Pharmaceutical Review Board for integration of Research and Development

- Acting VP licensing and corporate development 3/01 to 6/02

Activities/accomplishments included:

- Out-licensing of diagnostic in-licensed in 1997; in-licensing second AGI platform (11patents around MEKK technology) from National Jewish MRC (Denver)
- Founding member of Executive Committee;
- Presenter to potential investors and negotiator with all potential corporate partners;
- Execution of 10 Phase 1 studies (3 NCEs);
- Successful completion and reporting of Phase 2 study (AHA plenary session)
- Advancement of second NCE into Phase 2 and 3rd NCE into licensing discussions,
- Presentation of first and second strategic plan for AGI to Board of Directors.
- Successful IPO of AtheroGenics, Inc (AGIX) August 00.
- AGI Chair of Joint Management Committee with Schering Plough for co-development of AGI-1067:10/99- 10/01 (dissolution of collaboration).

1997    Consultant in clinical research and development to biotech and public companies

1995-6 Vice President and Director CardioPulmonary (Pulmonary/Diabetes) Therapeutic Unit
Clinical Research, Development and Medical Affairs, SmithKline Beecham Pharmaceuticals
Responsibilities included:

- Managing budget > $150 million and team of 55 FTEs (including 3 VPs)
- All aspects of phase 2 through 4 studies across a range of > 20 NCEs;
- Initial and subsequent clinical plans for NCEs (compound selection)
- Licensing diligence
- Providing strategic input as Senior Clinical Member of Cardiopulmonary TAT
- Filing NDA and MAA for TEVETEN, COREG (Heart Failure)
- Successful End of Phase 2 meeting and Phase 3 strategy for AVANDIA

1988-95  ICI Pharmaceutical Group and Zeneca PLC (Wilmington, DE)
Responsibilities included

- Managing budget that grew from $165,000 to > $30 million
- Filing 7 INDs and all aspects of phase 1 studies across a range of NCEs;
- Initial and subsequent clinical plans for ICI 204,219 (ACCOLATE)
- Developing, executing and reporting phase 2 studies for 5 pulmonary products
- Establishing and managing a new therapeutic team that grew from n =1 to > 30.
- Providing strategic input to all pulmonary and allergy projects
- International project Physician responsibility for ACCOLATE including Europe and Japan
- Preparation of NDA and MAA for ACCOLATE

**SPECIALTY CERTIFICATION:**

| | |
|---|---|
| 1980 | American Board of Internal Medicine |
| 1984 | Pulmonary Medicine (A.B.I.M.) |

2

**LICENSURE:**        PA MD 022820-E (inactive)

**PROFESSIONAL DEVELOPMENT AND CONTINUING EDUCATION:**

1999- present: Faculty of Pharmaceutical Education and Research Institute (PERI) Course Drug Development for Medical Scientists (DDMS-1) for doctors entering pharmaceutical industry: course covers pre-clinical and clinical activities through Phase 2 drug development and key elements of safety evaluation and reporting (pharmacovigilance) through life cycle of drugs

　　　　Invited Lectures: Good Clinical, Manufacturing and Laboratory Practices: what physicians
　　　　　　　　need to know (provided in 2010 to Astra Zeneca as teaching tool)

　　　　　　　　What Big Pharma and Small Pharma/ Biotech Value: drivers to strategic
　　　　　　　　decision making (presented with Dr. B. Spilker of PhRMA)

　　　　　　　　Preparation and Course facilitator of Workshops on IND, Phase 1 and
　　　　　　　　Phase 2 clinical trial development

2002- present:  Director of PERI Course DDMS-1

2004: Member of PERI faculty to develop on-line continuing education program for industry
　　　clinicians

**AWARDS, HONORS, AND MEMBERSHIP IN HONORARY SOCIETIES:**

| | |
|---|---|
| 1980-81 | Pennsylvania Thoracic Society Fellow |
| 1982-83 | American Thoracic Society Fellow |
| 1984-87 | E.L. Trudeau Fellow, American Thoracic Society |
| 1973 | Member, Sigma Xi |
| 1980 | Member, American Thoracic Society |
| 1991 | Member, American Academy Allergy & Immunology |
| 1991-9 | Member, Board of Directors, American Lung Association (ALA) of  Delaware |
| 1991-3 | Chairman, Medical Awareness Subcommittee,<br>International Pharmaceutical Aerosol Coalition (PACC/IPAC) |
| 1993-96 | Executive Board, American Lung Association (ALA) Delaware |
| 1996-7 | President - Elect Delaware Thoracic Society |
| 1997-8 | President, Delaware Thoracic Society |
| 1997 | Volunteer Excellence Award in Organizational Effectiveness; American<br>Lung Association (National Leadership Meeting) |
| 1997-8 | American Lung Association (national) Research Coordinating Committee |
| 1998 | ALA Scientific Advisory Board; Volunteer Leader Task Force on Self<br>Assessment and Strategic Planning |
| 1999 -2001 ALA: | Member of Strategic Planning Committeee (responsible for creation of<br>nationwide strategic plan adopted in 2001) |

3

2002- 08                Board of Governors, University of Chicago.  Oversight Committee for
                        Alumni Affairs

**ORIGINAL PAPERS:**

1.  Glass M, Kaplan JE, Macarak JE, Aukberg SA, Fisher AB, Serum fibronectin is elevated during normobaric and hyperbaric oxygen exposure in rats.  Am. Rev. Respir.  Dis 130:237-241, 1984.

