UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| ———————————————— | : | |
| N.A. Lambrecht and Jeffrey P. Jannett, | : | |
| Derivatively on Behalf of Nominal | : | |
| Defendant Eli Lilly & Company | : | |
| | : | |
| Plaintiffs, | : | C.A. No. 1:08-cv-0068-DFH-TAB |
| | : | |
| v. | : | |
| | : | |
| Sidney Taurel, John C. Lechleiter | : | |
| Sir Winfreid Bischoff, J. Michael Cook, | : | |
| Franlyn G. Pendergast, Kathi P. Seifert, | : | |
| George M. Fisher, Alfred G. Gilman, | : | |
| Martin S. Feldstein, J. Erik Fyrwald, | : | |
| Ellen R. Marram, Sir John Rose, | : | |
| Charles E. Golden, Steven C. Veering, | : | |
| August M. Watanabe, Linda Lay, | : | |
| Randall L. Tobias and | : | |
| J. Clayburn LaForce, Jr., | : | |
| | : | |
| Defendants | : | |
| | : | |
| -and- | : | |
| | : | |
| ELI LILLY & COMPANY, | : | |
| | : | |
| Nominal Defendant. | : | |
| ———————————————— | : | |

**Declaration of Professor Donald C. Langevoort**
**<u>Regarding the Substantive Benefits of the Settlement Terms</u>**

I, Donald C. Langevoort, under penalties as provided by law, declare that the statements set forth

in this instrument are true and correct.  I am over the age of 21, and have personal knowledge of

the facts stated herein.

1.      Plaintiffs' counsel in the above-captioned matter has asked me to review the proposed settlement terms and opine as to whether these reforms offer substantial benefits to Eli Lilly & Co. ("Lilly") and its shareholders.[1]

**Personal Background and Qualifications**

2.      I am the Thomas Aquinas Reynolds Professor of Law at the Georgetown University Law Center in Washington, D.C.  Prior to joining the Georgetown faculty in 1999, I was the Lee S. & Charles A. Speir Professor of Law at the Vanderbilt University School of Law in Nashville, Tennessee.  I have also been a visiting professor at the Harvard Law School, the University of Michigan Law School, and at the University of Sydney School of Law in Australia.  Before going into academia, I was a Special Counsel in the Office of the General Counsel at the United States Securities & Exchange Commission in Washington.  A copy of my curriculum vitae is attached as Exhibit A.

3.      My research and teaching is devoted to the fields of securities regulation, corporate governance and corporate behavior.  I have published numerous books and articles dealing with these subjects, all of which are set forth in my C.V., including work devoted to corporate compliance and internal controls programs.  I have testified before committees of the United States Congress numerous times on proposed securities reform legislation, and in November 2002, I testified about corporate compliance before the Ad Hoc Advisory Group on the Organizational Sentencing Guidelines, convened at the request of the United States Sentencing Commission.  The work of the Ad Hoc Advisory Group resulted in significant

---

[1]   My opinion is based on a review and analysis of the terms of the settlement and certain other materials relating to the above-captioned litigation.  I have not made any independent factual investigation into the Lilly's prior or existing corporate governance or internal controls policies and procedures, or into the merits of Plaintiffs' case.  I am not in a position to address, and do not express any opinion regarding, the extent to which the reforms described in the Proposed Settlement are the product of Plaintiffs' efforts as opposed to other factors.

changes to the OSG as they relate to compliance programs in U.S. business enterprises, some of which are discussed below.

**The Proposed Settlement**

4.      As I understand the proposed Settlement, it responds in part to concerns raised by the Plaintiffs about the adequacy of the oversight by Lilly's Board of Directors with respect to concealment of risks and off-label and other unlawful marketing practices by Lilly employees relating to a number of the company's products, particularly its best-selling drug Zyprexa.  These alleged practices ultimately led to substantial criminal and civil fines and sanctions imposed by the United States Department of Justice, the Department of Health and Human Services, and various state governments, as well as large settlements arising out of class actions brought by users of Zyprexa.  All in all, Lilly has paid over $2 billion in fines, penalties and settlements arising out of these matters, and additional claims are still pending.

5.      I have been asked to address a series of corporate governance and internal controls reforms agreed to as part of the Proposed Settlement to opine as to whether they would improve Lilly's compliance and risk management systems, and thereby benefit the Company and its shareholders. These reforms are detailed and wide-ranging, and I do not attempt to summarize or review all of them in this Report.  Rather, I will focus on those that I consider particularly significant.

6.      There are two central objectives of the reforms.  One is the adoption of policies and procedures to make objective scientific inquiry, analysis and communication in matters affecting patient benefit and safety the Company's paramount objective.   The Proposed Settlement describes this as the "Product Safety and Medical Risk Management Core Objective" (referred to as the "Scientific Core Objective").   To this end, many of the reforms in the

Proposed Settlement address the work of the Science and Technology Committee ("STC") of the Lilly Board of Directors, which is made up solely of independent directors and which has responsibility over issues relating to the safety and effectiveness of Lilly's products, and of the Chief Medical Officer ("CMO"), who is in charge of the company's medical, regulatory and safety practices. These reforms seek to assure that, in a regular and meaningful way, the CMO reports to, works closely with, and is accountable to the STC, while at the same time remains fully integrated into the management of Lilly at the highest level. The Proposed Settlement also creates new positions (*e.g.*, Product Safety Physicians for each product) and substantially increases the responsibilities of the Vice President of Global Patient Safety ("VP-GPS"), together expanding the oversight and authority of the CMO throughout the life-cycle of Lilly's product development, testing and marketing.

7. The second central objective under the Proposed Settlement is for Lilly to seek to operate its business in a way that earns the trust and respect of patients and customers; operate its business in compliance with applicable law and regulations; conduct its activities and have policies and procedures in place to avoid adverse regulatory enforcement action; and promptly detect, correct and prevent the recurrence of the actions that led to the derivative lawsuit. This is described under the Proposed Settlement as the "Compliance Core Objective." To this end, the Proposed Settlement expands and enhances the separate governance structure for non-financial compliance risks, through the Public Policy and Compliance Committee ("PPCC") of the Lilly Board of Directors, which oversees and works closely with the company's Chief Ethics and Compliance Officer ("CECO"). The role, responsibilities and authority of the CECO is also strengthened by adding new senior support positions so as to create a more powerful and wide-ranging compliance platform within Lilly.

8.    All reforms that are part of the Proposed Settlement – in particular the commitment to effective implementation of the two Core Objectives – must be maintained over the course of a three-year period (referred to as the "Agreed Upon Term"), after which Lilly will evaluate their efficacy and determine whether to continue or modify them.   This three-year period is a reasonable amount of time for the reforms to affect the routines and culture at Lilly with respect to the Core Objectives, in a way that should have lasting effects thereafter.   My opinion about the benefits that come from reforms like these is based on their cumulative effect, as opposed to each or any reform taken by itself.

9.    I do not profess expertise on the compliance and risk management issues specific to the pharmaceutical industry, and am thus not in a position to assess particular internal control mechanisms designed to manage those specialized issues.   For this reason, I rely heavily on the Report of Dr. Mitchell Glass, dated February 23, 2010, which addresses those issues in detail and concludes that the reforms in the Proposed Settlement relating to the STC and CMO function will substantially benefit Lilly and its shareholders.   My task in this respect is largely to supplement his report and explain how the reforms undertaken pursuant to the Proposed Settlement are consistent with frameworks for best practices that have emerged with respect to corporate compliance and risk management more generally.

