UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| N.A. Lambrecht and Jeffrey P. Jannett, Derivatively on Behalf of Nominal Defendant Eli Lilly & Company | : : : : | |
| Plaintiffs, | : : | C.A. No. 1:08-cv-0068-WTL-TAB |
| v. | : : | |
| Sidney Taurel, John C. Lechleiter Sir Winfreid Bischoff, J. Michael Cook, Franklyn G. Pendergast, Kathi P. Seifert, George M. Fisher, Alfred G. Gilman, Martin S. Feldstein, J. Erik Fyrwald, Ellen R. Marram, Sir John Rose, Charles E. Golden, Steven C. Beering, August M. Watanabe, Linda Lay, Randall L. Tobias and J. Clayburn LaForce, Jr., | : : : : : : : : : : : | |
| Defendants | : : | |
| -and- | : : | |
| ELI LILLY & COMPANY, | : : | |
| Nominal Defendant. | : : | |

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
FINAL APPROVAL OF PROPOSED SETTLEMENT,
AWARD OF ATTORNEYS' FEES, INCLUSIVE OF EXPENSES, AND
PAYMENT OF INCENTIVE AWARD TO NAMED PLAINTIFFS**

**TABLE OF CONTENTS**

PAGE

I.   INTRODUCTION ...................................................................................................1

II.  PROCEDURAL BACKGROUND OF THE DERIVATIVE ACTIONS ..........................2

    A.   The Derivative Actions .................................................................................3

    B.   Coordination of the Derivative Actions and Investigation of the
        Derivative Claims .........................................................................................5

    C.   The Design and Negotiation of Detailed Governance and
        Compliance Proposals ..................................................................................6

III. SUMMARY OF PROPOSED RELIEF .......................................................................7

    A.   Lilly's Adoption of the Scientific Core Objective and the
        Compliance Core Objective ..........................................................................8

        1.   The Scientific Core Objective ...........................................................8

        2.   The Compliance Core Objective ........................................................9

    B.   Board Level Provisions ...............................................................................10

        1.   Science & Technology Committee ("STC") ......................................10

            a.   Reports to the STC ...............................................................11

                (1)   Reporting from Management ...............................................11

                (2)   Other Reporting from the CMO ..........................................12

                (3)   Reporting from the Vice President-Global Patient
                      Safety .................................................................................12

                (4)   Reporting from the Vice President-Quality ........................13

            b.   Annual Assessment of Effectiveness and the
                Adequacy of Information .....................................................14

i

2.     The Public Policy and Compliance Committee ......................................15

     a.     CECO Reporting....................................................................16

     b.     General Auditor and Vice President-Quality Reporting...............16

     c.     Direct Access to the PPCC ...................................................17

     d.     Board Responsibility for Appointment and Retention .................17

     e.     Oversight of Enterprise Risk Management..................................17

     f.     Annual Assessment of the Adequacy of Information Flows .........19

3.     The Compensation Committee ..................................................19

4.     Tone at the Top ....................................................................20

5.     Enhanced Corporate Governance Practices................................21

     a.     Board Membership.............................................................21

     b.     The Presiding Director and the Role of Independent Directors.....22

     c.     Compliance Component to Annual Board Self-Assessment .........22

     d.     Board Training and New Director Orientation ............................23

C.     Management Level Provisions................................................................23

1.     Life Cycle Management.........................................................23

     a.     The Chief Medical Officer ("CMO") ...................................24

     b.     Vice President-Patient Global Safety ("VP-GPS") ....................25

     c.     Product Safety Physicians ("PSPs") ........................................28

     d.     Clinical Plan Document Template .................................................30

2.     Enhanced Global Ethics, Compliance and
Operational Risk Management .................................................32

a.      The Chief Ethics and Compliance Officer ("CECO")...................32

b.      Enterprise Risk Management.........................................................35

c.      Compliance Training ....................................................................35

d.      Performance and Compensation ..................................................36

e.      Discipline .....................................................................................37

f.      Monitoring ....................................................................................37

D.      The Three Year Commitment Period....................................................38

E.      The Funding Commitment.....................................................................38

IV.     THE APPLICABLE LEGAL STANDARDS...................................................39

A.      Settlements are Generally Favored .......................................................39

B.      Assessment of the Proposed Settlement under the Relevant
        Factors for Consideration in a Derivative Settlement............................41

1.      The First Consideration Is Whether the Settlement Provides a
        Substantial Benefit to Lilly .....................................................41

2.      Seventh Circuit Factors in Support of Final Approval .............43

a.      Assessing the Governance, Compliance and Medical
        Risk Management Provisions of the Settlement in
        Light of the Substantial Risks Plaintiffs Face on the
        Merits of the Litigation ..................................................44

b.      Further Litigation in the Absence of a Settlement Would Be
        Lengthy, Complex and Expensive ..................................46

c.      The Stage of the Proceedings, the Amount of Discovery
        Completed and the Opinion of Counsel..........................47

d.      The Settlement was Negotiated at Arm's Length
        Among Experienced Counsel and is Not Collusive.......48

iii

      e.     Plaintiffs' Counsel Developed Extensive Factual Information .....50

      f.     The Reaction of Lilly Shareholders to the Settlement ..................51

V.    THE NOTICE TO LILLY SHAREHOLDERS IS ADEQUATE .....................................52

    A.    Notice Was Disseminated in Accordance with the
        Preliminary Approval Order ........................................................52

    B.    The Notice Procedures Fully Satisfied Due Process ............................................53

VI.   THE APPLICATION FOR FEES AND REIMBURSEMENT OF
    EXPENSES BY PLAINTIFFS' COUNSEL IS FAIR AND
    REASONABLE BASED ON ALL RELEVANT FACTORS...........................................53

    A.    Applicable Legal Standards for Consideration of a Fee Request .........................55

        1.    The Substantial Benefit Doctrine ................................................................55

        2.    Consideration of Other Relevant Seventh Circuit Factors Fully
            Supports Payment of the Agreed Upon Fee Award Here .........................57

            a.     Assessment of the Benefits Achieved and the
                Quality of Services Rendered ..........................................................59

            b.     The Risk of Nonpayment and the Contingent
                Nature of the Representation ...........................................................60

            c.     Public Policy Considerations ...........................................................64

            d.     Fees Paid in Comparable Derivative Actions ...............................65

            e.     The Parties, in Arm's Length and Contentious Negotiations
                Pursuant to Formal Mediation, Mutually Agreed upon the
                Proposed Fee Amount ....................................................................68

            f.     Assessing Attorneys' Fees under the Lodestar Methodology .......70

            g.     Expenses of Plaintiffs' Counsel Would Otherwise Be
                 Reimbursable as Reasonable ..........................................................73

      B.     Payment of Incentive Awards to Named Plaintiffs..................................................73

VII.   CONCLUSION.................................................................................................................76

# TABLE OF AUTHORITIES

## CITATIONS

*American Union Insurance Company, et al. v. Meridian Insurance Group, et al.*,
137 F. Supp. 2d 1096 (S.D. Ind. 2001) ................................................................74

*Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305 (7th Cir. 1980) ........................................39

*Bailey v. Meister Brau, Inc.*, 535 F.2d 982 (7th Cir. 1976) ........................................56

*Bell Atlantic v. Bolger*, 2 F.2d 1304 (3d Cir. 1993) ................................................53

*Berger v. Xerox Corp. Retirement Income Guar. Plan*, 2004 U.S. Dist. Lexis 1819
(S.D. Ill. Jan 22, 2004) ................................................................................75

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ....................................................55

*Caremark International Inc. Derivative Litigation*, 698 A.2d 959 (Del. Ch. 1996) ....................62

*Carson v. Am. Brands*, 450 U.S. 79 (1981) .........................................................40

*Christman v. Brauvin Realty Advisors, Inc.*, No. 96-6025,
2001 U.S. Dist. LEXIS 11102 (N.D. Ill. Mar. 30, 2001) ..............................................56

*City of Pontiac Gen. Employees' Ret. Sys. v. Langone*, No. 2006-cv-122302, slip op.
(Fulton County, Ga. June 10, 2008) .................................................................67

*Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005) ..............................................72

*Cook v. Neidert*, 142 F.3d 1004 (7th Cir. 1998) ................................................73, 75

*Cooper v. The IBM Personal Pension Plan*, 2005 WL 1981501
(S.D. Ill., Aug. 16, 2005) .......................................................................59, 75

*Cotton v. Hinton*, 559 F.2d 1326 (5th Cir. 1977) ..................................................39

*Cutshall v. Barker*, 733 N.E.2d 973 (Ind. Ct. App. 2000) .........................................63

*Depoister v. Mary M. Holloway Found.*, 36 F.3d 582 (7th Cir. 1994) ................................41

vi

*Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) ....................................................40

*E.E.O.C. v. Hiram Walker & Sons, Inc.*, 768 F.2d 884 (7th Cir. 1985) ......................................40

*Florin v. National Bank of Georgia*, 60 F.3d 1245 (7th Cir. 1995)........................................65, 71

*Florin v. Nationsbank of Georgia, N.A.*, 34 F.3d 560 (7th Cir. 1994)............................60, 61, 70

*Freeman v. Berge*, 68 Fed.Appx. 738 (7th Cir. 2003) ....................................................44

*G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227 (Ind. 2001) .........................................45

*Gaskill v. Gordon*, 1995 U.S. Dist. Lexis 18576 (N.D. Ill. Dec. 14, 1995)................................................75

*Goldsmith v. Tech. Solutions Co.*, No. 92-C-4374, 1995 U.S. Dist. Lexis 15093
(N.D. Ill. Oct. 10, 1995)........................................................................48

*Granada Investments, Inc. v. DWG Corporation*, 962 F.2d 1203 (6th Cir. 1992)......................62

*Great Neck Capital Appreciation Investment Partnership v. PriceWaterhouseCoopers,*
*L.L.P.*, 212 F.R.D. 400 (E.D. Wis. 2002) .................................................58, 73

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) ..........................................68

*Harman v. Lyphomed, Inc.*, 945 F.2d 969 (7th Cir. 1991) ................................61, 63, 71

*In Re Abbott Laboratories Derivative Shareholder Litigation,*
Case No. 99 C 7246 (E.D. Ill.)........................................................................66

*In re AOL Time Warner Shareholder Derivative Litigation*, 2006 WL 2572114
(S.D.N.Y. Sept. 6, 2006)........................................................................42, 66, 71

*In re Automotive Refinishing Paint Antitrust Litigation*, 2003 WL 23316645
(E.D.Pa. 2003)........................................................................47

*In re BP PLC Derivative Litig.*, No. 3AN-06-11929CI, slip op. (Al. Sup. Ct.
May 7, 2008)........................................................................67

*In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112
(N.D. Ill. Feb. 10, 2000) ........................................................................71

*In re Cenco, Inc., Sec. Litig.*, 519 F. Supp. 322 (N.D. Ill. 1981)................................71

*In re Cendant Corp., Derivative Action Litigation*, 232 F. Supp. 2d 327 (D.N.J. 2002) ..............72

*In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) ......................................................73

*In re Fed. Home Loan Mortg. Corp. Sec. & Derivative Litig.*, MDL 1584,
Case Nos. 05-cv-2596 & 04-cv-2634 (S.D.N.Y. Oct. 26, 2006) ....................................................67

*In Re GMC Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995) ...............39

*In re ITT Corp. Derivative Litigation*, 588 F.Supp.2d 502 (S.D.N.Y. 2008) ...............................63

*In re ITT Corp. Derivative Litigation*, 653 F.Supp.2d 453 (S. D. N. Y. 2009) ..........................  63

*In re ITT Corp. Derivative Litigation,* 07-CV-2878 (CS), Order
(S. D. N. Y., October 27, 2009) .......................................................................................................63

*In re ITT Corp. Derivative Litigation,* 94S00-0911-CQ-508, Order
(Ind., November 24, 2009) ...............................................................................................................63

*In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631 (E.D. Pa. 2003) ........................................48

*In re Mid-Atlantic Toyota Antitrust Litig.,* 564 F. Supp. 1379, 1383 (D. Md. 1983) ...................48

*In re Pacific Enterprises Securities Litigation*, 47 F.3d 373 (9th Cir. 1995) ................................62

*In re Paypal Litigation*, 2004 U.S. Dist. LEXIS 22470 (N. D. Cal.
Oct. 13, 2004) ...................................................................................................................................68

*In re Pfizer, Inc. Derivative Securities Litigation*, 307 Fed. Appx. 590,
2009 WL 180349 (2nd Cir., January 27, 2009) ...............................................................................62

*In re Public Service Company of Indiana Derivative Litigation*, 125 F.R.D. 484
(S.D. In. 1988) ..................................................................................................................................57

*In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013
(D.N.J. Nov. 9, 2005).......................................................................................................................69

*In Re Schering-Plough Corporation Shareholders Derivative Litigation*,
Master Derivative Docket, Civ. Action No. 01-1412 (D.N.J.) .....................................41, 64, 69, 71

*In Re Schering-Plough/Merck Merger Litigation*, Civil Action No. 09-CV-1099 (DMC),
(D. N. J. March 25, 2010) .....................................................................................................60, 68

*In re VMS Ltd. P'ship Sec. Litig.*, 1991 U.S. Dist. Lexis 9624 (N.D. Ill. Jul. 16, 1991)..............76

*In the Matter of Synthroid Marketing Litig.*, 264 F. 3d 712 (7th Cir. 2001) ..............58, 63, 69, 73

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996).........................................................................39, 40

*Jeffboat, LLC and Signal Mutual Indemnity Assn. v. Director,*
*Office of Workers' Compensation Programs et al.*, 553 F.3d 487 (7th Cir. 2009) ................70, 71

*Kamen v. Kemper Fin. Servs.*, 500 U.S. 90 (1991)...................................................................64

*Lively v. Dynegy, Inc.*, 2008 U.S. Dist. Lexis 75774 (S.D. Ill. Sept. 30, 2008)........................ 75

*Maher v. Zapata Corp.,* 714 F.2d 436 (5th Cir. 1983) .....................................................39, 44, 62

*Mills v. Electric Auto Lite Co.,* 396 U.S. 375 (1970).........................................................41, 56, 60

*Montegomery v. Aetna Plywood Inc.*, 231 F.3d 399 (7th Cir. 2000)...........................................58

*Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306 (1950) ......................................53

*Newman v. Stein*, 464 F.2d 689 (2d. Cir. 1972).........................................................................45

*Peterson v. Arvida/Jmb Partners, L.P.*, II, 1994 U.S. Dist. Lexis 2109
(N.D. Ill. Feb. 25, 1994) ...........................................................................................................75

*Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188 (6th Cir. 1974) ...........................................65

*Shlensky v. Dorsey*, 574 F.2d 131 (3d Cir. 1978) ...............................................................62, 68

*Spicer v. Chicago Bd. Options Exchange, Inc.*, 844 F. Supp. 1226 (N.D. Ill. 1993) ...................75

*Taubenfeld v. Aon Corp.*, 415 F.3d 597 (7th Cir. 2005)............................................................58

*UAW v. Gen. Motors*, 497 F.3d 615 (6th Cir. 2007).................................................................41

ix

*Unite Nat. Retirement Fund v. Philip Watts*, 2005 WL 2877899
(D.N.J. Oct. 28, 2005) ................................................................................42, 44, 66

*Walsh v. Great Atlantic & Pacific Tea Co.*, 96 F.R.D. 632 (D.N.J. 1983) ...................................45

## RULES, CODES, AND MANUALS

*Attorney Fee Awards In Common Fund Class Actions, Class Action Reports*
(Mar.-Apr. 2003) ............................................................................................ 71

Fed. R. Civ. 23.1 ....................................................................................1, 44, 53

Ind. Code §23-1-35-1(e) ...................................................................................45

2 Newberg on Class Actions, (2d ed. 1985) ..............................................48

4 Newberg on Class Actions, (4th ed.) .......................................................73

7B Wright & Miller, Fed. Prac. & Proc. ....................................................40

## I.    INTRODUCTION

Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, Plaintiffs in the Derivative Actions (as defined in the Stipulation of Settlement, executed on February 25, 2010 (Docket # 69-1)), by and through the undersigned counsel, respectfully move the Court for final approval of the Settlement[1] as being fair, adequate, reasonable, and in the best interests of Eli Lilly and Company ("Lilly" or the "Company") and its shareholders, for approval of the requested award of attorneys' fees, inclusive of expenses, and for payment of an incentive award to named Plaintiffs.

As set forth in the Stipulation, Plaintiffs and the Settling Defendants acknowledge and agree that the Derivative Claims filed by the Plaintiffs, and the negotiations leading to this Settlement, were a substantial factor in the decisions by the Company to adopt, implement, enhance and/or maintain the corporate governance provisions set forth in Exhibit A to the Stipulation (the "Corporate Governance Terms").  The Special Litigation Committee of Lilly's Board of Directors (the "SLC")[2] has made the same acknowledgment.  As described below, the Corporate Governance Terms provide a substantial benefit to the Company, including in the prevention and detection of potential violations of law, regulation and Company policy.

In accordance with the Stipulation, the Company agrees to maintain its commitment to the effective implementation of the Corporate Governance Terms for a three year period from

---

[1] All capitalized terms used in this Memorandum, unless otherwise defined, shall have the same meaning as set forth in the Stipulation.

