UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| N.A. Lambrecht and Jeffrey P. Jannett, | : | |
| Derivatively on Behalf of Nominal | : | |
| Defendant Eli Lilly & Company | : | |
| | : | |
| Plaintiffs, | : | C.A. No. 1:08-cv-0068-WTL-TAB |
| | : | |
| v. | : | |
| | : | |
| Sidney Taurel, John C. Lechleiter | : | |
| Sir Winfreid Bischoff, J. Michael Cook, | : | |
| Franklyn G. Pendergast, Kathi P. Seifert, | : | |
| George M. Fisher, Alfred G. Gilman, | : | |
| Martin S. Feldstein, J. Erik Fyrwald, | : | |
| Ellen R. Marram, Sir John Rose, | : | |
| Charles E. Golden, Steven C. Beering, | : | |
| August M. Watanabe, Linda Lay, | : | |
| Randall L. Tobias and J. Clayburn | : | |
| LaForce, Jr., | : | |
| | : | |
| Defendants | : | |
| | : | |
| -and- | : | |
| | : | |
| ELI LILLY & COMPANY, | : | |
| | : | |
| Nominal Defendant. | : | |

**JOINT DECLARATION OF KAREN L. MORRIS AND RICHARD D. GREENFIELD
IN SUPPORT OF FINAL APPROVAL OF PROPOSED SETTLEMENT, AWARD OF
ATTORNEYS' FEES, INCLUSIVE OF EXPENSES, AND PAYMENT OF INCENTIVE
AWARD TO NAMED PLAINTIFFS**

I, Karen L. Morris and I, Richard D. Greenfield, individually declare and state pursuant

to 28 U.S.C. § 1746 as follows:

1.       Karen L. Morris is a member of the firm of Morris and Morris LLC Counselors

At Law (the "Morris Firm"), and Richard D. Greenfield is a member of the firm of Greenfield &

Goodman LLC (the "Greenfield Firm").  Each declares that the statements set forth in this

declaration are true and correct to the best of her or his individual knowledge and belief.  Each

further declares that she or he is over the age of 21.

2.      Ms. Morris and Mr. Greenfield (collectively "Co-Chair Counsel" (as defined at ¶

17 below)) submit this joint declaration in support of final approval of the proposed Settlement,[1]

an award of attorneys' fees, inclusive of expenses, to Plaintiffs' Counsel, and the payment of

incentive awards to named Plaintiffs in the Derivative Actions (the "Joint Declaration").

3.      The Joint Declaration sets forth a chronology of the conduct of the Derivative

Actions from their inception, addressing in detail the procedural history of the Derivative

Actions, the discovery process, the analysis of the factual record and the evaluation of the merits

of the derivative claims, the crafting and development of the Plaintiffs' governance and

compliance proposals, the dialogue and negotiation undertaken by the parties, including senior

personnel of the Company, and the negotiation and documentation of the proposed Settlement.

The Joint Declaration addresses as well the mediation process with respect to the Proposed

Settlement, the negotiation of the requested award of attorneys' fees, and the requested incentive

award for Plaintiffs.

**The Demand Letters to Lilly's Board and the Filing of the Derivative Complaints**

4.      Between March and September 2007, Lilly shareholders Lambrecht, Staehr and

Jannett, through their counsel, each sent demand letters to the board of directors (the "Board") of

Eli Lilly & Company ("Lilly" or the "Company").  These letters demanded that the Board take

remedial action for alleged breaches of fiduciary duty in connection with, *inter alia*, Lilly's

illegal marketing and promotion of Zyprexa and Evista for uses not approved by the FDA (called

"off-label" use), the concealment of the alleged link between Zyprexa and weight gain, high

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the
Stipulation of Settlement (Document # 69-1).

blood sugar and diabetes, violations of best price reporting obligations to the government in connection with sales of Axid, Evista, Humalog, Humulin, Prozac and Zyprexa, and alleged deficiencies in Eli Lilly's corporate governance, internal control and compliance practices.

5.      On January 17, 2008, based on the above analysis, the Morris and Greenfield Firms, on behalf of their clients Lambrecht and Jannett, jointly filed a derivative complaint, captioned *Lambrecht, et al. v. Taurel, et al.*, C.A. No. 1:08-cv-0068-DFH-TAB, in the United States District Court for the Southern District of Indiana, Indianapolis Division, alleging that the Board had wrongfully refused their demands (the "Lambrecht Action").  Thereafter, between February and June 2008, six other derivative complaints were filed on behalf of Lilly, including three in the Eastern District of New York, each alleging that demand on the Board was futile,[2] two in Indiana State Court – one filed by shareholder Staehr alleging wrongful refusal of demand, and a second alleging demand futility,[3] and a second action in the Southern District of Indiana, alleging demand futility.[4]

6.      These complaints, alleging that defendants' conduct exposed Lilly to substantial risk of damage, including regulatory and private investigations and litigation, are collectively referred to as the "Derivative Complaints," and, with the three demand letters described above, are referred to herein as the "Derivative Actions."

7.      In support of the drafting of the Demand Letters and the Derivative Complaints,

---

[2] *Waldman v. Taurel, et al.*, C.A. No. 08-560 (the "Waldman Action"), filed on February 11, 2008 by the firms of Paskowitz & Associates (the "Paskowitz Firm") and Abbey Spanier Rodd & Abrams, LLP (the "Abbey Firm"); *Robbins v. Taurel,et al.*, C.A. No. 08-1471, represented by Samuel Simon, Esq. and filed on April 9, 2008; and *City of Taylor General Employees Retirement System v.Taurel, et al.*, C.A. No. 08-1554, filed by April 15, 2008, by the firm of Coughlin Stoia Geller Rudman & Robbins (the "Coughlin Firm").

[3] *Staehr v. Taurel, et al.*, Cause No. 49DO2 08 03CT13786, filed by Robbins Umeda LLP (f/k/a Robbins Umeda & Fink LLP) (the "Robbins Firm") and *Solomon v. Taurel, et al.*, Cause No. 49D12 0803PL013729, filed by Faruqi & Faruqi LLP (the "Faruqi Firm"), respectively.  Both of these actions were filed on March 27, 2008.

[4] *Zemprelli vs. Taurel et al.*, C.A. No. 1:08-cv-0874-SEB-TAB, filed on June 24, 2008, by the Warner Law Firm (the "Warner Firm").

Plaintiffs' Counsel undertook legal and factual investigation and analysis including, *inter alia*, review of multiple publicly available sources, including Lilly's SEC filings, Internet research, and information that became available in the wake of a series of articles appearing in *The New York Times* in December 2006, in connection with products liability litigation involving Zyprexa.

