UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

_____

| | | |
|---|---|---|
| N.A. Lambrecht and Jeffrey P. Jannett, Derivatively on Behalf of Nominal Defendant Eli Lilly & Company | : : : : | |
| Plaintiffs, | : : | C.A. No. 1:08-cv-0068-WTL-TAB |
| v. | : : : | |
| Sidney Taurel, John C. Lechleiter Sir Winfreid Bischoff, J. Michael Cook, Franklyn G. Pendergast, Kathi P. Seifert, George M. Fisher, Alfred G. Gilman, Martin S. Feldstein, J. Erik Fyrwald, Ellen R. Marram, Sir John Rose, Charles E. Golden, Steven C. Veering, August M. Watanabe, Linda Lay, Randall L. Tobias and J. Clayburn LaForce, Jr., | : : : : : : : : : : : | |
| Defendants | : : | |
| -and- | : : | |
| ELI LILLY & COMPANY, | : : | |
| Nominal Defendant. | : : | |

_____

**DECLARATION OF MEDIATOR EDWARD A. INFANTE
IN SUPPORT OF THE PROPOSED SETTLEMENT
<u>AND AWARD OF ATTORNEYS' FEES, INCLUSIVE OF EXPENSES</u>**

I, Edward A. Infante, under oath, hereby declare and state the following:

1.      I am a citizen and resident of San Mateo County, California.  I am over the age of eighteen (18) years, competent to give this Declaration, and not disqualified by law from doing so.

2.      I served as the mediator in the Derivative Actions against certain directors and officers of Eli Lilly & Company ("Lilly" or the "Company").[1] This Declaration sets forth a detailed chronology of my activities and the mediation process in which the parties to the Derivative Actions engaged.

**Personal Background and Experience**

3.      I am the former Chief Magistrate Judge of the U.S. District Court, Northern District of California, and I currently serve as a mediator with JAMS. As a U.S. Magistrate Judge and with JAMS, I have more than 25 years of dispute resolution experience, with particular expertise in complex business litigation, derivative and securities class actions, employment, intellectual property, and antitrust cases.

4.      I have conducted over 2,000 settlement conferences in all types of civil litigation, including derivative litigation, securities fraud and shareholder class actions, intellectual property disputes, and employment cases, and served as Special Master in complex federal cases. A copy of my Curriculum Vitae is attached as Exhibit 1 hereto.

**The Commencement of the Mediation Process**

5.      The parties to the Derivative Actions approached me to act as mediator in or around April 2009. I was informed in connection with my retention that the parties had been involved in active discussions and negotiations over many months. I was told that this process included the production and review of tens of thousands of pages of discovery and the research, design and drafting of detailed and annotated governance, compliance and risk management

---

[1] The Stipulation of Settlement ("Stipulation") defines the Derivative Actions as the actions captioned *Lambrecht, et al. v. Taurel, et al.*, C.A. No. 1:08-cv-0068-DFH-TAB (S.D. Ind.) and *Zemprelli vs. Taurel et al.*, C.A. No. 1:08-cv-0854-SEB-TAB (S.D. Ind.); *Waldman v. Taurel, et al.*, C.A. No. 08-cv-560 (E.D.N.Y), *Robbins v. Taurel, et al.*, C.A. No. 08-cv-1471 (E.D.N.Y.) and *City of Taylor General Employees Retirement System v. Taurel, et al.*, C.A. No. 08-cv-1554 (E.D.N.Y.); and *Solomon v. Taurel,*

2

proposals by Plaintiffs' Counsel. Pursuant to the process, beginning in September 2008, Plaintiffs' Counsel had provided the Company with multiple proposals related to an array of subject matters, including management level Centralized Global Compliance; the Public Policy and Compliance Committee of the board of directors of Lilly (the "Board"); off-label drug promotion; best price and anti-kickback; enterprise risk management ("ERM")[2]; compensation; drug life cycle; and Board level governance.