2.  Glass M, Sutherland MW, Forman HJ, Fisher AB, Selenium deficiency potentiates paraquat-induced lipid peroxidation in isolated perfused rat lung. J. Appl. Physiol. 59:619-622, 1985.

3.  Sutherland MW, Glass M, Nelson J, Lyen Y, Forman HJ, Oxygen toxicity; loss of lung macrophage function without metabolite depletion.  Journal of Free Radicals in Biology and Medicine 1:209-214, 1985.

4.  Glass M, Forman HJ, Rotman EI, Clark JM, Pietra GC, Fisher AB, Bronchoalveolar polymorphonuclear leukocytes in pulmonary oxygen toxicity.  J. Hyperbaric Medicine, 1:107-121, 1986.

5.  Abrams WR, Kucich U, Kimbel P, Glass M, and Weinbaum G.  Acute cigarette smoke exposure in dogs: the inflammatory response.  Exper. Lung Res, 14:459-475, 1988.

6.  Smith LJ, Geller S, Ebright L, Glass M, and Thyrum PT.  Inhibition of leukotriene $D_4$-induced bronchoconstriction in normal subjects by the oral $LTD_4$, receptor antagonist ICI 204, 219.  Am Rev Respir Dis, 141:988-992, 1990.

7.  Bernstein JA, Greenberger PA, Patterson R, Glass M, Krell RD, and Thyrum PT  The effect of the oral leukotriene antagonist, ICI 204, 219, on leukotriene $D_4$, and histamine-induced cutaneous vascular reactions in man.  JACI, 87: 93-97, 1991.

8.  Glass M.  Early results with oral ICI 204,219.  Annals New York Academy of Sciences, 1991:629143-147.

9.  Glass, M.  Feasibility of an outcome trial in the preventive therapy of emphysema.  Annals New York Academy of Sciences, 624:195-208, 1991.

10. Glass M, Fisher AB, Alveolar lavage fibronectin in pulmonary oxygen toxicity.  J. Hyperbaric Medicine.

11. Anthonisen N, Connnett J, Friedman, B, Glass M, Kilday DP, Mingo TS, Rudolphus A, Williams GW. Design of a clinical trial to test a treatment of the underlying cause of emphysema.  AA NY Acad Sci, 624 Suppl: 31-34, 1991

12. Akers S, Kucich U, Swartz M, Rosen G, Glass M, Rosenbloom J, Kimbel P, Weinbaum G. Sensitivity and specificity of plasma elastin-derived peptides in chronic obstructive pulmonary disease.  Amer. Rev. Respir. Dis, 145: 1077-1081, 1992.

13. Findlay SR, Barden JM, Easley CB, Glass M.  Effect of the oral leukotriene antagonist ICI 204, 219 in antigen-induced bronchoconstriction in subjects with  asthma.  J Allergy Clin. Immunol. 89:1040-1045,  1992.

14. Ahn CM, Sandler M, Glass M, Saldeen, T. Effect of a synthetic leukocyte elastase inhibitor on thrombin-induced pulmonary edema in the rat.  Exper. Lung Res., 19: 125-135, 1993.

15. Smith LJ, Glass M, Minkwitz MC.  Inhibition of leukotriene D4-induced bronchoconstriction in subjects with asthma: a concentration effect study of ICI 204,219. Clin Pharmacol Ther, 54: 430-436, 1993.

16. Nathan RA, Glass M, Minkwitz MC. Inhaled ICI 204,219 blocks antigen-induced bronchoconstriction in subjects with bronchial asthma.  Chest, 105: 483-488, 1994.

17. Spector SL, Smith LJ, Glass M. Effects of 6 weeks of therapy with oral doses of ICI 204,219, a leukotriene D4 receptor antagonist, in subjects with bronchial asthma.  (ACCOLATE Asthma Trialists Group).  Am J Respir Crit Care Med, 150: 618-623, 1994.

18. Donnelly AL, Glass M, Minkwitz MC, Casale TB.  The leukotriene receptor antagonist, ICI 204,219 relieves symptoms of acute seasonal allergic rhinitis.  Amer J  Respir Crit Care Med, 151: 1734-1739, 1995.

19. Fish JE et al. Zafirlukast as therapy for mild to moderate asthma: a 13-week multicenter study.  Clinical Therapeutics: 1997

20. Tardif JC et al. AGI-1067 and Probucol reduce post angioplasty restenosis after percutaneous coronary intervention. Circulation (accepted for publication).

**ABSTRACTS (selected):**

1. Blank J, Glass M, Glasgow J, Burdette LJ, Weinbaum G.  Acute alveolar damage induces by exposure to $NO_2$.  Amer. Rev. Respir. Dis.  133:85A, 1986.