**Frameworks for Evaluating Corporate Compliance and Risk Management Practices**

10.    Companies and their shareholders benefit substantially from high quality compliance and risk management programs.   The most obvious benefit is preventative: such programs reduce the risk of illegal or otherwise dangerous activity, which can cost a company billions of dollars in fines, penalties, judgments and lost business.   The last decade has provided many high-profile examples of compliance or control failures that have been extraordinarily

costly, and in some cases resulted in the demise of the company itself. There is also the benefit that comes if, notwithstanding the presence of a high-quality compliance program, misconduct nonetheless occurs and is discovered. The federal Organizational Sentencing Guidelines ("OSG"), discussed below, state that the criminal sentence of a corporation will be adjusted downward – perhaps substantially – if it was found to have in place "effective programs to prevent and detect violations of law." Moreover, under Department of Justice internal policy, the decision whether to prosecute a corporation in the first place will be heavily influenced by the Department's assessment of the quality of the corporation's compliance practices and procedures. The Department of Justice uses the OSG as its reference point in making these decisions.[2]

11. Notwithstanding these benefits, there is no affirmative legal requirement that companies have high-quality compliance or risk management systems in place, except with respect to disclosure and financial reporting systems under the Sarbanes-Oxley Act of 2002. As a result, there remains wide variation in the quality of systems adopted by U.S.-based companies. The recent financial crisis has offered many examples that suggest persistent deficiencies in compliance and risk management, even among the country's largest and most heavily regulated financial institutions.

12. The immense challenge associated with compliance and risk management comes largely from understandable but misaligned incentives. Individual managers and management teams are under great short-term pressure to meet often aggressive performance targets, which tempts them to cheat by either violating the law to gain some competitive advantage, or take on additional risk to bolster the chance of meeting or exceeding those goals. Compensation plans

---

[2]   Department of Justice policy with regard to corporate governance reforms is discussed in Brandon Garrett, *Structural Reform Prosecution*, 93 Va. L. Rev. 853 (2007).

often amplify these pressures, creating over-sized bonuses or options-based benefits if – but only if – the near-term goals and targets are surpassed.  Conversely, employees may have substantial fear about the reputational and career consequences of falling short.  While there certainly may be adverse reputational and career consequences from cheating or taking excessive risks as well, these are neither as immediate nor as certain.  Internal cultures often develop in way that encourages aggressiveness and inattention to strong compliance norms, blinding managers to the longer-term risks.

13.     For various reasons, the boards of directors of many companies have not sought to counteract this temptation by demanding strong compliance and risk management control systems.  Because there is arguably no legal requirement for directors to do so, and because such initiatives often encounter strong internal resistance and pushback, a weak system is the easiest course to follow.  In my view, which is shared by many other commentators, too many boards still operate on a "check the box" mentality, leaving the task of compliance and risk management to the senior executive team so long as some formal system seems to be in place.  To a large extent, the compliance industry of consultants and lawyers who recommend systems have catered their products to senior managers rather than strong independent directors, so that the systems marketed to and adopted by many companies leave too much slack.

14.     There are two main frameworks that are used to evaluate and assess a particular company's compliance and internal control systems.  Because the needs and circumstances of each individual company are different, these frameworks are very open-ended – just a starting point for evaluation of a program suited for the needs of a given company.  The first of these are the Organizational Sentencing Guidelines themselves, which in Section 8B2.1(b), "Effective Compliance and Ethics Programs," describes seven fundamental requirements for a qualifying

program.   As noted earlier, the OSG are used not only for sentencing decisions after criminal conviction but also in the determination by the Department of Justice whether to bring a case against a corporate defendant in the first place.  Courts and other government agencies have referred to the OSG as authoritative as well.

15.     The other framework, which is more elaborate, was developed by a non-governmental organization, the "Committee of Sponsoring Organizations of the Treadway Commission on Fraudulent Financial Reporting," known as "COSO."   The Treadway Commission was formed in the 1980's to study the problem of fraudulent corporate disclosures, and recommended that better guidance be developed to assist companies with their internal controls.  Because many instances of false disclosure involve compliance failures, compliance programs were included in the scope of these recommendations.  COSO was formed shortly thereafter to develop a more elaborate set of principles as a framework for companies to follow. In 1992, COSO issued its landmark report, *Internal Control – Integrated Framework*, which remains the most well-known framework for evaluating such systems.  In rule-making under the Sarbanes-Oxley Act mandating internal controls over financial reporting in 2003, the SEC endorsed the COSO principles as a "suitable, recognized" framework for internal controls.  The SEC's rules, however, do not mandate an effective compliance system except as it relates to financial reporting and required disclosure.

16.     In addition to these two main frameworks, COSO has more recently recognized that a state of the art internal controls system should address not only financial reporting and legal compliance but the entire set of operational risks faced by a company.  In 2004, COSO published a new report entitled *Enterprise Risk Management – Integrated Framework*, calling on companies to treat risk more broadly and utilize tools and techniques that constitute best

practices for management risks throughout the enterprise.  Although enterprise risk management (ERM) best practices are increasing in use, they have not been thoroughly embraced for many of the same reasons that effective compliance systems are resisted: the incentive structure for corporate managers too often rewards excessive risk-taking, the adverse consequences of which are borne by the company and its shareholders.  Surveys of directors have shown that many still think of risk management as either a financial or internal audit matter rather than a company-wide challenge.[3]

**Evaluating the Proposed Settlement**

17.    The frameworks for evaluating high-quality internal control and compliance systems just described share the same basic insights.  Compliance breakdowns are most likely to occur when the people responsible for preventing and in the position to avoid inappropriate behavior are also responsible for delivering operational results – revenues and profits – and hence subject to conflicting pressures.  They also occur when there compliance-related information is fragmented inside the organization, so that no single responsible person or team is able to see the whole picture.  Thus, good compliance involves situating responsibility, power and authority in the hands of people who face less conflicting pressures, while at the same time integrating them effectively into the day-to-day operations of the company and conveying the message that *all* company personnel must make compliance and risk management important goals in their everyday activities.  By all accounts, this is a difficult challenge.  To accomplish this, the Proposed Settlement would require reforms that can be divided into five categories: changes at the board level; changes at the management level; discipline and compensation; tone at the top; and other specific reform initiatives.  I will address each of these categories in turn.

---

[3]  *See* The Conference Board, *Emerging Governance Practices in Enterprise Risk Management*, Res. Rept. No. R-1398-07-WG (2007), at 14-15.

### A. *Changes at the Board Level*

18.     As a matter of corporate law, all power and authority over the business and operations of the company resides in the board of directors.  The Organizational Sentencing Guidelines make clear that the board – not just company management – must take ownership and responsibility over compliance by saying that "the organization's governing authority shall be knowledgeable about the content and operation of the compliance and ethics program and shall exercise reasonable oversight with respect to the implementation and effectiveness of the compliance and ethics program."   Similarly, COSO says that "[a] strong active board, particularly when coupled with effective upward communications channels and capable financial, legal and internal audit functions, is often best able to identify and correct [problems]" (*Integrated Framework*, p. 7); elsewhere, it goes on to say, "[t]he control environment and 'tone at the top' are influenced significantly by the entity's board of directors and audit committee. Factors include the board or audit committee's independence from management, experience and stature of its members, extent of its involvement and scrutiny of activities, and the appropriateness of its actions" (*Integrated Framework*, p. 26).