[2] The SLC was made up of two then-current directors, Messrs. J. Michael Cook (who has since retired from the Board) and Erik Fyrwald, and one non-director, James A. Henderson.  The SLC was constituted in or around early August 2007 to investigate allegations raised in the Demand Letters.

the date the Settlement receives Court approval (the "Agreed Upon Term").  The Settlement further provides that during the Agreed Upon Term, Lilly will commit from its treasury funds as are necessary to implement the provisions set forth in the Corporate Governance Terms.[3]

Further reflecting the substantial benefits to Lilly and its shareholders from this Settlement, Plaintiffs' experts have opined in their expert reports[4] that the relief achieved under the Settlement: provides substantial benefits to Lilly; places Lilly at the forefront of the pharmaceutical industry; and provides a sound foundation for the management of drugs and drug candidates throughout their life cycle at Lilly.  Moreover, the proposed Settlement eliminates the risk of delay or non-recovery, as well as the uncertainty and expense of continued litigation.

For the reasons set forth herein, Plaintiffs respectfully request that the Court grant final approval of the proposed Settlement as fair, reasonable and adequate to Lilly and its shareholders, approve the requested award of attorneys' fees, inclusive of expenses, and approve the payment of the requested incentive award to named Plaintiffs.

## II.    PROCEDURAL BACKGROUND OF THE DERIVATIVE ACTIONS

The procedural background of the Derivative Actions is set forth in detail in the Joint Attorney Declaration in Support of Final Approval of the Proposed Settlement, Award of

---

[3] In addition, if, during the Agreed Upon Term, the Chief Ethics and Compliance Officer at Lilly wishes to seek additional funding for compliance-related expenditures, he or she shall be permitted at his or her option to petition directly the Board or an appropriate committee of the Board that such funding be included in or covered by business plans and budgets that are approved by the Board or such committee.

[4] Plaintiffs have filed the following expert reports: The Report of Dr. Mitchell Glass (Docket # 70); The Report of James Lam (Docket # 71) and the Declaration of Professor Donald C. Langevoort Regarding the Substantive Benefits of the Settlement Terms (Docket # 72).  Plaintiffs retained these experts based on their substantial experience and expertise in areas which were the focus of the parties' negotiations: *i.e.*, Dr. Mitchell Glass, a medical doctor, has expertise in the pharmaceutical industry and drug development; Professor Donald C. Langevoort has expertise in the areas of corporate governance and compliance, and

Attorneys' Fees, Inclusive of Expenses, and Payment of Incentive Award to Named Plaintiffs (the "Joint Attorney Declaration"), filed herewith, and in Plaintiffs' Memorandum of Law in Support of Preliminary Approval of Proposed Settlement (Docket # 69).  In the interest of brevity, Plaintiffs respectfully direct the Court to these documents for a more detailed discussion, and here provide a short summary for the Court's convenience.

### A.    The Derivative Actions

Beginning in January 2007, three Lilly shareholders sent demand letters to Lilly's board of directors ("Board") demanding that the Board take remedial action for alleged breaches of fiduciary duty (the "Demand Letters").[5]  A variety of issues were raised in the Demand Letters in connection with, *inter alia*, Lilly's allegedly illegal "off-label" marketing and promotion of Prozac, Evista, and Zyprexa, failure to warn and concealment of metabolic side effects of Zyprexa, and best price reporting in connection with Axid, Evista, Humalog, Humulin, Prozac and Zyprexa.[6]  Thereafter, between January and June 2008, a total of seven shareholder

---

Mr. James Lam has expertise in the area of enterprise risk management ("ERM").

[5] Indiana law provides for shareholder derivative actions as a means of seeking redress for harm to a corporation either following the board of directors' wrongful refusal of a pre-suit demand for remedial action, or without such a pre-suit demand, based on allegations that making a demand on the board would be futile, for example, because the board was not independent or disinterested.  As happened here, significant corporate controversies such as those reflected in the Lilly Derivative Actions often result in the filing of multiple shareholder derivative actions premised on both wrongful refusal of demand and claims of demand futility.

[6] The alleged wrongful conduct has been the subject of governmental investigations by the Department of Justice ("DOJ"), and private civil actions, consolidated by order of the Multi-District Litigation Panel in the Eastern District of New York (the "MDL").  Lilly resolved its actions with the DOJ in January 2009 and with the bulk of the private personal injury civil litigants in the MDL by 2007.  The alleged wrongful conduct also is the subject of on-going third party payor litigation, alleging that the Company overcharged for these drugs.

derivative complaints (the "Derivative Complaints") were filed in three separate jurisdictions[7] on behalf of Lilly alleging, in part, that current and former directors of Lilly (the "Individual Defendants") breached their fiduciary duties of care and oversight in connection with the alleged misconduct described above, exposing Lilly to substantial risk of damage, including regulatory and private investigations and litigation.

Pursuant to an agreement entered into beginning on March 20, 2008, the parties to the Derivative Actions agreed, *inter alia*, to establish a parallel track to explore possible resolution of the derivative claims and to enter into a discovery process (the "Settlement Process Agreement"). Pursuant to the Settlement Process Agreement, litigation of the Derivative Actions filed in the Eastern District of New York and Indiana State Court were held in abeyance to permit the parties to pursue potential settlement.[8] While the parties have kept the District Court of the Eastern District of New York and the Indiana State Court apprised of the status of the Derivative Actions, Magistrate Judge Baker of this Court undertook principal oversight of these derivative claims.

---

[7] The Derivative Actions include the actions captioned *Lambrecht, et al. v. Taurel, et al.*, C.A. No. 1:08-cv-0068-DFH-TAB (S.D. Ind.) and *Zemprelli vs. Taurel et al.*, C.A. No. 1:08-cv-0854-SEB-TAB (S.D. Ind.); *Waldman v. Taurel, et al.*, C.A. No. 08-cv-560 (E.D.N.Y), *Robbins v. Taurel, et al.*, C.A. No. 08-cv-1471 (E.D.N.Y.) and *City of Taylor General Employees Retirement System v. Taurel, et al.*, C.A. No. 08-cv-1554 (E.D.N.Y.); and *Solomon v. Taurel, et al.*, Cause No. 49D12 08 03PL013729 and *Staehr v. Taurel, et al.*, Cause No. 49DO2 08 03CT013786, pending in the Marion County Superior Court, Indiana.
[8] The parties have agreed to take all steps necessary to dismiss the Derivative Actions pending in the other jurisdictions upon the Court's final approval of the proposed settlement, if granted. Following the Court's entry of the Preliminary Approval Order on March 1, 2010 (Document #76), the parties notified the Eastern District of New York and the Indiana State Court that the proposed Settlement had been preliminarily approved. By Order dated March 12, 2010, the Eastern District of New York closed the three cases pending in that jurisdiction, with leave to reopen if the settlement was not finally approved.

4

**B.      Coordination of the Derivative Actions and
        Investigation of the Derivative Claims**

Over the course of the litigation and settlement negotiations of the Derivative Actions,

Plaintiffs' Counsel have undertaken substantial factual and legal investigation and research

related to the alleged wrongdoing.  In addition, the parties negotiated the production of relevant

documents.  Beginning in July 2008 and continuing through May 2009, Defendants produced on

a rolling basis over 85,000 pages of documents, including deposition transcripts and exhibits of

forty-eight (48) Lilly employees who had testified in the MDL and related proceedings, twenty-

two (22) expert witness transcripts, reports and exhibits, and documents related to, among other

issues, the safety, efficacy and off-label marketing of Zyprexa.

Pursuant to a coordination agreement among Plaintiffs' Counsel, entered into in May

2008, the Co-Chair Counsel of the Executive Committee, Karen L. Morris of Morris and Morris

LLC Counselors At Law, and Richard D. Greenfield of Greenfield & Goodman LLC, in

coordination and consultation with the other members of the Executive Committee,[9] worked to

ensure the efficient coordination and management of the litigation, including review and analysis

of the document production, and research in support of and the drafting and negotiation of

detailed governance, compliance and medical risk management proposals (described below).

This effort included the identification of designated counsel who were assigned specific tasks to

eliminate duplication of work and to facilitate the development of expertise in identified areas

critical to the effective litigation and negotiation of the derivative claims.  This effort culminated

---

[9] The Executive Committee included counsel from each firm representing a plaintiff in a Derivative
Action.

in the preparation of a comprehensive merits analysis which informed the crafting of the governance and compliance proposals discussed below, and served as the basis of Plaintiffs' submission to the Mediator in June 2009.

### C.   The Design and Negotiation of Detailed Governance and Compliance Proposals

Over an eighteen month period, Plaintiffs' Counsel, drawing from the merits analysis discussed above, and working as appropriate with their experts, particularly Dr. Glass, researched, crafted and presented to the Company a series of governance, compliance, and medical risk management proposals.  These proposals, provided to Lilly on a rolling basis,[10] were the subject of extensive discussions and negotiations among the parties.  Over the course of multiple face-to-face meetings and telephonic conferences, the parties discussed Plaintiffs' proposals in substantial detail within the context of Lilly's operations and business.

As appropriate, Plaintiffs' pharmaceutical expert, Dr. Glass, participated in these discussions, as did senior personnel at Lilly with knowledge of and responsibility over Lilly's operations in substantive corporate governance topic areas, including, *inter alia*, the Vice President, Compliance and Enterprise Risk Management and Chief Compliance Officer; the Manager, Enterprise Risk Management, Global Compliance and Ethics Program Office;  the Deputy General Counsel and Corporate Secretary; the Head of Global Medical, Regulatory and

---

[10] Plaintiffs sent their Management Level and Public Policy and Compliance Committee proposals to Lilly in September 2008, followed by their Off-Label proposal in November 2008 and their Best Price proposal in December 2008.  In January 2009, Plaintiffs provided Defendants with their proposal with respect to Management Compensation, followed in March 2009 by the presentation of Plaintiffs' Life Cycle Management proposal.  Plaintiffs provided two proposals regarding Enterprise Risk Management, the first in December 2008, and their revised proposal in March 2009.  In addition, Plaintiffs provided

Safety and Chief Medical Officer; the Executive Director, Global Medical, Regulatory and Safety; the Lilly USA Compliance Officer; and the Vice President, Human Resources – Global Compensation and HR.   In addition, Professor Langevoort and Mr. Lam assisted Plaintiffs' Counsel in the negotiation of relevant provisions of the Corporate Governance Terms.

The parties also retained the mediation services of retired Judge Edward A. Infante (the "Mediator"), a former Chief Magistrate Judge of the United States District Court, Northern District of California, who was provided detailed written submissions related to merits and damages, and conducted a full day mediation session in New York, as well as multiple telephone conferences.   The negotiation of the terms of the Stipulation and of the Corporate Governance Terms continued for approximately six months thereafter, with the Mediator being kept apprised by counsel of the status of such negotiations.   Plaintiffs' Counsel also spent considerable additional time in drafting and negotiating the extensive documentation presented to the Court in support of the proposed Settlement.

## III.    SUMMARY OF PROPOSED RELIEF

Following the discussions and negotiations detailed above, the parties reached agreement on the governance, compliance, and risk management policies, procedures and provisions set forth in the Stipulation, which provide the basis for the Settlement, key features of which are discussed below.

---

proposals related to the Board in May 2009.

A.   **Lilly's Adoption of the Scientific Core Objective and the
Compliance Core Objective**

Plaintiffs believe it is essential to establish a top level mandate as the foundation of improved governance, compliance and risk management practices at Lilly.  To achieve this, the Stipulation provides for the express adoption of clearly stated objectives in the areas of product safety and medical risk management and legal and regulatory compliance at the Company.

1.   **The Scientific Core Objective**

As detailed below, central aspects of the design and negotiation of the proposed Settlement relate to the management of safety and benefit issues in connection with Lilly's products and products candidates throughout their entire life cycle.  A principal component of the proposed Settlement provides for Lilly's adoption of the Product Safety and Medical Risk Management Core Objective (referred to herein as the "Scientific Core Objective").  The Settlement provides that Lilly shall adopt policies and procedures to support scientific excellence in the development and communication of product safety and effectiveness information and the medical and scientific risks and benefits throughout the life cycle of both products and product candidates at the Company.

Plaintiffs' pharmaceutical expert believes that adoption of the Scientific Core Objective provides a substantial benefit to Lilly and its shareholders.  Dr. Glass, in his Expert Report, states that the requirement to adopt the Scientific Core Objective:

> provides the foundation for the strengthening Lilly's systems of corporate governance, internal control and operations in the area of product safety and benefit.  By adopting the Scientific Core Objective, Lilly recognizes the unique nature of medical risk that arises from drug development and marketing, and assigns oversight for this risk up to the Board, through the Science & Technology

8

Committee ("S&T Committee"), which has the scientific and medical expertise to meet this oversight responsibility.

Glass Report at ¶ 9.  Likewise, Mr. James Lam, Plaintiffs' enterprise risk management ("ERM") expert, concludes:

> In my opinion, the adoption of the Scientific Core Objective and the improvements to the governance and reporting processes for the Science and Technology Committee will enhance Board oversight of critical risks associated with clinical development processes, patient benefit and safety, and product quality and labeling.  As such, these improvements will likely lead to enhanced control and mitigation of product liability, regulatory, and reputational risks.

Lam Report ¶ 11.

Pursuant to the proposed Settlement, specific responsibilities are set out at both the management and the Board levels in connection with the achievement of the Scientific Core Objective at Lilly.  As described below, the proposed Settlement provides both for critical functions, duties and responsibilities at the management level in support of the effective implementation of the policies and procedures necessary to support the adoption of the Scientific Core Objective, and for oversight responsibility over that Objective at the Board level, through the Science & Technology Committee ("STC").

### 2.    The Compliance Core Objective

The proposed Settlement also provides that Lilly will adopt a Compliance Core Objective.  Under the terms of the proposed Settlement, the Company's Compliance Core Objective will include: (i) operating Lilly's business to deliver quality, innovative medicines that improve individual patient outcomes, and, in so doing, earn the trust and respect of patients and customers; (ii) operating Lilly's business in compliance with applicable laws and regulations;

9

(iii) conducting Lilly's activities and having policies and procedures in place to avoid adverse regulatory enforcement action; and (iv) promptly detecting, correcting and preventing the recurrence of off-label promotion activities that violate applicable law, regulation, and/or Company policy by any Lilly employee or any person acting on Lilly's behalf.

> Mr. Lam found the adoption of the Compliance Core Objective at Lilly to be significant:

> In my opinion, the adoption of such a board-level resolution, including individual accountabilities for the Chief Executive Officer and Chief Ethics and Compliance Officer and ongoing communications at the highest levels of the organization [provided for under the proposed Settlement and described below], provides the 'tone from the top'" that will drive the Company to balance its business and financial objectives with patient care and compliance objectives.

Lam Report ¶ 7.

As with the Scientific Core Objective, the proposed Settlement reflects Board oversight of compliance and risk management matters on the part of the Public Policy and Compliance Committee ("PPCC").   In addition, the Settlement provides for enhanced responsibilities, processes and procedures related to the effective implementation of the Compliance Core Objective at the management level within Lilly.

### B.     Board Level Provisions

### 1.     Science & Technology Committee ("STC")

The proposed Settlement provides the STC with oversight responsibility for the effective design and implementation of the policies and procedures necessary to support the Company's adoption of the Scientific Core Objective.  In connection with this responsibility, the proposed Settlement provides for Lilly to amend the STC charter in multiple respects, including, among others, expressly providing for: (i) STC reporting to the full Board regarding the safety and

effectiveness of Lilly's marketed products and drugs/compounds in late-stage clinical development; (ii) STC responsibility to assist the Board in exercising reasonable oversight of product safety and medical risk management at Lilly; and (iii) the ability of the STC to retain outside scientific, medical and risk management consultants and to freely speak with members of management, including in-house medical and scientific personnel.

### a.   Reports to the STC

To support the STC's ability to meet its critical oversight function in connection with the Scientific Core Objective, the Settlement provides for timely reporting to the STC from multiple sources within Lilly, including:

### (1)   Reporting from Management

The Settlement provides that the STC will obtain from management on a periodic basis (or more frequently if the Chief Medical Officer ("CMO") or the STC believes it to be necessary), reasonable assurances of the effective design and implementation of the policies and procedures designed to maintain the primacy, in matters affecting patient benefit and safety, of objective scientific inquiry, analysis and communication, including annual reports from the CMO regarding the implementation and ongoing monitoring of such policies and procedures, the identification of important medical and scientific risks and the resolution of those risks.  These reports will inform the STC of the status of Lilly's implementation of policies and procedures supporting the Scientific Core Objective and will highlight significant medical and scientific risks affecting single products and global product development at the Company.  *See* Glass Report ¶ 10.d.

### (2)     Other Reporting from the CMO

The Settlement also provides for multiple reports from the CMO to the STC, including:

● not less than annually, a report concerning the conclusion of the Medical Review Committee (chaired by the CMO) either that the Company has taken necessary and appropriate steps to discover, analyze, interpret, investigate, and communicate significant patient safety risks affecting the products and product candidates, or setting out plans sufficient to permit such a conclusion on a basis acceptable to the STC;

● for products nearing first major launch, a report regarding whether the planned scope of initial marketing of the drug is appropriate, from a medical content perspective, given the state of knowledge concerning patient safety and efficacy, and benefit/risk assessment; and

● prompt reporting regarding patient safety issues related to product labeling or promotion or other product safety matters, where, after having informed and discussed the matter with the Chief Scientific Officer and the CEO, the CMO believes escalation of the issue to the STC is desirable.