**The Parties Negotiate and Enter into an Agreement Establishing a
Process for the Production of Discovery and for Exploring Potential
Settlement of the Derivative Actions**

8.      On March 20, 2008, counsel for plaintiffs in the then-filed derivative actions, counsel for the Special Litigation Committee of the Board (the "SLC")[5] and counsel for Lilly negotiated and entered into an agreement pursuant to which the parties agreed, *inter alia*, to enter into a discovery process and to explore possible resolution of the derivative claims (referred to herein as the "Settlement Process Agreement").[6]  As the other Derivative Complaints were filed, Ms. Morris of the Morris Firm, acting as the principal negotiator, approached counsel for plaintiffs in each case and was successful in securing their agreement to participate in the Settlement Process Agreement.

9.      Plaintiffs' Counsel had no assurance that the parties would be able to arrive at any agreement sufficiently substantive to support, in their view, potential settlement of the Derivative Actions.  The Settlement Process Agreement, by its terms, set out a process pursuant to which relevant discovery could be identified, its production could be negotiated and the parties could explore potential resolution of the derivative claims.

10.      To effectuate this process, the parties provided copies of the Settlement Process Agreement to the court in each of the three jurisdictions where Derivative Complaints were

---

[5] The SLC was made up of two then-current directors, Messrs. J. Michael Cook (who has since retired from the Board) and Erik Fyrwald, and one non-director, James A. Henderson.  The SLC was constituted in or around early August 2007 to investigate allegations raised in the Demand Letters.
[6] This was a successor agreement to an agreement that plaintiffs Jannett and Lambrecht, counsel for Lilly, and counsel for the SLC had entered into in December 2007.

pending.

**A.      The Eastern District of New York Federal Court Actions**

11.      On March 3, 2008, Defendants filed a motion to dismiss the Waldman Action. The parties thereafter fully briefed the motion.  Following the execution of the Settlement Process Agreement, Co-Chair Counsel, along with the parties to the Waldman Action appeared before Judge Weinstein of the Eastern District of New York to present the Agreement and to apprise the court of the parties' efforts to date in accordance with the Agreement.  As a result, at the request of the parties to the Waldman Action, Judge Weinstein first adjourned, and then terminated the hearing on the pending motion to dismiss filed in that action.  Judge Weinstein directed that the parties report to the court on the status of the three derivative cases filed in that jurisdiction.  Plaintiffs' counsel have provided the court with written submissions on the status of the litigation on an ongoing basis.

12.      On March 4, 2010, the parties notified Judge Weinstein of the entry by this Court of the Preliminary Approval Order (Document # 76), and provided for the Court's consideration a copy of the Order, and copies of the Stipulation of Settlement with all exhibits as filed, including, *inter alia*, the Corporate Governance Terms and the individual Notice to be sent to Lilly Shareholders. A copy of the letter to Judge Weinstein, without exhibits, is attached as Exhibit 1 hereto.  By Order dated March 12, 2010, Judge Weinstein directed that the Clerk of the Eastern District of New York close the three derivative actions filed in that jurisdiction, with the proviso that should issue arise in the execution of the Settlement, the parties may apply to the court to reopen proceedings.  A copy of Judge Weinstein's Order is attached as Exhibit 2 hereto.

**B.      The Indiana State Court Actions**

13.      Separately, the parties to the Indiana state court actions provided a copy of the

Settlement Process Agreement to that court as well.  Thereafter, at the request of the parties, the Indiana State Court stayed proceedings on the two derivative actions filed in that jurisdiction.  As with the Eastern District of New York, plaintiffs' counsel in the Indiana state court actions have kept that court apprised through periodic written submissions regarding the status of the action, and, by Joint Status Report filed March 25, 2010 notified the court of this Court's entry of the Preliminary Approval Order.  A copy of the Joint Status Report, without exhibits, is attached as Exhibit 3 hereto.

### C.  The Southern District of Indiana Federal Court Actions

14.  The parties appeared before Magistrate Judge Baker of this Court for an initial pretrial conference on May 8, 2008.  Following the conference, by Order dated June 26, 2008, Magistrate Judge Baker granted the parties' motion to defer the response date in the actions pending in this Court.

15.  Magistrate Judge Baker took the lead in overseeing the progress of the actions through periodic telephonic status conferences held with the parties following the initial pretrial conference.   In each of these conferences, the parties described their progress to date, addressing the discovery negotiation process, the progress of document production, the process of the merits evaluation, the crafting of plaintiffs' governance and compliance proposals and their submission to defendants.

16.  With the decision of the parties in September 2008 to commence a series of meetings among the parties and senior Lilly personnel, the parties apprised Magistrate Judge Baker of the process they were undertaking and the progress of their discussions.  In addition, the parties advised the Court both of the retention of Edward Infante, retired Chief Magistrate Judge of the United State District Court, Northern District of California, to assist the parties through a

6

mediation process, and of the resolution in principle of the derivative claims.  Thereafter, as described below, the parties undertook the intensive process of documenting the proposed Settlement.

**Plaintiffs' Counsel Created an Organizational Structure and
Selected Co-Chair Counsel of their Executive Committee**

17.     In order to provide for the efficient litigation of the claims and to ensure the attorney and financial resources necessary to address the complex issues the derivative claims presented, Plaintiffs' Counsel entered into an agreement among themselves to establish an organizational structure and litigation process (the "Coordination Agreement").  Pursuant to the terms of the Coordination Agreement, an Executive Committee was formed, which included counsel from each law firm representing a plaintiff in a Derivative Action.  Ms. Morris and Mr. Greenfield were chosen to serve as Co-Chairs of the Executive Committee (the "Co-Chair Counsel").

18.     The Coordination Agreement was first drafted and executed in May, 2008 by plaintiffs' counsel firms then representing Lilly shareholders in pending Derivative Actions. Counsel in the last filed action, the Warner Firm, subsequently joined the Coordination Agreement on July 11, 2008.

19.     Plaintiffs' Counsel, under the oversight of the Co-Chair Counsel, and in coordination and consultation with the other members of the Executive Committee, worked to ensure the efficient coordination and management of the litigation and conduct of the settlement negotiations.  As part of the coordination process, Plaintiffs' Counsel provided periodic updated lodestar reports to Co-Chair Counsel.

**Plaintiffs' Counsel Establish a Process for Proceeding in the
Litigation of the Derivative Actions**

20.     Co-Chair Counsel, working with the members of the Executive Committee,

created committees of Plaintiffs' Counsel to permit effective work assignments and the

development of substantive expertise in critical areas of the case.  Co-Chair Counsel, in

consultation with the Executive Committee, originally created the four committees described

below.  While membership on the committees was at times fluid as litigation of the Derivative

Actions unfolded and circumstances developed, these committees were as follows:

a.      the Governance and Compliance Development and Analysis Committee, with

principal responsibility assigned to the Morris Firm and the Coughlin Firm;

b.      the Discovery Management and Merits Analysis Committee, with principal

responsibility assigned to the Greenfield Firm, the Abbey Firm and the Faruqi Firm;

c.      the Legal Research and Motion Practice Committee, with principal responsibility

assigned to the Paskowitz Firm and the Abbey Firm; and

d.      the Experts and Damages Committee, with principal responsibility assigned to the

Morris Firm and the Robbins Firm.