6. In addition, I was informed that the parties had engaged in multiple telephonic and in-person meetings regarding these proposals, during which the Co-Chairs of Plaintiffs' Executive Committee[3], with Plaintiffs' pharmaceutical and drug development expert as appropriate, held detailed discussions with both in-house and outside counsel for Lilly, counsel for the Special Litigation Committee ("SLC")[4], and with various senior officers of Lilly based on the subject matter of the discussions, including the Vice President, Compliance and Enterprise Risk Management and Chief Compliance Officer; the Manager, Enterprise Risk Management, Global Compliance and Ethics Program Office; the Deputy General Counsel and Corporate Secretary; the Head of Global Medical, Regulatory and Safety and Chief Medical Officer; the Executive Director, Global Medical, Regulatory and Safety; the Lilly USA Compliance Officer.

7. As a result of this process, it was my understanding that the parties had made substantial progress in their efforts to resolve the Derivative Actions, and beginning in early

---

*et al.*, Cause No. 49D12 08 03PL013729 and *Staehr v. Taurel, et al.*, Cause No. 49DO2 08 03CT013786, pending in the Marion County Superior Court, Indiana.
[2] Two of these proposals related to Enterprise Risk Management ("ERM"), with the first ERM proposal being provided to the Company in December 2008, and a revised ERM proposal being provided in March 2009.
[3] According to a formal Coordination Agreement, a copy of which was provided to me, in or around May 2008, Plaintiffs' Counsel in the multiple Derivative Actions filed in three jurisdictions formed an Executive Committee, comprised of counsel from each law firm representing a plaintiff in a Derivative Action. Ms. Morris of Morris and Morris LLC Counselors At Law and Mr. Greenfield of Greenfield & Goodman LLC were chosen to serve as Co-Chairs of the Executive Committee (the "Co-Chair Counsel").

June, 2009, had begun negotiations on a proposed governance and compliance term sheet. . The parties agreed to meet before me in mid-June 2009.

8. In advance of this mediation session, I requested, and received, lengthy submissions from the parties addressing the background of the Derivative Actions to date, liability issues, damages, and defenses to claims raised.

**The Submissions of the Parties to the Derivative Actions**

9. Plaintiffs in the Derivative Actions submitted a fifty-eight page Mediation Statement, with hundreds of pages of exhibits and supporting materials. Plaintiffs' submission addressed, *inter alia*, a review of the procedural history of the Derivative Actions, the governmental investigations in connection with Zyprexa, the States Attorneys General lawsuits and the MDL proceedings, and provided a discussion of the document review, organization of the merits review process and work in support of the drafting of Plaintiffs' governance, compliance and medical risk management proposals.

10. Plaintiffs' submission also included a detailed assessment of the FDA regulatory framework and standards in connection with off-label drug promotion and failure to warn of risks. This included discussion of the New Drug Approval process with the FDA, the New Drug Approval application process, the role of pre- and post-marketing clinical trials and a drug manufacturer's duties and responsibilities in connection with drug labeling, particularly in connection with risks of use. Plaintiffs' submission then provided a discussion of Lilly's alleged misconduct related to Zyprexa within the context of these FDA standards and framework. Plaintiffs' Counsel also set forth their understanding of what they believed happened at Lilly to permit the alleged misconduct to occur, and provided a detailed survey of their assessment of the

---

[4] The SLC was made up of two then-current directors and one non-director. The SLC was constituted in or around early August 2007 to investigate allegations raised in the Demand Letters.

4

current law related to derivative litigation, wrongful refusal of demand and demand futility and director and officer liability. This survey of current law included an analysis of the significant risks faced by both sides in going forward in the Derivative Actions.