2. Glass M, Akers S., Wederbrand KS, Fibronectin concentration in rats with altered sensitivity to hyperoxia.  Amer. Rev. Respir. Dis. 135:A143, 1987.

3. Silverman S, Weinbaum G, Glass M, Alveolar permeability changes induced by acute exposure of rats to $NO_2$.  Amer. Rev. Respir. Dis. 135:A143, 1987.

4. Silverman S, Oppenheim DM, Glass M, Weinbaum G.  Neutrophil chemotaxis during the first twenty-four hours of exposure of rats to 30 ppm $NO_2$.  Amer. Rev. Respir. Dis. 135:A94, 1987.

5. Nguyenpho HT, Haas K, Glass M.  Effect of Vitamin E on occlusion and reperfusion arrhythmias and infarct size in canine model.  Chest:  1990.

6. Glass M, Wade M, and Campbell EJ.   The establishment of a library of patient samples to validate assays of elastase:  antielastase balance.  Amer. Rev. Respir. Dis.  143: A327, 1991

7. Nathan RA, Storms WW, Bodman SF, Minkwitz MC, and Glass M.   Inhibition by aerosolized ICI 204,219, $LTD_4$ receptor antagonist, of allergen-induced bronchoconstriction.  J. All. Clin. Immunol.  87:  256, 1991.

8. Smith LJ, Glass M, Miller CJ.  Effect of oral ACCOLATE (zafirlukast) on leukotriene D4 (LTD4)- induced bronchoconstriction in patients with asthma. Amer J Respir Crit Care Med 151: A378, 1995.

9. Calhoun WJ, Lavins BJ, Glass M.  Effect of ACCOLATE ( zafirlukast) on bronchoalveolar lavage fluid (BAL) after segmental antigen bronchoprovocation.  Amer J Respir Crit Care Med 151: A42, 1995.

5

10. Glass M, Snader LA, Israel E.  Effect of the inhaled $LTD_4$ receptor antagonist ICI 204,219 on cold air-induced bronchoconstriction in patients with asthma. J Allergy Clin Immunol 93: 295. 1994.

11. Spector SL, Miller, CJ Glass M, et al.  13-week dose-response study with Accolate (zafirlukast) in patients with mild to moderate asthma. Amer J Respir Crit Care Med 151: A379, 1995.

12. Kemp JP, Glass M, Minkwitz, MC.  Onset of action of the leukotriene-receptor antagonist zafirlukast ( ACCOLATE) in patients with asthma.  J Allergy Clin Immunol. 95: A844, 1995.

13. Nathan, RA Glass M, Snader LA, et al.  Effects of 13 weeks of treatment with ICI 204,219 (ACCOLATE) or sodium cromolyn  (INTAL) in patients with mild to moderate asthma.  J Allergy Clin Immunol. 95: A990, 1995.

14. 15 and 16 on AGI-1067 and CART-1 (Circulation 2001 and 2002)

**EDITORIALS:**

1. Fisher AB, Forman HJ, and Glass M, Mechanisms of pulmonary oxygen toxicity Lung.162:255-259, 1984.

2. Glass M, Karnovsky  M, and Fishman A.  Oxygen Free Radicals.   Proceedings of NIH symposium Dec 10-12, 1986 Summary of Frontiers in Basic Sciences that Relate to Heart, Lung and Blood Diseases Symposium.  (published by NIH).

**INVITED TALKS (selected):**

New York Academy of Science, "Early results with ICI 204,219 (NYAS)," London, UK. October 1991

NYAS, "Testing novel therapy in preventing emphysema," Orlando, Florida May 1991

Eighth Intl Conference on prostaglandins, "ICI 204,219," Montreal, Canada July 1992

American Thoracic Society Evening Symposium, Miami, Florida May 1992

IBC Conference New drugs for asthma (Chairman), Washington, D.C. October 1992

National Asthma Education Prog. Workshop Chair, "CFC's," Washington, D.C. December 1992

AAAI Clinical Research Coordinators' Course, Chicago, Illinois March 1993

Eur Respir Soc. (ERS), "Clinical Results for ICI 204,219," Florence, Italy September 1993

Interasthma, "Results with zafirlukast," Jerusalem, Israel October 1993

American Thoracic Society Evening Symposium, Boston, Massachusetts May 1994

Eur Respir Soc., "Compliance with novel oral therapy," Nice, France October 1994

First global symposium on asthma, "Plenary talk on new therapy for asthma," Chicago, Illinois July 1995

ERS Symposium Chairman, "Role of pranlukast in pediatric asthma," Stockholm, Sweden September 1996

Marcel Dekker Publishers, "Role of 5-lipoxygenase products in asthma," Puerto Rico March 1997

Conference organizer: "When zero percent is not enough; Atherosclerosis treatment in the era of coated stents" (Symposium associated with ACC Meeting; symposium proceedings accepted for publication). Atlanta, Georgia March 2002

Regulatory framework for establishing a US subsidiary for Japanese Pharma Co., Philadelphia, Pennsylvania December 2005

Early Stage East, panelist on "Venture capital: the entrepreneur's perspective," Philadelphia, Pennsylvania May 2008