19.     The main value of board-level involvement in compliance and risk management comes from the presence of independent directors, who today make up a majority of the boards of most all publicly-traded companies.   As noted earlier, management (including "inside" directors) faces extraordinary performance pressures.   Independent directors – in essence, the shareholders' voice on the board – do not share those same pressures, and there is research to show that greater director independence is associated with higher levels of corporate compliance

in those areas (like fraudulent financial reporting) where the directors become actively involved.[4]

Unfortunately, many independent directors avoid such involvement because of the difficulty and

challenge of the task and because there is no specific, affirmative legal requirement that compels

such involvement.  The result is excessive managerial autonomy over compliance and enterprise

risk.

20.     The following sections describe the authority and responsibilities of various board

committees that would be required (or required to be maintained) pursuant to the Proposed

Settlement:

### a.  The Science and Technology Committee

21.     The charter of the Science and Technology Committee ("STC") of the Lilly

Board, which is a committee made up entirely of independent directors, is revised to strengthen

its role in helping Lilly achieve the Scientific Core Objective.  The STC meets at least three

times a year, more as needed.  The STC has specific responsibility for advising the full Board on

scientific matters relating to product safety and effectiveness with respect to marketed products

and those in late-stage development, and assisting the Board in exercising reasonable oversight

over product safety and medical risk management.

22.     The STC must obtain from management on a periodic basis (or more frequently if

the CMO or the Committee deems necessary) reasonable assurance of the effective design and

implementation of policies and procedures necessary to satisfy the Scientific Core Objective,

along with the identification of important medical and scientific risks and the resolution of those

risks.  It must annually assess its own effectiveness and the adequacy of the information flows

that it is receiving and to make or recommend appropriate changes. Not less than annually, a

---

[4]    *See, e.g.*, Hatice Uzin et al., *Board Composition and Corporate Fraud*, Financial Analysts J., May-June 2004, at 33.

report concerning unresolved patient safety and utility issues that have been elevated to the Corporate Patient Safety Committee and the remediation of such issues is to be provided to the STC.  To help carry out these various tasks, the STC has the authority and responsibility to retain advisers and consultants as necessary and appropriate to meeting its duties and responsibilities.

23.     Because independent directors are not involved with the company on a day-to-day basis, their involvement means little unless they gain sufficient knowledge of compliance or risk-related matters to play a constructive role in addressing those issues.   COSO is specific in saying that the involvement of the board of directors in compliance and risk management oversight must be evaluated in large part by reference to the "sufficiency and timeliness with which information is provided to board or committee members, to allow monitoring of management's objectives and strategies, the entity's financial position and operating results and terms of significant agreements" and the "sufficiency and timeliness with which the board or audit committee is apprised of sensitive information, investigations and improper acts (*e.g.*, travel expenses of senior officers, significant litigation, investigations of regulatory agencies, defalcations . . . .)" (*Integrated Framework*, pp. 31-32).

24.     To this end, the Chief Medical Officer ("CMO") shall make reports directly to the STC and attend STC committee meetings as needed.  Not less than annually (and as reflected in the Medical Review Committee and the Safety Review Committee Charters) the CMO will report concerning the Medical Review Committee's conclusion that the Company has taken necessary and appropriate steps to discover, analyze, interpret, investigate and communicate significant patient safety risks, or plans sufficient to permit such a conclusion on a basis acceptable to the STC.  This report brings the independent directors who make up the STC into regular involvement on fundamental questions involving whether Lilly is satisfying the Scientific

Core Objective of making objective scientific inquiry the driver behind how the company's products are developed, marketed and sold.

25.     There are other required reports by the CMO as well.  With respect to product launches, there will be a separate report that the planned scope of any initial marketing is appropriate.  There will be prompt reports concerning patient safety issues relating to labeling or product promotion, or other product safety matters, where escalation of the issue to the STC is desirable in the judgment of the CMO.  In addition to the CMO, the VP-GPS also reports directly to the STC regarding patient safety.  Not less than annually, the VP-GPS must report regarding unresolved patient safety and utility issues that have been elevated to the Corporate Patient Safety Committee, and on the remediation of such issues.  Separately, the Vice President of Quality is assigned to monitor and audit the policies, procedures, systems and internal controls implemented to achieve the Scientific Core Objective and report any significant findings to the STC not less than annually, or promptly as needed.

### b. Public Policy and Compliance Committee

26.     Other compliance-related concerns addressed by the Proposed Settlement involved Lilly's alleged violations of other federal and state regulations relating to the sales and marketing of its products (*e.g.*, state and federal Medicare requirements).  Responding to this, the Proposed Settlement enhances and expands the responsibilities and duties of the Public Policy and Compliance Committee of the Board ("PPCC"), which is made up solely of independent directors.  The PPCC has oversight over the implementation and effectiveness of Lilly's internal controls over non-financial legal and regulatory compliance to help Lilly achieve the Compliance Core Objective.  It will meet at least five times per year, and more if necessary; at least four times each year, it will review and oversee significant elements of the compliance program and

receives updates about the activities of Lilly's Chief Ethics and Compliance Officer ("CECO") and other compliance personnel, including on substantive and preventive compliance matters. As with the STC, the PPCC is authorized to retain its own independent advisers to help it carry out its work.  It, too, must assess annually the adequacy of reporting and information flows it is receiving and make such changes as are required to maintain and enhance its effectiveness, including recommending changes in its charter or personnel to the full Board.

27.     Central to the work of the PPCC is reporting from the principal compliance officers at Lilly, particularly the CECO.  The PPCC and the CECO must jointly develop an agenda that specifies at least four substantive reports per year on compliance matters; implementation of existing compliance programs; processes for receiving and investigating compliance or ethics-related complaints; exceptions reporting; emerging compliance trends; and other important issues.  Importantly, the CECO will report compliance matters directly to the Chair of the PPCC if, in the CECO's view, prompt reporting is warranted.   The Proposed Settlement specifically provides that the chairman of the PPCC, in consultation with the committee, must approve the appointment and retention of the CECO.

28.     The PPCC will also review annually and approve aspects of Lilly's integrated audit plan for certain regulatory and compliance matters, and receive reports from the General Auditor on the annual audit plan, as well as prompt reports regarding material findings and management will provide follow-up reports until such time as the findings have been remediated to the PPCC's satisfaction.  At least annually, the PPCC will receive a report from the General Auditor regarding the Internal Audit Department's assessment of the effectiveness of the company's compliance and related risk management controls.  A similar review, approval and reporting procedure is created by those aspects of the audit plan, such as Good Manufacturing

Processes, over which the Vice President of Quality rather than the General Auditor has primary responsibility.

29.     The CECO, the General Auditor, the Vice President of Quality and the General Counsel will have direct access to the PPCC and will regularly be invited to attend Committee meetings, and the CECO, General Auditor and Vice President of Quality will have private sessions at least semiannually with the PPCC to discuss, among other things, management support for their organizations, including resources and management tone.

### c.  Enterprise Risk Management

30.     The Proposed Settlement also addresses board-level provisions designed to improve Lilly's enterprise risk management system.  Consistent with the 2004 COSO guidelines on enterprise risk, the PPCC is given responsibility for overseeing the processes by which ERM programs are reviewed by Lilly's Board and its various committees, and has specific responsibility for oversight of the non-financial compliance risk aspects of the ERM program.[5] To this end, it will receive a report each year from the CECO regarding the design, implementation and operation of the ERM program, as well as reports concerning risk management aspects of the company's strategic initiatives.  At least once a year, the PPCC will meet in joint session with the Audit Committee to review major non-financial compliance matters, and will coordinate with the Audit Committee to assist in assuring that appropriate risk disclosures are included in the company's public financial reports as required by law.