Dr. Glass states in his Expert Report that, in his opinion, the requirement of prompt reporting and escalation ensures that the STC will have prompt knowledge of significant safety issues:

> I believe that this escalation provision is one of a number of provisions that will help ensure prompt resolution of safety issues raised, for example, as discussed below, through the Product Safety Physicians or the Clinical Plan Document ("CPD").  Escalation to the Board by the CMO ensures that the STC will receive prompt communication of unresolved safety issues in accordance with the Scientific Core Objective and independent of commercial influence.

Glass Report ¶ 10.c.

### (3)     Reporting from the Vice President-Global Patient Safety

The Settlement provides that at least annually, the Vice President-Global Patient Safety (VP-GPS) – who reports directly to the CMO – shall report to the STC regarding both unresolved patient safety and utility issues that have been elevated to the Corporate Patient

Safety Committee, and the remediation of such issues.   This reporting by the VP-GPS complements the CMO reporting to the STC, providing the STC with a complete picture regarding both emergent, unresolved patient safety issues that were escalated, and patient safety issues that were resolved at the management level.   *See* Glass Report ¶ 10.e.

Assessing the required CMO and VP-GPS reporting responsibilities to the STC under the proposed Settlement, Dr. Glass opines:

> It is my opinion that the reporting responsibilities of the CMO and the VP- GPS to the S&T Committee are robust and provide the depth and frequency of reporting necessary to support the S&T Committee's oversight responsibilities as set forth in the Settlement.   Based upon these reports, the S&T Committee will be able to meet its responsibility for oversight of the primacy of patient safety and to provide assurance to the entire Board that the Scientific Core Objective is well established and is the guiding principle for scientific decision making with respect to safety and efficacy for the entire life cycle of Lilly products.

Glass Report ¶ 12.

### (4)    Reporting from the Vice President-Quality

The Settlement provides for the VP-Quality to monitor and audit the policies, procedures, systems and internal controls implemented to achieve the Scientific Core Objective, and to report any significant findings to the STC not less than annually or promptly as needed.   Dr. Glass finds that this will be a substantive review, requiring reporting to the STC by the VP-Quality of any significant findings, thereby assessing whether the relevant procedures and systems are identifying and resolving safety and benefit issues as required by the Scientific Core Objective. In Dr. Glass' opinion, this activity is critical, as continuous assessment is necessary to ensure that the Scientific Core Objective remains paramount and is not compromised, even inadvertently.  *See* Glass Report ¶ 13.

13

Overall, Dr. Glass finds that the scope and nature of the reporting obligations to the STC under the proposed Settlement serve a critical function: "Direct reporting to the S&T Committee ensures oversight and informed decision-making at the highest level of the corporation." Glass Report at ¶ 13.

### b.    Annual Assessment of Effectiveness and the Adequacy of Information

Further reflecting the importance of timely and adequate information flow to the STC in order for it to fulfill the oversight responsibilities provided for under the proposed Settlement, in addition to the reporting described above, the proposed Settlement also provides that the STC charter will be revised to provide for the STC to annually assess the adequacy of the reporting and information flows it receives, and to make such changes as are required to maintain and enhance the committee's effectiveness, including recommending to the full Board any desirable changes to its charter or membership.

*    *    *

In connection with the Settlement provisions related to the adoption of the Scientific Core Objective and the enhanced responsibilities of the STC, Dr. Glass opines that:

> It is my opinion that the Board level product safety and medical risk management oversight provisions offer substantial benefits to the Company. Together with supporting management level changes (discussed below), these Board level provisions represent a significant commitment to Lilly's governance and internal control processes relating to product safety and medical risk management throughout the life cycle of Lilly's products. If faithfully implemented, I believe that the adoption and maintenance of these provisions will contribute substantially to adequately resourced, timely and objective scientific inquiry, analysis and communication in matters affecting patient benefit and safety, and will provide

> powerful support in the prevention and detection of the types of issues that gave
> rise to the derivative actions.

Glass Report ¶ 16.

### 2.      The Public Policy and Compliance Committee

The Settlement sets forth compliance oversight commitments, including in connection

with the Compliance Core Objective, on the part of the Public Policy and Compliance

Committee of the Board (the "PPCC").  The PPCC, comprised of independent directors, has

responsibility over non-financial compliance and non-financial compliance risk aspects of the

enterprise risk management ("ERM") program at Lilly.  The Settlement provides for enhanced

oversight responsibilities by the PPCC in connection with these functions, as well as with

oversight responsibilities in connection with operational audit at the Company.   Professor

Langevoort, Plaintiffs' corporate governance and compliance expert, states in his Expert Report:

> Because independent directors are not involved with the company on a day-to-day
> basis, their involvement means little unless they gain sufficient knowledge of
> compliance or risk-related matters to play a constructive role in addressing those
> issues.  COSO is specific in saying that the involvement of the board of directors
> in compliance and risk management oversight must be evaluated in large part by
> reference to the "sufficiency and timeliness with which information is provided to
> board or committee members, to allow monitoring of management's objectives
> and strategies, the entity's financial position and operating results and terms of
> significant agreements" and the "sufficiency and timeliness with which the board
> or audit committee is apprised of sensitive information, investigations and
> improper acts (*e.g.*, travel expenses of senior officers, significant litigation,
> investigations of regulatory agencies, defalcations . . . .)" (*Integrated Framework*,
> pp. 31-32).

Langevoort Report, ¶ 23.  In this respect, to support the PPCC's ability to meet its enhanced

oversight responsibilities, the proposed Settlement provides for timely information flow, in the

form of direct reporting to the PPCC, from, among others officers, the Chief Ethics and Compliance Officer ("CECO"), the General Auditor and the Vice President-Quality.

### a.    CECO Reporting

Under the terms of the proposed Settlement, on an annual basis, the PPCC and the CECO must jointly develop an agenda that specifies the topics for the CECO's quarterly reporting to that committee on substantive compliance matters.  Agenda topics shall include, for example, implementation of existing compliance programs, processes for receiving and investigating compliance or ethics-related complaints, exceptions reporting, the allocation of resources to the compliance organization and compliance-related initiatives, emerging compliance trends and, as appropriate, plans of action to respond to such trends from a preventive compliance standpoint. In addition to such quarterly reporting to the entire committee, the CECO will also report compliance matters directly to the Chair of the PPCC if, in the CECO's view, prompt reporting is warranted.

### b.    General Auditor and Vice President-Quality Reporting

The proposed Settlement provides that the PPCC will annually review and approve the aspects of Lilly's integrated audit plan that relate to legal and regulatory compliance (excluding financial, Good Manufacturing Practices and Good Clinical Practices).  Pursuant to the Settlement, periodically throughout the year, the PPCC will receive reports from the General Auditor concerning the status of the implementation of the annual audit plans in the relevant areas, and will receive prompt reports regarding material findings, with management providing follow-up reports until such time as those findings have been remediated to the PPCC's

16

satisfaction.

The proposed Settlement provides for similar review, approval and reporting procedures from the VP-Quality regarding those aspects of the audit plan, such as Good Manufacturing Processes, over which that officer, rather than the General Auditor, has primary responsibility.

In addition, pursuant to the proposed Settlement, at least annually, the General Auditor will report to the PPCC regarding the Internal Audit Department's assessment of the effectiveness of the Company's compliance and related risk management controls.

### c.      Direct Access to the PPCC

Importantly, the Settlement provides that the CECO, the General Auditor, the VP-Quality and the General Counsel will have direct access to the PPCC and will regularly be invited to attend committee meetings, and that the CECO, General Auditor and VP-Quality will have private sessions at least semiannually with the PPCC to discuss, among other things, management support for their organizations, including resources and management tone.

### d.      Board Responsibility for Appointment and Retention

The Proposed Settlement provides that the chairman of the PPCC, in consultation with the PPCC, will approve the appointment and retention of the CECO, and that the Audit Committee Chairman, in consultation with the Audit Committee, will approve the appointment and retention of the General Auditor.

### e.      Oversight of Enterprise Risk Management

The proposed Settlement addresses both Board and management level changes directed to Lilly's enterprise risk management ("ERM") system.  At the Board level, the PPCC oversees

17

the process by which ERM programs are reviewed by Lilly's Board and its various committees.

The Settlement provides that in conjunction with the Audit Committee, the PPCC will exercise

reasonable oversight over the Company's enterprise risk management program, and will have

specific responsibility for the non-financial compliance risk aspects of the ERM program. To

support the Board's ability to meet this responsibility, the Settlement provides that the PPCC

will receive a report each year from the CECO regarding the design, implementation and

operation of Lilly's ERM program, as well as reports concerning risk management aspects of

Company strategic initiatives and developments affecting the Company's business, operations

and affairs.

      Plaintiffs' ERM expert, Mr. Lam, states that:

> The role of the board is widely recognized as critical to effective corporate
> governance and risk management.  . . .  Collectively, the provisions in the
> Agreement related to board reporting will significantly increase the level of risk
> transparency not only at the board level, but also throughout the Company. In my
> experience, the development and implementation of more effective board reports
> concerning risk management and compliance naturally lead to the identification,
> collection, and analysis of critical risk and compliance information throughout an
> organization.  In other words, improving board reporting leads to enhanced
> enterprise-wide risk transparency because the necessary risk and compliance
> information must be gathered and analyzed at all levels of the organization. . . .
> Enhanced risk transparency will likely result in more timely identification,
> reporting, and resolution of risk management and compliance issues.

Lam Report ¶ 12.

      In addition, the proposed Settlement provides that at least once a year, the PPCC will

meet in joint session with the Audit Committee to review major non-financial compliance

matters, and will coordinate with the Audit Committee to assist in assuring that appropriate risk

disclosures are included in the Company's public financial reports as required by law.

18

### f.      Annual Assessment of the Adequacy of Information Flows

Pursuant to the proposed Settlement, the PPCC, like the STC, will annually assess the adequacy of the reporting and information flows it receives, and make such changes as are required to maintain and enhance the committee's effectiveness, including recommending to the full Board any desirable changes to its charter or membership.

*    *    *

Regarding the role of the PPCC at Lilly and the enhanced oversight responsibilities it assumes under the proposed Settlement, Mr. Lam concludes:

> In my opinion, the PP&C Committee represents the centralized non-financial risk management and compliance committee for Lilly. . . . The PP&C Committee provisions are significant and will enhance the effectiveness of this critical board oversight function.   If faithfully implemented by Lilly, adoption of these governance, risk, and compliance improvements will contribute to more effective board oversight and monitoring of non-financial legal and regulatory compliance, as well as enterprise risk management and manufacturing quality.   These improvements, together with the management supports discussed below, will likely lead to the reduction of operational, legal, regulatory, reputational, and other enterprise-wide risks for the Company.

Lam Report ¶ 8.

### 3.      The Compensation Committee

Mr. Lam expressly notes: "In my assessment, one of the most significant provisions of the Agreement is related to the linkage between compliance factors and executive compensation."  Lam Report ¶ 14.  The Settlement provides that the Compensation Committee of the Board, as part of a review of the performance and associated compensation decisions for executive officers at Lilly, annually will discuss with the CEO the compliance performance of executive officers.   Under the Settlement, Human Resources will report annually to the

19

Compensation Committee regarding the results of periodic monitoring of compliance objectives,

which the Settlement provides must be set by executive officers (*see* Section V.C.2.d. below).

> Mr. Lam goes on to find:

> In my opinion, by incorporating compliance objectives into executive
> compensation and succession planning, these requirements will have a far-
> reaching impact on the culture, values, and executive/employee behavior
> throughout the Company.  First, I believe the linkage between compliance and
> compensation will extend beyond the top executives to the performance reviews
> and compensation systems of middle managers and other employees.  Senior
> executives who are accountable and rewarded for compliance will in turn make
> sure those reporting to them are also accountable and rewarded.  Second, the
> implementation of these requirements will likely result in the development of
> specific milestones to improve compliance systems and processes, as well as key
> risk indicators that track risk management performance and internal control
> effectiveness.  Such milestones and key risk indicators will be needed as the
> criteria for assessing the compliance component of executive compensation.
> Finally, these requirements will help the Company in achieving one of the key
> tenets of enterprise risk management, which is balancing the 'hard side' and the
> 'soft side' of risk management.

Lam Report ¶ 14.

### 4.    Tone at the Top

> Professor Langevoort expressly notes that:

> Both COSO and the OSG emphasize the need for a "top-down" commitment by
> the board of directors and senior management to a culture of integrity and
> responsibility.    The OSG states that organizations must "promote an
> organizational culture that encourages ethical conduct and a commitment to
> compliance with law."  Similarly, COSO states that "the effectiveness of internal
> controls cannot rise above the integrity and ethical values of the people who
> create, administer and monitor them" (*Integrated Framework*, p. 23).

Langevoort Report ¶ 47.  The proposed Settlement provides that Lilly's CEO and the Chairman

of the Board of Directors, in consultation with the CECO, will design periodic communications

regarding a culture of compliance and performance with integrity.  The Settlement also provides

20

that the CEO will meet at least annually with senior management to emphasize the importance of compliance and to emphasize their roles and accountability for both compliance and ethics at Lilly.

Mr. Lam states that, in his opinion, the adoption of the Compliance Core Objective, including individual accountabilities for the Chief Executive Officer and Chief Ethics and Compliance Officer and ongoing communications at the highest levels of the organization discussed above, "provides the 'tone from the top' that will drive the Company to balance its business and financial objectives with patient care and compliance objectives."  Lam Report ¶ 7.

### 5.    Enhanced Corporate Governance Practices

The proposed Settlement also includes provisions designed to enhance Lilly's Board level corporate governance practices, including:

### a.    Board Membership

To assure that individuals with appropriate technical experience, expertise and education are nominated to the Board so as, for example, to comply with the enhanced oversight responsibilities of the STC and PPCC provided for under the proposed Settlement, the Settlement provides that Lilly will consider prospective committee assignments when assessing the qualifications of Board nominees.  In addition, the Settlement provides that determination for re-nomination will include consideration of such factors as objectivity, candor, ethical commitment, independence, preparedness and participation.

To help ensure that Board members have the time necessary to commit to Lilly, the Settlement provides that the number of other public company boards on which Lilly directors

may sit shall be prospectively limited to four (including Lilly).   To provide appropriate flexibility to Lilly, the Settlement further provides that the Chair of the Directors and Corporate Governance Committee may, on a case-by-case basis, grant a waiver of this limitation under appropriate circumstances.

The Settlement further provides for amending the Company's Corporate Governance Guidelines (the "Guidelines") to prospectively establish independence standards for Board membership more stringent than the New York Stock Exchange (NYSE) listing standards.

### b.    The Presiding Director and the Role of Independent Directors

In order to enhance the role of the independent directors at Lilly, the Settlement provides that the Presiding Director will be elected annually by the independent directors.   Lilly's Guidelines will be amended to expressly encourage all directors to raise and discuss with the Chair of the Board, the Presiding Director or the Corporate Secretary any items they believe should be considered for inclusion on the agenda for Board or committee meetings.

### c.    Compliance Component to Annual Board Self-Assessment

In addition to the Settlement provisions regarding annual self-assessment of the effectiveness of the STC and the PPCC and the adequacy of reporting and information flow to each, the proposed Settlement provides that the Company will include in the Board and relevant committee self-assessment questionnaires a specific question assessing Board and committee performance regarding compliance and oversight, including related to the Board and committee responsibilities set forth in the Settlement.

22

### d.      Board Training and New Director Orientation

The Settlement provides that the Company shall provide risk, governance and compliance training to its directors as the Board determines is necessary to support its oversight undertakings.  Lilly will maintain its new director orientation program, including training with respect to Board and committee responsibilities; review of the pharmaceutical industry and issues facing the industry, including health care compliance risks; and corporate governance and regulatory trends.  Lilly also agrees that its new director orientation program will be expanded to include Board and committee responsibilities set forth in this Settlement; review of the Company's compliance history; and pharmacovigilence[11] compliance risks.

### C.      Management Level Provisions

### 1.      Life Cycle Management

The proposed Settlement sets forth detailed and comprehensive provisions addressing drug life cycle management within Lilly.  These far-reaching provisions are designed to provide a sound foundation for the management of drugs and drug candidates throughout their life cycle. As noted above, Lilly's adoption of the Scientific Core Objective applies across the entire Company, making patient safety paramount in decision-making across the drug development and post-launch process.  Dr. Glass states:

> Based on my experience in drug development and Life Cycle Management, Lilly's adoption of the Scientific Core Objective provides a powerful statement of its priorities that aligns corporate decision making with its responsibility to patients, providers and regulatory authorities.

---

[11]   At pharmaceutical companies, pharmacovigilence is responsible for product and product candidate safety.

Glass Report ¶ 9.

As detailed below, the proposed Settlement provides the Chief Medical Officer ("CMO") with management level responsibility for the implementation of the Scientific Core Objective. The responsibilities of the Vice President-Global Patient Safety ("VP-GPS"), who reports to the CMO, are substantially expanded and enhanced, and the critical position of Product Safety Physicians ("PSPs") shall have responsibility for tracking safety issues for each drug and drug candidate throughout its life cycle, from late stage development through patent expiration.

### a.    The Chief Medical Officer ("CMO")

The authority, responsibilities and staffing of the CMO are substantially enhanced under the proposed Settlement.  The Settlement provides that the CMO, who is in charge of Lilly's combined Global Medical, Regulatory and Safety Departments:

º    shall have senior executive authority and oversight responsibility for all product safety functions at Lilly, including pharmacovigilence;

º    shall monitor the implementation of, and take steps necessary to continuously improve, Lilly's policies, procedures, systems and internal controls designed to achieve the Scientific Core Objective, and shall report on the status and findings of such monitoring annually to the STC;

º    shall be the senior medical officer of the Company, and shall have executive authority over all medical physicians employed in drug development and medical research by the Company on issues of drug utility and safety and regulatory compliance;

º    both in his capacity as the Chair of the MRC and as the head of Global Medical, Global Regulatory Affairs[12] and Global Patient Safety, shall be provided robust information flow related to emerging product safety and efficacy issues;

º    has a direct line of responsibility in the area of patient safety, from the Vice President-

---

[12] Regulatory Affairs manages the company's relationship with regulators, including the product approval process.