21.     While the distribution of work across the various committees evolved over time,

as discussed below, Co-Chair Counsel adhered to this basic organizational structure as closely as

possible to ensure that the work necessary to review and analyze the document production and

carry out the tasks as assigned by Co-Chair Counsel was performed in a thorough and efficient

manner on a timely basis, without duplication of effort, and that the necessary degree of

expertise and institutional knowledge was developed in each of the critical committee areas.  Co-

Chair Counsel also worked to ensure that the staffing on these committees, and on individual

tasks as assigned, was undertaken by counsel with sufficient seniority and sophistication to

ensure the work was performed in an efficient manner and that the resultant memoranda and analyses were accurate and thorough.  Where appropriate, more junior attorneys or paralegals were assigned.

**The Document Production Process**

22.     Co-Chair Counsel met with Defendants on June 9, 2008 to discuss a process for the production of documents in accordance with the Settlement Process Agreement.  The process developed by the parties entailed Plaintiffs' Counsel providing their requests, followed by discussion and negotiation during which the parties agreed to the scope and type of relevant documents to be provided.

23.     Plaintiffs' requests were addressed to both merits and governance and compliance issues, including, *inter alia*, information related to how Lilly was organized and how it operated with respect to the development, testing and marketing of its drugs and drug candidates generally, and with respect to Zyprexa, Prozac and Evista specifically.

24.     In this regard, Plaintiffs sought, *inter alia*, documents sufficient to identify all operating and functional units during the relevant time period, organizational charts, documents identifying the personnel involved at the management level in each of the operating and functional units, Board and committee charter materials, Board minutes, agendas, resolutions and materials provided to directors, policy and procedural guidelines related to legal and regulatory compliance, corporate governance guidelines and documents related to risk management at Lilly. Plaintiffs' Counsel also sought production of materials provided to the SLC in connection with its investigation, materials related to the Multidistrict Litigation ("MDL") proceedings and related litigations in the Eastern District of New York under Judge Weinstein, and documents related to the various governmental and regulatory investigations of Lilly.

25.     Beginning in July 2008, Lilly began producing documents consisting primarily of deposition transcripts and exhibits from prior proceedings, particularly the Zyprexa MDL product liability proceeding.  Based on the parties' on-going negotiations and discussions regarding documents, Lilly made additional document productions, on a rolling basis, in August, October and December of 2008, and in February, March, May and June of 2009.  These additional productions included, *inter alia*, documents relevant to the activities of the Board and senior level management personnel and Board and committee minutes.

26.     In all, Lilly produced, and Plaintiffs' Counsel reviewed and analyzed, over 85,000 pages of documents, which, as described below, formed the basis of Plaintiffs' Counsel's assessment of the merits of the claims and provided the factual information necessary to understand Lilly's organizational structure and operational, governance and compliance weaknesses during the period of the alleged wrongdoing.

The Merits Analysis

27.     In order to provide the background necessary for a merits-related review of the factual record, Ms. Morris developed a detailed investigatory agenda and background information which was then provided to counsel in the action.  Following their receipt of these materials, Ms. Morris briefed counsel on the basic chronology of the drug life cycle, regulatory issues relevant to assessment of the evidentiary record, crucial events in the timeline of the development and marketing of the drug products at issue and other information necessary to ensure a sophisticated review of the documentary materials.  Ms. Morris remained actively engaged in overseeing the document review process.

28.     Critical to Plaintiffs' merits analysis was the production of tens of thousands of pages of exhibits in connection with deposition transcripts for forty-eight (48) Lilly employees

and, subsequently, for twenty-two (22) expert witnesses who had testified in the MDL and related proceedings.  These materials included documents related to an assessment of safety and efficacy issues, including, *inter alia*: data and analysis from olanzapine clinical trials, documents and e-mails from Advisory Committee meetings on Zyprexa; communications to and from the FDA and Lilly; e-mails and internal documents between and among members of the Zyprexa product team and to and from senior management regarding weight gain, hyperglycemia and diabetes; internal reports and analysis of data and studies regarding weight gain, hyperglycemia and diabetes; documents relating to proposed and actual product label changes; e-mails and other documents reflecting communications with foreign regulatory agencies, including Japan, Europe, Canada and South Africa; e-mails and documents reflecting communications between and among members of the Zyprexa product team and sales, marketing and issues management teams regarding how to deal with weight gain, hyperglycemia and diabetes; Speaker slide and presentation decks; and research papers and articles published in medical journals.

29.    These materials also included documents related to off-label issues, including, *inter alia*: documents related to market research regarding expanding Zyprexa into the primary care and long term care markets; e-mails and internal communications regarding the promotion of Zyprexa for off-label uses; documents regarding the planning and implementation of the *Viva Zyprexa* campaign; strategy and implementation guides for the sale of Zyprexa in the long-term and primary care markets; sales brochures; marketing and sales guides; sales representatives' call notes; sales force training guides; market research reports; sales meeting presentations and primary care sales force resource guides.

30.    The deposition transcripts, with their extensive exhibits, provided an invaluable source of information regarding, *inter alia*, the Company's organizational structure, the nature of

11

the alleged wrongdoing, and, based on Plaintiffs' Counsel's examination of these materials, the

structural and organizational weaknesses at Lilly that fostered an environment in which such

alleged wrongdoing could occur.  Plaintiffs' Counsel undertook the review and analysis of these

documents in a systematic manner, assigning the review to designated firms based on the subject

matter of relevant information from each deponent.  Assigned counsel performed a careful

analysis of each deposition transcript and supporting exhibits, and then drafted a deposition

summary directed to the specific issues and matters relevant to the derivative claims.  These

deposition summaries were then circulated for review by the merits team and/or by appropriate

counsel focusing on that specific area of the review and analysis.

   31. Plaintiffs' Counsel reviewed the deposition transcripts, exhibits and other related

documents with regard to both an evaluation of the alleged underlying wrongdoing and an

assessment of the management and Board's role in, and knowledge of, the alleged underlying

conduct.  In addition, these documents were reviewed with a view towards understanding the

reporting chains and internal procedures regarding drug development, marketing and post-

approval reporting, as well as to assess overall compliance oversight systems in place at Lilly

during the relevant time period.  The assessment of Lilly's governance and compliance systems

in the context of analyzing what occurred with respect to Zyprexa during this period was crucial

to, among other aspects of the litigation, the efforts of Plaintiffs' Counsel to design appropriate

corporate governance and compliance proposals for the Company (discussed below, beginning at

¶ 46).