11. The exhibits to plaintiffs' mediation submission included copies of the three demand letters sent to Lilly's Board of Directors, copies of the seven derivative complaints, the Settlement Process Agreement entered into by counsel for the Company, the SLC and Plaintiffs' Counsel, the Coordination Agreement establishing an organizational structure among, and governing how work was assigned and performed by Plaintiffs' Counsel, and relevant excerpts from Lilly public filings and the Zyprexa MDL proceedings in the Eastern District of New York. Also available to me at the mediation session were copies of the governance, compliance and risk management proposals, with supporting annotations and exhibits, which plaintiffs had presented to Lilly. These documents comprised ten binders and two substantial velo-bound packets of materials.

12. I was also provided separate mediation submissions from both Counsel for the SLC and from Defendants' Counsel. The SLC's submission included a discussion of the background of the Derivative Actions, and provided a history of the formation and activities of the SLC in connection with the various demand letters sent to the Board. The SLC submission also detailed the SLC's participation, through its counsel, in the settlement discussions to date, its assessment and investigatory activities in connection with the demands, and its determinations based on its investigation.

13. The Defendants' mediation submission gave a background of the Derivative Actions, laid out a detailed chronological history of the clinical testing and marketing of Zyprexa by the Company relevant to, among other issues, claims of off-label promotion and failure to

disclose risks of use of the drug, governmental investigations and third party litigations. The submission detailed the Defendants' contentions regarding the role of the Board and senior management in connection with the sales and marketing of Zyprexa during the relevant period, and the Defendants' position regarding the weaknesses and risks facing the Derivative Actions should they proceed to trial.

14. The parties' submissions were comprehensive, and reflected the complex and challenging legal environment, for both plaintiffs and defendants, in which these derivative claims must be litigated. In my view, both parties faced significant risks in pursuing these claims, including, *inter alia*, conflicting analyses and assertions regarding the scope, dollar amount and legal bases on which to recover potential damages within the context of derivative litigation. These factors made it apparent to me that any litigation of these issues would be highly contested, and that both sides would face substantial litigation risk.

**The Mediation Process**

15. I thoroughly reviewed all materials provided to me in advance of the mediation session, which occurred in New York City on June 25, 2009. At this session, Plaintiffs' Counsel gave me a detailed and substantive presentation of the background of the action, Plaintiffs' Counsel's factual and legal merits analysis, their proposals, the negotiation process and the major provisions of the proposed Settlement as of that time. In discussions both with all parties together and in break-out sessions with each side alone, I was able to fully explore with counsel the procedural background of the Derivative Actions, the history of the litigation to date, the status of the settlement discussions, the scope and nature of the governance, compliance and risk management provisions that were the subject of a possible resolution, and open areas still to be resolved.

16. I was also informed that Plaintiffs' Counsel had retained three experts in this action: Dr. Mitchell Glass, a medical doctor with extensive experience and expertise in the pharmaceutical industry and drug development; Professor Donald C. Langevoort, the Thomas Aquinas Reynolds Professor of Law at the Georgetown University Law Center in Washington, D.C., a recognized expert in the fields of corporate governance and compliance; and Mr. James Lam, President of James Lam & Associates, Inc., a recognized expert in the area of enterprise risk management ("ERM").

17. I was familiar with the quality of the work of Professor Langevoort and Mr. Lam from having mediated other complex derivative actions where they had served as experts. Plaintiffs' Counsel provided me with substantial information regarding Dr. Glass and the quality of the assistance he had provided to date in the Derivative Actions, particularly in connection with the life cycle of the drug provisions, which I understood constituted a significant aspect of the proposed settlement. I was favorably impressed with the qualifications of plaintiffs' experts and their substantive involvement in the settlement negotiation process to date, as described to me by Plaintiffs' Counsel.

18. While in my opinion the mediation session was productive, the parties did not reach final resolution of the terms of a proposed settlement of the Derivative Actions during the June 25 session. Thereafter, I understand the parties participated in extensive additional negotiations related to the governance and compliance provisions and the terms of the Stipulation of Settlement in this matter. I was kept apprised of these negotiations, and was available to assist the parties as needed.