### d.  Other Board-level Reforms

31.     In addition to the specific reforms relating to responsibilities and authority of the STC and PPCC, the Proposed Settlement addresses a number of other board-level matters.  The

---

[5]  Specific board level involvement in ERM is also identified as a best practice in *Emerging Governance Practices in Enterprise Risk Management*, supra, at 31-33.

new director orientation program will be enhanced to include, among other things, emphasis on compliance-related matters.  The "cooling off" period for former employees or affiliated persons to join the Lilly Board of Directors is extended to four years.  It creates a presumptive limitation of four public company directorships a Lilly director may hold.   The company's Corporate Governance Guidelines are revised to make clear that directors are encouraged to raise and discuss items for inclusion on the Board agenda with the Chairman, the Presiding Director or the Corporate Secretary.  The qualifications of Board nominees will be assessed, among other things, in the context of the committee assignments the member would receive.  The policy in the Corporate Governance Guidelines prohibiting directors from drawing from their stock-based compensation until they have left the Board will be maintained.  The Presiding Director on the Board will be elected annually by the independent directors on the Board.  And the annual Board and committee assessment questionnaires will have a specific question relating to compliance and oversight, including adherence to responsibilities created by the Proposed Settlement.

### B. *Changes at the Management Level*

32.      As discussed above, both COSO and the Organizational Sentencing Guidelines express the view that a well-designed compliance and internal controls system must address the problem of information flow as well as the problem of incentives.  Senior managers with clearly defined compliance responsibilities, sufficiently independent of the conflicting pressures to increase sales and revenues or cut expenses, are better positioned to discover compliance-related risks and act promptly in response.  As stated in one of the leading treatises on internal compliance, "compliance officers' obligations are limited to compliance and there is no

possibility of conflicting responsibilities or demands.  The compliance officers' focus on driving compliance throughout the business can thus be very concentrated."[6]

33.     In turn, these managers should have reporting responsibilities that go directly to the relevant committees of the company's board of directors when necessary so that the independent directors can effectively carry out their responsibilities and exercise their authority as described in the previous section without the information being "filtered" by senior corporate management.  The OSG, for example, specifically addresses the need to assure that managers with compliance responsibilities report periodically to the board on compliance and ethics issues, and be granted "direct access" to the board or relevant committee.

34.     Just as the Board-level functions of oversight of compliance and risk management are divided between the STC and the PPCC, the Proposed Settlement reorganizes and enhances managerial oversight at Lilly in two distinct parts.  To promote the Scientific Core Objective, Lilly's Chief Medical Officer (CMO), with executive authority over scientific and medical functions (including the Global Medical, Regulatory and Safety Departments), has – among other things – executive authority over all medical physicians employed in drug development and medical research on issues of drug utility and safety and regulatory compliance.  The CMO also chairs Lilly's Medical Review Committee.  As discussed earlier, the CMO reports regularly to, and works directly with, the STC to assure appropriate board-level involvement on compliance and risk management issues related to drug utility and safety and regulatory compliance.  The CMO, in turn, is supported by the Vice President, Global Patient Safety ("VP-GPS"), who, among other things, will pursuant to the terms of the Proposed Settlement supervise a set of Product Safety Physicians ("PCP") for each product or compound in development or on

---

[6]   JEFFREY M. KAPLAN & JOSEPH E. MURPHY, COMPLIANCE PROGRAMS AND THE CORPORATE SENTENCING GUIDELINES 9-19 (rev. ed. 2008-09).

the market.  These PCPs have detailed and extensive responsibilities for patient safety issues relating to that compound or product.

35.     The CECO, along with the CEO, are responsible for achieving the Compliance Core Objective at Lilly.  The Proposed Settlement substantially enhances the CECO's authority and responsibilities in connection with non-financial compliance and enterprise risk management ("ERM") functions.  The CECO will be a member of the senior management of the Company and will be a member of the Executive Committee – Lilly's most senior management committee. The CECO reports directly both to Lilly's chief executive officer and to the PPCC, thereby making him or her accountable specifically to the board committee charged with monitoring Lilly's compliance and risk management functions, as well as establishing a presence at the highest level of the senior management team.  In addition, as noted earlier, the appointment and retention of the CECO must be approved by the Chair of the PPCC, in consultation with other PPCC members.

36.     As described above, the Proposed Settlement expands the scope and nature of CECO reporting to the PPCC.  In addition, to support the work of the CECO, Lilly shall create four new senior level positions: the Vice President, Global Compliance Strategy and Enterprise Risk Management (who is involved in developing Lilly's compliance policies and procedures and responsible for driving a culture change to reflect highly ethical behavior); the Senior Director, Enterprise Risk Management (who assists the CECO on risk management matters); the CIA Project Manager (who assists the CECO in compliance with the Corporate Integrity Agreement entered into with the Department of Health and Human Services in January, 2009); and the Vice President, Global Ethics and Compliance Officer, Business Liaison (who oversees compliance at affiliated entities in the U.S. and abroad).  Compliance officers in the U.S. and

international affiliates will have responsibility for promoting compliance in those affiliates. Those compliance officers will report directly up through the Vice President, Global Ethics and Compliance Officer, Business Liaison, to the CECO, further strengthening the independence of the compliance function from the business units.

37.     Lilly will provide the CECO with sufficient staff and funding to fulfill his or her responsibilities.  On an annual basis, the CECO will assess the staffing and funding necessary to carry out these responsibilities, and in consultation with Lilly's Chief Executive Officer, reorganize, reduce or augment the staff.  Moreover, if, during the Agreed Upon Term, the CECO wishes to seek additional funding for compliance-related expenditures, he or she shall be permitted at his or her option to petition directly the Board or an appropriate committee of the Board that such funding be included in or covered by business plans and budgets that are approved by the Board or such committee.

38.     Internal investigations on compliance-related matters shall be conducted under the authority of the CECO (except for those conducted by the Law Division under the attorney-client privilege) and human resource related violations led by the Human Resources Department.

39.     Any exceptions to the company's compliance related policies must be approved in advance by the department with responsibility for the policy or procedure in question.  Such exceptions must first be reviewed by the Legal Department and the CECO (or the CECO's designee).  Any determination contrary to the recommendation of the CECO must be reported immediately to the CECO.

40.     The structure of the CECO responsibilities set forth in the Proposed Settlement are consistent with emerging best practices as articulated in a recent white paper by the Ethics

Resource Center, *Defining the Role of the Chief Ethics & Compliance Officer*, issued in 2007.[7] That report notes that there is not one design appropriate to all companies, and that too much separation and independence in the compliance function can be counterproductive because it isolates compliance from the day-to-day operations of the company.  It does conclude, however, that the CECO should be (1) held accountable to the governing authority while carrying out its delegated fiduciary responsibilities; (2) independent to raise matters of concern without fear of reprisal or a conflict of interest; (3) connected to company operations in order to build an ethical culture that advances the overall objectives of the business; and (4) provided with authority to have decisions and recommendations taken seriously at all levels of the organization.  It urges a balance between the CECO's accountability to the board and his or her integration within the managerial structure of the company – it is essential to have a close working relationship between the CECO and the company's CEO as well as a close working relationship with the board and its committees.  As described above, each of these elements is addressed by the reforms in the Proposed Settlement, which carefully tries to reach a balance between independence and integration.