Global Patient Safety (VP-GPS), and through him or her, to the Patient Safety Physicians (PSPs), which reporting structure assures the independence of this critical function from commercial considerations; and

º        shall assess annually the staffing and funding requirements necessary to fulfill his responsibilities and may, in consultation with the Executive Vice President of Science and Technology, reorganize, reduce or augment his staff.

As discussed above (*see* Section V.B.1.a.) the Settlement provides for robust reporting obligations by the CMO to the STC to support that committee's enhanced oversight responsibilities in connection with the Scientific Core Objective.

### b.        Vice President-Patient Global Safety ("VP-GPS")

The VP-GPS, responsible under the settlement for overseeing Patient Safety Physicians ("PSPs," discussed below), reports directly to the CMO.  The VP-GPS is tasked with critical safety review processes in connection with Lilly's adoption under the proposed Settlement of the Scientific Core Objective, including authority over and responsibility for all scientific analysis and interpretation of data and clinical studies related to utility and safety over the life cycle of each product and product candidate.  As such, the VP-GPS is responsible not only for ensuring the continuous identification and resolution of patient safety issues, but also for tracking and resolving safety and risk signals in light of product utility and benefit.  Maintenance of this responsibility under the proposed Settlement through all stages of the product life cycle provides a continuously developing product safety record and the timely updating of the clinical experience with Lilly products and product candidates.

The Settlement provides that the VP-GPS is responsible for all scientific analysis and interpretation of data and clinical studies, as well as for surveillance relating to product safety

derived from clinical studies.  The Settlement provides that the VP-GPS has responsibility for developing and implementing policies and procedures, among other things, for ascertaining and addressing issues arising in connection with the safety of Lilly's products and maintaining practices at Lilly to facilitate the collection and timely disclosure of information concerning the safe use of Lilly products.  As such, the VP-GPS will be regularly informed regarding safety issues to be reported externally to, for example, regulators and health care providers, and will establish the policies and procedures to ensure that these disclosures occur on a timely and accurate basis.

Pursuant to the proposed Settlement, the VP-GPS is responsible for providing recommendations to the CMO regarding the initiation of the next stage of a product or product candidate's development or expansion of commercialization, as supported by a risk versus benefit analysis across all target populations.  The Settlement provides that the VP-GPS will also make recommendations to the CMO regarding whether proposed additional studies would add usefully to the weight of evidence for a product's safety profile, including with respect to resolving open issues around off-label patient populations and safety.

Recognizing that safety information can arise after product launch, the Settlement provides for responsibility to the VP-GPS for recommending to the CMO and Global Product Labeling Committee all safety-related labeling changes for Lilly products.  As discussed above, reflecting the critical importance of labeling issues, under the proposed Settlement, the CMO has express responsibility and authority to elevate to the attention of the Board (by way of the STC) safety-related labeling issues that are not satisfactorily resolved at the management level.

As noted above, a critical responsibility of the VP-GPS under the proposed Settlement is oversight of all Product Safety Physicians, including assigning PSPs to products and product candidates; ensuring that the PSPs have completed full and accurate safety assessments prior to each Medical Review Committee meeting concerning relevant products and product candidates; and making recommendations regarding the hiring, retention, performance evaluation, compensation and promotion of PSPs.  As Dr. Glass opines, the VP-GPS will be responsible for escalating safety signals identified by the PSPs, whether the safety signal affects individual patients or populations.  In addition, the VP-GPS will receive recommendations from the PSPs for appropriate studies and resource allocation to support each product in light of the Scientific Core Objective, and will manage those recommendations through the CMO.

As discussed above, the VP-GPS is also tasked with direct reporting, at least annually, to the STC regarding unresolved patient safety and utility issues that have been elevated to the Corporate Patient Safety Committee, as well as regarding the remediation of such issues.  As Dr. Glass states:

> The analysis and communication of these reports to the CMO and to the S&T Committee would identify strengths and weaknesses of Lilly's Pharmacovigilance system and should provide the basis for robust assessment and the prioritization of the resolution of identified safety and utility issues. . . . Escalation by the VP-GPS, whether to the CMO, the Corporate Patient Safety Committee or the S&T Committee is free of undue commercial influence.

Glass Report ¶ 22.

*   *   *

As detailed in his Expert Report, Dr. Glass believes the VP-GPS plays a critical role under the proposed Settlement:

27

The VP-GPS, as the manager of the Product Safety Physicians, is charged with ensuring that the appropriate data collection, selection, analysis and interpretation are reported, and that the Scientific Core Objective is maintained as paramount throughout the life cycle of each product.  In my opinion, the VP-GPS, as the manager of the Product Safety Physicians and as a key member of the MRC, provides a critical management function in support of the achievement of the Scientific Core Objective.

Glass Report ¶ 28.

### c. Product Safety Physicians ("PSPs")

The proposed Settlement provides for the creation of PSPs, who play a key role in the integrated safety review process provided for under the Settlement.  PSPs are senior level physicians whose principal responsibility is acting as a medical science advocate for product safety.  Under the terms of the Settlement, every Lilly product currently on the market and every product candidate at the Company at the end of Phase 2 in the development process[13] will have a PSP with assigned responsibility for safety issues throughout that product's life cycle.

The PSP will act as a senior level medical science advocate for product safety and compliance with the Scientific Core Objective.  To assure effective performance in meeting this critical responsibility, the Settlement directly ties PSP professional advancement and compensation at Lilly to the VP-GPS' assessment of their effectiveness in promoting the Scientific Core Objective with respect to their individual product/product candidate.

As such, PSPs assigned to particular products are responsible for assuring that safety issues affecting the product are given primary weight in all labeling decisions, including (as

---

[13] Dr. Glass explains the Phases of drug development as follows: "Clinical trials supporting drug development and marketing are divided into four phases: Phase 1 focuses on safety.  Phases 2 and 3 studies test safety and efficacy in increasing test populations to support regulatory approval to market the product for specific diseases or disorders.  Phases 1 through 3 studies occur prior to a product being marketed to the

noted above) elevating any disagreements concerning safety issues in labeling decisions to, among others, the VP-GPS and CMO as appropriate and necessary, to assure that the matter is resolved in a manner consistent with maintaining the primacy of patient benefit and safety.  Dr. Glass notes: "In my opinion, this independent safety function, which is carried up to the CMO – and through the CMO, to the Board – strongly supports the implementation of the Scientific Core Objective."  Glass Report ¶ 30.

The PSP assigned to each product or product candidate must assure that all available product data is comprehensively reviewed for patient safety issues, and, at least annually (and more often as necessary) report to the VP-GPS on patient safety aspects of the Clinical Plan Document (the "CPD"), including making recommendations for reprioritizing clinical resources when the PSP believes such additional resources are necessary to fully develop required patient safety information for the product.  In Dr. Glass' opinion:

> Such reports provide a detailed update regarding the state of safety and development studies, investigations and analyses pertaining to the product or product candidate, and include requisitioning for reprioritizing critical resources whenever, in the judgment of the Product Safety Physician, such additional resources are necessary to  develop robust patient safety information for the product.

Glass Report ¶ 31.  Demonstrating the Company's commitment to this process, the Settlement further provides that the allocation of required funding will be ensured through Lilly's budget management and approval processes.

The proposed Settlement provides that PSPs will have full access to the entire clinical data base for a product or product candidate, and are accountable to ensure that all available

---

public.  Phase 4 studies support expanding the marketing of an approved drug."  Glass Report ¶ 4 fn 1.

product data is comprehensively reviewed for patient safety issues, that significant patient safety issues are promptly analyzed and interpreted, and that such patient safety issues are fully explored, for example, in clinical trials and post-marketing surveillance.

PSPs are also responsible under the proposed Settlement for ensuring that the scientific evidence supporting a benefit/risk assessment of a product is not overstated or presented in a misleading way.  The Settlement also provides that PSPs shall coordinate with the VP-GPS and the regulatory function at Lilly to assure that all product safety data, analysis, interpretation and investigations are appropriately disclosed to the FDA and corresponding foreign regulators.

Recognizing the critical function PSPs perform under the proposed Settlement, Dr. Glass opines:

> In my opinion, the access of a senior medical scientist responsible for patient safety and dedicated to a product or product candidate throughout its entire life cycle is a crucial element of the Company's ability to meet the Scientific Core Objective.   .   .   .   The Company shall provide the resources, authority, compensation and reporting structure necessary to assure the PSPs are able to fulfill their critical safety-related responsibilities.

Glass Report ¶ 35.

### d.        Clinical Plan Document Template

As noted above, the Settlement provides for the adoption and maintenance of the Clinical Plan Document Template ("CPD").  In Dr. Glass' opinion:

> The clinical plan document ("CPD") is the standardized framework for Lilly team members, including medical research, health outcomes and marketing experts, regulatory affairs, medical research and safety, to contribute to product development and strategy.  The CPD will be the key document for tracking the development of each product and product candidate over its entire life cycle, from the beginning of development to the expiration of the patent.   The CPD is overseen by the Medical Review Committee.   Contributors to the CPD have

30

> substantive input into their areas of expertise.  The CPD is designed to align clinical research activity to resource allocation, including budget, and to serve as the central authoritative repository of clinical and regulatory strategy safety and risk issues, and their resolution for the entire life cycle of the product.

Glass Report ¶ 36.

Because the CPD is maintained and continually updated over the entire life cycle of each product and product candidate, it will collect all relevant information about that product/product candidate, allowing for real-time analysis of evolving safety, risk and effectiveness issues.  This continuity is essential in Dr. Glass' view:

> In my opinion, the continuity afforded by a single document that tracks the entire life cycle of the product will provide substantial protection against the loss of important information, and will support the timely identification and resolution of safety, efficacy and labeling issues as they arise.

Glass Report ¶ 36.

As Dr. Glass opines, key aspects of the CPD are the risk minimization and risk management plans.  The risk minimization plan will track to resolution each risk identified over the life cycle of the product, ensuring that all relevant information is maintained and easily retrievable from a single source.  The risk management plan will include a comprehensive listing of clinical and non-clinical risk for each product/product candidate requiring a plan and action by Phamacovigilence at Lilly.  Dr. Glass finds that:

> The Company commits to risk identification and resolution from the first human exposure through the entire life cycle of each product.  This approach exceeds regulatory requirements for risk identification and mitigation plans, which focus on the initial launch, and are limited in scope and duration.

Glass Report ¶ 38.

Relevant to the alleged conduct that underlay the derivative claims, the CPD recognizes

31

that off-label use is always a medical risk for which there must be a written plan and appropriate

Company action.  Information captured in the CPD, combined with the PSPs' role in identifying

unresolved safety issues, is designed under the proposed Settlement to ensure Lilly will promptly

address off-label use to minimize patient exposure without adequate data support from sponsored

clinical trials.

As related to Lilly's ability to achieve the Scientific Core Objective, Dr. Glass further

finds:

> In my opinion, the CPD is a critical tool for enabling the CMO to report to the
> S&T Committee and for meeting the Scientific Core Objective.  The CMO, in
> reporting to the S&T Committee in his capacity as Chair of the Medical Review
> Committee, will have as a critical resource the CPD – which reflects input from
> the key stakeholders for each product.  In my opinion, the elements of strategy
> and operations, and the substance of the CPD are adequate to ensure careful
> ongoing evaluation of each product candidate to enable the CMO to provide
> accurate, adequate and timely reporting to the S&T Committee.

Glass Report at ¶ 44.

### 2.     Enhanced Global Ethics, Compliance and
### Operational Risk Management

#### a.     The Chief Ethics and Compliance Officer ("CECO")

Under the proposed Settlement, the CECO, along with the Chief Executive Officer, are

responsible for taking all actions necessary and appropriate to achieve the Compliance Core

Objective.

Enhancing the organizational stature and authority of the CECO, the proposed Settlement

provides that the CECO shall be both a member of senior management with the rank of not less

than Senior Vice President, and a member of the Executive Committee of the Company, which is

Lilly's most senior management committee.   Further enhancing the CECO function, the Settlement provides for the creation of the following new Vice President and Senior Director level positions at the Company, reflecting a substantial commitment of resources to the development of a robust centralized global compliance and enterprise risk management system:

  º Vice President, Global Compliance Strategy and Enterprise Risk Management, who will report to the CECO and will have responsibility for assisting in the development of global compliance strategy, partnering with senior leaders across Lilly to drive the culture change that reflects highly ethical and compliant behaviors, and addressing emerging regulatory and enforcement trends and enterprise-level risks.

  º Vice President, Global Ethics and Compliance Officer, Business Liaison, who will report to the CECO and will oversee the compliance function within the Company and its various US-based and International affiliates and will be responsible for developing and implementing policies, procedures and practices designed to promote compliance in that affiliate with applicable law or requirements regarding applicable health care programs.  Compliance officers of the Company's US-based affiliate and International OUS affiliates (responsible for promoting compliance in each affiliate) will report directly up through the Vice President, Global Ethics and Compliance Officer, Business Liaison, providing for compliance reporting  independent of the business lines.

  º Senior Director, Enterprise Risk Management, who reports to the Vice President, Global Compliance Strategy and Enterprise Risk Management, and will assist the CECO in administration of enterprise risk management at the Company.

  º CIA Project Manager, who will coordinate administration of compliance with the Company's obligations under the Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, dated January 14, 2009.

As summarized above (*see* Section V.B.2.a) and set forth in detail in the Settlement, the CECO is responsible for direct and timely reporting to the PPCC.  As Professor Langevoort states:

  [T]he Proposed Settlement expands and enhances the separate governance

> structure for non-financial compliance risks, through the Public Policy and Compliance Committee ("PPCC") of the Lilly Board of Directors, which oversees and works closely with the company's Chief Ethics and Compliance Officer ("CECO"). The role, responsibilities and authority of the CECO is also strengthened by adding new senior support positions so as to create a more powerful and wide-ranging compliance platform with Lilly.

Langevoort Report ¶ 7.

In addition, the Settlement sets forth compliance policy provisions, including that, with limited exceptions, all compliance-related investigations shall be conducted under the authority of the CECO, and all requested exceptions from Lilly compliance policies and procedures must be reviewed in advance by the CECO and legal. Any determination to grant an exception that is contrary to the CECO's recommendation must be immediately reported to the CECO.

As noted above, the appointment and retention of the CECO must be approved by the Chairman of the PPCC, in consultation with other committee members. Pursuant to the proposed Settlement, on an annual basis, the CECO will assess the staffing and funding necessary to carry out his or her responsibilities, and in consultation with Lilly's Chief Executive Officer, reorganize, reduce or augment the staff. In addition, if, during the Agreed Upon Term (defined in Section V.D. below), the CECO at Lilly wishes to seek additional funding for compliance-related expenditures, he or she shall be permitted at his or her option to petition directly the Board or an appropriate committee of the Board that such funding be included in or covered by business plans and budgets that are approved by the Board or such committee.

Professor Langevoort finds that the enhanced CECO responsibilities provided for under the proposed Settlement reflect emerging compliance best practices. *See, e.g.*, Langevoort Report ¶¶ 40-41.

34

### b.     Enterprise Risk Management

At the management level, the CECO is responsible for Lilly's enterprise risk management ("ERM") function.   As discussed above, the Settlement provides for the creation of two new senior executive positions related to ERM: the Vice President, Global Compliance Strategy and Enterprise Risk Management and the Senior Director, Enterprise Risk Management.   Under the Settlement, the Compliance and Risk Management Committee shall assist the CECO and the Senior Director of Enterprise Risk Management in identifying, prioritizing, assessing, evaluating and mitigating risks across the enterprise.   As discussed at Section V.B.2.e. above, the Settlement provides for direct reporting by the CECO to the PPCC in connection with ERM at Lilly, and for Board level oversight of, among other matters, resource allocation to the CECO related to compliance and ERM functions.   In addition, as Professor Langevoort notes:

> The Proposed Settlement also expands the responsibilities of Lilly's Compliance and Risk Management Committee – made up of senior managers from throughout the Lilly organization, and chaired by the CECO – to include enterprise risk management (including assisting the CECO in identifying, prioritizing, assessing, evaluating and mitigating risks throughout the enterprise), and states that the enterprise risk management function shall be designed with consideration to COSO's 2004 *Integrated Framework*.

Langevoort Report ¶ 41.  Mr. Lam concludes that "the Agreement will significantly enhance the effectiveness of risk management processes and internal controls at the management level." Lam Report ¶ 13.

### c.     Compliance Training

The Settlement provides for Lilly to retain a speaker identified by Plaintiffs' Counsel for

35

400 series compliance-related leadership training presentations for its US-based affiliates.

### d.  Performance and Compensation

Professor Langevoort states that:

> Because most serious compliance issues result from incentive pressures, it is essential that the compensation and discipline system recognize the paramount importance of compliance and ethics and assure that there are appropriate penalties for poor compliance and ethics and rewards for good compliance and ethics.