   32. As noted above, the forty-eight (48) witness depositions with exhibits were

divided by categories of information contained therein.  These categories included discovery

logistics (directed at developing an understanding of document retention and custody issues at

Lilly), senior level or key management functions, sales and marketing, science, and regulatory affairs – with some deponents falling potentially under more than one category. The four deposition transcripts (with exhibits) relevant to discovery logistics were reviewed and analyzed by the Faruqi Firm (three transcripts) and the Warner Firm (one transcript). The seven deposition transcripts (with exhibits) relevant to senior level or key management functions were reviewed and analyzed by the Greenfield Firm. The twenty-five deposition transcripts (with exhibits) related to sales and marketing at Lilly were reviewed and analyzed by counsel from several firms, including the Paskowitz Firm (sixteen transcripts), the Faruqi Firm (seven transcripts), the Abbey Firm (one transcript), and the Greenfield Firm (one transcript). The seven deposition transcripts (with exhibits) of scientific personnel at Lilly were reviewed and analyzed by the Greenfield Firm (four transcripts), the Abbey Firm (two transcripts), and the Warner Firm (one transcript). Finally, the five deposition transcripts (with exhibits) related to regulatory affairs at Lilly were reviewed and analyzed by the Paskowitz Firm (three transcripts), the Abbey Firm (one transcript), and the Warner Firm (one transcript).

33.    Review of the subsequently produced expert deposition transcripts and exhibits were also divided among specific Plaintiffs' Counsel firms as follows: the Greenfield Firm (seven transcripts), the Abbey Firm (seven transcripts), the Paskowitz Firm (four transcripts), the Warner Firm (one transcript), and the Faruqi Firm (three transcripts).

34.    This extensive merits-based review and analysis provided the foundation for the first of several comprehensive memoranda developed by the Greenfield Firm. The initial "global merits memorandum" set forth a detailed chronology of events at Lilly related to the claims raised in the Derivative Actions, beginning with data from the Zyprexa clinical trials performed at Lilly prior to FDA approval, and continuing through the end of the alleged period of

wrongdoing.  The chronology of events was constructed by discussing and analyzing each pertinent and relevant exhibit, the testimony related to each exhibit, and how the exhibit and the related testimony fit into the factual background of the alleged wrongdoing, including, *inter alia*, what senior management at Lilly knew and did over the course of the relevant period of the derivative claims, with annotations to supporting internal Company documentation.  This global merits memorandum was a dynamic document, subject to review and updated by the Greenfield Firm as additional information came to light through the rolling document production and deposition and document review process.

35.    In addition to its reliance on the deposition summaries, the Greenfield Firm's work in connection with the drafting of the global merits memorandum was also supported by additional research and analysis undertaken by it, facilitated by the loading of the document production into an OCR readable data base, allowing for efficient identification and analysis of additional relevant documents based on subject matter and key word searches, which were used to supplement the attorney memoranda and further explore and analyze the evidentiary record regarding particular areas of alleged wrongdoing.

36.    The analysis underlying the global merits memorandum further supported the Greenfield Firm's work in researching and drafting other analytic memoranda.  Two such memoranda reflected a comprehensive assessment, again supported by annotations to Lilly's internal documentation and deposition evidence, of the two core areas of alleged wrongdoing underlying Plaintiffs' allegations in the Derivative Actions, namely, off-label promotion and marketing of Zyprexa, and the failure by Lilly to warn of allegedly known adverse metabolic side-effects of the use of the drug.   These two memoranda built on the factual information contained in the global merits memorandum, but expanded and further refined the analysis in the

two key areas of alleged wrongdoing by including substantial additional information that had

come to light as a result of the continuing  merits analysis and document review process, review

of pleadings and documents in connection with the government's investigation and the

continuing analysis of management and Board level knowledge and involvement.  In addition,

these two memoranda were more analytical in nature and served to integrate and analyze the

facts in relation to the legal and regulatory landscape surrounding drug marketing and duty to

warn, as outlined in detailed legal research memoranda on these issues prepared by, among

others, the Coughlin Firm. *See, e.g.*, ¶ 43.

      37.    As a result of her merits-based work and analysis, the Greenfield Firm also

drafted memoranda related to Lilly's operational and compliance organizational structure, and to

its assessment of fundamental operational and compliance weaknesses at the Company.

      38.    This effort, in particular the global merits memorandum, combined with the

comprehensive off-label and failure to warn memoranda, provided the principal foundation for

substantial portions of the submission to the mediator and the presentations of Plaintiffs' Counsel

at the mediation session, described beginning at ¶ 58 below.

**The Governance and Compliance Analysis**

      39.    Plaintiffs' Counsel undertook an intensive process of review, analysis,

investigation and, ultimately, negotiation regarding governance, compliance and risk

management reforms to address the allegations of the derivative claims.  The development of the

governance and compliance reforms Plaintiffs' Counsel proposed was informed by, *inter alia*,

the merits analysis detailed above in terms of understanding how Lilly functioned during the

period of the alleged wrongdoing and the governance, compliance and operational weaknesses

within Lilly that Plaintiffs' Counsel concluded led to the alleged underlying wrongdoing, the

government's investigation and, ultimately, Lilly's guilty plea with respect to off-label promotion of Zyprexa.

40.     The work by Plaintiffs' Counsel in this area, under the direction of the Morris Firm, included, *inter alia*, researching and analyzing applicable statutory and regulatory provisions and guidance, both at the time of the alleged wrongdoing and currently, benchmarking governance and compliance processes and practices within the pharmaceutical industry, evaluating Lilly's governance, compliance and risk management policies, procedures and practices over time and currently, and crafting proposed reforms directed at the identified problem areas.  Counsel's evaluation included FDA and U.S. Department of Health and Human Services, Office of Inspector General guidances, evolving industry guidelines, international standards for good clinical practices, United States General Accounting Office reports, a comprehensive National Academy of Sciences, Institute of Medicine Report on the Future of Drug Safety, private reform proposals and academic and industry literature.

41.     In support of this effort, counsel from the Morris Firm researched and developed a detailed "Work Plan" directed to the identification and assessment of critical areas relevant to Plaintiffs' compliance assessment and to prospective management level compliance proposals. This comprehensive document, almost 50 pages in length, was broken down into eight specific areas for research and analysis.  These areas included: off-label promotion; Medicaid best price reporting; remuneration of health care professionals (including anti-kickback issues); managed care arrangements (including anti-kickback and best price issues); pre-approval clinical trial design, conduct and disclosure; post-marketing pharmacovigilence;[7] post-marketing clinical trial design and disclosure; and post-marketing labeling and marketing communications.