19. I was informed in early December that the parties had arrived at a settlement in principal of the Derivative Actions, and had completed documentation of the Settlement provisions.

20. I am satisfied based on all of the foregoing that the negotiation process underlying the corporate governance, compliance and risk management provisions detailed in Exhibit A to the Stipulation, the Corporate Governance Terms, was an intensive one, undertaken by sophisticated and experienced attorneys on both sides in good faith and completely at arm's length. In addition, based upon my involvement in the matter and my extensive discussions with the parties, I believe, as stated in the Stipulation, that the Derivative Claims filed by the Plaintiffs, and the negotiations leading to this Settlement, were a substantial factor in the decisions by the Company to adopt, implement, enhance and/or maintain the corporate governance provisions set forth in Exhibit A, and that these corporate governance provisions provide a substantial benefit to the Company, including in the prevention and detection of potential violations of law, regulation and Company policy.

21. In my opinion, the experts' reports, which I reviewed in draft, fully support this conclusion. *See*, for example, the Glass Report at ¶ 2, where Dr. Glass states that, in his professional opinion, the relief achieved under the Settlement provides substantial benefits to Lilly; the Settlement places Lilly at the forefront of the industry; and the Settlement provides a sound foundation for the management of drugs and drug candidates throughout their life cycle at Lilly. *See also*, Lam Report at ¶ 5, where Mr. Lam states that, in his expert opinion, the Agreement will significantly enhance Lilly's governance structure and effectiveness at the Board level; it will significantly enhance the effectiveness of risk management processes and internal

controls at the management level – both providing a substantial benefit to Lilly; and also the Company should achieve significant financial benefits in connection with the Agreement.

**Negotiations for Attorneys' Fees and Reimbursement of Expenses**

22. To the best of my knowledge, there were no discussions regarding the amount of attorneys' fees or expenses until after the parties had reached agreement in principle on the settlement terms, and the provisions of both the Stipulation and Exhibit A had been agreed to and locked in place. Thereafter, at the request of the parties, I agreed to assist in the mediation of a proposed agreed upon fee and reimbursement of expenses amount, for Plaintiffs' Counsel to submit for Court approval. The parties agreed to meet with me in early 2010 for this purpose.

23. In advance of that session, in late December 2009, Plaintiffs' Counsel provided me with a submission which included, *inter alia*, a discussion of the applicable Seventh Circuit standards related to the award of a fee in complex cases, a summary of the substantive nature of the relief achieved through the Settlement, a discussion of the settlement process which unfolded in this action and Plaintiffs' Counsel's work to design and negotiate extensive governance and compliance proposals and to secure the proposed Settlement relief.

24. Plaintiffs' submission also included an assessment of comparable derivative cases and their fee resolutions and discussed the application, under the present facts and circumstances, of Seventh Circuit legal precedent related to the application of percentage and lodestar methodologies. Plaintiffs' Counsel further provided a detailed analysis of relevant Seventh Circuit law related to the reimbursement of expenses and the payment of incentive awards to named plaintiffs, and a detailed breakdown, by firm and by category of expenses, of the total expenses incurred to date by Plaintiffs' Counsel.

25. Plaintiffs' Counsel also provided me with relevant supporting materials, including draft copies of the Stipulation of Settlement and Exhibit A, Corporate Governance Terms, as well as copies of the three expert reports and unreported relevant court orders. I was also provided detailed information regarding the lodestar incurred in the case, broken down into seven separate categories of tasks. The categories included investigation, pleadings and court filings; governance and compliance research, development and analysis; discovery and document review; work with experts; mediation process; and settlement negotiations and the drafting of settlement documentation. This lodestar information was provided on an aggregate basis and on a by-firm basis, with the by-firm information identifying the individual counsel and paralegals at each firm who worked in this matter. In addition, Plaintiffs' Counsel provided me with copies of daily time records reflecting the substantial majority of the work done litigating the Derivative Actions.