41.     The CECO is responsible for Lilly's ERM function.   To enhance the enterprise risk management function at Lilly, the Proposed Settlement, as noted earlier, requires the creation of new positions of Vice President, Global Compliance Strategy and Enterprise Risk Management, and Senior Director, Enterprise Risk Management, who report to and/or assist the CECO.  The Proposed Settlement also expands the responsibilities of Lilly's Compliance and Risk Management Committee – made up of senior managers from throughout the Lilly

---

[7]  Available at www.ethics.org/CECO.  The Kaplan & Murphy treatise, *supra*, refers to the CECO white paper as a "turning point in the evolution of corporate compliance and ethics efforts."  COMPLIANCE PROGRAMS AND THE CORPORATE SENTENCING GUIDELINES, at 39-40 (2008-09 Supp.).

organization, and chaired by the CECO – to include enterprise risk management (including assisting the CECO in identifying, prioritizing, assessing, evaluating and mitigating risks throughout the enterprise), and states that the enterprise risk management function shall be designed with consideration to COSO's 2004 *Integrated Framework*.  In addition, the Settlement provides for direct reporting by the CECO to the PPCC in connection with ERM at Lilly, and for Board level oversight of, among other matters, resource allocation to the CECO related to compliance and ERM functions.

### C.  Compensation and Discipline

42.     Because most serious compliance issues result from incentive pressures, it is essential that the compensation and discipline system recognize the paramount importance of compliance and ethics and assure that there are appropriate penalties for poor compliance and ethics and rewards for good compliance and ethics.

43.     The Proposed Settlement requires that company employees be subject to appropriate disciplinary action if they violate any law regulation, or company policy or procedure, including federal health care program requirements, FDA requirements, or company policy related thereto.  The CECO will provide an organization-level summary of disciplinary actions on a quarterly basis to the CEO, who will be advised specifically of all compliance related performance issues and disciplinary actions involving senior management, and be involved in determining the associated compensation consequences that will result from these issues and actions.

44.     At least during the Agreed Upon Term, all employees shall continue to be evaluated based in part on their adherence to Lilly's Code of Conduct (*The Red Book*).  Senior managers must have a compliance objective and measurement in their annual performance

management plans, with periodic monitoring and auditing to assure adherence to this requirement. Achievement of performance objectives will, in turn, factor into compensation decisions. The CECO will provide compliance performance feedback both to the CEO and the Senior Vice President for Human Resources. The specific design and implementation of sales incentive programs will be undertaken with oversight from Sales and Marketing Compliance and Global Compensation and Benefits.

45.     Lilly's CEO will discuss the compliance performance of Lilly's executive officers with the Compensation Committee of the Board of Directors in connection with the annual reviews of the performance and compensation of those executive officers. The Vice President of Human Resources, Global Compensation and Benefits will report annually to the Compensation Committee on the results of the periodic monitoring of compliance objectives for senior executives noted above. At year end, the CECO, Chief Audit Officer and Vice President of Global Compensation and Benefits will review the performance and compensation outcomes for all senior management, which audit will include a review of actions taken pursuant to the semi-annual executive review of compliance and ethics requirements.

46.     The Proposed Settlement also directly ties the compensation and career advancement of PSPs to their compliance with meeting their obligations to patient safety. Specifically, the VP-GPS's recommendations regarding the hiring, retention, performance evaluations, compensation and promotions of PSPs shall afford primary weight to the assessment of each PSP 's effectiveness in promoting the Scientific Core Objective with respect to the product or products for which that PSP has responsibility.

### D. *Tone at the Top*

47.    Both COSO and the OSG emphasize the need for a "top-down" commitment by the Company's board of directors and senior management to a culture of integrity and responsibility.  The OSG states that organizations must "promote an organizational culture that encourages ethical conduct and a commitment to compliance with law."  Similarly, COSO states that "the effectiveness of internal controls cannot rise above the integrity and ethical values of the people who create, administer and monitor them" (*Integrated Framework*, p. 23).

48.    To help assure that the right tone is set at the top of the Lilly organization, Lilly's CEO and the Chairman of the Board of Directors, in consultation with the CECO, shall design periodic communications regarding a culture of compliance and performance with integrity.  The CEO will meet at least annually with senior management to emphasize the importance of compliance and to emphasize their roles and accountability for both compliance and ethics at Lilly.

### E. *Funding*

49.    The OSG requires that the individuals within the organization who are given compliance oversight responsibilities have "adequate resources" to perform their tasks.  While this is a vague admonition, it reflects the concern that companies are inclined to short-change their compliance programs, thereby disabling what on paper appears to be a first-rate system. The reason is not necessarily sinister.  Good compliance programs do not generate measurable "return on investment" or other metrics that are important when corporate budgeting decisions are made.  More immediately justifiable investments tend to get priority, even though the costs to the company from compliance and ethics failures can be catastrophic.  To this end, Lilly agrees

that for the Agreed Upon Term it will commit from its treasury funds as are necessary to implement the provisions set forth in the Proposed Settlement.

**Summary and Conclusion**

50.     The frameworks put forth by COSO and in the OSG share the common assumption that an improved compliance and internal controls environment comes about mainly by (a) putting clearly-articulated responsibility for monitoring and overseeing compliance in the hands of well-qualified personnel who are sufficiently independent of the business pressures to generate sales and cut costs; (b) assuring that those personnel have the authority, resources and scope of reach to gather information and monitor effectively throughout the organization; (c) creating accountability on the part of these personnel not only to senior management but to the company's board of directors, particularly the independent directors on the board, and giving the board clearly-articulated oversight responsibility over these matters; and (d) communicating to all company employees that good compliance and ethics are a core corporate goal and that compensation and disciplinary decisions will be made by reference to that goal, among others.

51.     Taken together, the numerous reforms set forth in the Proposed Settlement are reasonably designed to meet these four objectives.  With respect to product safety, utility and compliance issues and the effort to achieve the newly articulated Scientific Core Objective as a paramount corporate goal, the Proposed Settlement makes the CMO the central authority on these matters, and substantially enhances the scope of the authority, responsibilities and resources available to the CMO by expanding and/or creating senior positions so that that office has the capacity for deep involvement in all phases of the product life cycle.  The responsibility of that office to intervene with respect to any compromise of the Scientific Core Objective is made clear.  Similarly, the CECO is an independent authority with respect to the Compliance

Core Objective, and has enhanced obligations and expanded duties, with equally well-defined responsibilities and the senior staff and resources that should enable that office to have an effective reach throughout the organization.

52.     The Proposed Settlement specifically charges two committees of the Lilly Board of Directors (and the Board generally) with oversight responsibilities over the medical and non-medical compliance efforts – the STC with respect to the work of the CMO, and the PPCC with respect to the work of the CECO.  In my opinion, this is particularly important for two reasons. First, by creating a detailed information flow to these Board committees on compliance, internal controls and risk management matters, it opens independent directors' eyes to sensitive issues that they would likely not learn about otherwise, and effectively causes them to engage with these issues, thereby offering a potential counterweight to the internal pressures from others inside the company.  Second, this constant interaction and dialogue is likely to empower the CMO and CECO in their work at Lilly: having taken responsibility for overseeing and evaluating the compliance work done by these two offices, the independent directors on these committees are presumably more likely to act to support the CMO and CECO when they are challenged, or, in the case of the CECO, should he or she seek additional funding for compliance-related expenditures.  In this regard, I consider particularly important the maintenance of the policy that Lilly directors are not permitted to draw from their stock-based compensation until after they have left the Board – something that gives them a particular incentive to take a long-term view of the company's best interests.