Langevoort Report ¶ 42.  The Settlement provides that all senior management personnel shall include a compliance objective and measurement of that objective in their annual performance management plans.  These objectives will be personalized to each executive based on job content and level.  To insure these compliance objectives are included in these executives' performance management plan, Lilly will undertake periodic monitoring and sample auditing.  Achievement of performance objectives will factor in compensation decisions for these senior executives.  Mr. Lam states that in his opinion:

> The establishment of a compliance objective in all executive and senior management annual performance plans and reviews is significant and far-reaching because it will raise awareness and accountability for compliance and risk management at the highest levels of the Company.

Lam Report ¶ 14.

Also pursuant to the proposed Settlement, the CECO shall provide compliance performance feedback for senior management to both the CEO (as part of the semi-annual executive review and during the end-of-year performance review) and the Senior Vice President of Human Resources (as input to the Company's on-going succession management review process).

In addition, pursuant to the proposed Settlement, the Company shall continue to make the promotion of, and adherence to, the Company's Code of Conduct, *The Red Book*, an element in evaluating the performance of all employees.

### e.       Discipline

The proposed Settlement also provides that Company employees are subject to appropriate disciplinary action if they violate any law regulation, or Company policy or procedure, including federal health care program requirements, FDA requirements, or company policy related thereto.  Pursuant to the Settlement, the CECO will provide an organization-level summary of disciplinary actions on a quarterly basis to the CEO, who will be advised specifically of all compliance related performance issues and disciplinary actions involving senior management, and be involved in determining the associated compensation consequences that will result from these issues and actions.

### f.       Monitoring

The Settlement provides for at least annual reporting to the PPCC regarding the results of the annual surveys of interactions with health care professionals set forth in the Company's Corporate Integrity Agreement with the Office of Inspector General of the Department of Health and Human Services, dated January 14, 2009 (the "CIA").

The Settlement also provides that field force monitoring, in the form of "ride-alongs" with sales representatives, shall be based on a relative assessment of the potential risk for improper off-label promotion.

In addition, the Settlement provides that all communications to external parties regarding

products and product candidates, including by the Lilly Answers Center, shall include only medical and scientific conclusions approved by Lilly Medical.  Additional review and consultation may be provided by Lilly Regulatory and Lilly Legal.  Pursuant to the Settlement, the Chief Medical Officer shall have executive authority over the Lilly Answers Center.

The Settlement also sets forth specific provisions related to the monitoring of FDA-regulated speaker programs and educational grants and continuing medical education to ensure compliance with Lilly's compliance program or policies and procedures.

### D.    The Three Year Commitment Period

As described in more detail in Exhibit A to the Stipulation, the Company has agreed to keep in place the changes in corporate governance, compliance and risk management structures and procedures for a three year period from the date the Settlement receives Court approval (the "Agreed Upon Term").  Subject to Board approval as necessary, Lilly shall reassess the processes implemented under the Agreement after three years to determine whether to continue or modify them.  As noted above, certain of the Board-level changes are reflected in amendments and changes to the Company's Guidelines and board committee charters.

### E.    The Funding Commitment

Lilly agrees that for the Agreed Upon Term it will commit from its treasury funds as are necessary to implement the provisions set forth in Exhibit A.  This commitment is critical.  As Professor Langevoort concludes:

> The OSG requires that the individuals within the organization who are given compliance oversight responsibilities have "adequate resources" to perform their tasks.  While this is a vague admonition, it reflects the concern that companies are inclined to short-change their compliance programs, thereby disabling what on

38

paper appears to be a first-rate system. The reason is not necessarily sinister. Good compliance programs do not generate measurable "return on investment" or other metrics that are important when corporate budgeting decisions are made. More immediately justifiable investments tend to get priority, even though the costs to the company from compliance and ethics failures can be catastrophic. To this end, Lilly agrees that for the Agreed Upon Term it will commit from its treasury funds as are necessary to implement the provisions set forth in the Proposed Settlement.

Langevoort Report ¶ 49.

## IV.   THE APPLICABLE LEGAL STANDARDS

### A.   Settlements are Generally Favored

There is an overriding public interest in settling and quieting litigation, and this is particularly true in complex litigation, such as the Derivative Actions. *See, e.g., See Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) ("Federal courts naturally favor the settlement of class action litigation"); *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 312 (7th Cir. 1980) ("It is axiomatic that the federal courts look with great favor upon the voluntary resolution of litigation through settlement"), *overruled on other grounds*, *Felzen v. Andreas*, 134 F.3d 873 (7th Cir. 1998). Settlements of complex actions minimize the litigation expenses of the parties and reduce the strain such litigation imposes upon already scarce judicial resources. *See, e.g.*, *In Re GMC Pick-up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 784 (3d Cir. 1995) *cert. denied,* 516 U.S. 824 (1995*)* ("the law favors settlement, particularly in class actions and other complex cases where substantial judicial resources can be conserved by avoiding formal litigation"); *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) (same). This strong public policy in support of settlement applies with even greater weight to derivative litigations. *See, e.g.*, *Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983) ("Settlement of shareholder derivative

39

actions are particularly favored because such litigation is 'notoriously difficult and unpredictable.'" (citations omitted)).

> Recognizing that a settlement represents an exercise of judgment by the negotiating parties, courts have consistently held that the function of a judge reviewing a proposed settlement is neither to rewrite the settlement agreement reached by the parties nor to try the case by resolving issues left unresolved by the settlement itself.  Thus, the Court's inquiry "is limited to the consideration of whether the proposed settlement is lawful, fair, reasonable, and adequate."

*Isby*, 75 F.3d at 1196.

Because the very point of compromise is to avoid determining unsettled issues and the waste and expense of litigation, the Court does not "decide the merits of the case or resolve unsettled legal questions." *Carson v. Am. Brands*, 450 U.S. 79, 88 n.14 (1981). *See also E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 889 (7th Cir. 1985) (the district court is to "refrain from resolving the merits of the controversy or making a precise determination of the parties' respective legal rights"), *cert. denied,* 478 U.S. 1004 (1986); *Detroit v. Grinnell Corp.,* 495 F.2d 448, 456 (2d Cir. 1974) (the trial court does not "have the right or the duty to reach any ultimate conclusions on the issues of fact and law which underlie the merits of the dispute"); 7B Wright & Miller, Fed. Prac. & Proc. at § 1797.5 ("the court may not try disputed issues in the case since the whole purpose behind a compromise is to avoid a trial . . . . Rather the judge is restricted to determining whether the terms proposed are fair and reasonable.").

Evaluation and approval of the Settlement is committed to the sound discretion of the Court.  The proper focus "is upon 'the general principles governing approval of class action settlements' and not upon the 'substantive law governing the claims asserted in the litigation.'" *Isby*, 75 F.3d at 1197, *quoting Armstrong,* 616 F.2d at 315. The Court has wide latitude in

making this determination. There is "no requirement that an evidentiary hearing be conducted as a precondition to approving a settlement in a class action suit." *Depoister v. Mary M. Holloway Found.*, 36 F.3d 582, 586 (7th Cir. 1994). Therefore, the Court "may limit the fairness hearing to whatever is necessary to aid it in reaching an informed, just and reasoned decision" and should not resort to a full-blown trial on the merits. *UAW v. Gen. Motors*, 497 F.3d 615, 635 (6th Cir. 2007) (internal quotation marks and citation omitted).

### B.   Assessment of the Proposed Settlement under the Relevant Factors for Consideration in a Derivative Settlement

#### 1.   The First Consideration Is Whether the Settlement Provides a Substantial Benefit to Lilly

Courts have long recognized that in derivative actions, non-monetary benefits, such as material changes in corporate management or policies, provide real and substantial benefits and settlements based on such benefits warrant approval. *See, e.g. Mills v. Electric Auto Lite Co.,* 396 U.S. 375, 397-398 (1970). Thus, Judge Hayden in the District of New Jersey, in approving the governance and compliance settlement of derivative claims on behalf of Schering-Plough Corporation ("Schering"), found:

> The changes highlighted by Professor Langevoort's declaration support a determination that the derivative litigation brought about significant changes to Schering's corporate governance structure. The changes implemented by the settlement will serve to prevent or deter misconduct at the Board and middle-management levels, while also providing mechanisms to identify emerging misconduct. . . . These corporate governance changes are substantial non-pecuniary benefits to Schering . . . .

*In Re Schering-Plough Corporation Shareholders Derivative Litigation,* Master Derivative Docket, Civ. Action No. 01-1412 (D.N.J.) ("*Schering*"), Amended Opinion (Granting Legal Fees

and Costs), dated January 14, 2008 (attached as Exhibit 1). *See also*, *In re AOL Time Warner Shareholder Derivative Litigation*, 2006 WL 2572114 *4 (S.D.N.Y. Sept. 6, 2006) ("*AOL Time Warner*") (after discussing the role the derivative litigation played in assisting the company to recover insurance proceeds, Court found "*[e]ven more importantly*, the governance and compliance provisions memorialized in the Settlement directly address the failure of internal controls that precipitated the instant lawsuits.  The preventive aspects of these provisions is [sic] itself a significant benefit of the Settlement. (emphasis added.)"); *Unite Nat. Retirement Fund v. Watts*, 2005 WL 2877899 *5 (D.N.J. Oct. 28, 2005) ("*Shell*") (District court recognized "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement" that "will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoings.").

As reflected in the Stipulation, and discussed in detail in the expert reports (*see* Section III, *infra*), the relief achieved under the Settlement provides substantial benefits to Lilly.   Dr. Glass, Plaintiffs' pharmaceutical and drug development expert, opined that the drug life cycle management provisions of the Settlement place Lilly at the forefront of the pharmaceutical industry; and that the Settlement provides a sound foundation for the management of drugs and drug candidates throughout their life cycle.  *See, e.g.*, Glass Report ¶ 2.  These reforms were specifically tailored to Lilly's operations and structure.  The parties to the proposed Settlement believe that these reforms provide a substantial benefit to the Company, including in the prevention and detection of violations of law, regulation, or Company policy.  *See* Stipulation ¶ M.

Mr. Lam specifically discusses at least three major benefits to Lilly from the proposed Settlement.  First, the Settlement will significantly enhance Lilly's governance structure and effectiveness at the Board level.  *See* Lam Report ¶ 6 *et seq.*  Second, the Settlement will significantly enhance the effectiveness of risk management processes and internal controls at the management level.  *Id.* ¶ 13 *et seq.*  These provisions, in Mr. Lam's professional opinion, provide a substantial benefit to Lilly.  Third, the Company should also achieve significant financial benefits in connection with the Settlement.  *Id.* ¶ 19 *et seq.*

Moreover, the provisions of the Governance Compliance Terms (Exhibit A to the Stipulation) must be maintained and fully funded by the Company for a three year period going forward, at which time, subject to Board approval as necessary, Lilly shall reassess the processes implemented under the Settlement to determine whether to continue or modify them.   In addition, pursuant to the proposed Settlement, if, during the three year Agreed Upon Term, the Chief Ethics and Compliance Officer wishes to seek additional funding for compliance-related expenditures, he or she shall be permitted at his or her option to petition directly the Board or an appropriate committee of the Board that such funding be included in or covered by business plans and budgets that are approved by the Board or such committee.

The proposed Settlement thus provides substantial benefits to Lilly and its shareholders. Therefore, the most important factor with respect to the approval of derivative settlements – benefit to the company – clearly weighs in favor of approval.

## 2.      Seventh Circuit Factors in Support of Final Approval

Once a proposed non-monetary settlement has been demonstrated to comply with

Supreme Court precedent requiring a showing of substantial benefit, the Seventh Circuit has set forth factors for consideration in deciding whether to grant final approval:

> In making that determination, a district court should examine (1) the strength of the plaintiffs' case compared to the amount of the settlement offer; (2) an assessment of the likely complexity of a trial; (3) the length and expense of the litigation; (4) the amount of opposition to settlement among affected parties; (5) the opinion of competent counsel; and (6) the stage of the proceedings and amount of discovery completed at the time of settlement.

*Freeman v. Berge*, 68 Fed. Appx. 738, 742-43 (7th Cir. 2003), *citing Isby v. Bayh,* 75 F.3d 1191, 1199 (7th Cir. 1996).  As described below, an assessment of relevant factors fully supports final approval of the proposed Settlement at this time.

<div style="margin-left:2em"><strong>a.     Assessing the Governance, Compliance and Medical Risk Management Provisions of the Settlement in Light of the Substantial Risks Plaintiffs Face on the Merits of the Litigation</strong></div>

In evaluating the settlement of a derivative action, courts have long recognized that such cases "are notoriously difficult and unpredictable."  *Maher*, 714 F.2d at 455.  *See also, Shell*, 2005 WL 2877899 at *3 ("Derivative suits are by their nature undeniably complex.")  Plaintiffs recognize that if this case were to go forward, they would face substantial risks.  These risks include the burden of rebutting the presumptive validity of an SLC motion to terminate.  In addition, derivative litigation raises other procedural hurdles and risks for shareholders not found in typical class action or securities class action litigation, including, most importantly: (i) the requirement to make a demand on the board before proceeding to file a complaint or face heightened pleading requirements to demonstrate such demand should be excused, *see* Fed. R. Civ. P. 23.1; (ii) the potential effect on defendants' liability of the business judgment rule, *see, e.g.*, *G & N Aircraft, Inc. v. Boehm*, 743 N.E.2d 227, 238 (Ind. 2001); and (iii) the potential

44

effect on director defendants' liability of statutory exculpation for breaches of fiduciary duty. *See* Ind. Code § 23-1-35-1(e).

In negotiating the proposed Settlement, Plaintiffs' Counsel, while strongly believing they had powerful arguments and evidence to overcome these hurdles, were nonetheless fully aware of the material risks of continuing to litigate this action, particularly when weighed against the immediate and tangible benefits conferred upon the Company by the proposed Settlement detailed above and in the expert reports, particularly in the prevention and detection of potential violations of law, regulation and Company policy. Litigating these claims to trial and on appeal would entail substantial costs and impose material burden on Plaintiffs and the Company. Instead of the risk of failing to obtain any benefit for Lilly through costly and time-consuming litigation, the proposed Settlement allows Lilly to put these matters to rest and to go forward armed with corporate governance, compliance and medical risk management practices that the experts opine place Lilly at the forefront of the industry. *See, e.g.*, Glass Report ¶ 2.

The litigation risks discussed above reinforce the conclusion that the comprehensive proposed Settlement falls well within the "range of reasonableness." *See, e.g.*, *Newman v. Stein*, 464 F.2d 689, 693 (2d. Cir. 1972) (the range of reasonableness of a settlement "recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion"). *See also*, *Walsh v. Great Atlantic & Pacific Tea Co.*, 96 F.R.D. 632, 642 (D.N.J. 1983), *aff'd*, 726 F.2d 956 (3rd Cir. 1983).

### b. Further Litigation in the Absence of a Settlement Would Be Lengthy, Complex and Expensive

In the absence of this Settlement, further litigation of this case would entail intensive, lengthy proceedings. While Plaintiffs' Counsel have already performed significant work on the case, it is probable that the future of the case before trial would be marked by complex, expensive, and contested discovery, detailed expert studies and related discovery, one or more motions for summary judgment or partial summary judgment, and *Daubert* motions. In addition to uniquely derivative risks described above, Plaintiffs face risks inherent in any complex litigation, including factual and legal issues that are technical in nature, requiring extensive expert analysis and establishing liability in the face of conflicting testimony and evidence. Should Plaintiffs' claims have survived to proceed to trial, a jury would have been presented with the Individual Defendants' portrayal of their responses to the unfolding problems the Company confronted as reasonable and appropriate under the circumstances (*i.e.*, a valid exercise of their business judgment), and their complete denial of any wrongdoing.

Plaintiffs' claims would also be subject to the unpredictability of a lengthy and complex jury trial**,** the possible unavailability of witnesses, and the possibility that jurors could react to the evidence in unforeseen ways. Should Plaintiffs have prevailed on liability, they would continue to face substantial hurdles in demonstrating and quantifying damages, with any such showing likely ending up as a battle of competing experts – a situation fraught with unpredictability. Moreover, the losing party at trial most likely would pursue an appeal to the Seventh Circuit, which would involve further delay and expense, possibly postponing final resolution of the claims for years.

The Settlement avoids all of these delays, uncertainties, complexities, and expenses and offers immediate substantial benefits to Lilly and its shareholders.

<p style="text-align:center;"><strong>c.     The Stage of the Proceedings, the Amount of<br>Discovery Completed and the Opinion of Counsel</strong></p>

During this litigation, Plaintiffs' Counsel have had ample opportunity to fully investigate Plaintiffs' claims – including through the review and analysis of over 85,000 pages of documentary production; extensive review of documents in the public record; intensive factual and legal research and analysis in support of the pleadings filed in this action;[14] the review and synthesis of deposition discovery; the coordination of merits-based legal research; extensive research and analysis undertaken in the drafting and negotiation of detailed governance, compliance and medical risk management proposals directed to what Plaintiffs contend was misconduct and/or weaknesses at Lilly; and the preparation of a detailed submission to the Mediator – to arrive at a well-reasoned determination of the strengths and weaknesses of their derivative claims, and to assess the reasonableness of the proposed Settlement.  Based on this analysis, Plaintiffs' Counsel – sophisticated counsel experienced in complex and derivative litigation – strongly supports the Settlement.  Counsel for Defendants also support the Settlement, as do counsel for the Special Litigation Committee.  Counsel's opinion regarding the proposed Settlement should be given "considerable weight and deference" by the Court when assessing "the merits of an arms-length settlement."  *In re Automotive Refinishing Paint Antitrust Litigation*, 2003 WL 23316645 at *2 (E.D.Pa. 2003).