---

[7] At a pharmaceutical company, pharmacovigilance encompasses the safety of products and product candidates.

16

42.     For each topic area, the Work Plan listed open issues for research and analysis by Plaintiffs' Counsel, as assigned.  The nature and scope of the open issues were designed to permit the designated counsel to develop an in-depth understanding in that area.  The Work Plan included citations to relevant source materials identified during the detailed preliminary research supporting the drafting of the Work Plan, which served as a roadmap for counsel assigned to the research and analysis of each area.  Where available, these references were provided in the form of Internet links, permitting assigned counsel to immediately access the underlying materials with the click of a mouse. The Work Plan provided not only the intellectual framework for much of Plaintiffs' compliance evaluation, but permitted the efficient conduct of research at a more detailed level by specifically assigned counsel as warranted.

43.     As a result of the research and analysis undertaken related to the Work Plan, a series of memoranda were drafted and exchanged among designated Plaintiffs' Counsel that supported the design and drafting of Plaintiffs' governance and compliance proposals (*see* ¶ 46 *et seq.* below).  These included, for example, memoranda by the Coughlin Firm regarding, *inter alia*, relevant regulations and regulatory guidance governing prescription drug post-marketing safety reporting to the FDA; the identification, collection and summarization of statutes, regulations and regulatory guidance that governed the labeling of prescription drugs sold in the U.S., with particular emphasis on describing the various places where safety-related information was required to appear in the FDA approved package insert for the drug; directly relevant to Plaintiffs' claims regarding the alleged failure of Lilly to timely warn of adverse metabolic side effects from use of Zyprexa, an assessment of the extent under historical and current FDA rules and guidance that a "causal association" must be demonstrated to exist between use of the prescription drug and a "clinically significant" adverse event to trigger a "warning" labeling

revision under 21 CFR § 2-1/80(e); an assessment detailing the type and nature of post-approval studies that the FDA can require, and the type of information generated by post-approval studies that must be disclosed to the FDA and in what manner; the identification, collection and summarization of statutes, regulations and  regulatory guidance governing what information relating to drug safety must be disclosed to the FDA prior to approval of a drug candidate; an assessment of executive compensation at Lilly as compared to its peer companies; and a survey of corporate governance enhancements sought by institutional investors in recent securities litigations.

44.    The Paskowitz Firm did work surveying and analyzing relevant pharmaceutical corporate governance charter provisions, examining the existence and role of regulatory liaison executives within the pharmaceutical industry, and examining the existence and role of risk executives at Lilly peer companies.  The Robbins Firm researched and drafted memoranda relevant to, *inter alia*, the evolution of the Office of the Inspector General of the Department of Health and Human Services Corporate Integrity Agreements ("CIAs"), and their scope and provisions against pharmaceutical companies, and relevant FDA statutes, regulations and guidance and Health and Human Services announcements regarding the Medicaid Drug Rebate Program.   The Robbins Firm also researched and sought to quantify total damages, including damages resulting from the tort and government actions brought against Lilly.

45.    These memoranda assisted counsel both in the evaluation of Lilly's compliance systems historically and in the development of Plaintiffs' compliance proposals, providing the regulatory and industry framework necessary to craft Plaintiffs' governance, compliance and medical risk management proposals, as described below.

**The Design and Drafting of Governance, Compliance and
Risk Management Proposals**

46.     In designing and drafting the governance, compliance and risk management

proposals described below, Plaintiffs' Counsel took into consideration at each step the extensive

merits investigation and analysis regarding the key problem areas and organizational weaknesses

they concluded were extant at the time of the alleged wrongdoing.  Drawing on their experience

and expertise in the field of corporate governance, compliance and risk management reforms

developed over the course of litigating multiple complex derivative cases, and working with their

experts, as discussed below, Plaintiffs' Counsel, in an effort spearheaded by the Morris Firm,

worked to design governance, compliance and risk management proposals addressed to the

detection and prevention of the alleged wrongdoing underlying the Derivative Actions.

47.     Over a period spanning approximately nine (9) months, based on the research and

analysis described above, Plaintiffs' Counsel drafted and presented to Lilly the following series

of proposals extensively annotated with supporting authorities and analytic materials:

- º     Management level Centralized Global Compliance proposals and Board level
  Public Policy and Compliance Committee proposals – provided to Company
  Counsel in September 2008;

- º     Off-Label Promotion – provided to Company Counsel in November 2008;

- º     Best Price – provided to Company Counsel in December 2008;

- º     Anti-Kickback and Best Price – provided to Company Counsel in December
  2008;

- º     Enterprise Risk Management – provided to Company Counsel in December 2008;

- º     Compensation – provided to Company Counsel in January 2009;

- º     Drug Life-Cycle – provided to Company Counsel in March 2009;

- º     Enterprise Risk Management (supplemented) – provided to Company Counsel in
  March 2009; and

       °     Board level proposals – presented to Company Counsel in May 2009.

48.    Based on a format developed by the Morris Firm, each of these proposals contained a stated "core objective" for the Company in each topic area, designed to broadly encompass the goals of the proposed operational and organizational changes.  In addition to outlining the proposed organizational and operational structure in significant detail, each proposal contained detailed annotations with citations and references to benchmarks and other source material supporting the governance, compliance and risk management initiatives proposed, as well as indices of supporting materials.

49.    Plaintiffs' retained as experts in this action three individuals with substantial experience and expertise in areas which were the focus of the parties' negotiations: Dr. Mitchell Glass, a medical doctor and executive with extensive experience and expertise in the pharmaceutical industry and drug development; Professor Donald C. Langevoort, the Thomas Aquinas Reynolds Professor of Law at the Georgetown University Law Center in Washington, D.C., and a recognized expert in the fields of corporate governance and corporate behavior; and Mr. James Lam, an expert in the area of enterprise risk management ("ERM"), and the President of James Lam & Associates, Inc., a Massachusetts firm that provides world-wide consulting and training services in risk management.

50.    As appropriate while designing and drafting their proposals and (as described below) when meeting with Defendants' counsel and senior company representatives and when negotiating the Settlement terms, Plaintiffs' Counsel consulted and coordinated with their experts.  This process aided Plaintiffs' Counsel in the design of governance and compliance proposals tailored to Lilly's organizational structure, business and operations.  Plaintiffs' proposals related to drug and drug candidate life cycle management grew out of an intensely

interactive collaboration between counsel from the Morris and Greenfield Firms and Dr. Glass. The Abbey Firm participated in this process as well.   Over the course of many face-to-face meetings and telephone conferences with Dr. Glass, Plaintiffs' Counsel designed and drafted their Drug-Life Cycle Management proposals, supported with annotated materials.  Dr. Glass also worked closely with Plaintiffs' Counsel in the development and design of Plaintiff's proposed Clinical Plan Document template, designed to provide, *inter alia*, a single, computerized repository for all relevant historical, chronological, analytical and developmental information and clinical data collected for each drug and drug candidate at Lilly.