26. I was provided a submission with respect to fees from Defendants' Counsel in early January 2010, which set forth the standard in the Seventh Circuit for awarding attorneys' fees in shareholder derivative settlements and an analysis of that standard as applied to Plaintiffs' Counsel's work in the Derivative Actions. In addition, Defendants' Counsel provided a detailed review of both comparable derivative shareholder settlements to, and those that can be distinguished from, the Settlement in the Derivative Actions.

27. Based on a process discussed with me in advance, Plaintiffs' Counsel agreed to permit counsel for Lilly's directors' and officers' insurance carriers ("Carrier Counsel"), within the parameters of agreed upon conditions, to review the same daily time records previously provided to me.

28.   Following discussions between me, Co-Chair Counsel, Counsel for the Defendants and Carrier Counsel, on January 27, 2010, Co-Chair Counsel met with Carrier Counsel in New York. I understood from the parties involved that Plaintiffs' Counsel first provided Carrier Counsel with a detailed presentation, including a chronology of the work performed, and then allowed Carrier Counsel substantial time to review the daily time records in private. In addition, it is my understanding that Plaintiffs' Counsel also made available to Carrier Counsel multiple notebooks containing thousands of pages of work product created over the course of the litigation and negotiation of the Derivative Actions. These substantial materials were also made available to me at the February 1, 2010 mediation session in New York, discussed below.

29.   I was involved with discussions with Carrier Counsel, Defendants' Counsel and Co-Chair Counsel preceding and following this meeting. These discussions included issues raised by Carrier Counsel from their review of the daily time records. This effort preceded a face-to-face meeting between Co-Chair Counsel, Defendants' Counsel, Carrier Counsel and me in New York on February 1, 2010.

30.   Over the course of this all day negotiation session, the parties discussed the lodestar, risk factors and applicable legal standards for a fee in the Seventh Circuit. As the entities that would fund the fee, both Carrier Counsel and the Company took a highly active role in negotiating the amount of fees to which they and the Company would agree.

31.   While, in my opinion, progress was made during this session, no resolution of an agreed upon fee award and reimbursement of expenses amount was reached by the parties. At the end of this session, I recommended to the parties a fee of $8.75 million, inclusive of expenses, as an amount I believed was reasonable and appropriate in this case. Thereafter, I was

involved in multiple, additional telephonic conferences between and among Carrier Counsel, Company Counsel and Co-Chair Counsel regarding this proposed fee amount.

32.     These fee negotiations were contentious. However, as a result of these additional efforts at mediation, the parties were ultimately able to agree on an attorneys' fee amount of $8.75 million, inclusive of expenses, subject to the Court's approval. As reflected in the Notice sent to Lilly shareholders, I believe I had a detailed understanding of the litigation and the intensive negotiation process, the nature and extent of Plaintiffs' Counsel's work throughout the litigation, and I was able to call upon this knowledge in mediating an agreed upon amount which all the parties could support as fully reflective of the services Plaintiffs' Counsel rendered to Lilly.

33.     I am fully satisfied with the resolution the parties reached with respect to Plaintiffs' Counsels' compensation, and I believe this amount is fair and reasonable, and fully reflective of the services Plaintiffs' Counsel rendered for the benefit of Lilly.

Under penalties as provided by law, I certify that the statements as set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief, and as to such matters I certify as aforesaid that I believe the same to be true.