53.     Finally, the Proposed Settlement addresses both tone at the top and the problem of incentives.  The core objective of scientific and medical integrity is made clear, and ethics and compliance performance is made a part of the evaluation and compensation of Lilly's senior

management.  With respect to the company's executive officers, the CEO and the Compensation Committee of the Board of Directors are involved in seeing to it that compliance performance is a factor in their compensation.  With respect to the PSPs, their compensation and advancement at the Company is directly tied to their effectiveness at promoting the Scientific Core Objective.

54.     To be sure, structural reforms by themselves can never be sufficient to assure the effectiveness of any compliance and internal controls systems.  Without a genuine and sustained commitment by both the board of directors and the senior management team to making the system work, failures are likely to occur even in the best-designed system.  However, when that commitment is present, a well-designed system makes it more likely to succeed.  In my opinion, the design described in the Proposed Settlement is consistent with the standards found in frameworks like COSO and the OSG.  Assuming that the company's commitment is and remains strong, this consistency supports a determination that the Proposed Settlement offers substantial benefits to Lilly and its shareholders.

_____

Donald C. Langevoort

Date:  February 22, 2010

# EXHIBIT A

# DONALD CARL LANGEVOORT

**Home Address:**                                                   **Office Address:**

9511 Bent Creek Lane                                   Georgetown University Law Center
Vienna, Virginia  22182                              600 New Jersey Ave., N.W.
(703)757-7535                                              Washington, D.C. 20001
                                                                     tel.: (202)662-9832
                                                                     fax: (202)662-9412
                                                                     langevdc@law.georgetown.edu

**Birthdate**: February 20, 1951
**Family Status:** Married (Joni J. Langevoort), 1 daughter and 1 son

**Teaching Experience:**

> July 1999 – present          *Georgetown University Law Center*
>
> Thomas Aquinas Reynolds Professor of Law (2003 – present)
> Professor of Law (1999-2003)
>
> > *Courses*:  Securities Regulation, Contracts, Corporations, Securities Fraud Seminar
>
> August 1981 – June 1999     *Vanderbilt Law School*
>
> Lee S. and Charles A. Speir
>   Professor of Law (1990-99)
> Professor (1988 - 1999)
>   Associate Professor (1985-88)
>   Associate Dean (1984-86)
>   Assistant Professor (1981-85)
>
> > *Courses*: Contracts,
> > Securities Regulation,
> > Regulation of Financial
> > Institutions, Corporations,
> > Selected Issues in
> > Corporate Litigation
> > Contracts Theory Seminar
>
> > Paul J. Hartman Award for
> >   Excellence in Teaching (1983,
> > 1990, 1998 and 1999)
>
> July 2003                              Visiting Global Law Professor, *University of Sydney*
>
> August 1998 - December 1998   Visiting Professor of Law
>                             *Georgetown University Law Center*

2

August 1987 - June 1988   Visiting Professor of Law, *University of Michigan* (fall semester), *Harvard Law School* (spring semester)

August 1980 - May 1981   Lecturer, *Washington College of Law, American University* (Business Associations I&II)

**Other Employment:**

December 1978 - July 1981   Special Counsel, Office of the General Counsel, United States Securities & Exchange Commission, Washington, D.C.

August 1976 - December 1978   Associate, Wilmer Cutler & Pickering, Washington, D.C.

**Educational Experience:**

J.D., Harvard Law School, June 1976.  Editor, *Harvard Law Review* (vols. 88-89) (Senior Editor, vol. 89)

B.A., University of Virginia, June 1973.  Concentration in religion and social philosophy. Awarded highest honors.  Chairman, Curriculum Reform Committee.  Phi Beta Kappa. Raven Society.  Echols Scholar.

**Publications:**

**Books**:

INSIDER TRADING: REGULATION, ENFORCEMENT AND PREVENTION (West Group (formerly Clark Boardman Callahan) 1991, with annual supplementation 1992-present)

INSIDER TRADING REGULATION (Clark Boardman Co., 6 eds.: 1985-91)

SECURITIES REGULATION: CASES AND MATERIALS (with J. Cox and R. Hillman) (1st ed., Little Brown & Co. 1991, with annual supplements; 2nd -6th eds., Aspen: 1997, 2001, 2004, 2006 and 2009, with annual supplements)

**Articles**:

*The SEC, Retail Investors and the Institutionalization of the Securities Markets*, VIRGINIA LAW REVIEW, vol. 95, p. 1025 (2009)

3

Basic *at Twenty: Rethinking Fraud on the Market*, WISCONSIN LAW REVIEW, vol. 2009, p. 151 (2009)

*The Social Construction of Sarbanes-Oxley*, MICHIGAN LAW REVIEW, vol. 105, p. 1817 (2007)

*On Leaving Corporate Executives "Naked, Homeless and Without Wheels:" Corporate Fraud, Equitable Remedies and the Debate Over Entity versus Individual Liability*, WAKE FOREST LAW REVIEW, vol. 42, p. 627 (2007)

*The SEC as a Lawmaker: Choices About Investor Protection in the Face of Uncertainty*, WASHINGTON UNIVERSITY LAW REVIEW, vol. 84, p. 1591 (2006)

*Internal Controls After Sarbanes-Oxley: Revisiting* Corporate Law's *"Duty of Care as Responsibility for Systems,"* JOURNAL OF CORPORATION LAW, vol. 31, p. 949 (2006)

*Reflections on Scienter (and the Securities Fraud Case Against Martha Stewart that Never Happened),* LEWIS & CLARK LAW REVIEW, vol. 10, p. 1 (2006)(symposium), reprinted in MARTHA STEWART'S LEGAL TROUBLES (Joan Heminway, ed., Carolina Academic Press 2007)

*Private Litigation to Enforce Fiduciary Duties in Mutual Funds: Derivative Suits, Disinterested Directors and the Ideology of Investor Sovereignty*, WASHINGTON UNIVERSITY LAW QUARTERLY, vol. 83, p. 1017 (2005)(symposium)

*Opening the Black Box of 'Corporate Culture' in Law and Economics*, JOURNAL OF INSTITUTIONAL AND THEORETICAL ECONOMICS, vol. 162, p. 80 (2005)(symposium)

*The Muddled Duty to Disclose Under Rule 10b-5,* VANDERBILT LAW REVIEW, vol. 57, p. 1639 (2004)(with G. Mitu Gulati)(symposium)

*Resetting the Corporate Thermostat: Lessons from the Recent Financial Scandals About Self-deception, Deceiving Others, and the Design of Internal Controls*, GEORGETOWN LAW JOURNAL, vol. 93, p. 285 (2004)

*Overcoming Resistance to Diversity in the Executive Suite: Grease, Grit and the Corporate Promotion Tournament*, WASHINGTON & LEE LAW REVIEW, vol. 61, p. 1615 (2004)(symposium)

*Technological Evolution and the Devolution of Corporate Financial Reporting*, WILLIAM AND MARY LAW REVIEW, vol. 46, p. 1 (2004)(George Wythe Lecture)

*Fraud by Hindsight*, NORTHWESTERN UNIVERSITY LAW REVIEW, vol. 98, p. 773 (2004)(with Jeffrey Rachlinski and G. Mitu Gulati)

*Agency Law Inside the Corporation: Problems of Candor and Knowledge*, UNIVERSITY OF CINCINNATI LAW REVIEW, vol. 71, p. 1187 (2003)(symposium)