---

[14] In addition, prior to the execution of the Settlement Process Agreement resulting in the stay of the Eastern District of New York actions, the parties to the Waldman action had fully briefed a motion to

### d.   The Settlement Was Negotiated at Arm's Length
#### Among Experienced Counsel and is Not Collusive

The requirement that settlements be fair is designed to protect against collusion among

the parties.  *See In re Mid-Atlantic Toyota Antitrust Litig.,* 564 F. Supp. 1379, 1383 (D. Md.

1983) (on preliminary approval).  When negotiated at arm's length, a proposed settlement is

presumptively fair and reasonable.  *See Goldsmith v. Tech. Solutions Co.*, No. 92-C-4374, 1995

U.S. Dist. Lexis 15093, at *10 n.2 (N.D. Ill. Oct. 10, 1995) ("it may be presumed that the

agreement is fair and adequate where, as here, a proposed settlement is the product of arm's-

length negotiations"); 2 Newberg on Class Actions, § 11.40 at 451 (2d ed. 1985).   Thus,

settlements proposed by experienced counsel, reached as the result of arm's length negotiations,

are entitled to deference from the Court.  *See*, *e.g.*, *Goldsmith*, 1995 U.S. Dist. Lexis 15093, at

*10 n.2; *In re Linerboard Antitrust Litig.*, 292 F. Supp. 2d 631, 640 (E.D. Pa. 2003) ("A

presumption of correctness is said to attach to a class settlement reached in arms-length

negotiations between experienced, capable counsel after meaningful discovery.") (*quoting

Hanrahan v. Britt*, 174 F.R.D. 356, 366 (E.D. Pa. 1997)).  The initial presumption in favor of

such settlements reflects courts' understanding that vigorous negotiations between seasoned

counsel protect against collusion and advance the fairness concerns of Rule 23(e).

As the biographical information before the Court sets forth,[15] the Plaintiffs' Counsel who

negotiated the Settlement are highly experienced in the complex field of derivative and

---

dismiss.
[15] *See, e.g.*, the individual firm resumes provided at exhibits C through L of the Declaration of Karen L. Morris in Support of Final Approval of Proposed Settlement and the Award of Attorneys' Fees, Inclusive of Expenses ("Morris Declaration"), filed herewith.

representative litigation.  Plaintiffs' Counsel have served as lead or co-lead counsel in numerous derivative and other complex litigation around the country, and as executive committee members in others.

One measure of the abilities and experience of Plaintiffs' Counsel is the high caliber of defense counsel with whom they negotiated. Lilly retained excellent defense counsel in this case. Pepper Hamilton is well known for the quality of its lawyers.  Likewise, counsel for the SLC, the firm of Cravath Swaine & Moore LLP, well-represented the interests of the SLC.

In negotiating the Settlement, Plaintiffs' Counsel took into account, *inter alia*, the numerous and significant legal issues presented by this case, as described above.  In this process, they evaluated both the strengths and the various risks presented by each of these issues.  The Settlement was thus ultimately reached based on the highly informed judgment of Plaintiffs' Counsel of the risks both Plaintiffs and Defendants faced moving forward in the litigation and the scope and nature of the governance, compliance and medical risk management reforms Plaintiffs' were able to negotiate.  Throughout the negotiations in this case the parties remained adversarial, yet professional.  In addition, as detailed above, the parties undertook mediation before retired Federal Magistrate Judge Infante.  As part of the mediation process, the parties submitted substantive mediation submissions, with exhibits and other supporting materials, and participated in a full day, face-to-face session, as well as multiple telephone conferences with Judge Infante.  *See, e.g.*, Joint Attorney Decl. ¶¶ 58-60; *see also*, Declaration of Mediator Edward A. Infante in Support of the Proposed Settlement and Award of Attorneys' Fees, Inclusive of Expenses ("Infante Decl.") filed herewith, ¶¶ 9-14.

49

Consideration of these factors further supports final approval of the Settlement

       **e.**      **Plaintiffs' Counsel Developed Extensive Factual Information.**

As described above and detailed in the Joint Attorney Declaration, Plaintiffs' Counsel developed an extensive factual record in this case.  They undertook substantial legal research and factual investigation related to the underlying alleged wrongdoing at issue in the Derivative Actions.  They performed a thorough analysis of Lilly's financial and operating condition.  This work provided Plaintiffs' Counsel with a detailed understanding of the alleged wrongdoing, and of Lilly's organizational structure and practices during the period of the alleged misconduct.

In addition, Plaintiffs' Counsel negotiated for the production of approximately 85,000 pages of discovery, including deposition transcripts and exhibits of forty-eight (48) Lilly employees who had testified in the MDL and related proceedings, twenty-two (22) expert witness transcripts, reports and exhibits, and documents related to, among other issues, the safety, efficacy and off-label marketing of Zyprexa.  These documents were carefully reviewed and analyzed by designated counsel under the direction and oversight of Co-Chair Counsel of Plaintiffs' Executive Committee.

The work by Plaintiffs' Counsel in connection with the design and negotiation of proposed corporate governance and compliance reforms, undertaken in coordination with their retained experts as appropriate, included, *inter alia*, benchmarking governance and compliance processes and practices within the pharmaceutical industry, both at the time of the alleged wrongdoing and currently, and assessing corporate governance and compliance materials from numerous sources, including evolving industry guidelines, private reform proposals and

academic and industry literature.  Plaintiffs' Counsel also reviewed and assessed Lilly's Board committee charters and charter provisions, as appropriate, in connection with crafting and negotiating governance and compliance proposals.  Most importantly, in conjunction with their experts, Plaintiffs' Counsel brought to bear their expertise in fashioning Plaintiffs' governance and compliance proposals and, thereafter engaging in highly interactive, and ultimately, highly productive discussions and negotiations with senior Lilly personnel and Lilly counsel, resulting in the proposed Settlement.  *See, e.g.*, Joint Attorney Decl. ¶¶ 46-55.

This entire corpus of information provided a substantial basis for Plaintiffs' Counsel and their experts to understand the organization at Lilly, how the alleged misconduct occurred and to develop corporate governance, compliance and medical risk management proposals designed to prevent future recurrence of these problems.  Thus, in negotiating and agreeing to the Settlement, Plaintiffs' Counsel were knowledgeable and well-informed.

This factor, like the others already discussed, militates strongly in favor of approval of the proposed Settlement.

<div align="center">

**f.     The Reaction of Lilly Shareholders
to the Settlement**

</div>

In accordance with the Preliminary Approval Order, entered March 1, 2010 (Document # 76), between March 5 and 26, 2010, the Notice Administrator, The Garden City Group ("GCG"), sent a total of 368,417 individual Notices by first class mail to Lilly Shareholders, and the Court-approved Summary Notice was published in *The Wall Street Journal* on March 12, 2010.  *See, e.g.*, Affidavit of Mailing of the Notice of Settlement of Eli Lilly & Company Derivative Claims, filed herewith by Stephen Cirami, Vice President of Operations at GCG (the "Cirami Aff.") filed

<div align="center">51</div>

herewith, ¶¶10, 15.  Pursuant to the schedule set forth in the Preliminary Approval Order, the Court has set April 15, 2010 as the deadline for Lilly shareholders to file objections to the proposed Settlement.  As contemplated by the Order, Plaintiffs' Counsel shall file a reply to any objections by April 22, 2010.

## V.       THE NOTICE TO LILLY SHAREHOLDERS IS ADEQUATE

### A.       Notice Was Disseminated in Accordance with the Preliminary Approval Order

As noted above, a total of 368,417 notices were mailed to Lilly Shareholders.  The approved Notice contains a detailed description of the nature and procedural history of the Derivative Actions, the terms of the Settlement and the claims that will be released in the Settlement.  The Notice also provides a detailed description of the benefits to the Company of the proposed Settlement, and sets forth the amount Plaintiffs' Counsel would seek in attorneys' fees, inclusive of expenses, and as payment of an incentive award to named Plaintiffs.  The Notice further advised Lilly shareholders of their right to object to the Settlement, to the petition for attorneys' fees, inclusive of expenses, or to the request for payment of an incentive award, by filing written objections no later than April, 15, 2010.

In addition, a copy of the approved Summary Notice was published in the national edition of *The Wall Street Journal* on March 12, 2010 (Cirami Aff. ¶ 10), and GCG set up a toll-free call-in center for the purpose of allowing Lilly shareholders to access general information about the Settlement and to request a copy of the Notice, the Stipulation, Exhibit A, Corporate Governance Terms, Plaintiffs' legal memoranda in support of the Settlement and other relevant documents.  Cirami Aff. ¶ 11.

**B.     The Notice Procedures Fully Satisfied Due Process**

Rule 23.1 of the Federal Rules of Civil Procedures requires notice be given to shareholders in derivative actions "in such manner as the court directs."  The notice process detailed herein satisfies the requirements set forth by Rule 23.1, as well as the terms of the Court's Order, and otherwise fulfills the due process rights of Lilly shareholders in that adequate notice was received, since it informed shareholders of the settlement's terms, "the availability of further information from the Court . . . and the right . . . to object and be heard." *Bell Atlantic v. Bolger*, 2 F.2d 1304, 1317 (3d Cir. 1993).  Moreover, the notice was "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the [settlement] and afford them an opportunity to present their objections."  *See Mullane v. Central Hanover Bank and Trust Co.,* 339 U.S. 306, 314 (1950).

*   *   *

For the reasons stated above, Seventh Circuit precedent fully supports the Court granting final approval of the proposed Settlement.

**VI.    THE APPLICATION FOR FEES AND REIMBURSEMENT OF EXPENSES BY PLAINTIFFS' COUNSEL IS FAIR AND REASONABLE BASED ON ALL RELEVANT FACTORS**

Plaintiffs' Counsel in the Derivative Actions respectfully request approval of an award of attorneys' fees in the amount of $8.75 million, inclusive of expenses.[16]  As set forth above, and as supported by, *inter alia*, the reports of Plaintiffs' experts, the Settlement provides substantial

---

[16] As set forth in the Notice and detailed in Section IV.A.2.g. below, Plaintiffs' Counsel's expenses, including their expert costs and expenses, are approximately $450,000.

benefits to Lilly and its shareholders.  *See, e.g.*, Section III above, and Glass Report ¶ 2, Lam

Report ¶ 5; Langevoort Report ¶¶ 51-54.

> The parties have stipulated that:

> Plaintiffs, Settling Defendants and the SLC have conducted extensive arm's-length negotiations over an extended period of time and have reached agreement regarding certain corporate governance provisions related to, among other things, the Company's management structure; compliance and risk management and medical/safety organizations, policies and procedures; and oversight of these matters by Lilly's Board of Directors.  Certain of the provisions are enhancements to prior governance practices; others provide for adoption of certain governance reforms, and others are commitments to maintain in place current governance practices.  Plaintiffs and the Settling Defendants acknowledge and agree that the Derivative Claims filed by the Plaintiffs, and the negotiations leading to this Settlement, were a substantial factor in the decisions by the Company to adopt, implement, enhance and/or maintain the corporate governance provisions set forth in Exhibit A.  The corporate governance provisions provide a substantial benefit to the Company, including in the prevention and detection of potential violations of law, regulation and Company policy.

Stipulation, ¶ M.

As reflected in Judge Infante's Declaration and described in detail in the Joint Attorney

Declaration, there were no discussions related to attorneys' fees until after the parties had

finalized the Corporate Governance Terms and all other provisions of the Stipulation.  The fee

agreement was arrived at following intensive negotiations under the auspices of the independent

Mediator.  This process entailed both face-to-face sessions and multiple telephone conferences,

involving not only Plaintiffs' Counsel and both in-house and outside Company counsel, but also

the active participation of the Company's directors' and officers' insurance carriers and their

counsel.  As set forth in the Joint Attorney Declaration (*see. e.g.*, ¶¶ 70-77), after an extensive

process, the parties agreed to the $8.75 million fee amount, inclusive of expenses.  This was the

amount recommended by the Mediator following the intensive negotiation process. Supporting

his determination of this amount, he states in his Declaration that:

> I believe I had a detailed understanding of the litigation and the intensive
> negotiation process, the nature and extent of Plaintiffs' Counsel's work
> throughout the litigation, and I was able to call upon this knowledge in mediating
> the agreed upon fee amount, which all of the parties could support as fully
> reflective of the services Plaintiffs' Counsel rendered to Lilly.

Infante Decl. ¶ 31.

As the Mediator further recognized, the carriers – as well as the Company – had every

incentive to negotiate the lowest possible fee amount.  *See* Infante Decl. ¶ 30 ("As the entities

that would fund the fee, both Carrier Counsel and the Company took a highly active role in

negotiating the amount of fees to which they and the Company would agree.").  Lilly does not

oppose the proposed fee of $8.75 million, inclusive of expenses.  *See* Stipulation, ¶ 5.1.

Plaintiffs' Counsel respectfully submit that the requested fee, inclusive of expenses, is

reasonable under the circumstances of this case, as measured against applicable legal standards,

and should be approved in its entirety**.**

**A.      Applicable Legal Standards for Consideration of a Fee Request**

**1.      The Substantial Benefit Doctrine**

The starting point in assessing derivative counsel's entitlement to fees, just as with

assessing the adequacy of a proposed derivative settlement, is a determination that the benefits

derived from the proposed settlement to the corporation and its shareholders are substantial.  The

United States Supreme Court has long recognized counsel's entitlement to compensation for

achieving substantial non-monetary relief in settlement of a derivative claim.  *See, e.g., Boeing*

*Co. v. Van Gemert, 444 U.S. 472, 278 (1980); Mills*, 396 U.S. at 395 ("a corporation may receive a 'substantial benefit' from a derivative suit, justifying an award of counsel fees, regardless of whether the benefit is pecuniary in nature").  As detailed herein, courts within the Seventh Circuit and elsewhere have consistently held that an award of fees is justified in nonmonetary settlements where plaintiffs have successfully negotiated changes in corporate governance and business practices that confer a substantial benefit on the nominal defendant corporation and, derivatively, its shareholders.  *See, e.g.*, *Bailey v. Meister Brau, Inc.*, 535 F.2d 982, 995 (7th Cir. 1976) ("It is well settled that the counsel fees and litigation expenses incurred by a minority stockholder in vindicating a corporate claim for relief can be assessed against all the shareholders substantially benefited by means of an award against the corporation."); *Christman v. Brauvin Realty Advisors, Inc.*, No. 96-6025, 2001 U.S. Dist. LEXIS 11102, at *27 (N.D. Ill. Mar. 30, 2001) ("It is well-established that a fee award may be predicated on a benefit to the class which is non-monetary in nature.").

As described in detail in Section III above, the terms of the proposed Settlement are wide- ranging, impact Lilly across its operations and set forth policies and practices that place Lilly at the forefront of the pharmaceutical industry. The Stipulation confirms that Plaintiffs and the Settling Defendants acknowledge and agree that the proposed Settlement provides a substantial benefit to the Company, including in the prevention and detection of potential violations of law, regulation and Company policy.  Stipulation ¶ M.  The Special Litigation Committee of the Board has made the same acknowledgment.  As detailed above, Plaintiffs' experts – Dr. Glass, Mr. Lam and Professor Langevoort – each fully support the proposed

56

Settlement as providing substantial benefits to Lilly.  Moreover, the parties acknowledge that Derivative Claims filed by the Plaintiffs, and the negotiations leading to this Settlement, were a substantial factor in the decisions by the Company to adopt, implement, enhance and/or maintain the corporate governance provisions set forth in the Corporate Governance Terms.  *Id.*

> The Mediator stated:
>
> I am satisfied based on all of the foregoing that the negotiation process underlying the corporate governance, compliance and risk management provisions detailed in Exhibit A to the Stipulation, the Corporate Governance Terms, was an intensive one, undertaken by sophisticated and experienced attorneys on both sides in good faith and completely at arm's length.  In addition, based upon my involvement in the matter and my extensive discussions with the parties, I believe, as stated in the Stipulation, that the Derivative Claims filed by the Plaintiffs, and the negotiations leading to this Settlement, were a substantial factor in the decisions by the Company to adopt, implement, enhance and/or maintain the corporate governance provisions set forth in Exhibit A, and that these corporate governance provisions provide a substantial benefit to the Company, including in the prevention and detection of potential violations of law, regulation and Company policy.

Infante Decl. ¶ 20.

As detailed above and supported by the expert reports, the proposed Settlement clearly provides substantial benefits to Lilly and its shareholders.

## 2. Consideration of Other Relevant Seventh Circuit Factors Fully Supports Payment of the Agreed Upon Fee Award Here

Legal precedent in the Seventh Circuit is clear that the trial court has discretion in the determination of an appropriate award of attorneys' fees in the context of representative litigation such as class or derivative actions.  *See, e.g.*, *In re Public Service Company of Indiana Derivative Litigation*, 125 F.R.D. 484, 487 (S.D. In. 1988).  The Seventh Circuit has recognized that: "Where a district court is asked to award reasonable attorneys' fees or reasonable costs, the

measure is what an attorney would receive from a paying client in a similar case." *Montegomery v. Aetna Plywood Inc.*, 231 F.3d 399, 408 (7th Cir. 2000), citing the seminal cases of *Cook v. Neidert*, 142 F.3d 1004, 1012 (7th Cir. 1998) and *In re Continental Ill. Sec. Litig.*, 962 F.2d 566, 568, 570, 573 (7th Cir. 1992). *See also*, *Great Neck Capital Appreciation Investment Partnership v. PriceWaterhouseCoopers, L.L.P.*, 212 F.R.D. 400, 411 (E.D. Wis. 2002) ("Put slightly differently, the measure of what fees and costs are reasonable is what an attorney would receive from a paying client in a similar case.").