51.     Each of the above proposals was specifically and carefully designed to address and rectify key governance, compliance and risk management issues Plaintiffs' Counsel believed were at the heart of the alleged wrongdoing and, as well, to bring Lilly to the forefront of pharmaceutical company corporate governance and compliance "best practices."

**Inter-Active Exchange Related to Plaintiffs' Governance,
Compliance and Risk Management Proposals**

52.     In an effort to achieve these goals, Co-Chair Counsel, together with Lilly's counsel and counsel for the SLC, engaged in a highly interactive "give and take" dialogue that included senior executives from Lilly with knowledge and responsibility over Lilly's operations in each substantive corporate governance topic area.  This process, undertaken over twelve months, included extensive telephonic conferences, as well as multiple in-person meetings among Co-Chair Counsel, Lilly's Counsel, SLC Counsel, and Lilly executives.  Lilly was highly engaged throughout this process and, it is the understanding of Plaintiffs' Counsel, the Company formed an extensive internal process to support the negotiation process.

53.     The parties met in October 29, 2008 regarding Plaintiffs' Compliance and Enterprise Risk Management proposals; on February 5, 2009 regarding Plaintiffs' Off-Label

proposals; on March 5, 2009 regarding Plaintiffs' Public Policy and Compliance Committee proposals; on March 27, 2009 regarding Plaintiffs' Anti-Kickback proposals; on April 6, 2009 regarding Plaintiffs' Compensation and Human Resources proposals; on April 21, 2009 regarding Plaintiffs' Drug Life-Cycle proposals; and on May 8, 2009 regarding Plaintiffs' Board level proposals.

54.     Lilly personnel who either met personally with Co-Chair Counsel at these meetings, or who participated in these meetings with Co-Chair Counsel by way of video teleconferencing, included Anne Nobles, Vice President, Compliance and Enterprise Risk Management and Chief Compliance Officer; Traci Fitzsimmons, Manager, Enterprise Risk Management, Global Compliance and Ethics Program Office;  James Lootens, Esq., Deputy General Counsel and Corporate Secretary; Timothy J. Garnett, M.D., Head of Global Medical, Regulatory and Safety and Chief Medical Officer; Robert Metcalf, Ph.D., Executive Director, Global Medical, Regulatory and Safety; Kelly Freeman, Lilly USA Compliance Officer; Chris Fletchall, a Lilly USA Compliance Manager; and Sharon L. Sullivan, the Vice President, Human Resources - Global Compensation and HR.

55.     As noted above, as well as working closely with Plaintiffs' Counsel in the drafting of the relevant proposals, Plaintiffs' pharmaceutical and medical expert, Dr. Glass, also attended the Drug Life-Cycle meeting on April 21, 2009.

56.     As the process progressed, the parties engaged with each other in ever greater detail regarding the scope of potential reforms.  By agreement of the parties, following the completion of the parties' meetings and telephonic conferences, on June 5, 2009, Lilly provided a draft Term Sheet to Plaintiffs' Counsel addressing each of the areas which had been the subject of Plaintiffs' proposals.  It was at this juncture that the possibility of a resolution of the derivative

claims through substantial and meaningful corporate governance, compliance and medical risk management reforms became more clear.  The draft Term Sheet incorporated significant portions of Plaintiffs' proposals, addressing the central aspects of reform directed to the prevention of a recurrence of the alleged wrongdoing and reflecting a substantial forward looking document which could serve Lilly going forward.  The draft Term Sheet was the basis for the parties' further negotiations, described below.

**Negotiation of the Term Sheet and Stipulation of Settlement, and Participation in the Mediation with Judge Infante**

57.     Following the receipt of the draft Term Sheet, Plaintiffs' Counsel, principally the Morris Firm (working closely with Plaintiffs' experts), and counsel for Lilly (working with key senior officers at the Company), actively negotiated the detailed governance, compliance and risk management provisions at the heart of the proposed Settlement.  This process entailed many hours of work by each side separately and in face-to-face and telephonic negotiations with each other.

58.     In support of the settlement negotiation process, the parties retained the services of retired Magistrate Judge Edward A. Infante, to assist in the resolution of the derivative claims through mediation.  The parties provided Judge Infante with detailed written submissions related to merits and damages.

59.     Plaintiffs' Counsel's submission to Judge Infante was approximately sixty (60) pages long, with hundreds of pages of exhibits and additional supporting submissions.  Plaintiffs' Mediation Statement, drafted principally by the Morris and Greenfield Firms, included a review of the procedural history of the Derivative Actions, the governmental investigations in connection with Zyprexa, the States Attorneys General lawsuits and the MDL proceedings, and provided a discussion of the document review, organization of the merits review process and

work in support of the drafting of Plaintiffs' governance, compliance and medical risk management proposals.  Plaintiffs' Counsel provided the Mediator with a detailed assessment of the FDA regulatory framework and standards in connection with off-label promotion and failure to warn of risks, and Lilly's alleged conduct in those areas related to Zyprexa.  Plaintiffs' Counsel also provided the Mediator with their assessment, taken from the document review and, in particular, the analysis of the seventy (70) witness and expert deposition transcripts with exhibits, of what they believe happened at Lilly to permit the alleged misconduct to occur.  Finally, Plaintiffs' Counsel gave the Mediator a detailed survey of the current law related to derivative litigation, wrongful refusal of demand and demand futility and director and officer liability.

60.     Counsel from the Morris and Greenfield Firms, with outside and in-house Counsel for Lilly, participated in a full day session with the Mediator in New York on June 25, 2009.

61.     Thereafter, the parties continued their negotiation of the detailed governance and compliance provisions which are reflected in Exhibit A to the Stipulation, the Corporate Governance Terms (Document # 69-2) and the other terms of the proposed Settlement set forth in the Stipulation of Settlement of the derivative claims (the "Stipulation") (Document # 69-1).  This process included continued consultation with Plaintiffs' experts and multiple telephonic and face-to-face sessions between the parties.  The negotiation and drafting of the Corporate Governance Terms and the Stipulation were completed in early December, 2009.