Dated: March 18, 2010

Edward A. Infante

# EXHIBIT 1





**T:** 415-982-5267
**F:** 415-982-5287

*Recognized as a Top California Neutral, Daily Journal, 2003, 2004, 2006, 2007, 2008, and 2009*

*Recognized as a Northern California Super Lawyer, ADR Category, San Francisco Magazine, 2009*

*Recognized as the Best Neutral in the Bay Area (2007, 2008) and as one of the three Best Neutrals in the Bay Area (2009), through an open survey of attorneys, The Recorder*

**Case Manager**
Sandra Chan
JAMS
Two Embarcadero Center
Suite 1500
San Francisco, CA 94111
415-774-2611 Phone
415-982-5287 Fax
Email:
schan@jamsadr.com

**Hon. Edward A. Infante (Ret.)**

**Hon. Edward A. Infante (Ret.)** is known for his ability to mediate complex cases involving a wide range of issues. A former Chief Magistrate Judge of the U.S. District Court, Northern District of California, Judge Infante has more than 30 years of dispute resolution experience. He has particular expertise in complex business litigation, securities class actions, securities, employment, intellectual property, and antitrust cases.

**ADR Experience and Qualifications**
- Conducted over 2,500 settlement conferences in all types of civil litigation including securities fraud and shareholder class actions, intellectual property disputes, and employment cases
- Resolved thousands of pretrial matters including discovery, pleading, and summary judgment motions, and presided over numerous jury trials
- Served as Special Master in several complex federal cases; Authored Chapter 53, entitled "Masters," in *Moore's Federal Practice* (copyright 1997) -- the chapter discusses the appointment and procedures of Special Masters

**Representative Matters**
- *In re McKesson HBOC, Inc. Securities Litigation,* settled for $960 million, one of the largest security fraud class settlements ever reported
- *Nikon v. ASML*, international patent dispute involving multiple patents resulting in complex cross-licensing agreements
- *In re Methionine Antitrust Litigation*, multi-district litigation alleging international price fixing conspiracy brought by livestock producers and feed companies, settled for $107 million
- *Sun Microsystems v. Microsoft Corp.,* copyright and licensing dispute involving the JAVA programming language
- *Applied Materials Inc. v. Advanced Semiconductor Materials*, a multi-million dollar patent infringement dispute between competitors
- *e-Bay v. Reverse Auction.com*, trade secret/unfair business competition case between competitors
- **Securities Class Actions:** involving over 100 NASDAQ and NYSE companies
- **Consumer Class Actions:** mediated a national consumer class action allegedly involving abusive and fraudulent lending practices against a major lending institution
- **Employment:** mediated race, gender, and age discrimination suits; mediated sexual harassment, wrongful discharge, and other employment related breach of contract disputes; mediated numerous class actions including wage and hour claims
- **Insurance:** mediated coverage disputes involving multi parties and bad faith allegations
- **Business/Commercial:** mediated all types of business suits involving breach of contract, accounting, valuation, and breach of warranty claims

**Honors, Memberships, and Professional Activities**
- Recognized as a Top California Neutral, *Daily Journal*, 2003, 2004, 2006, 2007, 2008, and 2009
- Recognized as the Best Neutral in the Bay Area (2007, 2008) and as one of the three Best Neutrals in the Bay Area (2009), through an open survey of attorneys, *The Recorder*
- Recognized as a Northern California Super Lawyer, ADR Category, *San Francisco Magazine*, 2009
- Member, Federal Magistrate Judges Association, 1973-present; (President, 1981, 1982; Vice President, 1979-1980); Moderator and panelist in various federal practice seminars including the Federal Practice Institute, 1983-1993
- Adjunct professor at Santa Clara University Law School: lectured in evidence, judicial administration, and alternative dispute resolution, 1990-2002

**Background and Education**
- Chief Magistrate Judge, U.S. District Court, Northern District of California, 1990-2001
- United States Trustee, U.S. Dept. of Justice, Region XV Southern District of California, District of Hawaii, Territory of Guam, and Commonwealth of the Northern Marianas Islands, 1988-1990
- Partner, Schall, Boudreau & Gore, San Diego, CA, 1986-1988
- U.S. Magistrate Judge, U.S. District Court, Southern District of California, 1972-1986
- Partner, Pedersen, Flowers & Infante, San Diego, CA, 1970-1972

- J.D., Boston University School of Law, 1965
- A.B., Boston College, 1962