*Managing the "Expectations Gap" in Investor Protection: The SEC and the Post-Enron Reform Agenda*, VILLANOVA LAW REVIEW, vol. 48, p. 1139 (2003)(symposium)

*Taming the Animal Spirits of the Stock Markets: A Behavioral Approach to Securities Regulation*, NORTHWESTERN UNIVERSITY LAW REVIEW, vol. 97, p. 137 (2002)[reprinted in

CORPORATE PRACTICE COMMENTATOR, vol. 45, no. 2 (2003)]

*When Lawyers and Law Firms Invest in their Corporate Clients' Stock*, WASHINGTON UNIVERSITY LAW QUARTERLY, vol. 80, p. 569 (2002)(symposium)

*Monitoring: The Behavioral Economics of Corporate Compliance with Law*, COLUMBIA BUSINESS LAW REVIEW, vol. 2002, p. 71 (2002)

*Seeking Sunlight in Santa Fe's Shadow: The SEC's Pursuit of Managerial Accountability*, WASHINGTON UNIVERSITY LAW QUARTERLY, vol. 79, p. 449 (2001)(symposium)

*The Human Nature of Corporate Boards: Law, Norms and the Unintended Consequences of Independence and Accountability*, GEORGETOWN LAW JOURNAL, vol. 89, p. 797 (2001)

*Cross-Border Insider Trading*, JOURNAL OF FINANCIAL CRIME, vol. 8, p. 254 (2001) [reprinted in DICKINSON J. INT'L L., vol. 19, p. 161 (2000)]

*Deconstructing Section 11: Public Offering Liability in a Continuous Disclosure Environment*, LAW & CONTEMP. PROBS., vol. 63, no. 3, p. 45 (2000)(symposium)

*Taking Myths Seriously: An Essay for Lawyers*, CHICAGO-KENT LAW REVIEW, vol. 74, p. 1569 (2000)(symposium)

*Half-Truths: Protecting Mistaken Inference by Investors and Others*, STANFORD LAW REVIEW, vol. 52, p. 87 (1999)

*Rereading* Cady, Roberts*: The Ideology and Practice of Insider Trading Regulation*, COLUMBIA LAW REVIEW, vol. 99, p. 1319 (1999)

*Behavioral Theories of Judgment and Decision Making in Legal Scholarship: A Literature Review*, VANDERBILT LAW REVIEW, vol. 51, p. 1499 (1998)(symposium)

*Angels on the Internet: The Elusive Promise of Technological Disintermediation for Unregistered Offerings of Securities,* JOURNAL OF SMALL AND EMERGING BUSINESS LAW, vol. 2, p. 1 (1998)(symposium)

*The Epistemology of Corporate-Securities Lawyering: Beliefs, Biases and Organizational Behavior*, BROOKLYN LAW REVIEW, vol. 63, p. 629 (1997)(published version of the Seventh Abraham L. Pomerantz Lecture)

*Organized Illusions: A Behavioral Theory of Why Corporations Mislead Stock Market Investors (and Cause Other Social Harms),* UNIVERSITY OF PENNSYLVANIA LAW REVIEW, vol. 146, p. 101 (1997)

*Toward More Effective Risk Disclosure for Technology-Enhanced Investing,* WASHINGTON UNIVERSITY LAW QUARTERLY, vol. 75, p. 753 (1997)(symposium)

*Skewing the Results: The Role of Lawyers in Transmitting Legal Rules,* SOUTHERN CALIFORNIA INTERDISCIPLINARY LAW JOURNAL, vol. 5, p. 375 (1997)(with R. Rasmussen)

*Selling Hope, Selling Risk: Some Lessons for Law from Behavioral Economics About Stockbrokers and Sophisticated Customers,* CALIFORNIA LAW REVIEW, vol. 84, p. 627 (1996)

*The Reform of Joint and Several Liability Under the Private Securities Litigation Reform Act: Proportionate Liability, Contribution Rights and Settlement Effects,* THE BUSINESS LAWYER, vol. 51, p. 1157 (1996)(symposium)

*Capping Damages for Open-Market Securities Fraud,* ARIZONA LAW REVIEW, vol. 38, p. 639 (1996)(symposium)

*Words from On High About Rule 10b-5*: Chiarella's *History*, Central Bank's *Future*, DELAWARE JOURNAL OF CORPORATE LAW, vol. 20, p. 865 (1995)(Francis X. Pillegi Lecture)

*Ego, Human Behavior and Law,* VIRGINIA LAW REVIEW, vol. 81, p. 853 (1995)

*Disclosures That "Bespeak Caution",* THE BUSINESS LAWYER, vol. 49, p. 481 (1994)

*Where Were the Lawyers?  A Behavioral Inquiry into Lawyers' Responsibility for Clients' Fraud,* VANDERBILT LAW REVIEW, vol. 46, p. 75 (1993)

*Theories, Assumptions and Securities Regulation: Market Efficiency Revisited,* UNIVERSITY OF PENNSYLVANIA LAW REVIEW, vol. 140, p. 851 (1992)

Schoenbaum *Revisited: Limiting the Scope of Antifraud Protection in an Internationalized Securities Marketplace*, LAW AND CONTEMPORARY PROBLEMS, vol. 55, p. 241 (1992)(symposium)

*The SEC as a Bureaucracy: Public Choice, Institutional Rhetoric and the Process of Policy Formulation,* WASHINGTON & LEE LAW REVIEW, vol. 47, p. 527 (1990)

*Investment Analysts and the Law of Insider Trading,* VIRGINIA LAW REVIEW, vol. 76, p. 1023 (1990)

*The Supreme Court and the Politics of Corporate Takeovers,* HARVARD LAW REVIEW, vol. 101, p.96 (1987)

*Statutory Obsolescence and the Judicial Process: The Revisionist Role of the Courts in Federal Banking Regulation*, MICHIGAN LAW REVIEW, vol. 85, p.672 (1987)

*Information Technology and the Structure of Securities Regulation*, HARVARD LAW REVIEW, vol. 98, p. 747 (1985).

*The Insider Trading Sanctions Act of 1984 and its Effect on Existing Law*, VANDERBILT LAW REVIEW, vol. 37, p. 1273 (1984).

*Fraud and Deception by Securities Professionals*, TEXAS LAW REVIEW, vol. 61, p. 1247 (1983).

*Insider Trading and the Fiduciary Principle:  A Post*-Chiarella *Restatement*, CALIFORNIA LAW REVIEW, vol. 70, p. 1 (1982).

*State Tender Offer Legislation: Interests, Effects and Political Competency*, CORNELL LAW REVIEW, vol. 62, p. 213 (1977).