While the Seventh Circuit has adopted a market-based approach to the determination of a reasonable fee in representative actions (*see, e.g.*, *In the Matter of Synthroid Marketing Litig.*, 264 F. 3d 712, 718 (7th Cir. 2001)), the Seventh Circuit recognizes that *ex ante* fee agreements in these types of litigation are unusual. To determine the "market rate," courts in the Seventh Circuit therefore rely on multiple factors traditionally considered in determining an appropriate fee in a common fund case:

> The market rate for legal fees depends in part on the risk of nonpayment a firm agrees to bear, in part on the quality of its performance, in part on the amount of work necessary to resolve the litigation, and in part on the stakes of the case.

*Synthroid*, 264 F.3d at 721. *See also*, *Great Neck*, 212 F.R.D. at 411 (in determining the appropriate percentage award in a common fund case, court considered such factors as "the contingent nature of the case, the quality of services rendered, the benefits derived by the class, and the public service aspects of the case" (citations omitted)).

The Seventh Circuit also considers fees awarded in similar cases. *See, e.g.*, *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 600 (7th Cir. 2005) (affirming 30% award in common fund case based,

in part, upon district court's consideration of awards in analogous class actions, as being "indicative of a rational relationship between the record in this similar case and the fees awarded by the district court."). *See also*, *Cooper v. The IBM Personal Pension Plan*, 2005 WL 1981501 at *4 (S.D. Ill., Aug. 16, 2005) ("While not dispositive, attorneys' fees from analogous class action settlements are indicative of what the market is for such representation and, therefore, what an appropriate fee should be here.").

In addition, as discussed below, where applicable, as here, courts have considered the presence of an independent mediator in determining the reasonableness of the fee request as well.

An assessment of relevant factors cited above fully supports award of the agreed-upon attorneys' fees, inclusive of expenses, in the present action.

### a.    Assessment of the Benefits Achieved and the Quality of Services Rendered

Pursuing the complex Derivative Claims in a manner that resulted in the achievement of the substantial benefits to Lilly provided by the Settlement and detailed herein required the participation of highly skilled and experienced attorneys with expertise in the specialized areas of derivative litigation and substantive corporate governance, compliance and risk management reforms. *See, e.g.*, individual firm resumes provided as Exhibit 2 to each individual firm declaration, attached as Exhibits C through L of the Declaration of Karen L. Morris in Support of Final Approval of Proposed Settlement and the Award of Attorneys' Fees, Inclusive of Expenses ("Morris Declaration"). Plaintiffs' Counsel brought a high degree of expertise and sophistication to bear in the litigation of the Derivative Actions. The Mediator recognized, among other

59

factors, the nature and extent of the work by Plaintiffs' Counsel throughout the litigation as

supporting, in his opinion, the agreed upon fee amount of $8.75 million, inclusive of expenses,

which all parties were able to support as fully reflective of the services Plaintiffs' Counsel

rendered to Lilly.  *See* Infante Decl. ¶ 32.  The substantive provisions of the proposed Settlement

reflect the experience and ability of Plaintiffs' Counsel.

> **b.      The Risk of Nonpayment and the
> Contingent Nature of the Representation**

Seventh Circuit law mandates that in determining the market rate for counsels' fees, the

Court must take into account the extent to which counsel undertook the representation on a

contingent basis.  *See Synthroid*, 264 F.3d at 718 ("courts must do their best to award counsel the

market price for legal services, in light of the risk of nonpayment and the normal rate of

compensation in the market at the time").  In *Florin v. Nationsbank of Georgia*, N.A., 34 F.3d

560 (7th Cir. 1994) ("*Florin I*"), the Seventh Circuit stated that a risk multiplier is "mandated" in

cases controlled by common fund principles[17] where the Court finds that plaintiffs' "counsel

---

[17] This case is governed by "common fund principles" requiring that those enjoying the benefit produced by representative litigation share of the cost of producing that benefit.  *See, e.g.*, *Mills*, 396 U.S. at 392 (in derivative action establishing violation of proxy rules, Supreme Court held that common fund principles apply to non-monetary common benefit cases: "To allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense. . . . The fact that this suit has not yet produced, and may never produce, a monetary recovery from which the fees could be paid does not preclude an award based on this rationale.").  *See also*, *In Re Schering-Plough/Merck Merger Litigation*, Civil Action No. 09-CV-1099 (DMC), slip op. at 10 (D. N. J. March 25, 2010) (*see* Exhibit 2 hereto) (awarding risk multiplier of 2.18, court observes that  the common benefit doctrine derives from the common fund doctrine, *citing Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 145 (3d Cir. 1999) ("The origins of [the common benefit] doctrine can be traced to the common fund rule whereby those who share in a fund must participate in paying attorney's fees when a prevailing plaintiff's litigation redounds to the benefit of the common fund.")).  This case is thus distinguishable from fee shifting cases, in which statutory policy mandates that the prevailing plaintiffs' attorneys' fee expense be shifted to the defendant.  *See* discussion in *Florin I,* 34

'had no sure source of compensation for their services.'" *Id.*, 34 F.3d at 565 (*quoting In re Continental Illinois Securities Litigation*, 962 F.2d 566, 569 (7th Cir.1992)). The risk determination must be made *ex ante*, requiring the Court "to assess the multiplier with regard to the probability of success in this type of litigation at the outset of the case . . . without regard to most developments during discovery and litigation because it is designed to reflect the riskiness of the case at the outset." *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 976 (7th Cir. 1991).

The outcome achieved here has involved intensive effort by Plaintiffs' Counsel undertaken on a wholly contingent basis. As discussed above and detailed in the Joint Attorney Declaration, Plaintiffs' Counsel, working in an organized and efficient manner pursuant to a Coordination Agreement, undertook, *inter alia*: (i) extensive legal and factual research and investigation, including the review and analysis of over 85,000 pages of documentary production; (ii) work in support of the drafting of the demand letters and the pleadings filed in this action; (iii) review and synthesis of seventy deposition transcripts with exhibits of Lilly employees and experts; (iv) the coordination of merits-based legal research and factual investigation; (v) extensive research and analysis undertaken in the drafting of detailed governance, compliance and medical risk management proposals directed to what Plaintiffs' contend was misconduct and/or weaknesses at Lilly; (vi) months of intensive discussions and negotiations with counsel for Lilly, the SLC and senior Lilly personnel regarding these proposals within the context of Lilly's structure and operations; (vii) the preparation of detailed submissions to the Mediator; and (viii) drafting and negotiating complex and extensive

---

F.3d at 563-565.

settlement documentation.  This work was performed over more than a three year period on a fully contingent basis.

Derivative litigation is inherently highly risky (*see, e.g.*, *Granada Investments, Inc. v. DWG Corporation*, 962 F.2d 1203, 1205 (6th Cir. 1992) (finding that derivative litigation is "notoriously difficult and unpredictable")), entailing a substantial risk of non-payment (*see, e.g.*, *In re Pacific Enterprises Securities Litigation*, 47 F.3d 373, 378 (9th Cir. 1995) (Court found "the odds of winning [a] derivative lawsuit [are] extremely small" because "derivative lawsuits are rarely successful.")).  As highlighted in Section IV.B.2.a. above, derivative actions face substantial procedural and legal risks.  *See, e.g.*, *Maher*, 714 F.2d at 455 ("such litigation 'is notoriously difficult and unpredictable'"); *Shlensky v. Dorsey*, 574 F.2d 131, 148 (3d Cir. 1978) (high level of risks of establishing liability and proving damages considered in approving settlement of derivative case).

This is particularly so where – as here – the derivative action is premised on a claim that a corporate board failed to properly monitor the operations and employees of a company.  *See, e.g.*, *Caremark International Inc. Derivative Litigation*, 698 A.2d 959, 967 (Del. Ch. 1996) (Delaware Chancery Court found failure to monitor claim "is possibly the most difficult theory in corporate law upon which a plaintiff might hope to win a judgment."); *In re Pfizer, Inc. Derivative Securities Litigation*, 307 Fed. Appx. 590, 2009 WL 180349 at *3 (2nd Cir., January 27, 2009) (summarily affirming dismissal of derivative action, holding that standard for failure of oversight claim is more demanding than scienter under Rule 10b-5, requiring "both a showing of knowledge and that the knowledge created an affirmative duty to act, which the directors

62

consciously ignored").

As a result particularly of, *inter alia*, the interplay of the business judgment rule and the demand requirement, a large portion of filed derivative actions are dismissed.  *See, e.g., In re ITT Corp. Derivative Litigation*, 588 F.Supp.2d 502 (S.D.N.Y. 2008) (dismissing derivative case on behalf of Indiana corporation, applying business judgment rule to demand futility analysis);[18] *Cutshall v. Barker*, 733 N.E.2d 973 (Ind. Ct. App. 2000) (dismissing derivative action on behalf of Indiana corporation based on SLC motion to terminate, deferring to SLC's business judgment where plaintiff failed to demonstrate lack of independence or inadequacy of investigation). Thus, very substantial risks confronted Plaintiffs' Counsel at the inception of the Derivative Actions, when they decided to invest their time and resources in this litigation.  *See, e.g.*, *Synthroid*, 264 F.3d at 718; *Harman*, 945 F.2d at 976.

In the face of these risks and without any assurance of compensation, Plaintiffs' Counsel undertook extensive efforts over a period of more than three years in the litigation of the claims. Unlike Defendants' counsel, who have been compensated on a current basis throughout this action, Plaintiffs' Counsel have received no compensation for any of the work they have performed or in recognition of the substantial benefits the proposed Settlement provides.

---

[18] *But see In re ITT Corp. Derivative Litigation*, 653 F.Supp.2d 453 (S. D. N. Y. 2009) (again dismissing plaintiffs demand futility allegations on defendants' Rule 23.1 motion to dismiss, but denying SLC motion to terminate where SLC members were directors during time of alleged wrongdoing and were defendants against whom plaintiffs had pleaded non-frivolous claims).  On the ITT SLC's motion for reconsideration of the September 8, 2009 Memorandum Decision and Order, the District Court certified to the Indiana Supreme Court the question of what standard should be used to determine whether a director is interested under the Indiana SLC statute, *see In re ITT Corp. Derivative Litigation,* 07-CV-2878 (CS), Order (S. D. N. Y., October 27, 2009) (*see* Exhibit 3 hereto), and on November 24, 2009, the Indiana Supreme Court accepted the certified question.  *See In re ITT Corp. Derivative Litigation,* 94S00-0911-CQ-508, Order (Ind., November 24, 2009) (*see* Exhibit 4 hereto).  Plaintiffs' Counsel are informed

In addition to the substantial work undertaken, Plaintiffs' Counsel incurred significant expenses in the litigation of the claims.   These commitments were assumed on a wholly contingent basis as well. Plaintiffs' Counsel retained preeminent experts, incurring hundreds of thousands of dollars of expense, in order to ensure a rigorous evaluation of the merits of the claims and the crafting of reforms which would prevent and detect, going forward, the alleged wrongdoing at the heart of the litigation.   As set forth at Exhibit B to the Morris Declaration, these expenses total $424,746.48 and, as discussed in Section VI.A.2.g. below, reflect expenses reasonably incurred in connection with the conduct of the litigation.

### c.        Public Policy Considerations

The U.S. Supreme Court has recognized the important public policy considerations at issue in derivative litigation:

> Devised as a suit in equity, the purpose of the derivative action was to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of faithless directors and managers.

*Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 95 (1991).  While fraught with risk under prevailing corporate law standards, the claims at issue in the Derivative Actions strike at the root causes of corporate wrongdoing.  When, as here, settlements of such actions entail substantive provisions directed to corporate governance, compliance and risk management systems designed to improve oversight and prevent future corporate wrongdoing, they serve important public policy goals. *See, e.g.*, *Schering* ("The results of counsels' efforts achieve the socially laudable goal of promoting regulatory compliance, which is particularly important in light of Schering's role as

---

that as of March 16, 2010, the parties are awaiting a decision of the Indiana Supreme Court.

one of the world's leading pharmaceutical companies.") (Exhibit 1 hereto); *see also*, Transcript of *Schering* Final Settlement Hearing (Exhibit 5 hereto).

This litigation, and the substantial benefits achieved through the proposed Settlement, would not have been possible if prior cases had not recognized the societal interest in providing incentives to counsel to bring such risky representative actions.  *See, e.g.*, *Florin v. National Bank of Georgia*, 60 F.3d 1245 (7th Cir. 1995) ("*Florin II*") (in context of representative litigation, Seventh Circuit noted "However, the court must also be careful to sustain the incentive for attorneys to continue to represent such clients on an 'inescapably contingent' basis." (citations omitted)).  In view of the results achieved in this action, and society's interest in the continued encouragement of similar efforts by skilled plaintiffs' counsel, this Court should grant Plaintiffs' Counsel's fee and expense request.  *See, e.g., Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1197 (6th Cir. 1974) (in context of derivative litigation, Sixth Circuit endorsed the district court's finding "that the public had a stake in this and similar litigation.").

### d.    Fees Paid in Comparable Derivative Actions

Reflective of the growing recognition by the courts of the critical importance of strengthening corporate governance and compliance systems, the District of New Jersey, approved an award of $9.5 million in fees and expenses in *Schering*, finding that "[t]he changes implemented by the settlement will serve to prevent or deter misconduct at the Board and middle-management levels, while also providing mechanisms to identify emerging misconduct" and that [t]hese corporate governance changes are substantial non-pecuniary benefits to Schering."  (*see* Exhibit 1).   In another complex derivative litigation, the District Court for the

65

District of New Jersey awarded a fee of $9.2 million in *Shell*, 2005 WL 2877899 at *5.  The Court based its fee award on "the great benefit conferred upon Shell as a result of the new corporate governance principles provided for in the settlement agreement" that "will serve to prevent and protect Shell from the reoccurrence of certain alleged wrongdoing."  *Id.*  The settlement included no monetary benefit or explicit funding commitment.  The governance relief obtained required Shell, a foreign-based corporation with significant assets in the United States, to adopt American-style governance and compliance standards**,** directed primarily at board level reforms.

In *In Re Abbott Laboratories Derivative Shareholder Litigation*, Case No. 99 C 7246 (E.D. Ill.), by Order dated March 1, 2005, the District Court for the Northern District of Illinois awarded attorneys' fees in the amount of $9 million.  (A copy of the Final Judgment and Order of Dismissal is attached at Exhibit 6 hereto).  The benefits obtained included a commitment by the Company to fund regulatory/compliance activities in an amount not less than $27 million and the adoption of a charter for a Public Policy Committee of the Board.  The Southern District of New York recently awarded $8.77 million in *AOL Time Warner* (*see* Exhibit 7 hereto), where the District Court had found, *inter alia*, that "the governance and compliance provisions memorialized in the Settlement directly address the failure of internal controls that precipitated the instant lawsuits.  The preventive aspects of these provisions is [sic] itself a significant benefit of the Settlement.").  (*see* Exhibit 8 hereto).

Achievement of substantial governance and compliance reform, tailored to the alleged wrongdoing which underlay the derivative claims, has become an accepted and valuable form of

relief fully endorsed by other courts around the country in resolving complex derivative litigation.  In *In re BP PLC Derivative Litig.*, No. 3AN-06-11929CI, slip op. (Al. Sup. Ct. May 7, 2008) (*see* Exhibit 9 hereto), the settlement provided for, among other relief, the creation of two operations committees with responsibilities related to, *inter alia*, operational and financial risk management.  A new management team, including a new technical directorate, was put in place in Alaska, and the positions of VP Compliance & Ethics and VP Safety Operations and Assurance were created.  In addition, the BP Board approved restated and updated Board governance policies, and, at the senior management level, the settlement provided that BP's operating health, safety and environmental performance would be a factor in determining compensation awards.  The court approved a $9.75 million fee, plus costs and expenses incurred. *See, also*, *City of Pontiac Gen. Employees' Ret. Sys. v. Langone*, No. 2006-cv-122302, slip op. (Fulton County, Ga. June 10, 2008) (awarding $14.5 million fee in connection with corporate governance stock option backdating settlement where "[m]uch of the prolonged settlement process was focused on the corporate governance reforms") (*see* Exhibit 10 hereto); *In re Fed. Home Loan Mortg. Corp. Sec. & Derivative Litig.*, MDL 1584, Case Nos. 05-cv-2596 & 04-cv-2634 (S.D.N.Y. Oct. 26, 2006) (granting attorneys' fees of $15.25 million where derivative actions conferred "substantial benefits" to Freddie Mac because they were "a factor in . . . making material corporate governance changes.") (*see* Exhibit 11 hereto).

e.   **The Parties, in Arm's Length and Contentious Negotiations Pursuant to Formal Mediation, Mutually Agreed upon the Proposed Fee Amount**

The parties here arrived at the agreed upon $8.75 million attorneys' fees, inclusive of expenses, pursuant to a lengthy negotiation under the auspices of an independent mediator, retired Magistrate Judge Infante.  *See, e.g.*, Infante Decl. ¶ 32 ("These fee negotiations were contentious.") and ¶ 30 ("As the entities that would fund the fee, both Carrier Counsel and the Company took a highly active role in negotiating the amount of fees to which they and the Company would agree.").  The fact that the requested fee amount, inclusive of expenses, was recommended by the Mediator and agreed to by the parties in active mediation is deserving of weight in the Court's analysis of a reasonable fee.  *See, e.g.*, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1029 (9th Cir. 1998) (holding that it was proper to give weight to the role of a mediator in considering negotiated fee amount for the purpose of determining whether negotiations were at arm's length); *In re Paypal Litigation*, 2004 U.S. Dist. LEXIS 22470 at *8, n.1 (N. D. Cal., Oct. 13, 2004 ) (recommendation of mediator who had worked with the parties to achieve settlement over the course of several months entitled to significant weight in Court's assessment of a reasonable fee); *In Re Schering-Plough/Merck Merger Litigation*, Civil Action No. 09-CV-1099 (DMC), slip op. at 34(D. N. J. March 25, 2010) (court gives weight to negotiation of requested fee award before a respected neutral mediator).  The presence and active involvement of Company and separate counsel representing the Company's directors' and officers' insurance carriers ("Carrier Counsel") in these mediations is of particular importance in the context of derivative litigation.  *See, e.g.*, *Shlensky*, 574 F.2d at 150 ("the presence and active involvement

68

of the corporation against which an award of the plaintiffs' attorneys' fees and other litigation costs may be assessed distinguishes a shareholders' derivative suit from a class action for purpose of the fee awards").