62.      In addition to the Stipulation, Plaintiffs' Counsel drafted other important settlement documentation, including the Notice to be sent to Lilly Shareholders (Document # 69-5).  This document entailed substantial time and effort, both in the drafting and negotiation, as it

sets out a detailed summary of the governance, compliance and medical risk management provisions of the proposed Settlement.  To ensure both that this discussion was a fair reflection of all parties' understanding of the terms of the agreement and that it was written in a reasonably clear and comprehensible manner for shareholders to understand, the Notice was the subject of careful vetting and negotiation by Counsel.  The Robbins Firm assisted the Morris Firm in the drafting of the settlement documentation.

63.     Plaintiffs' Counsel, principally the Morris and Greenfield Firms, assisted by the Robbins Firm, drafted Plaintiffs' Memorandum of Law in Support of Preliminary Approval of Proposed Settlement (the "Preliminary Approval Brief") (Document # 69).  Like the Notice, the proposed Preliminary Approval Brief sets forth a detailed summary of the governance, compliance and risk management provisions of the proposed Settlement, and, like the Notice, the Preliminary Approval Brief was also the subject of substantial review and discussion by counsel for the parties to ensure that it fairly reflects the parties' understanding of the Settlement's terms.

64.     Plaintiffs' Counsel also drafted other documents to be filed in support of preliminary approval of the proposed Settlement, including the Summary Notice (Document # 69-6) and forms of Orders for both preliminary and final approval (Documents # 69-4 and 69-3, respectively).  These documents were likewise reviewed and negotiated among the parties.

65.     Co-Chair Counsel, in connection with the negotiation and settlement process, coordinated with the members of the Executive Committee, providing the firms with drafts of the Term Sheet and the Stipulation for their review and comment.  In addition, Co-Chair Counsel provided members of the Executive Committee with draft copies of the expert reports by Dr. Glass, Mr. Lam and Professor Langevoort (*see* ¶ 66 below), the draft Preliminary Approval Brief and drafts of other of documents in support of preliminary approval of the proposed Settlement.

Members of the Executive Committee reviewed these documents and provided comments to Co-Chair Counsel as appropriate.  On behalf of their clients, each of the Executive Committee members authorized Co-Chair Counsel's execution of the Stipulation.

**Work with Experts**

66.     As discussed above, Plaintiffs' Counsel worked extensively with their three experts, whose reports were previously submitted to the Court as part of the preliminary approval process.  *See* Report of Dr. Mitchell Glass (Document # 70); Report of James Lam (Document # 71); and Declaration of Professor Donald C. Langevoort Regarding the Substantive Benefits of the Settlement Terms (Document # 72).

67.     As further detailed above, Plaintiffs' Counsel worked closely with Dr. Glass, including multiple face-to-face meetings and telephone conferences, in connection with the design and drafting of the Drug Life-Cycle proposals, discussions with Company Counsel and senior officers regarding these proposals, and in the negotiation of the Term Sheet provisions directed to these proposals.  Plaintiffs' Counsel consulted as well with Mr. Lam and Professor Langevoort in connection with the negotiation of relevant settlement terms.

68.     Plaintiffs' Counsel further spent substantial time and effort working with the experts in connection with the drafting, review and finalization of their expert reports.  Plaintiffs' Counsel provided the experts with expansive underlying materials for their use in assessing the underlying merits of the proposed corporate governance, compliance and medical risk management reforms, in support of their performance of a detailed and critical evaluation of the scope and nature of the changes involved and the benefits to the Company from their implementation.

69.     Work on the expert reports entailed significant interaction between Plaintiffs'

Counsel and the experts, particularly with Dr. Glass, where the explanation of complex and technical medical risk management and Drug Life-Cycle concepts had to be presented in terms that were understandable to the lay reader but still conveyed the sophistication of the scope and nature of the relief obtained.

**Mediation of the Proposed Attorneys' Fees, Inclusive of Expenses**

70.     Not until after the parties had finalized the terms of the corporate governance, compliance and risk management provisions of the Settlement and the Stipulation did the parties have any discussions related to a proposed award of attorneys' fees and reimbursement of expenses.  Based on his experience and expertise in complex class and derivative litigation, as well as his familiarity with the specific facts of this action and the scope and nature of the relief obtained, the parties turned to Judge Infante to assist in the mediation of a proposed fee.

71.     Plaintiffs' Counsel provided Judge Infante with a detailed fee submission, which included, *inter alia*, a discussion of the applicable Seventh Circuit standards related to the award of fees in complex cases, a summary of the substantive nature of the relief achieved through the Settlement, a discussion of the settlement process which unfolded in this action and the work of Plaintiffs' Counsel to design and negotiate extensive governance and compliance proposals and to secure the proposed Settlement relief.  Plaintiffs' Counsel also provided for the Mediator's consideration an assessment of comparable derivative cases and their fee resolutions and discussed the application, under the present facts and circumstances, of Seventh Circuit legal precedent related to the application of percentage and lodestar methodologies.

72.     In addition, Plaintiffs' Counsel provided the Mediator with an analysis of relevant Seventh Circuit law related to the reimbursement of expenses and the payment of incentive awards to named Plaintiffs.  Accompanying their fee submission to the Mediator, Plaintiffs'

Counsel provided supporting materials, including drafts of the three expert reports and copies of unreported relevant court orders, as well as final drafts of settlement documents, including the Stipulation, Exhibit A "Corporate Governance Terms" and the individual Notice to Lilly shareholders.

73.     In early January 2010, Defendants' Counsel provided a separate submission to the Mediator related to a proposed award of attorneys' fees and the reimbursement of expenses to Plaintiffs' Counsel.

74.     The parties' submissions addressed to fees were provided on an *ex parte* basis to the Mediator.

75.     At the request of counsel for Lilly's directors' and officers' insurance carriers ("Carrier Counsel"),  Plaintiffs' Counsel agreed to permit Carrier Counsel, within the parameters of agreed upon conditions, to review daily time records reflecting the work performed by Plaintiffs' Counsel in litigating the Derivative Actions.  These daily time records, accompanied by a summary categorized time chart by subject area of activity, were first provided to the Mediator as part of the fee submission to him by Plaintiffs' Counsel for his review and assessment.

76.     Following discussions between the Mediator, Co-Chair Counsel, Counsel for Lilly and Carrier Counsel, on January 27, 2010 , Counsel from the Morris and Greenfield Firms met with Carrier Counsel in New York.  Ms. Morris first provided a detailed presentation, including a chronology of the work performed, and then allowed Carrier Counsel over four hours to review daily time records in private.  In addition, Plaintiffs' Counsel collected and made available to Carrier Counsel extensive work product, including legal and factual memoranda, created over the course of the litigation of the Derivative Actions.