**Book Chapters:**

*Steps Toward the Europeanization of US Securities Regulation, with Thoughts on the Evolution and Design of a Multinational Securities Regulator*, in Michael Tison et al., eds., PERSPECTIVES ON COMPANY LAW AND FINANCIAL REGULATION (Cambridge University Press 2009)

*Sarbanes-Oxley, Global Competitiveness and the Future of U.S. Securities Regulation*, in VIII DIREITO DOS VALORES MOBILIARIOS (Coimbra Editora, Portugal 2008)

*Investor Protection and the Perils of Corporate Publicity*: Basic Inc. v. Levinson, in Jonathan Macey, ed., THE ICONIC CASES IN CORPORATE LAW (West 2008)

*Diversity and Discrimination from a Corporate Perspective: Grease, Grit and the Personality Types of Tournament Survivors*, in Mitu Gulati & Michael Yelnosky, eds., NYU SELECTED ESSAYS ON LABOR AND EMPLOYMENT LAW (VOL. 3): BEHAVIORAL ANALYSIS OF WORKPLACE DISCRIMINATION (Kluwer Law Int'l 2007)

*Structuring Securities Regulation in the European Union: Lessons from the U.S. Experience*, in Guido Ferrarini & Eddy Wymeersch, eds., INVESTOR PROTECTION IN EUROPE (Oxford University Press 2006)

*Heuristics Inside the Firm: Perspectives from Behavioral Law and Economics*, in Gerd Gigerenzer & Christoph Engel, eds., HEURISTICS AND THE LAW (MIT Press 2006)

*The Regulators and the Financial Scandals*, in Jay Lorsch, Leslie Berkowitz and Andy Zelleke, eds., RESTORING TRUST IN AMERICAN BUSINESS (American Academy of Arts and Sciences, 2005)

*The Law's Influence on Managers' Behavior in Control Transactions,* in K. Hopt and E. Wymeersch, eds., EUROPEAN TAKEOVERS: LAW AND PRACTICE 255 (Butterworths, 1992)

**Shorter Commentaries and Other Contributions**:

*U.S. Securities Regulation and Global Competition*, VIRGINIA LAW & BUSINESS REVIEW, vol. 2, p. 191 (2008)

*Criminalization of Corporate Law: Impact on Director and Officer Behavior*, JOURNAL OF BUSINESS & TECHNOLOGY LAW, vol. 2, p. 89 (2007)

*Someplace Between Philosophy and Economics: Legitimacy and Good Corporate Lawyering*, FORDHAM LAW REVIEW, vol. 75, p. 1615 (2006)

*Federalism in Corporate/Securities Law: Reflections on Delaware, California and State Regulation of Insider Trading*, UNIVERSITY OF SAN FRANCISCO LAW REVIEW, vol. 40, p. 879 (2006)

*Foreword: Revisiting Gilson and Kraakman's Efficiency Story*, JOURNAL OF CORPORATION LAW, vol. 28, p. 499 (2003)

*Panel Presentation:  Securities Regulation and Corporate Responsibility*, ADMINISTRATIVE LAW REVIEW, vol. 55, pp. 241-55 (2003)

*Introduction: Issue on the Harmonization of the Securities Laws*, LAW AND POLICY IN INTERNATIONAL BUSINESS, vol. 33, p. 439 (2002)

*Review: The Organizational Psychology of Hyper-Competition:* Corporate Irresponsibility *and the Lessons of Enron*, GEORGE WASHINGTON LAW REVIEW, vol. 70, p. 968 (2002)

*Review Essay: Are Judges Motivated to Create "Good" Securities Fraud Doctrine?,* EMORY LAW JOURNAL, vol. 51, p. 309 (2002)

*Commentary: Stakeholder Values, Disclosure and Morality*, CATHOLIC UNIVERSITY LAW REVIEW, vol. 48, p. 93 (1998)(symposium)

*What Was Kaye Scholer Thinking?,* LAW AND SOCIAL INQUIRY, vol. 23, p. 297 (1998)(commentary on William Simon's *The Kaye Scholer Affair: The Lawyer's Duty of Candor and the Bar's Temptations of Evasion and Apology*)

*The Demise of Dirks: Shifting Standards for Tipper-Tippee Liability*, INSIGHTS, vol. 8, no. 6, p. 23 (1994)

*Rule 10b-5 as an Adaptive Organism*, FORDHAM LAW REVIEW, vol. 61, p. S7 (1993)(Graduate Colloquium Lecture)

*Fraud and Insider Trading in American Securities Regulation: Its Scope and Philosophy in a Global Marketplace*, HASTINGS INTERNATIONAL AND COMPARATIVE LAW REVIEW, vol. 16, p. 175 (1993)(symposium issue)

*Defining Insider Trading: The Experience in Other Countries,*  INSIGHTS, vol. 6, no. 4 (1992)

*Symposium Introductory Essay -- Of Forests and Trees: The Jurisprudence of Rule 10b-5*, ALBANY LAW REVIEW, vol. 39, p. 629 (1989)

*Setting the Agenda for Legislative Reform: Some Fallacies, Anomalies and Other Curiosities in the Prevailing Law of Insider Trading*, ALABAMA LAW REVIEW, vol. 39, p. 399 (1988)(symposium issue)

*Interpreting the McFadden Act: The Economics and Politics of Shared ATM's and Discount Brokerage Services,* THE BUSINESS LAWYER, vol. 41, p. 1265 (1986).

*The Education of a Securities Lawyer* (book review of L. Loss, *Fundamentals of Securities Regulation*), NORTHWESTERN UNIVERSITY LAW REVIEW, vol. 80, p. 259 (1985).


**Professional Memberships and Activities:**

Member, American Law Institute

Lecturer, Edward Jones & Co. Compliance Institutes

Member of the SEC Advisory Committee on Market Data (2000-2001)

Member of the Legal Advisory Committee, New York Stock Exchange (1996-99)

Member of the Legal Advisory Board, National Association of Securities Dealers (NASD) (1988-93)

Editor-in-chief, SECURITIES LAW REVIEW (West Group) (since 1984).

Member, American Bar Association, Section on Business Law, Committee on the Federal Regulation of Securities

Chair, American Bar Association, Section on Business Law, Ad Hoc Committee on the Business Lawyer as a Problem Solver (1998-2000)

Member of the Bar: District of Columbia, United States Court of Appeals for the District of Columbia and Sixth Circuits, and United States Supreme Court

Public Arbitrator, National Association of Securities Dealers and American Arbitration Association (1995-97)

Chair, Section on Business Associations, American Association of Law Schools (1993)

Chair, Section on Financial Institutions and Consumer Financial Services, American Association of Law Schools (1991)

Chair, Section on Securities Regulation, American Association of Law Schools (2001)

Member of the Editorial Advisory Board, INSIGHTS:THE CORPORATE & SECURITIES LAW ADVISOR (Prentice Hall)

Congressional testimony on securites law matters: U.S. Senate Subcommittee on Securities (Committee on Banking, Housing and Urban Affairs) on S. 1380 (December 1987) and on the impact of the Supreme Court's *Central Bank of Denver* decision (May 1994); U.S. House of Representatives Subcommittee on Telecommunications and Finance (Committee on Energy and Commerce) on H.R. 975 (July 1989) on the general question of class action litigation reform in securities cases (August 1994), and on the Sarbanes Oxley Act of 2002 (April 2002)

Informal consultant to the White House Office of Counsel to the President on the issue of securities litigation reform, July-December 1995

Annual endowed lecture on securities regulation, entitled "The SEC as a Bureaucracy," Washington & Lee University Law School, March 1990

Graduate Colloquium lecture at Fordham University School of Law, entitled "Rule 10b-5 as an Adaptive Organism," November 1992

Eleventh Francis X. Pillegi Lecture at Widener University School of Law, October 1995, entitled "Words from on High About Rule 10b-5"

Seventh Abraham Pomerantz Lecture at Brooklyn Law School, April 1997, entitled "Beliefs, Biases and Organizational Behavior: Challenges for the Corporate-Securities Lawyer"

2003 George Wythe Lecturer, William & Mary Law School

2004 Nichols Distinguished Lecturer, Stetson University Law School

2009  Dorsey & Whitney Lecturer, William Mitchell School of Law