Courts in this Circuit and elsewhere have recognized that "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *Synthroid,* 264 F.3d at 718.  "The object … is to give the lawyer what he would have gotten in the way of a fee in an arm's length negotiation." *In re Remeron Direct Purchaser Antitrust Litig.*, 2005 U.S. Dist. LEXIS 27013 at *89 (D.N.J. Nov. 9, 2005).  The contentious mediation process undertaken before Judge Infante by experienced counsel actively representing their client's positions reflects such "arm's length negotiation." *See, e.g.*, *Schering*, p. 10 (district court noted with favor the role played by Judge Infante in mediation of the agreed upon $9.5 million fee awarded in that case.).  As in *Schering*, Judge Infante received substantive submissions from Plaintiffs' Counsel in advance of the fee mediation regarding applicable legal standards and their application under the facts of the case, as well as daily time records.  Carrier Counsel were fully involved, including reviewing daily time records of Plaintiffs' Counsel, and thousands of pages of work product created by Plaintiffs' Counsel in this case.  There was a full day face-to-face mediation session before the Mediator with Plaintiffs' Counsel, Carrier Counsel and in-house and outside counsel for Lilly, followed by multiple telephonic conferences.  Also as in *Schering*, here, based on his knowledge of the settlement process and the role Plaintiffs' Counsel played in achieving the benefits provided for

in the Settlement, Judge Infante proposed the fee amount, inclusive of expenses, that the parties ultimately agreed upon.  *See, e.g.*, Infante Decl. ¶¶ 31-32.

<div align="center">

**f.       Assessing Attorneys' Fees under the Lodestar Methodology**

</div>

Under the lodestar method, the number of hours expended by counsel is multiplied by the hourly rate normally charged for similar work by attorneys of like skill.  *See, e.g.*, *Florin I*, 34 F.3d at 563.  The court then applies a multiplier.  *Id.* ("once this base or lodestar is established the final fee is determined by considering other less objective factors such as the risk of not prevailing in the lawsuit (citation omitted)").

The Seventh Circuit has made clear that in cases involving a high degree of expertise and specialization, the court should assess the reasonableness of counsel's hourly rates not based on local rates for counsel in the forum, but rather based on a national market for such services.

> The precedents on this issue require the attorneys' fees to be reasonable within the 'community.'  (Citations omitted)  Jeffboat takes the word 'community' to mean 'local market area.'  It would be just as consistent, however, to read the word as referring to a community of practitioners; particularly when, as is arguably the case here [an ERISA class action], the subject matter of the litigation is one where the attorneys' practicing it are highly specialized and the market for legal services in that area is a national market.

*Jeffboat, LLC and Signal Mutual Indemnity Assn. v. Director, Office of Workers' Compensation Programs et al.*, 553 F.3d 487, 491 (7th Cir. 2009) ("*Jeffboat*").  The Seventh Circuit further found that:

> Contrary to Jeffboat's argument, our cases have consistently recognized that an attorneys' actual billing rate for comparable work is presumptively appropriate for use as a market rate when making a lodestar calculation.  *Spegon*, 175 F.3d at 555.

<div align="center">70</div>

*Jeffboat*, 553 F.3d at 491.  The hourly rates requested by Plaintiffs' Counsel in this matter are reasonable and consistent with the standards for complex litigation in federal court and fees awarded in other similar contingent litigation.

Under the lodestar method, a court must apply a multiplier to compensate counsel for the risk involved due to the contingent nature of the litigation.  As the Seventh Circuit found in *Florin II*:

> In *Florin I*, we remanded, holding 'that a risk multiplier is not merely available in a common fund case but mandated, if the court finds that counsel 'had no sure source of compensation for the services.'  (Citation omitted).

*Id.*, 60 F.3d at 1247.  The Seventh Circuit went on to describe as a rationale behind mandating risk multipliers:  "…, the court must also be careful to sustain the incentive for attorneys to continue to represent such clients on an 'inescapably contingent' basis.  (Citations omitted)."  *Id.*

In the Seventh Circuit, a multiplier between 2 and 4 is common.  *See, e.g., Harman*, 945 F.2d at 976 (multipliers up to four have been approved) (*citing*, *inter alia*, *In re Cenco, Inc., Sec. Litig.*, 519 F. Supp. 322, 325 (N.D. Ill. 1981) (four multiplier).[19]  Multipliers awarded by courts in comparable derivative litigation include from 1.37 to 2.9.  *See, e.g.*, *Schering* (Court awarded fee request of $9.5 million, which constituted a multiplier of 1.37); *AOL Time Warner* (Court

---

[19] *See also*, *In re Brand Name Prescription Drugs Antitrust Litig.*, 2000 WL 204112, *3 (N.D. Ill. Feb. 10, 2000) (in awarding a premium above lodestar of approximately $91 million, the Court held that "[a]n award of more than two times the lodestar calculation is believed to be fair and just in these circumstances"); *In re Cenco, Inc. Sec. Litig.*, 519 F. Supp. 322 (N.D. Ill. 1981) (approving fees with a multiplier of 4).  According to a recent Class Action Reports study (which was based on a calculation of then-current rates), the average multiplier awarded from 2001 to 2003 in class action settlements was 4.35, and the average multiplier over the thirty years from 1973 to 2003 was 3.89.  The former is drawn from a universe of 134 cases, the latter from a universe of 1,120 cases.  S. Logan, J. Moshman and B. Moore, Jr., *Attorney Fee Awards In Common Fund Class Actions, Class Action Reports*, 167, 197 (Mar.-Apr. 2003).

awarded fee request of $8.77 million, which constituted a multiplier of 1.6); *In re Cendant Corp. Derivative Action Litigation*, 232 F. Supp. 2d 317, 341-42 (D.N.J. 2002) (court approved fee request of $12 million, which constituted a multiplier of 2.59); *Cohn v. Nelson*, 375 F. Supp. 2d 844, 862 (E.D. Mo. 2005) (court approved request for 2.9 multiplier in a derivative settlement involving corporate governance relief, noting that in shareholder derivative actions, "courts typically apply a multiplier of 3 to 5 to compensate counsel for the risk of contingent representation").

As reflected at Exhibit A to the Morris Declaration, Plaintiffs' Counsel have expended a total of approximately 11,500 hours in prosecuting the Derivative Actions since their inception in early 2007 to the end of December 2009, when Plaintiffs' Counsel provided their fee mediation submission to Judge Infante.  As reported to the Mediator, these hours reflected a total lodestar of $6,414,511.25.  Plaintiffs' Counsel have incurred additional lodestar in the amount of $232,864.75 since that time (*see* Exhibits C through L of the Morris Declaration) for such activities as, *inter alia*, finalizing, executing and filing the Stipulation and other documents in support of preliminary approval, working with the Notice Administrator to ensure efficient and effective dissemination of the notice, and drafting documentation in support of final settlement approval.

Award of the agreed-upon amount of $8.75 million in attorneys' fees, when calculated exclusive of expenses, constitutes a multiplier of approximately 1.25, falling substantially below the range of multipliers awarded in complex derivative litigations such as the Derivative Actions, and reflects the hard-fought fee negotiations in which the parties engaged.

72

### g.    Expenses of Plaintiffs' Counsel Would Otherwise Be Reimbursable as Reasonable

As discussed above, the proposed fee amount of $8.75 million is inclusive of expenses. Plaintiffs' Counsel have incurred a total of $424,746.48 in unreimbursed costs and expenses since the inception of this case.  *See, e.g.*, Exhibit B to the Morris Declaration.  These costs were incurred to pay litigation expenses for, among other things, experts and mediation.  *See, e.g.*, Exhibits C to L to the Morris Declaration.  These are the type of expenses reasonably incurred in this type of complex litigation.  Seventh Circuit case law fully supports the reimbursement of such expenses.  *See, e.g.*, *Synthroid*, 264 F.3d at 722 (where court recognizes propriety of paying litigation expenses in a class action that reflect what "the private market would permit"); *see also*, *Great Neck*, 212 F.R.D. at 412 (approving reimbursement of approximately $330,000 in litigation expenses, noting that "the paying arms-length market typically reimburses lawyers for expenses of the type as reflected in plaintiffs' counsel documentation.").  The fact that the requested attorneys' fee amount is inclusive of expenses further supports the reasonableness of the request.

### B.    Payment of Incentive Awards to Named Plaintiffs

Courts in this Circuit have approved incentive awards to named plaintiffs on the basis that class representatives take on risks and perform services for the benefit of the class. *See, e.g.*, Albert Conte and Herbert B. Newberg, 4 Newberg on Class Actions, §11:38 (4th ed.).  Indeed, "[s]ince without a named plaintiff there can be no class action, such compensation as may be necessary to induce him to participate in the suit could be thought the equivalent of the lawyers' nonlegal but essential case-specific expenses." *Continental Ill.*, 962 F.2d at 571.  *See also*, *Cook*,

73

142 F.3d at 1016 ("Because a named plaintiff is an essential ingredient of any class action, an incentive award is appropriate if it is necessary to induce an individual to participate in the suit.").

As discussed above, derivative litigation serves a critical public policy. The substantial relief provided for under the proposed Settlement, in the areas of corporate governance, compliance, operational audit, compensation, and, risk management, and here, particularly, drug life-cycle management, offer important societal benefits.  Unlike in securities fraud and other types of class actions, however, where any recovery inures to the direct benefit of individual shareholders, in derivative litigation, shareholders are not motivated to bring such actions by the opportunity for direct financial recovery.  Rather, such actions inure to the benefit of the corporation, and only indirectly to its shareholders.  Nonetheless, derivative plaintiffs assume the same fiduciary responsibilities and burdens as any named representative.  Derivative plaintiffs are at a further disadvantage compared to representatives in other types of class actions in that they must maintain continuous stock ownership in the corporation throughout the entire course of the litigation or lose standing to maintain the action.  *See, e.g.*, *American Union Insurance Company, et al. v. Meridian Insurance Group, et al.*, 137 F. Supp. 2d 1096, 1108 (S.D. Ind. 2001) (court found "As a general rule, only a current shareholder in a corporation may bring a shareholder derivative action.").  For these reasons, derivative litigation such as the Derivative Actions raises the type of issues recognized by the Seventh Circuit in *Cook*, where the payment of an incentive award is necessary and appropriate to induce individuals to assume the burdens, obligations and fiduciary responsibilities inherent in this type of important representative action.

74

Incentive awards for class representatives have been regularly granted and upheld in this Circuit. [20]   In *Cook*, the Seventh Circuit set forth factors for courts to consider in determining whether to pay incentive awards to plaintiffs in representative litigation

> In deciding whether such an award is warranted, relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation.

*Id.*, 142 F.3d at 1016.   As set forth in the Joint Attorney Declaration, consideration of these factors further supports the payment of the incentive awards sought here.   As described above, the named representatives in the Derivative Actions have willingly shouldered fiduciary and financial obligations solely for the potential benefit of Lilly – and indirectly, for all shareholders of the Company.   As detailed herein, and reflected in the expert reports, as the result of the willingness of these named representatives to step forward, Lilly will benefit substantially. Moreover, in fulfilling their fiduciary responsibilities, the named representatives expended time and effort in discussions with their counsel, keeping apprised of the progress of the litigation, providing documentation as required and reviewing the operative pleadings and other materials, including plaintiffs' proposals and settlement-related documents, as the litigation progressed.

Plaintiffs' Counsel seek an aggregate incentive award in an amount not to exceed

---

[20]   Instances where district courts in this circuit have awarded incentive payments to named representatives include, for example: *Lively v. Dynegy, Inc.*, 2008 U.S. Dist. Lexis 75774 at *6 (S.D. Ill. Sept. 30, 2008); *Cooper*, 2005 U.S. Dist. Lexis 17071 at *8; *Berger v. Xerox Corp. Retirement Income Guar. Plan*, 2004 U.S. Dist. Lexis 1819 at *7 (S.D. Ill. Jan 22, 2004); *Gaskill v. Gordon*, 1995 U.S. Dist. Lexis 18576 *13 (N.D. Ill. Dec. 14, 1995); *Peterson v. Arvida/Jmb Partners, L.P.*, II, 1994 U.S. Dist. Lexis 2109 at *3, *49 (N.D. Ill. Feb. 25, 1994); *Spicer v. Chicago Bd. Options Exchange, Inc.*, 844 F. Supp. 1226, 1267-68 (N.D. Ill. 1993); *In re VMS Ltd. P'ship Sec. Litig.*, 1991 U.S. Dist. Lexis 9624 at *14 (N.D. Ill. Jul. 16, 1991).

$35,000.  This request was fully disclosed to all Lilly shareholders in the Notice.  As set forth in the Stipulation and further disclosed in the Notice, Plaintiffs' Counsel will pay any incentive award authorized by the Court out of awarded attorneys' fees in this case.

## VII.    CONCLUSION

For the reasons set forth herein, the detailed provisions of the proposed Settlement provide substantial benefits to Lilly; placing the Company at the forefront of the industry and providing a sound foundation for the management of drugs and drug candidates throughout their life cycle.  Plaintiffs and Plaintiffs' Counsel respectfully request that the Court find the proposed Settlement to be fair, reasonable and adequate to Lilly and its shareholders, and approve the Settlement in its entirety.

Plaintiffs and Plaintiffs' Counsel further respectfully request that the Court approve the requested award of attorneys' fees in the amount of $8.75 million, inclusive of expenses, and the payment of incentive awards to named Plaintiffs in the aggregate amount of $35,000 in recognition of their efforts in initiating and pursuing this litigation.

Dated: April 1, 2010

Respectfully submitted,

s/ Karen L. Morris
Karen L. Morris
Patrick F. Morris
MORRIS and MORRIS LLC
    COUNSELORS AT LAW
4001 Kennett Pike, Suite 300
Wilmington, DE 19807
Phone: (302) 426-0400
Fax: (302) 426-0400
kmorris@morrisandmorrislaw.com

76

Richard D. Greenfield
Ann M. Caldwell
GREENFIELD & GOODMAN, LLC
250 Hudson Street – 8th Floor
New York, NY 10013
Phone: (917) 495-4446

David C. Campbell
BINGHAM MCHALE LLP
10 West Market Street, Suite 2700
Indianapolis, IN  46204-4900
Phone: (317) 635-8900

James P. Stenski
CANTRELL, STRENSKI & MEHRINGER, LLP
2400 Market Tower
10 West Market Street
Indianapolis, IN  46204
Phone: (317) 352-3500

*Attorneys for Plaintiffs, Jeffrey P. Jannett and N.A.
Lambrecht, Derivatively on Behalf of Nominal
Defendant, Eli Lilly & Company*

Of Counsel:

ABBEY SPANIER RODD & ABRAMS LLP
Karin E. Fisch
212 East 39th Street
New York, NY  10016

COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS LLP
Andrew J. Brown
655 West Broadway, Suite 1900
San Diego, CA 92101

FARUQI & FARUQI, LLP
Beth A. Keller
369 Lexington Avenue, 10th Floor
New York, NY 10017

PASKOWITZ & ASSOCIATES
Lawrence D. Paskowitz
60 East 42nd Street, 46th Floor
New York, NY  10165

ROBBINS UMEDA LLP
Daniel R. Forde
600 B Street, Suite 1900
San Diego, CA 92101

ROY JACOBS & ASSOCIATES
Roy L. Jacobs
60 E. 42nd Street, 46th Floor
New York, NY 10165

THE WARNER LAW FIRM
Paul T. Warner
11123 McCracken Circle, Suite A
Cypress, TX 77429

## CERTIFICATE OF SERVICE

I hereby certify that on April 1, 2010, a copy of the foregoing was filed electronically. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

Michael E. Baughman
Robert L. Hickok
PEPPER HAMILTON LLP
baughmanm@pepperlaw.com
hickokr@pepperlaw.com

Christopher G. Scanlon
Matthew T. Albaugh
BAKER & DANIELS
chris.scanlon@baker.com
matthew.albaugh@bakerd.com

Jan M. Carroll
BARNES & THORNBURG LLP
jan.carroll@btlaw.com

Peter T. Barbur
Duane L. Loft
Kyle W. Mach
CRAVATH SWAINE & MOORE LLP
pbarbur@cravath.com
dloft@cravath.com
kmach@cravath.com

Marc J.M. Moss
MARC J.M. MOSS, ESQ.
mmoss@mosslawllc.com

Paul T. Warner
THE WARNER LAW FIRM
pwarner@warner-law.net

/s/ Patrick F. Morris

79