77.     On February 1, 2010, Co-Chair Counsel, Company Counsel and Carrier Counsel met with the Mediator in New York in an effort to reach agreement on a requested attorneys' fee. This session was lengthy, with the mediator spending extensive time with each of the parties represented.  The discussions were pointed and contentious, with each party pressing their positions in detail.  The day ended with a joint session and the parties, through the auspices of the Mediator, agreeing to continued discussions.  While progress was made, multiple additional telephonic conferences between and among Carrier Counsel, Company Counsel, Co-Chair Counsel and the Mediator were required before the parties arrived at a final agreement on the proposed amount of attorneys' fees of $8.75 million, inclusive of expenses, which Plaintiffs would seek without objection from Defendants.

78.     The parties separately submit the Mediator's declaration describing in detail the negotiation process from his perspective, involved directly, as he was, with all sides during the face-to face session and subsequent telephonic discussions.  *See* Declaration of Edward A. Infante in Support of the Proposed Settlement and Award of Attorneys' Fees, Inclusive of Expenses.

79.     In addition, the individual Notice distributed to Lilly shareholders sets forth the requested fee amount, inclusive of expenses, the approximate amount of expenses incurred by Plaintiffs' Counsel in litigating the Derivative Actions, and explains the role played by the independent Mediator in the determination of an agreed upon amount of attorneys' fees, inclusive of expenses.  The Notice also informs Lilly shareholders that Plaintiffs' Counsel will file with the Court papers in support of, *inter alia*, an award of attorneys' fees and payment of an incentive award to named Plaintiffs no later than April 1, 2010, and explains how to obtain copies of those and other documents relevant to the proposed Settlement of the Derivative

Actions.

**Counsels' Request for an Incentive Award for the Named Plaintiffs in the Action**

80.     Plaintiffs' Counsel set forth in the accompanying Plaintiffs' Memorandum of Law

in Support of Final Approval of Proposed Settlement, Award of Attorneys' Fees, Inclusive of

Expenses, and Payment of Incentive Award to Named Plaintiffs (the "Final Approval

Memorandum") the legal basis for the request for an incentive award for Plaintiffs.  As described

in Counsels' briefing, the important public policy goals served by this type of litigation, and as

supported by the substantial nature of the relief set forth in the terms of the proposed Settlement,

would not have been possible without the willingness of named plaintiffs to step forward to seek

redress on behalf of Lilly and its shareholders.  In addition, in support of the litigation process,

named plaintiffs responded promptly to counsels' requests for documentation, participated in

teleconferences and reviewed documentation provided to them over the course of the litigation

keeping plaintiffs apprised as the litigation proceeded.

81.     As required in order to maintain their standing, Plaintiffs have maintained their

stock ownership in Lilly throughout the course of the litigation.

**Work with the Notice Administrator**

82.     In addition, both preceding and following entry by the Court of the Preliminary

Approval Order, Plaintiffs' Counsel worked closely with the Court-approved Notice

Administrator, The Garden City Group ("GCG"), to ensure the timely and efficient

dissemination of notice in this case.

83.     In advance of the Court's entry of the Preliminary Approval Order, Plaintiffs'

Counsel, working with GCG in coordination with Lilly and its transfer agent, undertook an effort

to compile an initial mailing list of Lilly shareholders and to locate those shareholders whose

stock was held in street name.  Based on the agreement of the parties, on February 19, 2010,

GCG sent a pre-notification letter and sample file layout to approximately 2,500 brokerage firms,

banks, institutions and other nominees (reflected in GCG's proprietary database), placing them

on notice of the proposed Settlement and the anticipated mailing of the Notice, and requesting

that they either (i) provide GCG with individual mailing information (including names and

addresses) for eligible Lilly shareholders, or (ii) indicate the number of Notice packets for GCG

to provide to the brokerage firm for mail out to their Lilly shareholder clients.  *See* Affidavit of

Mailing of the Notice of Settlement of Eli Lilly & Company Derivative Claims, filed herewith by

Steven J. Cirami, Vice President of Operations for The Garden City Group ("Cirami Aff."), ¶ 5.

84.     Upon entry of the Preliminary Approval Order on March 1, 2010, GCG

immediately began the final printing and dissemination by first class mail of the Notice, and the

publication of the Summary Notice in accordance with the provisions of the Preliminary

Approval Order.  As the result of the efforts by Plaintiffs' Counsel and GCG described above,

beginning on March 5, 2010, GCG was able to mail 114,217 copies of the Notice directly to

Lilly Shareholders; 3,641 copies of the Notice to designated brokerage firms at their request for

them to mail out to Lilly shareholders who were their clients; and approximately 2,500 copies of

the Notice to brokerage firms, banks, institutions and other nominees.  Cirami Aff. ¶¶ 7-9.

85.     GCG has continued to mail out copies of the Notice on a rolling based on requests

from Lilly Shareholders and/or brokerage firms, banks, institutions and other nominees.

Pursuant to this process, from March 6 through March 9, GCG mailed out an additional 45,926

copies of the Notice, from March 10 through March 12, an additional 134,951 copies of the

Notice, and from March 13 through March 26, an additional 62,973 copies of the Notice.  Cirami

Aff. ¶ 12.  Thus, from March 6 through March 26, 2010, GCG mailed out a total of 243,850

additional copies of the Notice.  In addition, GCG sent out a total of 441 copies of the Notice as a result of obtaining corrected addresses through the United States Postal Service National Change of Address database for returned copies of the Notice.  Cirami Aff. ¶ 14.  In all, as of March 26, 2010, GCG has sent a total of 368,417 copies of the Notice by first class mail.  Cirami Aff. ¶ 15.

86.    GCG further caused the Summary Notice to be published in *The Wall Street Journal* on March 12, 2010.  Cirami Aff. ¶ 10.

87.    Plaintiffs' Counsel have also worked with The Garden City Group to ensure timely set up and maintenance of the toll free call-in center for the benefit of the Lilly Shareholders in learning more about the proposed Settlement.  Cirami Aff. ¶ 11.

88.    Plaintiffs' Counsel has fielded calls and letters from shareholders following the distribution of the Notice.  Counsel have responded to each inquiry, telephonically where possible, and, together with GCG, have provided further detailed information regarding the proposed Settlement.

**Work on Documents in Support of Final Approval of the Settlement**

89.    Plaintiffs' Counsel have also undertaken the necessary research and drafting of documentation in support of final approval of the proposed Settlement, including the Final Approval Memorandum and supporting documents, and this Joint Attorney Declaration in order to provide the Court with a detailed record upon which to consider the final approval of the proposed Settlement, and Counsels' request for an award of attorneys' fees, inclusive of expenses, and the payment of an incentive award to the named Plaintiffs.

Under penalties as provided by law, the undersigned certify that the statements as set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and, as to such matters, the undersigned certify as aforesaid that they verily believe the same to be true.

Date:  April 1, 2010

_____
Karen L. Morris

Date:  April 1, 2010

_____
Richard D. Greenfield